IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. |
| | ) | |
| v. | ) | |
| | ) | |
| NANCY ZAK, | ) | |
| CLAUD CLARK III, | ) | |
| ECOVEST CAPITAL, INC., | ) | |
| ALAN N. SOLON, | ) | |
| ROBERT M. MCCULLOUGH, | ) | |
| RALPH R. TEAL JR., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT

Plaintiff, the United States of America, for its complaint against Defendants

Nancy Zak, Claud Clark III, EcoVest Capital, Inc., Alan N. Solon, Robert M.

McCullough, and Ralph R. Teal, Jr. (collectively, "Defendants"), alleges as

follows:

## NATURE OF THE ACTION

1.      Defendants organize, promote, or sell (or assist in the organization,

promotion and sale of) a highly structured – and abusive – tax scheme involving

the syndication of conservation easement donations. Defendants' "conservation easement syndication scheme" – as described herein – encourages Defendants' customers to "invest" in a conservation easement syndicate under the assumption that the syndicate will donate a conservation easement, claim a tax deduction for that conservation easement, and allocate a portion of that tax deduction to each customer who "invests" based on their "investment" in the syndicate.

2.     In reality, Defendants' conservation easement syndication scheme amounts to nothing more than a thinly veiled sale of grossly overvalued federal tax deductions under the guise of investing in a partnership.

3.     In organizing, promoting, and selling their scheme, Defendants make (or cause others to make) statements about the allowance and amount of federal tax deductions a customer is entitled to claim based on their "investment" in the syndicate. But these statements are false, as explained in more detail below. As a result of the false statements made by or caused by Defendants, the customers claim improper and grossly overvalued federal tax deductions on their tax returns. Defendants make these statements, and cause others to make these statements, despite the fact that they knew or had reason to know that they were false.

4.     Defendants also rely on grossly overvalued appraisals as part of their scheme. Defendants furnish, and cause others to furnish, statements regarding

value to customers, including the "fair market value" of the conservation easements. Defendants' customers then use those valuations to claim highly inflated and overvalued federal tax deductions (in the form of noncash charitable contribution deductions) on their individual tax returns.

5.      Collectively, since 2009, Defendants have organized, promoted, or sold (or assisted in the organization, promotion, and sale of) at least 96 conservation easement syndicates that have resulted in over $2 billion of federal tax deductions (in the form of noncash charitable contribution deductions) reported by the syndicates. Of those 96 conservation easement syndicates and over $2 billion of tax deductions, each Defendant has organized, promoted, or sold (or assisted in the organization, promotion, and sale of) the following number of syndicates and associated tax deductions:

| Defendant | Number of Syndicated Conservation Easements | Federal Tax Deductions Reported by those Syndicates as "Partners' Distributive Share Items" |
|---|---|---|
| Nancy Zak | 42 | $381,268,644 |
| Claud Clark III | 58 | $1,855,235,588 |
| EcoVest Capital, Inc. | 51 | $1,708,222,000 |
| Alan N. Solon | 55 | $1,607,841,485 |
| Robert M. McCullough | 42 | $1,504,962,000 |
| Ralph T. Teal, Jr. | 45 | $1,594,323,000 |

6.      The United States brings this complaint pursuant to 26 U.S.C.

§§ 7402, 7407, and 7408 to enjoin Defendants, and any other person or persons in

active concert or participation with them, from, among other things:

      a.      organizing, promoting, or selling (or assisting in the organization, promotion, or sale of) the "conservation easement syndication scheme," described herein, or any other plan or arrangement that encourages taxpayers to claim a deduction for a qualified conservation contribution under 26 U.S.C. § 170(h);

      b.      participating (directly or indirectly) in the sale of any conservation easement syndicate, or any other plan or arrangement that encourages taxpayers to claim a deduction for a qualified conservation contribution;

      c.      making or furnishing (or causing another to make or furnish) a statement about the allowance of any federal tax benefit as a result of participating in a conservation easement syndicate or any other plan or arrangement that encourages taxpayers to claim a qualified conservation contribution deduction;

      d.      making or furnishing (or causing another to make or furnish) a gross valuation overstatement as to any material matter related to participating in a conservation easement syndicate or any other plan or arrangement that encourages taxpayers to claim a qualified conservation contribution deduction;

      e.      organizing, promoting, or selling (or assisting in the organization, promotion, or sale of) any other plan or arrangement that advises or assists taxpayers to attempt to violate the internal revenue laws or unlawfully evade the assessment or collection of their federal tax liabilities;

      f.      in connection with organizing, promoting, or selling a plan or arrangement that advises or assists taxpayers to attempt to violate the internal revenue laws or unlawfully evade the

assessment or collection of their federal tax liabilities, making or furnishing (or causing another to make or furnish) false statements about the allowance of any federal tax benefit resulting from participating in the plan or arrangement;

g.    in connection with organizing, promoting, or selling a plan or arrangement that advises or assists taxpayers to attempt to violate the internal revenue laws or unlawfully evade the assessment or collection of their federal tax liabilities, making or furnishing (or causing another to make or furnish) a gross valuation overstatement as to any material matter related to participating in the plan or arrangement;

h.    preparing (or assisting in the preparation) of any federal tax return, or any document that may be filed in support of a tax return or other submission to the IRS claiming benefits resulting from a qualified conservation contribution under 26 U.S.C. § 170(h), including, but not limited to, Forms 8283 (appraisal summaries) or qualified appraisals;

i.    preparing (or assisting in the preparation of) any federal tax return, or any document that may be filed in support of a tax return or other submission to the IRS that they know will result in the understatement of any tax liability or the overstatement of any federal tax refund;

j.    facilitating any donation that is intended to qualify as a "qualified conservation contribution" under 26 U.S.C. § 170(h);

k.    advising or representing any individual before the IRS with respect to any donation that is intended to qualify as a "qualified conservation contribution" under 26 U.S.C. § 170(h);

l.    preparing (or assisting in the preparation of) any appraisal that is intended to be a "qualified appraisal" within the meaning of 26 U.S.C. § 170(f)(11)(E);

m.    engaging in any activity subject to penalty under 26 U.S.C.
§§ 6694, 6695A, 6700, or 6701; and

n.    engaging in conduct that substantially interferes with the proper
administration and enforcement of the internal revenue laws;

7.    Further, pursuant to 26 U.S.C. § 7402, the United States seeks an order requiring, among other things, that all Defendants disgorge to the United States the gross receipts that they received from any source as a result of the conservation easement syndication scheme described herein, together with prejudgment interest thereon.

## AUTHORIZATION

8.    This action has been requested by a delegate of the Secretary of the Treasury and commenced at the direction of a delegate of the Attorney General of the United States, pursuant to 26 U.S.C. §§ 7402, 7407, and 7408.

## JURISDICTION AND VENUE

9.    This Court has jurisdiction over this action under 28 U.S.C. §§ 1340 and 1345 and 26 U.S.C. § 7402.

10.    Venue is proper in this Court because the Defendants engaged in the penalty conduct at issue in this judicial district and a substantial part of the events giving rise to the claims herein occurred in this judicial district. 26 U.S.C. § 7408(a); 28 U.S.C. § 1391(b).

## THE PARTIES

11.     Plaintiff is the United States of America.

*Defendant Zak*

12.     Nancy Zak ("Zak") is a resident of the State of Georgia. Zak, individually and as the principal of several entities, is a conservation manager, consultant, and project manager who assists in the planning and execution of conservation easement donations and conservation easement syndicates. Zak has organized, promoted, and sold the conservation easement syndicates through several entities over the years, including Forever Forests, LLC ("Forever Forests"), Greenth, Inc., and Conservation Project Strategies, LLC.

13.     On the website for her entity Forever Forests, Zak states that her career has focused on "conservation easements and their associated tax benefits since 1999." Zak advertises that she formed Forever Forests and "the creation of the basic structure now being followed in the industry in what are commonly called 'conservation partnerships'" after managing the preservation of several parcels of land through conservation easements for a Georgia real estate developer.

14.     In her role as a conservation manager, consultant, and/or project manager, Zak assisted in the organization and promotion of conservation easement syndicates by providing a number of services including: providing guidance in

planning of ownership structure, negotiating agreements with land trusts and appraisers, assisting in the highest and best use determination, recommending legal counsel for legal and tax review, and managing the preparation and distribution of required IRS tax forms.

15.     Between 2011 and 2014, Zak was a registered representative of two different broker-dealers: Strategic Financial Alliance and Arque Capital. Zak has also promoted and sold conservation easement syndicates outside of her work as a registered representative.

16.     Zak has reaped substantial financial gain from her participation in the organization and sale of conservation easement syndicates as well as her conservation consulting services. Zak also purchased interests in several conservation easement syndicates and benefited from the improper and overvalued conservation easement deductions she personally claimed on her federal income tax returns.

17.     Zak is subject to this Court's jurisdiction because she resides in this judicial district.

18.     Since 2009, Zak has been involved with at least 42 conservation easement syndicates as the conservation manager, project manager, and/or a seller of conservation easement syndicate interests.

*Defendant Clark*

19.     Claud Clark, III ("Clark") is a resident of Alabama. Clark is a real property appraiser and is a certified appraiser in multiple states, including the State of Georgia.

20.     Clark owns and operates Claud Clark, III, P.C., formerly known as Clark-Davis, P.C., a real estate appraisal firm based in Magnolia Springs, Alabama. Clark advertises on the Claud Clark III, P.C. website that the firm specializes in historical preservation and conservation easement appraisals throughout the United States.

21.     Clark advertises on the Claud Clark III, P.C. website that he has completed more than 200 conservation easement appraisals. Clark also promotes his services and experience through speaking engagements at conservation easement seminars. Clark has made presentations about appraisal techniques used in valuing conservation easements and appraisal issues that have arisen in specific cases.

22.     As an appraiser of conservation easements, Clark provides an opinion of fair market value of the conservation easement, which is documented in an appraisal report. Clark's statements of the fair market value of the conservation easement are used by the conservation easement syndicates in the promotion and

sale of the syndicates. Specifically, Clark's opinions of value are furnished to prospective customers and used to show the anticipated return on investment a customer can expect through tax savings

23.    Since 2009, Clark's opinions of value as documented in appraisal reports have been used as the basis for the tax deductions reported by at least 58 conservation easement syndicates (and ultimately claimed as deductions by the individual customers of those syndicates). Copies of Clark's appraisal reports were attached to these customers' filed tax returns.

24.    Clark has reaped substantial financial gain from his participation in the organization, promotion, and sale of conservation easement syndicates.

25.    Clark is subject to this Court's jurisdiction because he has appraised real property and conservation easements within the State of Georgia and within this judicial district. Clark's clients include limited liability companies with their principal place of business and operational headquarters in Georgia. Clark has also participated directly or indirectly in the sale of conservation easement partnership interests to residents within this judicial district.

*Defendants Solon, EcoVest, McCullough and Teal*

26.     Alan Solon ("Solon") is a resident of the State of Georgia and a part owner of EcoVest. Solon currently serves as the President, Chief Executive Officer and a manager of EcoVest. Solon is also on the Board of Directors of EcoVest.

27.     Prior to working at EcoVest, Solon served as the Chief Marketing Officer of SFA Holdings, Inc., a holding company formed to operate financial service businesses through its subsidiaries which included: (1) The Strategic Financial Alliance, Inc., a broker-dealer for which defendant Zak was at one time a registered representative; (2) SFA Insurance Services, Inc., an insurance agency; and (3) Conservation Resources, Inc.

28.     Conservation Resources, Inc. was formed on December 2, 2010.

29.     From the date of its formation until at least 2012, Conservation Resources, Inc. provided conservation easement consulting services and assisted in the organization, promotion, and sale of conservation easement syndicates.

30.     Solon served as President of Conservation Resources, Inc. until August 2012.

31.     Conservation Resources, Inc. assisted primarily on the organization, promotion, and sale of conservation easement syndicates offered through its related company, Strategic Financial Alliance, Inc.

32.     In his role at Conservation Resources, Inc., Solon organized, promoted, and sold (or assisted in the organization, promotion, and sale of) conservation easement syndicates.

33.     After the formation of EcoVest in 2012, Solon continued to organize, promote, and sell conservation easement syndicates through EcoVest.

34.     Solon has reaped substantial financial gain from his participation in the organization and sale of conservation easement syndicates.

35.     Since 2009, Solon has organized, promoted, or sold (or assisted in the organization, promotion, and sale of) at least 55 conservation easement syndicates.

36.     Solon is subject to this Court's jurisdiction because he resides in this judicial district.

37.     In 2012 EcoVest Capital, Inc. ("EcoVest") was formed as a Delaware corporation. EcoVest has a principal place of business and operational headquarters located at 3424 Peachtree Road NE, Suite 1550, Atlanta, Georgia. EcoVest offers and sponsors real estate investments focused on conservation, including conservation easement syndicates.

38.     EcoVest functions and communicates through Alan Solon, Robert McCullough, Ralph Teal, and other individuals. EcoVest has at least 17 employees including Solon and McCullough.

39.     EcoVest, directly and indirectly through subsidiaries, organizes, promotes, and sells conservation easement syndicates. Among other things, EcoVest provides consulting services regarding proposed conservation easement syndicates and assists in the securing of a land trust, appraiser, and the documentation used by the syndicates and customers to claim the noncash charitable contribution deductions on their tax returns.

40.     EcoVest sponsors specific conservation easement syndicate offerings that are sold through broker-dealers. EcoVest has worked with numerous broker-dealers on its conservation easement syndicate offerings, including: Strategic Financial Alliance, Arque Capital, and Triloma Financial Group.

41.     Between 2012 and 2013, Defendant Zak was a part-owner and employee of EcoVest.

42.     Between 2012 and 2013, Defendant Zak, when working as a registered representative of Strategic Financial Alliance and/or Arque Capital, sold conservation easement syndicate offerings sponsored by EcoVest.

43.     EcoVest has reaped substantial financial gain from its participation in the organization and sale of conservation easement syndicates.

44.     Since 2012, EcoVest or its affiliates, organized, promoted, or sold (or assisted in the organization, promotion, and sale of) at least 51 conservation easement syndicates.

45.     EcoVest is subject to this Court's jurisdiction because it is a resident of and conducts business in this judicial district.

46.     Robert McCullough ("McCullough") is a resident of the State of Georgia. McCullough currently serves as the Senior Vice President and CFO of EcoVest.

47.     McCullough, directly and indirectly, including through EcoVest, organizes, promotes, and sells conservation easement syndicates. McCullough has reaped substantial financial gain from his participation in the organization and sale of conservation easement syndicates.

48.     Since 2009, McCullough has organized, promoted, or sold (or assisted in the organization, promotion, and sale of) at least 42 conservation easement syndicates.

49.     McCullough is subject to this Court's jurisdiction because he resides in this judicial district.

50.     Ralph Teal ("Teal") is a resident of South Carolina and part owner of EcoVest. Teal currently serves on EcoVest's Board of Directors.

51.     Teal, directly and indirectly, including through EcoVest and other companies that he owns, organizes, promotes and sells conservation easement syndicates. Teal has reaped substantial financial gain from his participation in the organization and sale of conservation easement syndicates.

52.     Since 2009, Teal or his affiliated entities, organized, promoted, or sold (or assisted in the organization, promotion, and sale of) at least 45 conservation easement syndicates.

53.     Teal is subject to this Court's jurisdiction because Teal personally and/or through agents, including EcoVest, transacts business in the State of Georgia.

### Conservation Easements Generally

54.     A conservation easement is a legal agreement between a landowner and another party, generally a land trust or government agency, that permanently restricts the development and/or use of land with the purpose of achieving certain conservation or preservation goals.

55.     In the federal tax context, while a taxpayer may take a deduction for any charitable contribution made during the taxable year (subject to certain limitations), a deduction is generally not allowed for a taxpayer's contribution of a partial interest in property. The Internal Revenue Code provides for certain

exceptions where a deduction for the donation of a partial interest in property is permitted, one of which is for the donation of a "qualified conservation contribution."

56.     A "qualified conservation contribution" is defined as a contribution (A) of a qualified real property interest, (B) to a qualified organization, (C) made exclusively for conservation purposes. Before a deduction can be claimed, however, certain criteria must be met, as discussed further herein.

**Defendants' Scheme Hinges Upon an Entity Taxed as a Partnership**

57.     Defendants' conservation easement syndication scheme, as described in this Complaint, hinges upon the use of an entity taxed as a partnership under subchapter K of the Internal Revenue Code. Defendants use entities organized as limited liability companies ("LLCs") under state law. Each conservation easement syndicate is a state law entity that is taxed as a partnership, a pass-through entity, for federal tax purposes. Without the use of an entity taxed as a partnership, Defendants would be unable to deliver the advertised tax deductions to their prospective customers and, as described in more detail below, Defendants knew or had reason to know that.

58.     An entity taxed as a partnership is not liable for income tax; instead, its partners are liable for income tax in their separate or individual capacities based

on the income, losses, deductions, or credits that flow from the entity. Because of the structure in which partnerships "pass through" income and losses to their partners, they are commonly referred to as "pass through" or "flow through" entities.

59.     Each partner takes into account his or her distributive share of the partnership's income or loss and any "separately stated items" in computing his or her income tax liability. "Separately stated items" are specific items of income, gain, loss, deductions and/or credits that a partner must account for separately; these items are not taken into account when computing the partnership's income or loss for a tax year. Charitable contributions (as defined in section 170(c)) constitute a "separately stated item."

60.     Although partnerships do not pay federal income tax, partnerships still have tax filing requirements. Specifically, partnerships are required to file an annual return, Form 1065 (U.S. Return of Partnership Income) that reports the partnership's income, deductions, gain, losses, etc. The partnership is also required to furnish statements, or Schedules K-1, to its partners (and the IRS) reporting each partner's distributive share of partnership income or loss, and separately stated items, among other things.

17

**The Steps in Defendants' Conservation Easement Syndication Scheme**

61.     Defendants' conservation easement syndication scheme is highly structured and typically involves multiple entities. At the very least, the scheme involves one LLC (or other state law entity) taxed as a partnership in which customers "invest." Defendants market (or assist in marketing) the LLC interests to potential "customers." Defendants' scheme has evolved over the years and been executed in different iterations and permutations, but the general pattern of the conservation easement syndication scheme is as follows:

    a.  **<u>Step One:</u>** A "sponsor" creates a conservation easement syndicate (LLC) or identifies an existing LLC that can be turned into a conservation easement syndicate. The LLC is taxed as a partnership. If the LLC does not own the real property at issue, the real property is contributed by its owners in exchange for the LLC interests in a transaction that is considered a "nonrecognition" transaction for federal income tax purposes. This means that the parties to the transaction do not have to recognize the gain or loss on the transaction for federal tax purposes.

    b.  **<u>Step Two</u>**: The LLC acts through a manager. The manager is generally the sponsor or an employee, agent, or subsidiary of the sponsor. The LLC engages the services of a conservation manager who assists in the planning, organization, and execution of a conservation easement. As part of these services, the conservation manager contacts a land trust and works in conjunction with the land trust to draft the deed of conservation easement and the baseline documentation. Baseline documentation that describes and depicts the property at the time of the donation is required. Generally, the initial services provided by the conservation manager include hiring an appraiser and assisting with the

determination of the highest and best use of the property to be used in the appraisal.

c. **Step Three**: The appraiser, prepares an "initial valuation" of the proposed conservation easement. Here, in creating their initial valuation, the appraisers utilize unrealistic assumptions, violate the standards governing appraisal practice and otherwise prepare valuations that grossly overvalue the conservation easement. This initial valuation is used to market and sell the LLC interests. The appraisers know that their valuation will be used in this manner.

d. **Step Four**: The LLC or conservation manager engages a law firm to provide a tax opinion letter, confidential offering summary or private placement memorandum, and other transactional documents (subscription agreements for purchasing LLC units, operating agreement(s) of the LLC, redemption agreements, etc.) to be used in marketing and selling the LLC interests. The marketing materials include the initial valuation and typically state that the land trust has preliminarily accepted the draft deed of conservation easement.

e. **Step Five**: The LLC interests are marketed and sold as securities that are exempt from registration under Regulation D of the Securities Act. The LLC interests are generally sold in an "all or nothing" or "minimum/maximum" offering, meaning that a specific number of units must be subscribed or the closing will not take place. The LLC interests are sold either privately (through accountants, return preparers, financial advisors, and/or Defendants) or through broker-dealers. The LLC interests are generally marketed to taxpayers who, without the deductions stemming from the LLC interests, would be in one of the highest federal income tax brackets.

f. **Step Six:** Prospective customers are given an offering package with the marketing materials and transactional documents, including the confidential offering summary or private placement memorandum, tax opinion, operating agreement(s), subscription agreement, and redemption agreement. The offering package

includes the anticipated value of the conservation easement, the anticipated value of the corresponding tax deduction (as determined by the preliminary appraisal,) and states that a draft deed of conservation easement has been approved by a land trust. Copies of the preliminary appraisal and draft deed are not provided, but are available for review by prospective customers. The offering package includes an example of the tax benefit or a "tax savings analysis" of a customer's investment. The "tax savings analysis" explains the return on investment by quantifying the amount of tax benefits to be received for every dollar "invested" like in the following example:



### SAVE YOUR TAXES—MAKE THEM GREEN! — page 2
*private action preserving private lands*

**_Here's a Simplified Savings Example:_**

*You participate in a project that will produce $2 million in deductions and $250,000 in state tax credits for you. These tax benefits will have the following values for someone in the highest brackets (using GA as an example):*

| | |
|---|---|
| Amount of Tax Deductions | $2,000,000 |
| Combined Federal & State Tax Rates | 41% |
| Federal & State Tax Savings (cash value) | $ 820,000 |
| State Tax Credit | $ 250,000 |
| Total Federal & State Tax Savings (cash value) | $1,070,000 |
| Your Cost — varies by project, say<br>(these are funds you would have otherwise sent to the government) | $ 750,000 |
| **Simple Return** | **43%** |

Plus your residual value in the land for recreation, hunting, limited development...

g. **<u>Step Seven</u>**: Each customer who wants to purchase LLC interests must fill out certain transactional documents, including a subscription agreement, indicating the number of units to be purchased. The customer must also certify that the customer is an "Accredited Investor" as defined by securities law. Broker-dealers or the syndicate's sponsor may require prospective customers to complete additional forms.

h. **Step Eight**: After all LLC interests are subscribed and accepted by the LLC, the closing transaction is executed. Customers wire money to the LLC through a bank designated by the LLC or the sponsor and proceeds are distributed as described in the offering documents. The LLC uses the proceeds to pay fees and expenses, redeem the membership interests of the original LLC members, and to set up an operating account and an audit reserve fund.

i. **Step Nine:** Shortly after closing, the LLC's manager makes a recommendation to the members regarding the use of the property – to place a conservation easement over the property. The LLC then executes a conservation easement over the property.

j. **Step Ten**: An appraiser, generally the same person who provided the initial valuation, finalizes the value of the conservation easement by preparing a "final appraisal" that purports to be a qualified appraisal (as defined in 26 U.S.C. § 170 and the regulations thereunder). The appraiser generally uses the same flawed assumptions and methodology as used in the initial valuation to arrive at approximately the same grossly overstated value. On occasion, the LLC hires a second appraiser (the review appraiser) to provide a "review" of the appraiser's initial or final valuation and support the value provided by the original appraiser.

k. **Step Ten**: A return preparer prepares the LLC's tax return, Form 1065 and accompanying schedules reporting the conservation easement as a charitable contribution. As part of this process, the return preparer also prepares the Schedules K-1 for each customer/LLC member on which the customer's share of the conservation easement deduction is reported. As part of the Form 1065, the LLC files a Form 8283 (appraisal summary), which must be signed by the appraiser and the land trust (or other organization to which the conservation easement was donated). The appraiser also prepares a supplemental statement to accompany the Form 8283 and submits a copy of the final appraisal to the LLC with the knowledge that it will be used to support a charitable contribution deduction reported on the Form 1065 and ultimately claimed by the individual customers.

l. **<u>Step Eleven</u>**: Customers file their income tax returns, Forms 1040, reporting overvalued charitable contribution deductions arising from the conservation easements. The customers receive copies of their Schedules K-1, Forms 8283 (appraisal summaries), supplemental statements, and appraisal reports from the LLC and submit them with their income tax returns as support for the improper and overstated deductions claimed. The improper and overstated deductions ultimately reduce the customers' reported tax liabilities.

62.     Defendants' conservation easement syndication scheme has evolved over time and is now structured to include tiered-entities (the "tiered-entity structure"). In the "tiered-entity structure," the steps generally remain the same except that at the onset two LLCs are formed, one which will own the land and one which will own 90 percent or more of the LLC owning the land. The customers "invest" in the LLC that owns the land-holding LLC.

### The Evolution of Defendants' Relationships in the Conservation Easement Syndication Scheme

63.     As least as early as 2009, Defendant Zak began organizing, promoting, and selling conservation easement syndicates.

64.     Between 2009 and 2011, Zak worked on a series of at least 13 conservation easement syndicates that owned land outside of Savannah, Georgia. The land was all originally owned by one entity and was subdivided into smaller tracts for each of these conservation easement syndicates. Zak, through her entity,

Forever Forests, provided conservation services to these syndicates and assisted in the organization, promotion, and sale of the syndicates to customers.

65.    Starting no later than 2010, Defendant Zak began working with Defendants Clark and Solon in organizing, promoting, and selling (or assisting in the organization, promotion, and sale of) conservation easement syndicates. Between 2010 and 2012, Solon operated through his role at Conservation Resources, Inc.

66.    Beginning in 2012, when it was formed, EcoVest began providing consulting services for conservation easement syndicates. Starting in or around 2013, EcoVest became the "sponsor" of specific conservation easement syndicates (directly or through the formation of subsidiaries) that were sold as securities exempt from registration through broker-dealers. Solon has worked at EcoVest since it was formed, assisting in the organization, promotion, and sale of the conservation easement syndicates sponsored by EcoVest. Defendant Teal started his association with EcoVest and his role in organizing, promoting, and selling (or assisting in the organization, promotion, and sale of) conservation easement syndicates no later than 2013. Starting no later than January 2014, when Defendant McCullough joined EcoVest, he began organizing, promoting, and selling (or

assisting in the organization, promotion, and sale of) conservation easement syndicates.

67.     As described above, Defendant Zak was a part-owner of EcoVest between 2012 and 2013. After Defendant Zak disposed of her ownership interest in EcoVest, she continued to organize, promote, and sell conservation easement syndicates that were separate than the ones organized, promoted and sold by EcoVest.

68.     Each Defendant continues to organize, promote, and sell (or assist in the organization, promotion, and sale of) conservation easement syndicates to date.

### Examples of Defendants' Conservation Easement Syndicates

*Example 1: Partnership Z in 2009*

69.     On October 17, 2008, Sponsors A, B, and C organized **Partnership Z** as a Georgia LLC with a principal place of business in Garden City, Georgia.

70.     Partnership Z owned real property in Georgia consisting of approximately 140 acres of vacant land.

71.     On or about December 29, 2009, Sponsors A, B, and C initiated a private offering of 99 ownership units of **Partnership Z** at a price of $8,620 per unit plus an operating reserve capital contribution of $1,010 per unit. Ultimately,

**Partnership Z** sold all 99 units for a total offering of $853,380 plus a total operating reserve capital contribution of $99,990.

72.      Defendant Zak, through her entity Forever Forests, assisted in the organization, promotion, and sale of ownership units in **Partnership Z**. Defendant Zak also purchased ownership units in **Partnership Z** and was allocated a portion of the federal tax deduction reported by **Partnership Z** from the conservation easement donation.

73.      In assisting in the organization, promotion, and sale of **Partnership Z**, Zak furnished, or caused others to furnish, the summary offering memorandum to prospective customers. The summary offering memorandum indicated that the granting of a conservation easement could result in substantial tax benefits to those who purchased units. The summary offering memorandum also included a copy of a tax opinion letter which stated it was "more likely than not" that **Partnership Z** would be treated as a partnership for federal tax purposes and that people purchasing units of **Partnership Z** would thus be entitled to their share of its income, loss, deductions and credits.

74.      On December 31, 2009, **Partnership Z** executed a conservation easement on approximately 135 acres of the 140-acre parcel of real property.

75.     Sponsors A, B, and C, with the assistance of Zak, hired an appraiser to value the conservation easement. The appraiser completed an appraisal report dated January 11, 2010 that valued the conservation easement at $4,592,000 as of December 1, 2009.

76.     The appraiser's valuation of Partnership Z's conservation easement was based on his determination of "market value" using a pre-determined highest and best use of a residential development. The appraiser ignored relevant comparable sales, used the incorrect standard for valuation, and otherwise used flawed assumptions and unsuitable data in reaching his opinion of value. As a result of these flaws, the appraiser's valuation of the conservation easement exceeds by 200 percent or more, the correct value of the conservation easement.

77.     On its Form 1065 for the short tax year ending December 31, 2009, **Partnership Z** reported no income or loss and the noncash charitable contribution deduction arising from the conservation easement in the amount of $4,592,000. This amount created a tax deduction for each customer of over $4.76 for every dollar invested (including both the price per unit and the operating reserve capital contribution required per unit). If, for example, a customer purchased 10 units for $9,630 per unit (price per unit plus the operating reserve capital contribution required per unit), for a total of $96,300, **Partnership Z** would subsequently

allocate a charitable contribution deduction of over $459,000 to that customer.

**Partnership Z** allocated the $4,592,000 to its 16 partners on Schedules K-1 as follows:

| Partner No. | Ownership Interest | Noncash Contribution |
|---|---:|---:|
| 1 | 3.0% | $137,760 |
| 2 | 2.0% | $91,840 |
| 3 | 7.0% | $321,440 |
| 4 | 5.0% | $229,600 |
| 5 | 2.0% | $91,840 |
| 6 | 4.0% | $183,680 |
| 7 | 2.5% | $114,800 |
| 8 | 12.5% | $574,000 |
| 9 | 8.0% | $367,360 |
| 10 | 3.0% | $137,760 |
| 11 | 8.0% | $367,360 |
| 12 | 5.0% | $229,600 |
| 13 | 10.0% | $459,200 |
| 14 | 5.0% | $229,600 |
| 15 | 22.0% | $1,010,240 |
| 16 | 1.0% | $45,920 |
| **Total** | **100.0%** | **$4,592,000** |

*Example 2: Partnership Y in 2012*

78.     In 2012, EcoVest provided consulting services to **Partnership Y**, a conservation easement syndicate organized as a Georgia LLC with a principal place of business in Rome, Georgia.

79.     **Partnership Y** owned real property in Georgia consisting of approximately 324.90 acres of wooded unimproved land.

80.     On or about December 12, 2012, **Partnership Y** initiated a private

offering of 900 to 950 ownership units at $1,799 per unit. Ultimately, **Partnership**

**Y** sold 950 units for a total offering of $1,709,050. EcoVest assisted in the

organization, promotion, and sale of these 950 units of **Partnership Y**.

81.     In connection with the organization, promotion, and sale of

**Partnership Y** units, EcoVest assisted in obtaining a tax opinion letter that it

subsequently furnished to prospective customers. The tax opinion letter stated that

it was "more likely than not" that **Partnership Y** would be treated as a partnership

for federal tax purposes, and that the customers who purchased ownership interests

of **Partnership Y** would be entitled to a portion of the charitable contribution

deduction arising from the conservation easement relative to their ownership

interest in **Partnership Y**. The tax opinion letter was included as an exhibit to

**Partnership Y**'s confidential private offering summary. The tax opinion letter was

based on facts and documents provided by or on behalf of **Partnership Y** that

were not correct.

82.     **Partnership Y**'s confidential private offering summary stated that

**Partnership Y** had engaged in no business activities, that **Partnership Y** would

need additional capital if it chose to develop the property, that the offering price for

a partnership unit was not an indication of the value of the unit, that **Partnership**

**Y** did not expect to make any cash distributions to the customers, that the term of **Partnership Y** was to be five years, and that the manager of **Partnership Y** had the authority to sell or dispose of the real property (**Partnership Y**'s only asset) within four years of a conservation easement being granted.

83.    **Partnership Y**'s offering summary and exhibits contained pages analyzing the risks associated with the investing in **Partnership Y**, the majority of which pertain to the tax risks and potential of an IRS audit for the anticipated conservation easement donation.

84.    **Partnership Y**'s confidential private offering summary also contained a "Source and Use of Funds" section as follows, which detailed how the $1,709,050 total offering would be used by **Partnership Y**:

| Proceeds Used For | Minimum Offering [1] | Maximum Offering [2] |
|---|---|---|
| Redemption Price [3] | 677,874 | 723,867 |
| Estimated Sales Commissions [4] | 194,292 | 205,087 |
| Project Management / Land Planner [5] | 357,800 | 382,800 |
| Other Estimated Offering expenses [6] | 50,000 | 50,000 |
| North American Land Trust [7] | 35,000 | 35,000 |
| Appraisal [8] | 20,000 | 20,000 |
| Survey [9] | 3,580 | 3,580 |
| Real Estate Closing Costs & Legal Expenses [10] | 20,575 | 20,575 |
| Land Engineer [11] | 1,200 | 1,200 |
| Soil Engineer [12] | 1,314 | 1,314 |
| Escrow Agent [13] | 2,500 | 2,500 |
| 2012 Property Taxes [14] | 4,033 | 4,033 |
| Geologist [15] | 4,574 | 4,574 |
| Working Capital [16] | 246,358 | 254,520 |
| **TOTAL** | **$ 1,619,100** | **$ 1,709,050** |

85.     Of the $254,520 of working capital, $150,000 was set aside as an audit reserve for a period of five years. If, after five years, **Partnership Y** did not receive notice from the IRS indicating that one or more of its or its affiliates' tax returns were being audited, the audit reserve would be released to **Partnership Y** for its use.

86.     In connection with the organization, promotion, and sale of its units, **Partnership Y** hired Clark to provide a preliminary appraisal. Clark opined that as of December 5, 2012, **Partnership Y**'s real property had a fair market value of $6,619,788. Clark's opinion of value was included in the **Partnership Y** confidential private offering summary. Based on Clark's opinion, **Partnership Y** told prospective customers this valuation would result in a conservation easement deduction in the amount of $6,295,000 that would be allocated to the customers based on their unit ownership. Clark furnished his opinion of value to **Partnership Y** and EcoVest who in turn furnished this statement of value to customers.

87.     In connection with the organization, promotion, and sale of **Partnership Y** units, Defendants Zak and EcoVest furnished the confidential private offering summary to prospective customers, which included Clark's opinion of value and statements to customers that "the grant of the Conservation Easement would generate a charitable contribution easement deduction [], which

would inure to the Members based upon their relative ownership percentage in the Company."

88.     EcoVest utilized broker-dealer Strategic Financial Alliance to assist in the promotion and sale of interests in **Partnership Y** to customers.

89.     After the closing of the private offering, on or about December 31, 2012, **Partnership Y** placed a conservation easement on approximately 322.90 acres of the 324.90 acre property.

90.     Defendant Clark completed a subsequent appraisal for **Partnership Y**; his appraisal, dated February 10, 2013, valued the easement at $6,295,000 as of December 27, 2012.

91.     Clark's appraisal of the **Partnership Y** conservation easement reached a pre-determined highest and best use of a rural residential development. Clark's opinion of value also relies on at least one inappropriate methodology by using a discounted cash flow analysis while ignoring relevant comparable sales, including the sale of easements or property subject to easements.

92.     As a result of Clark's inappropriate methodology, flawed assumptions and unsuitable data, Clark's valuation of the conservation easement exceeds by 200 percent, or more, the correct value of the conservation easement.

93.     On its Form 1065 for tax year 2012, **Partnership Y** reported a

charitable contribution deduction arising from the conservation easement in the

amount of $6,295,000, creating a tax deduction for each customer of over $3.50 for

each dollar invested. If, for example, a customer purchased 10 units for $1,799

each, for a total of $17,990, **Partnership Y** would subsequently allocate a

charitable contribution deduction of over $62,965 to that customer.

94.     Defendant Clark knew or had reason to know that his preliminary

valuation would be used by EcoVest in the marketing and sale of **Partnership Y**.

Defendant Clark also knew or had reason to know that his final valuation and

appraisal report would be used by **Partnership Y** and the individual customers to

support the tax deductions claimed as a result of the conservation easement.

*Example 3: Partnership X and Partnership W in 2015*

95.     In 2015, EcoVest sponsored **Partnership X**, a conservation easement

syndicate organized as a Delaware LLC on May 18, 2015, with a principal place of

business in Atlanta, Georgia. **Partnership X** operated through its principals,

including Defendant McCullough, who served as the senior vice president and

chief financial officer of **Partnership X**.

96.     **Partnership X** was formed with the purpose of purchasing

approximately 94.5% of **Partnership W**.

97.     **Partnership W** was organized as a Delaware LLC on May 19, 2015, with a principal place of business in Atlanta, Georgia for the purpose of owning a 28.04 acre parcel of vacant and unimproved real property in South Carolina.

98.     In December 2011, Nonprofit A acquired, by gift, the 28.04 acre parcel of real property in South Carolina that **Partnership W** was organized to own.

99.     On or about June 8, 2015, **Partnership X** and **Nonprofit A** entered into a Purchase Agreement that set forth a series of transactions related to the purchase of the 28.04 acre piece of real property from **Nonprofit A**:

   a.   **Nonprofit A** would contribute the 28.04 acre parcel of real property to **Partnership W** in exchange for 95% of the ownership units of **Partnership W** in a transaction intended to qualify as a nonrecognition transaction under I.R.C. § 721;

   b.   **Nonprofit A** would contribute $52,000 (approximately 4.76% of the value of the real property assigned to the property in the Purchase Agreement as of June 8, 2015, $1,092,000) to a newly formed entity, **LLC B**. **LLC B** would then contribute the cash to **Partnership W** in exchange for 5% of the ownership units of **Partnership W** in a transaction intended to qualify as a nonrecognition transaction under I.R.C. § 721;

   c.   On or before December 31, 2015, **Nonprofit A** would convey 95% of the ownership units of **Partnership W** to **Partnership X** for a purchase price of $1,040,000 (the remaining 95.24% of the value of the real property).

100.   Without the contributions to **Partnership W** as described in the
Purchase Agreement qualifying as nonrecognition transactions under the Internal
Revenue Code, **Partnership W** would not have been permitted to treat the real
property as long-term capital gain property. If the real property was not treated as
long-term capital gain property, the amount of the charitable contribution
deduction for the conservation easement permitted under the Code would have
been limited to **Partnership W**'s basis in the real property.

101.   On or about July 10, 2015, Clark provided a preliminary appraisal of
**Partnership W**'s real property. Clark opined that as of July 10, 2015, the
conservation easement contemplated by **Partnership W** was valued at
$38,879,000. Clark's appraisal report indicates that he intended to revise the
appraisal after the execution and filing of the conservation easement. At the time
Clark gave his preliminary appraisal report and opinion of value, Clark knew or
had reason to know that his statement of value was to be used in the promotion and
sale of interests in **Partnership X**. Clark furnished his statement of value and
appraisal report to **Partnership X** and EcoVest which in turn furnished the
statement of value to prospective customers.

102.   On or about August 3, 2015, EcoVest, directly or indirectly, initiated a
private offering of **Partnership X** units at a price of $9,483 per unit.

103.   In connection with the organization, promotion, and sale of **Partnership X** units, EcoVest caused offering documents including a confidential private placement memorandum to be prepared and distributed to prospective customers. EcoVest included Clark's statement of value, of $38,879,000 of the conservation easement in its offering materials, telling customers that by investing in **Partnership X**, they would be entitled to a portion of that conservation easement deduction.

104.   In connection with the organization, promotion, and sale of **Partnership X**, EcoVest furnished the confidential private placement memorandum to prospective customers or caused others to furnish the confidential private placement memorandum to prospective customers. **Partnership X**'s confidential private placement memorandum stated that **Partnership X** would need additional capital if it chose to develop the property, that the offering price for a partnership unit was not an indication of the value of that unit, that the term of **Partnership X** was not expected to last beyond six years, and that the manager of **Partnership X** had the authority to sell or dispose of the real property (**Partnership X**'s only asset) after four years of a conservation easement being recorded. Yet, **Partnership X**'s offering documents asserted that the customers would be entitled to a portion of the charitable contribution deduction arising from

the conservation easement because **Partnership X** would be treated as a partnership for federal tax purposes. Specifically, EcoVest made and caused others to make the specific statement that "the donation of the conservation easement would generate a charitable contribution deduction in the approximate amount of $38,879,000, which would inure to the Members based upon their relative beneficial ownership percentage in the [**Partnership X**]."

105.   EcoVest utilized broker-dealers Strategic Financial Alliance and Triloma Securities to assist in the promotion and sale of interests in **Partnership X** to customers.

106.   After the closing of the private offering, on or about December 15, 2015, **Partnership W** executed a deed of conservation easement to be effective on December 22, 2015, with respect to its approximately 28.04 acre parcel in South Carolina. **Partnership W** retained the right to build one residential building and one recreational building within an approximately four-acre building site.

107.   Defendant Clark completed a subsequent appraisal for Partnerships X and W; his appraisal, dated December 15, 2015, valued the easement at $39,697,000 as of December 15, 2015. Clark's final appraisal differed minimally from his original appraisal dated July 10, 2015.

108.   Clark's appraisal of the **Partnership W** conservation easement reached a pre-determined highest and best use of a multi-family resort-like development, relied upon inappropriate methodology and assumptions and excluded pertinent facts, including:

      a.   Clark inappropriately used a discounted cash flow analysis while ignoring relevant comparable sales, including the sale of easements or property subject to easements.

      b.   Clark's appraisal omitted mention of the Purchase Agreement between **Nonprofit A** and **Partnership X** and the stated value in that agreement of the property of $1,092,000 as of June 8, 2015.

109.   As a result of Clark's inappropriate methodology, flawed assumptions and unsuitable data, Clark's valuation of the conservation easement exceeds by 200 percent, or more, the correct value of the conservation easement.

110.   On its Form 1065 for tax year 2015, **Partnership W** reported a charitable contribution deduction arising from the conservation easement in the amount of $39,697,000 which was allocated to its partners, including **Partnership X**. **Partnership X** in turn allocated the deduction to its members based on their unit ownership, creating a tax deduction for each customer of approximately $4.12 for each dollar invested. If, for example, a customer purchased 10 units for $9,483,

for a total of $94,830, **Partnership X** would subsequently allocate a charitable

contribution deduction of over $390,699 to that customer.

111.   Defendant Clark knew or had reason to know that his preliminary

valuation would be used by EcoVest in the marketing and sale of **Partnership X**.

Defendant Clark also knew or had reason to know that his final valuation and

appraisal report would be used by Partnerships W and X and the individual

customers to support the tax deductions claimed as a result of the conservation

easement.

### In Organizing, Promoting, and Selling (or Assisting in the Organization, Promotion and Sale of) Conservation Easement Syndicates, Defendants Made Statements that Defendants Knew or Had Reason to Know Were False

112.   Defendants' collective 96 conservation easement syndications involve

real property, primarily vacant and unimproved parcels, in the states of Alabama,

Georgia, Indiana, Kentucky, North Carolina, South Carolina, Tennessee, and

Texas. At least 21 of those syndicates involved real property in the State of

Georgia.

113.   Defendants have directly or indirectly sold interests in these 96

conservation easement syndicates to thousands of customers (although some

customers purchased interests in multiple conservation easement syndicates) from

at least 45 different states and the District of Columbia. These 96 conservation

easement syndicates reported in excess of $2 billion in charitable contribution deductions arising from the conservation easements on their federal tax returns (Forms 1065), which were intended to be passed through to the individual customers who would use these deductions to reduce their federal tax liabilities.

114.   In organizing, promoting, and selling (or assisting in the organization, promotion, and sale of) the 96 conservation easement syndicates, Defendants Zak, EcoVest, Solon, McCullough, and Teal made statements (or caused others to make statements) regarding the availability of qualified conservation contribution deductions a customer could claim as a result of participating in the conservation easement syndication scheme. Similar to the statements outlined above in promoting the specific examples, these Defendants marketed the conservation easement syndicates as a way for a customer to participate in tax benefits by becoming a "partner" in or "part-owner" of an LLC that would donate a conservation easement.

115.   In organizing, promoting, and selling (or assisting in the organization, promotion, and sale of) the 96 conservation easement syndicates, all Defendants made or furnished statements about the amount of a qualified conservation contribution deduction that would be available to customers if they invested in a

conservation easement syndicate. These statements were based on the appraisals and/or opinions of value prepared by Clark or another real estate appraiser.

116.   Defendants Zak, EcoVest, Solon, McCullough, and Teal marketed the conservation easement syndication scheme through word of mouth as well as through broker/dealers, financial advisors, return preparers, CPAs, and other individuals. Defendant Clark knew that his opinions of value were being used to market the conservation easement syndicates. Further, Defendant Clark knew or had reason to know how the syndicates were structured and being marketed and sold and that his statements of value and the statements of value he caused others to make were false.

### *Specific Statements by Zak*

117.   Defendant Zak uses websites and social media sites to promote the abusive conservation easement syndication scheme, including the website of her wholly owned entity, Forever Forests. Zak publishes "success stories" on the Forever Forests' website, all of which describe the availability of federal income tax deductions as a primary purpose for purchasing an interest in a conservation easement syndicate.

118.   One "success story" example Zak publicizes on her website, "The

Conservation Facilitator," describes a specific transaction between Ms. A and Mr.

B (the names on the website have been shortened to initials in this Complaint):

> The sale of Ms. A[ ]'s company in January generated an ordinary
> income windfall profit. She contacted Forever Forests who introduced
> her to another of their clients, Mr. B[ ]. With the help of Forever
> Forests, Mr. B[ ] had earlier evaluated the possibility of permanently
> preserving his timber tract and a qualified appraiser had estimated the
> amount of federal income tax deductions that could be claimed if the
> property were to be conserved. Unfortunately, Mr. B[ ] was unable to
> utilize all of the deductions. Ms. A[ ] offered to purchase a significant
> share of his ownership interests in the property while agreeing that
> Mr. B[ ] could retain managerial control. After closing, the partners
> agreed to preserve the property through the grant of a conservation
> easement. Ms. A[ ] offset 50% of her windfall profit using her share
> of the tax benefits whose cash value was more than 30% in excess of
> her purchase price. After a few years, Mr. B[ ] repurchased Ms. A[ ]'s
> shares and the partnership dissolved.

*See*, http://foreverforests.net/index.php/success-stories/ last accessed on
December 13, 2018.

119.   Defendant Zak, in promoting her services and her company, Forever

Forests, prepared promotional materials that were distributed by her and others in

organizing, promoting, and selling the conservation easement syndicates. In one of

these promotional documents, Zak stated that "[a]n owner who wishes to conserve

their property but cannot utilize all of the deductions may choose to put the

property's ownership into a partnership prior to the placement of a conservation

easement on the property. The generated deductions are then shared

proportionately between the partners. … Partners also receive sufficient tax benefits to offset their investment and realize a meaningful return."

120.   In that same promotional document, Defendant Zak advises prospective customers that they can redirect some of their "tax dollars into a pre-structured Conservation Partnership" allowing them to "cut [their] taxes by 30% to 50% (or more)." Zak also assures her customers that "[the Partnership] project structure allows for the tax savings to be shared among the owners in place at the time the easement is granted." Defendant Zak shared these promotional materials with prospective customers and with others who furnished the promotional materials to prospective customers.

121.   Defendant Zak also promoted and sold specific conservation easement syndicates as a registered representative of broker-dealers, including the Strategic Financial Alliance. In selling the syndicates as a registered representative, Zak and her agents or employees told prospective customers about the tax benefits they could receive by purchasing an interest in the syndicate. Zak frequently promoted new conservation easement syndicates to individuals who had previously purchased interests in an earlier conservation easement syndicate. Zak and her agents or employees promoted and sold several conservation easement syndicates that were "all being offered at a pricing ratio of 1:4.25, so that for each dollar

invested the partner receives $4.25" in tax deductions. At least one of these

conservation easement syndicates offering this ratio was sponsored by EcoVest.

122.   Defendant Zak continues to engage in the organizing, promoting, and

selling (or assisting in the organization, promotion or sale of) the conservation

easement syndicates. For example, Zak has been marketing a conservation

easement syndicate involving real property in the state of Florida since at least

December 2016. In promoting the conservation easement syndicate offering to

prospective customers, Zak made the following statements:

- We've been in this business 14 years
- To date, prior to this year's efforts, we concluded 91 CE projects, spanning coast to coast
- That has resulted in over 30,000 acres preserved
- Those projects have generated $780,673,972 in Federal deductions
- They have further generated $24,520,304 in state tax credits
- Out of $780,673,972 deductions declared by our clients, **only 1% of those deductions were disallowed in appeals in an administrative adjustment, with no penalties levied to the taxpayer**.

(Emphasis in original.)

### *Specific Statements by EcoVest, Solon, McCullough and Teal*

123.   Defendant EcoVest, as a sponsor of conservation easement syndicates,

prepared marketing materials and offering documents outlining the structure of the

transaction and tax deductions a customer could expect for purchasing an interest

in a specific syndicate. Defendant EcoVest furnished these documents and the

statements contained therein to prospective customers or to broker-dealers who disseminated them to prospective customers.

124.   Defendant EcoVest continues to sponsor conservation easement syndicates, directly or indirectly, by organizing, promoting, and selling (or assisting in the organization, promotion, or sale of) interests in more than one conservation easement syndicate in each of 2016, 2017, and 2018.

125.   Defendants Solon, McCullough, and Teal, in their capacity as owners, directors, officers, and/or employees of EcoVest organized, promoted, and sold (or assisted in the organization, promotion, and sale of) EcoVest-sponsored conservation easement syndicates. Defendants Solon, McCullough, and Teal, directly or indirectly, prepared (or assisted in the preparation of) the marketing materials and offering packages for EcoVest-sponsored conservation easement syndicates. Defendants Solon, McCullough, and Teal furnished (or caused others to furnish) these marketing materials and offering packages to prospective customers and made statements regarding the allowance and amount of tax deductions that a customer could receive for purchasing an interest in an EcoVest-sponsored conservation easement syndicate.

126.   In the marketing materials and offering documents for the EcoVest-sponsored conservation easement syndicates, Defendants EcoVest, Solon,

McCullough, and Teal made statements and caused others to make statements that
were false or fraudulent, including:

    a. That the syndicates would qualify as partnerships for federal tax
       purposes, and;

    b. That the customers would be entitled to their pro rata portion of the
       charitable contribution deduction arising from the conservation
       easement in proportion to their ownership interests in the
       syndicates.

127.   EcoVest also used marketing materials prepared by a law firm in
organizing, promoting and selling its conservation easement syndicates including
one document copyrighted in 2013 entitled, "Conservation Easement Overview."

128.   The Conservation Easement Overview, which EcoVest furnished to
its customers, included background information on conservation easements and a
summary of the tax benefits one could expect to receive from participating in a
conservation easement syndicate because "[t]he use of partnership structures can
allow, under the right circumstances, the maximum use of tax benefits attributable
to a conservation easement deduction."

129.   In the "Conservation Easement Overview," the analysis continued,
explaining that:

> Many landowners are not able to take advantage of a
> deduction for a conservation easement on their property
> because they lack sufficient income. However, there are
> high-income taxpayers willing to invest in land owning

entities if they can receive the benefit of a conservation easement deduction. This matching of interests allows preservation of the land on terms satisfactory to all and increases the amount of land preserved by fully utilizing the tax incentives of section 170(h).

…

…Below is an example of how this works:

*Assume that Mr. Jones [] owns the property with his son, Casey, in a partnership, and assume that Mr. Jones and Casey each have an annual adjusted gross income of only $50,000. If Mr. Jones and Casey were to donate a conservation easement over their property, they would likely be unable to fully utilize the $9 million deduction attributable to an easement donation because of the deduction limitations discussed above (Mr. Jones and Casey would each be limited to deducting $25,000 of the $9 million deduction in the year of donation, and roughly the same amount for each carryover year afterward). However, if Mr. Jones and Casey admitted other high-income investors into their partnership by selling them LLC interests, and the partnership subsequently elected to donate an easement over the property, the investors would be able to share in the deduction. Thus, the partnership structure, and the admission of additional partners, can enable the tax benefits attributable to a conservation easement donation to be fully utilized.*

**Defendants knew or had reason to know that their statements about securing tax benefits, namely charitable contribution deductions, were false.**

130.   As described herein, Defendants' conservation easement syndication

scheme relies upon the use of an entity taxed as a partnership to pass tax

deductions through to the customers who purchase ownership units of a conservation easement syndicate.

131.   In organizing, promoting, selling, and/or opining on the conservation easement syndication scheme, Defendants Zak, EcoVest, Solon, McCullough, and Teal made statements regarding the allowance of the federal tax deductions that they knew, or had reason to know, were false or fraudulent as to material matters. These statements include those described herein about the syndicate qualifying as a partnership for federal tax purposes, that the donations qualify as "qualified conservation contributions," and that the customers are entitled to a portion of the charitable contribution deduction by virtue of their ownership units in the syndicate.

132.   Among other things, Defendants Zak, EcoVest, Solon, McCullough, and Teal knew or had reason to know that the customers were not entitled to the charitable contribution deductions claimed because:

   a.  The conservation easement syndicates exist solely as a conduit for selling tax deductions;

   b.  The conservation easement syndicates are shams;

   c.  The conservation easement syndicates lack economic substance;

   d.  The conservation easement syndicates are not organized for the purpose of carrying on of a business or joint venture;

e.  The conservation easement syndicates do not contribute a qualified real property interest as required to be a valid "qualified conservation contribution"; and

f.  The conservation easement donations are not made exclusively for conservation purposes.

133.  Defendants also made or furnished gross valuation overstatements about the value of the conservation easement syndicate units, the value of the conservation easements and associated value of the tax benefits to be received from that easement by each customer. Defendants knew or had reason to know that their statements were based on improper and overvalued appraisals. Defendants knew or had reason to know that the appraisals relied upon inappropriate assumptions, data, and methodology and otherwise failed to comply with the Internal Revenue Code and regulations thereunder. As a result, Defendants knew or had reason to know that the valuation statements they made were false as well as gross valuation overstatements.

*Defendants Knew or Had Reason to Know That the Conservation Easement Syndicates Lack Economic Substance and Are Shams*

134.  In the tax context, the term "partnership" includes a syndicate, group, pool, joint venture, or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on, and which is not, a corporation or a trust or estate. However, if the partnership is organized with no

48

business purpose other than tax avoidance, the partnership lacks economic substance and/or is a sham.

135.   Defendants Zak, EcoVest, Solon, McCullough, and Teal knew, or had reason to know that: (1) the syndicates they organized, promoted, sold, and/or opined on had no business purpose other than tax avoidance; (2) the customers did not join together for the purpose of carrying on a business and sharing in the profits or losses or both of that business; and, (3) the syndicates lack economic substance and are shams.

136.   For example, Defendants Zak, EcoVest, Solon, McCullough, and Teal knew or had reason to know that:

    a.   the syndicates did not have ongoing business ventures, the syndicates did not expect to generate any profits, and the customers did not anticipate any distributions from the syndicates;

    b.   the partners' only return on investment came in the form of tax benefits;

    c.   the partners were not required to make any additional capital contributions to the syndicates and the syndicate was not funded (and had no financing plans or capability) for anything other than donating a conservation easement on the real property;

    d.   the only asset the syndicate had was the real property upon which the conservation easement was placed;

    e.   the manager of the syndicate had the ability to dispose of that only asset (without the approval of the partners) after a period of years after the conservation easement is granted;

    f.  the investment risks outlined by the syndicate focused primarily on the tax consequences that could result from the IRS auditing the conservation easement donation; and

    g.  the syndicate had a specific term or otherwise included termination provisions or provisions for the customers to exit the syndicate after a period of years and were marketed as a limited term investment.

137.  Defendants knew or had reason to know that the sale of federal tax deductions is prohibited and created a structure in an attempt to avoid this prohibition. Defendants' conservation easement syndication scheme is nothing more than a thinly veiled attempt to facilitate the sale of federal tax deductions by a person who cannot fully utilize them to people who can. Defendants knew or had reason to know that the use of a partnership or other pass-through entity was the only way to otherwise attempt to avoid the prohibition on selling federal tax deductions.

138.  As such, Defendants knew or had reason to know that the statements they made or furnished (and the statements they caused others to make or furnish) regarding the allowance of the deductions from the conservation easement syndicates or the securing of other tax benefits by reason of purchasing interests in the conservation easement syndicates were false or fraudulent as to a material matter. This includes statements made or furnished by Defendants and others about

the partnership structure being "proper," and a customer's entitlement to federal tax deductions by purchasing an interest in a conservation easement syndicate.

*Defendants Knew or Had Reason to Know that the Conservation Easement Donations Were Not "Qualified Conservation Contributions"*

139.   Before a taxpayer qualifies for a noncash charitable contribution deduction arising from a "qualified conservation contribution" or conservation easement, several criteria must be met. In particular,

  a.   the contribution must be of a "qualified real property interest"; if the real property interest is a restriction on the use of the property, as is the case with the conservation easements at issue in this Complaint, that restriction must be granted in perpetuity;

  b.   the contribution must be made exclusively for conservation purposes, and the easement must incorporate legally enforceable restrictions on the property at issue that will prevent uses of the retained interest in the property that are inconsistent with the "conservation purpose" of the contribution, and must run in perpetuity;

  c.   where a donor of a conservation easement retains rights to the property subject to the easement which could impair the conservation interests, the donor is required to document the condition of the property at the time of the gift, commonly referred to as the "baseline documentation" that presents an accurate representation of the protected property at the time of the transfer; and

  d.   the conservation easement's value must be determined by a "qualified appraiser," and the appraisal must be a "qualified appraisal" prepared in accordance with generally accepted appraisal standards.

140.   Defendants knew or had reason to know that the conservation easements granted by the conservation easement syndicates did not qualify as "qualified conservation contributions." For instance, Defendants knew or had reason to know:

    a.  the syndicates did not donate a "qualified real property interest" because the property subject to the conservation easement could be modified;

    b.  the syndicates retained or reserved rights to the property that were inconsistent with the conservation purpose(s) of the conservation easement;

    c.  the syndicates did not properly document the condition of the property at the time of the donation; and/or

    d.  the appraiser was not a "qualified appraiser" and did not prepare a "qualified appraisal" as required by the Internal Revenue Code and regulations thereunder.

141.   Defendants made or furnished statements (or caused others to make or furnish statements) regarding the allowance of the "qualified conservation contribution" or securing of other tax benefits from the "qualified conservation contribution" that they knew or had reason to know were false or fraudulent.

*Defendants Made or Furnished or Caused Others to Make or Furnish Gross Valuation Overstatements*

142.   When valuing a conservation easement for purposes of claiming a federal tax deduction, an appraiser must determine the easement's "fair market value" as of the date of the contribution. "Fair market value" is defined as "the

price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts."

143.   The Treasury Regulations set forth additional guidance for determining the fair market value of a perpetual conservation restriction on a given property as of the date of the contribution:

> If there is a substantial record of sales of easements comparable to the donated easement (such as purchases pursuant to a governmental program), the fair market value of the donated easement is based on the sales price of such comparable easements. If no substantial record of market-place sales is available to use as a meaningful or valid comparison, as a general rule (but not necessarily in all cases) the fair market value of a perpetual conservation restriction is equal to the difference between the fair market value of the property it encumbers *before* the granting of the restriction and the fair market value of the encumbered property *after* the granting of the restriction.

26 C.F.R. § 1.170A-14(h)(3)(i) (emphasis added).

144.   The applicable regulations further provide that the analysis of a property's fair market value before and after the contribution of a conservation easement must be based on the property's "highest and best use." A property's "highest and best use" is the reasonable and probable use that supports the highest present value of the property. Appraisers generally determine "highest and best use" by considering uses for the property that are: (1) physically possible; (2) legally permissible; and (3) financially feasible. Then, the appraiser must

53

determine which of those uses is the maximally productive use of the property, or creates the highest value of the property. This use is then the "highest and best use" of the property.

145.   The analysis of a property's fair market value before and after the contribution of a conservation easement must also take into account "how immediate or remote the likelihood is that the property, absent the restriction, would in fact be developed, as well as any effect from zoning, conservation, or historic preservation laws that already restrict the property's potential highest and best use." 26 C.F.R. § 1.170A-14(h)(3)(ii). Indeed, there may be instances where the grant of a conservation easement may have no material effect on the value of the property or may in fact serve to enhance, rather than reduce, the value of the property; in such instances, no deduction would be allowable. *Id.* The highest and best use analysis in an appraisal is critical in determining fair market value.

146.   Defendant Clark holds himself out as professional appraiser of conservation easements, and claims that he meets the definition of a "qualified appraiser" as defined in 26 U.S.C. §§ 170(f)(11).

147.   Clark appraised at least 187 conservation easements between 2009 and 2016 in the following amounts: 61 conservation easements between 2009 and 2014, 59 conservation easements during 2015, and 67 conservation easements

during 2016. This total includes at least 58 conservation easement syndicates, as described herein.

148.   Nearly all of the conservation easement appraisals referenced in paragraph 147, completed by Clark, have been submitted to the IRS to support a claimed charitable contribution deduction arising from the conservation easement. Defendant Clark claims that the appraisal reports he generates meet the definition of a "qualified appraisal" in the Internal Revenue Code and regulations thereunder.

149.   Clark earned substantial fees for his appraisals.

150.   Continually and repeatedly, Defendant Clark relied upon inappropriate assumptions, utilized inappropriate methodology and used various techniques to improperly inflate the value of the conservation easements. This inflated value results in Defendants' customers claiming inflated and improper deductions from their participation in the conservation easement syndication scheme. For example:

     a.  Defendant Clark incorrectly reached unsupportable or predetermined highest and best use conclusions – usually concluding that the highest and best use is a residential subdivision that must be valued using a discounted cash flow analysis;

     b.  Defendant Clark arrived at the unsupportable highest and best uses by ignoring local zoning rules and other legal restrictions on purported developments, physical feasibility, market conditions, and market data;

    c.  Defendant Clark ignored the sale of conservation easements in the area of the property in determining the value of the conservation easement and ignored the proceeds garnered by the LLC by its sale of membership interests to customers;

    d.  Defendant Clark failed to employ recent, local, or similar sales that competed with the subject property or would have been considered "substitutes" for the subject property by potential buyers when employing the "comparable sales method;"

    e.  Defendant Clark improperly used the income approach and/or the subdivision analysis in his appraisals;

    f.  Defendant Clark ignored relevant data about recent sales, contributions, or agreements concerning the real property that included relevant data for the value of the real property.

151.  By using these improper methods in appraising conservation easements, Defendant Clark generated grossly overvalued appraisals, which in turn resulted in taxpayers grossly overstating their tax deductions.

152.  Continually and repeatedly, Clark overstated the fair market value of the conservation easements by hundreds of thousands, if not millions, of dollars.

153.  Clark claims that his appraisals follow the Uniform Standards of Professional Appraisal Practice ("USPAP"), but because of his flawed methodology, inappropriate data and supportable assumptions, including those errors outlined above, Clark's appraisals do not comply with USPAP. Clark's appraisals are therefore unreliable and fail to comply with the Internal Revenue

Code and regulations thereunder for valuing conservation easements and preparing qualified appraisals.

154.   In light of Clark's professional experience and education, he knew or should have known that the manner in which he valued the conservation easements was contrary to the internal revenue laws and regulations, violated the professional standards for real estate appraisers, and resulted in gross valuation overstatements for the easements he appraised.

155.   Defendant Clark not only prepared appraisal reports for use by the conservation easement syndicates in marketing and selling their units, but also knew or had reason to know that his appraisal reports would be attached to the tax returns as required by the Code to support the charitable contribution deductions reported by the syndicates and ultimately claimed by Defendants' customers.

156.   Defendant Clark also completed the required Forms 8283 for the conservation easement syndicates who engaged him to provide appraisal services, reporting the gross valuation overstatements as to the valuation of the conservation easements to the IRS. In doing so, Clark also caused others, including the conservation easement syndicates and the sponsors of those syndicates, to furnish those gross valuation overstatements to the individual customers who used the

Forms 8283 to support the charitable contribution deductions they claimed on their returns.

157.   Defendant Zak made or furnished statements (or caused others to make or furnish statements) as to the valuation of the conservation easements as she "guid[ed] appraisal methodology and execution" and "assist[ed] in highest & best use market determination" for the conservation easement syndicates.

158.   Defendant Zak also assisted in the preparation of IRS tax forms, including the Form 8283 and reviewed the valuation statements made on the Forms 8283 and appraisals that were then furnished to individual customers.

159.   Defendant EcoVest also assisted in the preparation of the Forms 8283 as part of the consulting and management services they provide to their specific conservation easement syndicates. Defendant EcoVest generally received copies of the draft appraisals and was permitted to provide input to the appraisers on the methodology and conclusions the appraisers reached.

160.   Defendants made or furnished (or caused others to make or furnish) gross valuation overstatements regarding the value of the conservation easements and associated tax deductions to the thousands of customers (and prospective customers) in the conservation easement syndicates.

161.   Defendants also knew or had reason to know that Clark's valuations were grossly overvalued and/or false or fraudulent because:

a. Defendants knew or had reason to know that the manner in which Clark valued the conservation easements was contrary to internal revenue laws and regulations, violated the professional standards for real estate appraisers, and resulted in improper and grossly overvalued conservation easement appraisals.

b. Defendants knew or had reason to know that a conservation easement's fair market value derives from appropriate, timely data from the market and not conjecture or unsupported conclusions and assumptions that favor extraordinarily high property values.

c. Defendants knew or had reason to know about prior sales attempts or agreements regarding the real property that was evidence of value and did not support the grossly overvalued appraisals completed by Clark.

162.   Defendants also knew or had reason to know that the ultimate customers would use the inflated values provided by Clark to claim overvalued charitable contribution deductions on their federal income tax returns. Defendants knew or had reason to know that these deductions would reduce the federal income tax liabilities of the customers.

163.   Defendant Clark knew or should have known that overstated appraisals could subject him to penalty under section 6701(a) and section 6695A.

**Defendants' Conservation Easement Syndication Scheme Causes Irreparable Harm to the United States and the Public**

164.   The harm caused by this conservation easement syndication scheme is widespread. The United States, Defendants' customers, and the taxpaying public are all adversely affected.

165.   The United States Treasury has suffered losses through tax refunds wrongfully issued and taxes uncollected. As part of their scheme, Defendants have organized, promoted, or sold (or assisted in the organization, promotion, and sale of) at least 96 conservation easement syndicates leading to over $2 billion of charitable contribution deductions reported. But the total amount of wrongful federal tax benefits claimed as a result of Defendants' abusive conservation easement syndication scheme is yet to be fully determined.

166.   The IRS has expended considerable time and resources to address Defendants' conservation easement syndication scheme. IRS employees, including revenue agents, engineers and appraisers, have spent a substantial number of hours examining the conservation easement syndicates and the conservation easement appraisals.

167.   The IRS is harmed because it must dedicate scarce resources to detecting and examining inaccurate returns filed by the conservation easement syndicates as well as assessing and collecting unpaid tax. Defendants' scheme is

highly structured and involves the use of tiered pass-through entities which can conceal the true economic nature of the transaction. Defendants continue to implement variations or permutations to their scheme, resulting in a larger chance of avoiding IRS scrutiny and IRS audit.

168.   Defendants' customers have also incurred direct financial harm because they remain liable for any unpaid federal tax they owe. They will also be liable for interest that has accrued on their unpaid federal tax obligations. Defendants' customers may also be liable for substantial federal tax penalties as a result of participating in Defendants' conservation easement syndication scheme.

169.   Defendants' abusive conservation easement syndication scheme undermines public confidence in the fair administration of the federal tax system and encourages noncompliance with the internal revenue laws, which causes irreparable harm to the United States. Specifically, Defendants' abusive conservation easement syndication scheme inspires contempt for the system of honest, voluntary income tax reporting and undermines the public's confidence in a deduction designed to encourage preservation and conservation efforts that is instead being abused to financially benefit Defendants and their customers at the expense of the U.S. Treasury.

170.    Defendants have been unjustly enriched by operating their conservation easement syndication scheme because the scheme relies upon the abuse of federal tax laws.

## Defendants' Continued Organizing, Promoting, and Selling of Conservation Easement Syndicates to Customers

171.    Despite IRS scrutiny into conservation easement syndicates, including the issuance of IRS Notice 2017-10, 2017-4 I.R.B. 544 on December 23, 2016 identifying conservation easement syndications as a "listed transaction," Defendants Zak, EcoVest, Solon, McCullough, and Teal continue to organize, promote, and sell (or assist in the organization, promotion, and sale of) conservation easement syndicates and their corresponding tax benefits. Defendant Clark also continues to appraise conservation easements for syndicates in the same manner as before the listing notice despite the IRS's scrutiny and identification of gross overvaluation as an issue with conservation easement syndicates.

172.    A "listed transaction" is a reportable transaction that is the same as, or substantially similar to, a transaction specifically identified by the Secretary of the Treasury as a tax avoidance transaction. Once the transaction becomes "listed," certain reporting and disclosure requirements arise. The December 23, 2016 Notice created reporting obligations for participants in conservation easement

syndications as well as material advisors, including appraisers, of conservation easement syndications, for transaction entered into, on, or after January 1, 2010.

173.   In response to the listing notice, Defendants Zak, Clark, and EcoVest filed Forms 8918, Material Advisor Disclosure Statements, reporting their roles with certain conservation easement syndicates which are the subject of this Complaint.

174.   Collectively, Defendants continued to organize, promote, and sell (or assist in the organization, promotion, and sale of) at least 27 conservation easement syndicates that reported sale activity between November 2016 and January 2018.

## COUNT I:

### Injunction against All Defendants under 26 U.S.C. § 7408 for Engaging in Conduct Subject to Penalty under 26 U.S.C. § 6700

175.   The United States incorporates by reference the allegations contained in paragraphs 1 through 6 and 8 through 174.

176.   Section 7408(a) authorizes a district court to enjoin any person from engaging in conduct subject to penalty under 26 U.S.C. § 6700 if injunctive relief is appropriate to prevent recurrence of that conduct or any other activity subject to penalty under the Internal Revenue Code.

177.   Section 6700 imposes a civil penalty on any person who: (1) either organizes or assists in the organization of a plan or arrangement or participates in

the sale of any interest in a plan or arrangement; and (2) makes or furnishes, or causes another to make or furnish, certain statements.

178.   One such statement subject to penalty is a statement with respect to the securing of a tax benefit by reason of holding an interest in an entity or participating in a plan or arrangement that the person has reason to know is false or fraudulent as to any material matter. 26 U.S.C. § 6700(a)(2)(A).

179.   Another such statement subject to penalty is a "gross valuation overstatement as to any material matter." 26 U.S.C. § 6700(a)(2)(B). A gross valuation overstatement is "any statement as to the value of any property or services" if the value of the property or services is directly related to the amount of any tax deduction or credit and the stated value is more than 200 percent of the correct value of the property or services. 26 U.S.C. § 6700(b)(1).

180.   Defendants' conservation easement syndication scheme is a plan or arrangement within the meaning of 26 U.S.C. § 6700.

181.   Defendants have organized, promoted, or sold (or assisted in the organization, promotion, and sale of), the conservation easement syndication scheme to thousands of customers.

182.   In connection with the conservation easement syndication scheme, Defendants made and furnished false and/or fraudulent statements regarding the

securing of a tax benefit by reason of participating in the conservation easement

syndication scheme and the amount of that tax benefit in the form of a

conservation easement deduction.

183.   Defendants knew and had reason to know that these statements were

false or fraudulent within the meaning of 26 U.S.C. § 6700(a)(2)(A).

184.   In connection with the conservation easement syndication scheme,

Defendants made or furnished or caused another person to make or furnish gross

valuation overstatements within the meaning of 26 U.S.C. § 6700(a)(2)(B).

185.   If Defendants are not enjoined, they are likely to continue to promote

this conservation easement syndication scheme.

186.   The United States will suffer irreparable injury if Defendants are not

enjoined.

187.   Enjoining Defendants is in the public interest because an injunction,

backed by the Court's contempt powers if needed, will stop Defendants' illegal

conduct and the harm it causes the United States.

188.   Defendants have engaged in conduct – including but not limited to the

conduct described in this complaint – that is subject to penalty under 26 U.S.C.

§ 6700, and an injunction under 26 U.S.C. § 7408 is appropriate to prevent

recurrence of such conduct.

# COUNT II:

## Injunction against Defendants Zak and Clark under 26 U.S.C. § 7402 for Engaging in Conduct Subject to Penalty under 26 U.S.C. § 6695A

189.   The United States incorporates by reference the allegations contained in paragraphs 1 through 6, 8 through 25, 41 through 42, 54 through 121, 129, 132, and 141 through 174.

190.   Section 7402(a) authorizes a district court to issue injunctions and to render judgments that may be necessary or appropriate for the enforcement of the internal revenue laws even when the United States may have other remedies available for enforcing those laws.

191.   Section 6695A(a) imposes a civil penalty on any person who appraises property and knows (or reasonably should have known) that the appraisal would be used in connection with a federal tax return or a claim for refund, and the claimed value of the property results in a substantial valuation misstatement or a gross valuation misstatement. A substantial valuation misstatement results when the value of any property claimed is 150% or more of the property's correct valuation (26 U.S.C. § 6662(e)), and a gross valuation misstatement results when the value of any property claimed is 200% or more of the property's correct valuation (26 U.S.C. § 6662(h)).

192.   Section 6695A penalizes conduct that interferes with the enforcement of the internal revenue laws.

193.   As alleged herein, Defendant Zak assisted in appraising the conservation easements. Among other things, Zak assisted in making the highest and best use determinations, a critical component in determining fair market value of a conservation easement.

194.   Defendants Zak and Clark knew or reasonably should have known that the appraisals they prepared would be used in connection with a federal tax return or a claim for refund.

195.   The appraisals that Defendants Zak and Clark prepared provided the basis for the value of the charitable contribution deductions claimed on each conservation easement syndicates' Forms 1065 that passed-through to individual customers' tax returns or claims for refund.

196.   Defendants Zak and Clark have consistently overvalued property by at least 150%.

197.   Defendants Zak and Clark have consistently engaged in conduct – including overvaluing appraised property by at least 150% -- that is subject to penalty under 26 U.S.C. § 6695A, and an injunction under 26 U.S.C. § 7402 is appropriate to prevent recurrence of such conduct.

198.   The United States will suffer irreparable injury if Defendants are not enjoined.

199.   Enjoining Defendants is in the public interest because an injunction, backed by the Court's contempt powers if needed, will stop Defendants' illegal conduct and the harm it causes the United States.

200.   Enjoining Defendants is also necessary as the United States otherwise lacks an adequate remedy at law.

## COUNT III:

**Injunction against Defendant Clark under 26 U.S.C. § 7407 for Engaging in Conduct Subject to Penalty under 26 U.S.C. § 6694**

201.   The United States incorporates by reference the allegations contained in paragraphs 1 through 6, 19 through 25, 54 through 62, 65, 68, 77 through 112, 114 through 115, 132, and 141 through 174.

202.   Section 7407 authorizes a district court to enjoin any person from engaging in conduct subject to penalty under 26 U.S.C. § 6694 if injunctive relief is appropriate to prevent recurrence of that conduct or any other activity subject to penalty under the Internal Revenue Code.

203.   Section 6694 imposes penalties on tax return preparers for understatements of tax liability due to unreasonable positions, as well as understatement of tax liability due to willful or reckless conduct.

204.   A "tax return preparer" as used in Section 6694 is defined as any person who prepares for compensation, any return of tax or any claim for refund of tax *including the preparation of a substantial portion* of a return or claim for refund. 26 U.S.C. § 7701(a)(36) (emphasis added).

205.   A tax return preparer includes the individual who signed the tax return or a return preparer who did not sign the tax return but who prepared all or a substantial portion of a return or claim for refund regarding events occurring at the time the advice is rendered. 26 C.F.R. §§ 1.6694-1; 301.7701-15.

206.   As alleged herein, Defendant Clark is a tax return preparer because he prepares tax returns or portions of tax returns for compensation and/or provides advice for positions or entries taken on federal tax returns.

207.   Defendant Clark prepared portions of the conservation easement syndicates' tax returns, including the Forms 8283 (appraisal summary) and appraisal required to be attached to a tax return to support the claimed charitable contribution deduction. Defendant Clark received compensation for the preparation of the appraisal(s) and the IRS forms.

208.   Defendant Clark has consistently engaged in conduct – including understating the federal tax liabilities on tax returns or claims for refund (or portions of tax returns or claims for refund) that he has prepared – that is subject to

penalty under 26 U.S.C. § 6694, and an injunction under 26 U.S.C. § 7407 is appropriate to prevent recurrence of such conduct.

209.   The United States will suffer irreparable injury if Defendant Clark is not enjoined.

210.   Enjoining Defendant Clark is in the public interest because an injunction, backed by the Court's contempt powers if needed, will stop Defendant Clark's illegal conduct and the harm it causes the United States.

## COUNT IV:

**Injunction against All Defendants under 26 U.S.C. § 7402 for Unlawful Interference with the Administration and Enforcement of the Internal Revenue Laws**

211.   The United States incorporates by reference the allegations contained in paragraphs 1 through 174.

212.   Section 7402(a) authorizes a district court to issue injunctions and to render judgments that may be necessary or appropriate for the enforcement of the internal revenue laws even when the United States may have other remedies available for enforcing those laws.

213.   Section 7402 manifests the congressional intention to provide the district courts with a full arsenal of powers to compel compliance with the internal revenue laws. The statute has been used to enjoin interference with tax

enforcement even when such interference does not violate any particular tax statute.

214.   Defendants, through the actions described above, have engaged in conduct that interferes substantially with the administration and enforcement of the internal revenue laws. Defendants have promoted an abusive tax scheme and aided and abetted understatements of tax liabilities. Defendants, through their conduct, have caused their customers to claim over 1.8 billion dollars of overvalued and improper charitable contribution deductions, resulting in hundreds of millions of dollars of tax harm.

215.   Defendants continue to promote the conservation easement syndication scheme, and participation in their conservation easement syndication scheme appears to be growing over the last five to seven years.

216.   Customers continue to claim bogus deductions as a result of the conservation easement syndication scheme.

217.   Defendants' conservation easement syndication scheme has caused irreparable harm to the United States.

218.   Defendants' conduct has caused and is causing substantial revenue loss to the United States Treasury, some of which may be unrecoverable.

219.   IRS scrutiny of the conservation easement syndication scheme, including issuing a Notice identifying the conservation easement syndication scheme as a "listed transaction," has not deterred Defendants from promoting this abusive tax scheme, aiding and abetting understatements of tax liabilities, and otherwise interfering with the enforcement of the internal revenue laws.

220.   If Defendants are not enjoined, they will likely continue to engage in conduct subject to penalty under 26 U.S.C. §§ 6700, 6701, 6695A, and 6694, and conduct that interferes with the enforcement of the internal revenue laws.

221.   Enjoining Defendants is in the public interest because an injunction, backed by the Court's contempt powers if needed, will stop Defendants' illegal conduct and the harm it causes the United States.

222.   Enjoining Defendants is also necessary as the United States otherwise lacks an adequate remedy at law.

## COUNT V:

### Disgorgement under 26 U.S.C. § 7402 against all Defendants as Necessary or Appropriate to Enforce the Internal Revenue Laws

223.   The United States incorporates by reference the allegations contained in paragraphs 1 through 174.

224.   Section 7402 of the Internal Revenue Code authorizes a district court to issue orders, judgments, and decrees as may be necessary or appropriate for the enforcement of the internal revenue laws.

225.   Defendants have unjustly profited at the expense of the United States by charging customers fees for participating in the conservation easement scheme which Defendants knew hinged upon the improper and overvalued tax deductions that their customers claimed.

226.   Defendants are not entitled to these ill-gotten gains. But for the Defendants' conduct, customers would not have received the overvalued and improper tax benefits (and corresponding refunds).

227.   The Court should enter an order under 26 U.S.C. § 7402(a) requiring Defendants to disgorge to the United States the gross receipts that Defendants received for their participation in the conservation easement syndication scheme.

## **RELIEF SOUGHT**

WHEREFORE, Plaintiff, the United States of America, prays for the following relief against Defendants:

    a.   That with respect to Count I this Court find that Defendants have engaged in conduct subject to penalty under 26 U.S.C. § 6700 and that

injunctive relief under 26 U.S.C. § 7408 is appropriate to prevent

recurrence of that conduct.

b.   That with respect to Count II this Court find that Defendants Zak and

Clark have engaged in conduct subject to penalty under 26 U.S.C.

§ 6695A and that injunctive relief under 26 U.S.C. § 7402(a) is

appropriate to prevent recurrence of that conduct.

c.   That with respect to Count III this Court find that Defendant Clark has

engaged in conduct subject to penalty under 26 U.S.C. § 6694 and that

injunctive relief under 26 U.S.C. § 7407 is appropriate to prevent

recurrence of that conduct.

d.   That with respect to Count IV the Court find that Defendants have

engaged in conduct interfering with the administration and

enforcement of the internal revenue laws and that injunctive relief

under 26 U.S.C. § 7402(a) is appropriate to prevent recurrence of that

conduct.

e.   That this Court, with respect to Counts I through IV, and pursuant to

26 U.S.C. §§ 7402, 7407, and 7408, enter permanent injunctions

prohibiting Defendants from directly or indirectly:

(i)     organizing, promoting, or selling (or assisting in the
organization, promotion, or sale of) the "conservation easement

74

syndication scheme," described herein, or any other plan or arrangement that encourages taxpayers to claim a deduction for a qualified conservation contribution under 26 U.S.C. § 170(h);

(ii)     participating (directly or indirectly) in the sale of any conservation easement syndicate, or any other plan or arrangement that encourages taxpayers to claim a deduction for a qualified conservation contribution;

(iii)    making or furnishing (or causing another to make or furnish) a statement about the allowance of any federal tax benefit as a result of participating in a conservation easement syndicate or any other plan or arrangement that encourages taxpayers to claim a qualified conservation contribution deduction;

(iv)     making or furnishing (or causing another to make or furnish) a gross valuation overstatement as to any material matter related to participating in a conservation easement syndicate or any other plan or arrangement that encourages taxpayers to claim a qualified conservation contribution deduction;

(v)      organizing, promoting, or selling (or assisting in the organization, promotion, or sale of) any other plan or arrangement that advises or assists taxpayers to attempt to violate the internal revenue laws or unlawfully evade the assessment or collection of their federal tax liabilities;

(vi)     in connection with organizing, promoting, or selling a plan or arrangement that advises or assists taxpayers to attempt to violate the internal revenue laws or unlawfully evade the assessment or collection of their federal tax liabilities, making or furnishing (or causing another to make or furnish) false statements, about the allowance of any federal tax benefit resulting from participating in the plan or arrangement;

(vii)    in connection with organizing, promoting, or selling a plan or arrangement that advises or assists taxpayers to attempt to violate the internal revenue laws or unlawfully evade the assessment or collection of their federal tax liabilities, making

or furnishing (or causing another to make or furnish) a gross valuation overstatement as to any material matter related to participating in the plan or arrangement;

(viii)  preparing (or assisting in the preparation of) any federal tax return, or any document that may be filed in support of a tax return or other submission to the IRS claiming benefits resulting from a qualified conservation contribution under 26 U.S.C. § 170(h), including, but not limited to, Forms 8283 (appraisal summaries) and attachments or qualified appraisals;

(ix)  preparing (or assisting in the preparation of) any federal tax return, or any document that may be filed in support of a tax return or other submission to the IRS that they know will result in the understatement of any tax liability or the overstatement of federal tax refunds;

(x)  facilitating any donation that is intended to qualify as a "qualified conservation contribution" under 26 U.S.C. § 170(h);

(xi)  advising or representing any individual before the IRS with respect to any donation that is intended to qualify as a "qualified conservation contribution" under 26 U.S.C. § 170(h);

(xii)  preparing (or assisting in the preparation of) any appraisal that is intended to be a "qualified appraisal" within the meaning of 26 U.S.C. § 170(f)(11)(E);

(xiii)  engaging in any activity subject to penalty under 26 U.S.C. §§ 6694, 6695A, 6700, or 6701; and

(xiv)  engaging in conduct that substantially interferes with the proper administration and enforcement of the internal revenue laws.

f.   That this Court, under 26 U.S.C. § 7402(a), order Defendants to

provide to counsel for the United States, no later than 30 days from

the date judgment is entered, a list of

    (i)   all conservation easement syndicates that Defendants have organized, promoted, or sold (or assisted in the organization, promotion, and sale), along with each syndicate's taxpayer identification number, mailing address, e-mail address (if any), telephone number, and the name and contact information of the manager or other person with authority to act on behalf of the syndicate; and

    (ii)  all persons who, in or since calendar year 2009, have purchased any interest in a conservation easement syndicate, including each person's mailing address, e-mail address, telephone number, and taxpayer identification number.

g.    That this Court, under 26 U.S.C. § 7402(a), order Defendants, no later than 30 days from the date judgment is entered, to contact by mail (and also by e-mail, if an address is known) all persons who purchased an interest in a conservation easement syndicate and provide them with

    (i)   a copy of the Court's judgment plus any findings of fact and conclusions of law in support of the judgment, and

    (ii)  a copy of the permanent injunction.

And the Court order that Defendants shall not provide any other document to such purchasers unless that document is first approved by the United States or by this Court.

h.    That this Court, under 26 U.S.C. § 7402(a), order Defendants, within 14 days of entry of the judgment in this case, to prominently display a copy of the final judgment of permanent injunction in this case on the

77

front page and every subpage of all websites Defendants control or

maintain, and any website on which Defendants advertise or market

the conservation easement syndication scheme.

i.    That this Court, under 26 U.S.C. § 7402(a), order Defendants to

provide, within 30 days of entry of the judgment in this case, a copy

of the judgment in this case to all of their employees, independent

contractors, agents, directors, and officers, and provide to counsel for

the United States, within 30 days of the Court's judgment a signed

and dated acknowledgement of receipt for each person who was

provided such copy.

j.    That this Court, under 26 U.S.C. § 7402(a), order Defendants to file

with the Court, within 45 days of entry of the judgment in this case, a

certification signed under penalty of perjury that they have complied

with paragraphs g., h., and i., above.

k.    That this Court retain jurisdiction to allow the United States full post-

judgment discovery to monitor Defendants' compliance with the

injunction.

l.    That this Court, pursuant to Rule 65(d)(2) of the Federal Rules of

Civil Procedure, order that entry of the judgment in this case binds the

following who receive actual notice of it by personal service or
otherwise:

   (i) Defendants Nancy Zak, Claud Clark III, EcoVest Capital,
       Inc., Alan N. Solon, Robert M. McCullough, and Ralph T.
       Teal, Jr.;

   (ii) The officers, agents, servants, employees, and attorneys of
       each of the Defendants described in (i) above; and

   (iii) Other persons who are in active concert or participation with
       anyone described in (i) or (ii) above.

m.   That with respect to Count V and under 26 U.S.C. § 7402(a), this
     Court enter an order requiring all Defendants to disgorge to the United
     States the gross receipts (the amount of which is to be determined by
     the Court) that Defendants received from any source as a result of the
     abusive conservation easement syndication scheme described herein,
     together with prejudgment interest thereon.

n.   That this Court grant the United States such other and further relief as
     the Court deems just and proper, including awarding the United States
     its costs and expenses incurred in this suit.

//

//

[signature on following page]

Dated: December 18, 2018                    Respectfully submitted,

                                           RICHARD E. ZUCKERMAN
                                           Principal Deputy Assistant Attorney
                                           General

                                           */s Erin R. Hines*
                                           ERIN R. HINES
                                           FL Bar No. 44175
                                           Email: Erin.R.Hines@usdoj.gov
                                           Telephone: (202) 514-6619
                                           Trial Attorney, Tax Division
                                           U.S. Department of Justice
                                           P.O. Box 7238
                                           Ben Franklin Station
                                           Washington, D.C.  20044
                                           Facsimile: (202) 514-6770

                                           Local Counsel:
                                           BYUNG J. PAK
                                           United States Attorney
                                           _____
                                           NEELI BEN-DAVID
                                           ASSISTANT U.S. ATTORNEY
                                           Georgia Bar No. 049788
                                           Office of the United States Attorney
                                           Northern District of Georgia
                                           600 U.S. Courthouse
                                           75 Ted Turner Drive, SW, Suite 600
                                           Atlanta, Georgia 30303
                                           Telephone: (404) 581-6303
                                           Facsimile: (404) 581-4667

                                           Email: Neeli.ben-david@usdoj.gov

*I certify that this motion has been prepared with one of the font and point selections approved by the court in LR 5.1C.

80