IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | CASE NO. 1:18-cv-05774-AT |
| NANCY ZAK, | ) | |
| CLAUD CLARK III, | ) | |
| ECOVEST CAPITAL, INC., | ) | |
| ALAN N. SOLON, | ) | |
| ROBERT M. MCCULLOUGH, | ) | |
| RALPH R. TEAL JR., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT ZAK'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO DISMISS**

Defendant Nancy Zak respectfully submits this Memorandum of Law in Support of her Motion to Dismiss the Complaint, pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6) and Rule 9(b).

Ms. Zak seeks dismissal of all counts in the Complaint that relate to her. Specifically, and as set forth below, Count II requires dismissal because the statute upon which it is premised, section 6695A of the Internal Revenue Code, only applies to persons who prepare appraisals, Ms. Zak does not prepare appraisals,

and plaintiff does not allege otherwise.[1]  Counts I and IV should be dismissed

because they fail to satisfy the pleading requirements of Rule 9(b), and thus fail to

state a claim upon which relief can be granted under Rule 12(b)(6).  Finally,

Count V requires dismissal because (1) it is untimely; (2) it fails to state a claim

upon which relief can be granted under Rules 12(b)(6) and 9(b); and (3) it exceeds

plaintiff's authority because it seeks to circumvent the statutory penalty regime and

constitutes an excessive fine in violation of the Eighth Amendment.[2]

### A.  Background

Plaintiff seeks to enjoin defendants from encouraging the use of partnerships

in connection with the charitable contribution of conservation easements to

qualified land preservation organizations.  The Complaint rests on a statement of

the law that is inaccurate, as discussed in detail below.  In addition, the Complaint

attempts to paint a picture of conservation easements that significantly diminishes

their value and importance.  Conservation easements, in fact, protect America's

irreplaceable land resources by permanently limiting the future development of

---

[1] Unless otherwise indicated, references to "sections" are to sections of the Internal Revenue Code of 1986, as amended, 26 U.S.C. § 1, *et seq.* (the "Code" or "IRC").

[2] Count III, which contains the only substantive allegations regarding section 7407, pertains solely to Clark.  Compl. ¶¶ 201–210.  Although other language in the Complaint suggests that section 7407 applies to all defendants (*see*, *e.g.*, Compl. ¶ 6), no substantive allegations concern section 7407 and Ms. Zak.  Therefore, Ms. Zak will not address Count III further, as she is not named as a defendant in it, and it cannot apply to her as a matter of law.

property.  As this Court has stated, "[a] conservation easement is a permanent

agreement between a property owner and a land trust, non-profit, or government

entity through which the owner gives up some of her rights of ownership in order

*to advance conservation purposes*." *Greenberger v. IRS*, 283 F. Supp. 3d 1354,

1358 (N.D. Ga. 2017) (emphasis added).

Section 170(h) permits a tax deduction for the charitable contribution of a

conservation easement.  IRC § 170(h).  Specifically, a qualifying conservation

easement "allows the property owner to claim a federal tax deduction for up to 50

percent of the owner's adjusted gross income (and 100 percent if she is a rancher

or farmer)." *Greenberger*, 283 F. Supp. 3d at 1358.  Congress enacted section

170(h) in 1980, and amended the conservation easement statutory scheme as

recently as 2015.  *See* Pub. L. No. 114-113, Title I, § 111(a), 129 Stat. 3046 (2015)

(making permanent the 50 percent income limitation (up from 30 percent)).

The federal income tax deduction for the charitable contribution of

conservation easements has "enjoyed decades of bipartisan support."  *BC Ranch II,*

*L.P. v. Comm'r*, 867 F.3d 547, 551 (5th Cir. 2017).  Section 170(h) was adopted:

> (1) at the behest of conservation activists, not property-owning,
> potential-donor taxpayers (2) by an overwhelming majority of
> Congress (3) in the hope of adding untold thousands of acres of
> primarily rural property for various conservation purposes—acreage
> that would never become available for conservation if land-owning
> potential donors were limited to the traditional method of conveyance,
> *i.e.*, transferring the full fee simple title of such properties.

*BC Ranch II*, 867 F.3d at 553.  Congress thus made and codified a public policy decision in favor of conserving lands and preserving natural resources, and did so despite the loss of significant tax revenue.

Through the use of conservation easements, individuals, families, and partnerships have permanently conserved more than 27 million acres of land in the United States.  *See* National Conservation Easement Database, *at* https://www.conservationeasement.us/.  Conserved lands serve to protect identifiable conservation purposes, such as the preservation of existing natural habitats, open spaces, and scenic views.  *See* IRC § 170(h)(4)(A). Conserved lands also "provide economic benefits to local communities in the form of natural goods and services, opportunities for tourism and outdoor recreation, support for working farms and forests, increased quality of life that attracts business and employees, avoided costs on expensive infrastructure, and places to improve health through exercise."  *See* The Trust for Public Land, Aug. 2016 at 3, *at* https://www.tpl.org/sites/default/files/VA%20ROI_report.pdf.

The Complaint largely casts the statutory tax benefits from conservation easements in pejorative terms, contrary to the bipartisan sentiments of Congress. This is consistent with the broader war waged by the IRS against conservation easements, in which it has challenged the entirety of such charitable deductions

based on minor violations of highly technical provisions, and has asserted narrow interpretations of the statute and regulations.  *See, e.g.*, *Top 6 IRS Attacks on Conserv. Easements*, G. Rhodes, Law360 (July 5, 2018).

Plaintiff also seeks to sensationalize the unremarkable fact that the preservation of valuable lands though conservation easements correspondingly produces substantial tax benefits.  *See, e.g.*, Compl. ¶ 5.  If conservation easements did not produce such tax benefits, then much if not all of those "untold thousands of acres" would "never become available for conservation." *BC Ranch II*, 867 F.3d at 553-54.  The amount of any tax benefits is always dictated by the value of the land, based on its unique attributes, and that amount is the same whether the charitable deductions ultimately are enjoyed by individuals, families, or partners.

The Complaint cites no statute, regulation or case that says the use of conservation partnerships in connection with the charitable contribution of a conservation easement is improper.  Furthermore, it does not disclose that in multiple published decisions, courts have recognized deductions claimed by conservation partnerships, a fact that is key to understanding why the allegations in the Complaint do not withstand scrutiny, as a matter of law.  In effect, the basis for plaintiff's claims appears to be that defendants did things that the IRS does not like, not that they did anything inconsistent with the established legal standards.

**B.  Count II and the Allegations Concerning Section 6695A Must Be Dismissed Because Ms. Zak Does Not Prepare Appraisals.**

The Complaint seeks to enjoin Ms. Zak under section 7402 for supposedly engaging in conduct under section 6695A.  *See* Compl. ¶¶ 189-200.  However, section 6695A applies only to a person who "*prepares* an appraisal of the value of property . . . ."  *See* I.R.C. § 6695A.  That provision is unambiguous in limiting its application, and the plain language of the statute controls in all cases of statutory interpretation.  *See generally*, *Cypress v. U.S.*, 646 Fed. Appx. 748, 752 (11th Cir. 2016) ("We begin any statutory interpretation analysis with the statute's text.").

Plaintiff's 80-page complaint never avers facts stating that Ms. Zak has ever prepared an appraisal.  Because the complaint fails to allege that Ms. Zak prepares appraisals—and because the plain language of the statute applies only to those persons who actually *prepare* appraisals—the allegations regarding section 6695A and Ms. Zak must be dismissed.  *See* I.R.C. § 6695A; Fed. R. Civ. P. 12(b)(6).

Although the statute applies only to those persons who prepare appraisals, the Complaint attempts to insert the word "assists" into the statute.  It states that Ms. Zak "*assisted in appraising* the conservation easements," and that "[a]mong other things, Zak *assisted in* making the highest and best use determinations . . . ."  Compl. ¶ 193.  But the statute contains no language that would make it applicable to a person who "assisted in appraising."  *See* I.R.C. § 6695A.  The IRS may not expand the scope of statutory language and cannot unilaterally insert words that are

not in the statute.  Indeed, even a court "cannot simply add phrases or words that do not appear in the statute." *Energy East v U.S.*, 645 F.3d 1358, 1362 (Fed. Cir. 2011).  Doing so would constitute impermissible "phantom legislative action."  *Id*.

A review of the surrounding code sections reaffirms that section 6695A does not apply to persons who provide assistance.  While section 6695A contains no language concerning persons who "assist" in preparing appraisals, section 6700 *does* include language that applies to persons who provide assistance in another context.  That statute expressly pertains to any person who "organizes  . . . or *assists* in the organization of" certain plans or arrangements.  *See* IRC § 6700. Thus, Congress knows full well how to regulate conduct that involves *assistance* when it means to do so.  The fact that section 6695A does not contain such a provision, when a nearby Code section does, is a strong indication that plaintiff's addendum is not what Congress meant.  A widely followed canon of statutory construction, known as *expressio unius*, observes, "[i]t is well settled that 'where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'"  *Duncan v. Walker*, 533 U.S. 167, 173 (2001); *Keene Corp. v. U.S.*, 508 U.S. 200, 207-08 (1993).  In other words, where a statute provides a rule in one section, and excludes a similar rule from another, it is presumed the latter exclusion was

deliberate and must be given meaning.

Plaintiff also provides no policy rationale for trying to create an extra-statutory test.  Even if it had, however, such rationale would not justify its effort to change the statute by fiat.  The Eleventh Circuit recently rejected an attempt to rewrite statutory text by invoking purported legislative purpose.  *See CRI-Leslie LLC v Comm'r*, 882 F.3d 1026 (11th Cir. 2018).  In *CRI-Leslie*, the taxpayer sought capital gains treatment related to a cancelled property sale, although the statute required that the resulting gain be taxed as ordinary income.  The taxpayer argued that "to fulfill the legislative purpose underlying the statute, 'capital asset' as used in § 1234A must be read as including § 1231 property," which, if accepted by the Court, would have resulted in capital gains treatment.  *Id*. at 1032.  The Court held that the problem with the taxpayer's view, "is that the Code's plain language flatly forecloses it."  *Id*.  The Eleventh Circuit explained that:

> In a contest such as we have here, between clear statutory text and (even compelling) evidence of sub- or extra-textual 'intent,' the former must prevail.  That is so for myriad well-established reasons that we needn't belabor but that, in view of the parties' contending arguments, we recap briefly.  *As a formal matter, it is of course only the statutory text* (as relevant here, I.R.C. §§ 1221 and 1234A) *that is "law" in the constitutional sense*—that's all that was enacted through the bicameral legislative process and presented to the President for his signature. And as a practical matter, conscientious adherence to the statutory text best ensures that citizens have fair notice of the rules that govern their conduct, incentivizes Congress to write clear laws, and keeps courts within their proper lane.

*Id*. at 1033 (citations omitted) (emphasis added).  The Eleventh Circuit also addressed and rejected the possibility that "Congress really did mean" for Section 1234A to reach beyond capital assets to include Section 1231 property, and that perhaps "Congress just stubbed its toe between the hearing room and the House and Senate floors."  *Id*.  Even in that event, however, the Court held, "it's not our place or prerogative to bandage the resulting wound.  If Congress thinks that we've misapprehended its true intent—or, more accurately, that the language that it enacted in I.R.C. §§ 1221 and 1234A inaccurately reflects its true intent—then it can and should say so by amending the Code."  *Id*. (citations omitted).

Just last year, the Supreme Court in a tax case reaffirmed this basic notion of statutory construction.  *See Wisc. Central Ltd. v. U.S.*, 138 S. Ct. 2067, 2073 (2018) ("It is not our function 'to rewrite a constitutionally valid statutory text under the banner of speculation about what Congress might have' intended."); *see also Hall v. U.S.*, 132 S.Ct. 1882, 1893 (2012) ("Given the statute's plain language, context, and structure, it is not for us to rewrite the statute . . . .").

Because the Code's plain language forecloses the IRS from modifying the statute, Count II must be dismissed as to Ms. Zak under Rule 12(b)(6) because the Complaint fails to allege that she has engaged in conduct actually prohibited by section 6695A.

## C.  Counts I and IV Should be Dismissed Pursuant to Rules 12(b)(6) and 9(b) for the Failure to Allege Precise Misconduct.

Under Rule 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  To survive a motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  This requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Thus, a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  Rather, the plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Id.*

Separately, Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  The standard of review under Rule 9(b) is even more stringent than under Rule 12(b)(6).  Accordingly, to satisfy the particularity requirement, the complaint must set forth, "(1) *precisely* what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) [the] same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants

obtained as a consequence of the fraud." *Mizzaro v. Home Depot, Inc*., 544 F.3d 1230, 1237 (11th Cir. 2008) (citations omitted) (emphasis added).  In other words, much like a good newspaper column, a complaint must allege "the who, what, when, where, and how" of the alleged fraudulent conduct.  *Id*.  Absent pleading of each of those crucial elements with specificity and detail, a complaint that alleges fraudulent conduct must be dismissed.

Rule 9(b)'s particularity rule is no mere triviality and "serves an important purpose in fraud actions." *U.S. ex rel. Clausen v. Lab. Corp. of Am*., 290 F.3d 1301, 1310 (11th Cir. 2002).  The particularity requirement "alert[s] defendants to the *precise misconduct* with which they are charged." *Id*. (emphasis added).  It also "ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of . . . ." *Wagner v. First Horizon Pharm. Corp*., 464 F.3d 1273, 1277 (11th Cir. 2006) (quotations omitted).

Furthermore, "[t]he particularity requirement of Rule 9(b) applies to all claims that *sound in fraud*, regardless of whether those claims are grounded in state or federal law." *Llado-Carreno v. Guidant Corp*., 2011 WL 705403, at *5 (S.D. Fla. 2011) (emphasis added); *see, e.g.*, *Thompson v. Relation Serve Media, Inc*., 610 F.3d 628, 633 (11th Cir. 2010) ("Because Rule 10b–5 *sounds in fraud*, the plaintiff must plead the elements of its violation with particularity.") (emphasis added).  Therefore, courts have held that Rule 9(b) applies in cases like this one

and to counts like Counts I and IV, where the plaintiff has alleged violations of section 6700.  *See*, *e.g.*, *U.S. v. Hempfling*, 2005 WL 2334713, at *4-5 (E.D. Cal. 2005) (holding section 6700 sounds in fraud); *cf. Carlson v. U.S.*, 754 F.3d 1223, 1226-27 (11th Cir. 2014) (holding section 6701—which plaintiff in this case references but fails to plead as a separate count—"requires the government to prove fraud," and that it must do so "by clear and convincing evidence.").

Finally, where multiple defendants are accused of fraudulent conduct, the plaintiff must identify the role of each defendant in the alleged scheme.  *See Brooks v. Blue Cross & Blue Shield*, 116 F.3d 1364, 1381 (11th Cir. 1997) ("in a case involving multiple defendants . . . the complaint should inform each defendant of the nature of his alleged participation in the fraud.") (citations omitted).

### 1. Counts I and IV should be dismissed because they fail to satisfy Rule 9(b)'s particularity requirement.

Plaintiff alleges that defendants collectively participated in 96 conservation partnership transactions.  Compl. ¶ 5.  Plaintiff further alleges that those transactions resulted in over $2 billion of federal tax deductions.  *Id*.  The Complaint states that each defendant is responsible for at least $1.5 billion of those tax deductions, except for Ms. Zak, whom it says accounts for approximately 1/4 of that amount.  Compl. ¶ 5.  Of the 96 total transactions, plaintiff avers that Ms. Zak participated in 42 of them.  Compl. ¶¶ 5, 18.  The Complaint fails, however, to distinguish between the transactions that Ms. Zak allegedly engaged in and the 54

that she did not.  In addition, it fails even to identify when 40 of the 42 transactions occurred.  With respect to the two transactions for which plaintiff alleges a date, the most recent occurred seven years ago, and the other a decade ago.  Compl. ¶¶ 74, 89.  Another 12 transactions purportedly occurred eight to ten years ago. Compl. ¶ 64.  When during that three-year range is anyone's guess.  No other dates are provided for the remaining 28 transactions.

The Complaint claims that false statements were made.  Compl. ¶¶ 130–138, 140–141, 182.  But it lumps all defendants together, so one cannot tell who the alleged speaker was at any point in time, or to whom the statements were provided, or to which transaction they purportedly related.  That alone fails to satisfy Rule 9(b).  *See Brooks*, 116 F.3d at 1381.[3]

The Complaint also rests on a series of unsupported legal conclusions that are inconsistent with the applicable case law.  Plaintiff uses those unsupported legal conclusions to say defendants made false statements because the alleged, unspecified statements are supposedly inconsistent with plaintiff's incorrect statement of the law.  *See*, *e.g.*, Compl. ¶ 132 (alleging conservation partnerships "exist solely as a conduit for selling tax deductions," that conservation partnerships "are shams," and that conservation partnerships "lack economic substance.").  As

---

[3] The complaint also cites Forever Forest's website and undated statements (¶¶ 117 – 122), but fails to identify what is false about any of the statements, or the "manner in which they misled" the reader.  *Mizzaro*, 544 F.3d at 1237.

an initial matter, unsupported legal conclusions masquerading as factual allegations are insufficient for purposes of Rules 12(b)(6) or 9(b). *See Iqbal*, 556 U.S. at 678-79) (courts "are not bound to accept as true a legal conclusion couched as a factual allegation."); *Suarez v. Sch. Bd.*, 2014 WL 1946536, at *1 (M.D. Fla. 2014) (a "court will not presume the truth of a complaint's legal conclusions."). Even if unsupported legal conclusions could be considered, plaintiff's assertions about conservation partnerships are inconsistent with the actual law, as explained below, and therefore cannot supply the basis necessary to say defendants made false statements.

Just as importantly, the alleged false statements are untethered in time or place. For instance, the Complaint alleges at ¶ 135 that all of the defendants "knew, or had reason to know that: (1) the syndicates they organized, promoted, sold, and/or opined on had no business purpose other than tax avoidance; (2) the customers did not join together for the purpose of carrying on a business and sharing in the profits or losses or both of that business; and, (3) the syndicates lack economic substance and are shams." To which of the 96 transactions does this apply? The Complaint does not say, even though plaintiff presumably could not have brought this action unless it possessed the information, and one is required by the Federal Rules to provide that level of specificity.

Even if one could tell which transactions the statements concern, one still has no idea when the vast majority of the statements occurred.  Were most of them made a decade ago?  Again, the Complaint does not say.  Consequently, no specificity is provided as to the speaker, the time or the place of the statements or with respect to which transactions such statements relate, making it impossible to formulate a defense to them, in violation of Rule 9(b).

Furthermore, by lumping everything together and offering no details, the Complaint fails to identify the distinctions between the statements made in connection with the 42 transactions that Zak allegedly participated in and the 54 in which she did not.  We know some differences exist, because the Complaint proclaims that the transactions "evolved" over time.  Compl. ¶ 62 ("Defendants' scheme has evolved over the years and been executed in different iterations and permutations. . . .").  Which "iterations," or "permutations" involved Ms. Zak, how were they different, and when did they occur?  The Complaint does not say, yet such information is crucial to an elementary understanding of plaintiff's allegations of fraud.  *See Mizzaro*, 544 F.3d at 1237.  The purpose of the particularity requirement is to "alert defendants to the *precise misconduct* with which they are charged," and ensure that they have "sufficient information to formulate a defense by putting [them] on notice of the conduct complained of."  *U.S. ex rel. Clausen*, 290 F.3d at 1310; *Wagner*, 464 F.3d at 1277.  That fundamental information is

missing, and a complaint which merely says that some statements were made at some point in connection with some transactions that some defendants should have known were inaccurate does not meet the requirements of Rule 9(b).

As another example, the Complaint at ¶ 136 alleges that the manager had the ability to dispose of the land "without the approval of the partners" after a period of years after the conservation easement was granted.  Is that true of all 96 transactions, or does it apply only to the 54 transactions in which Ms. Zak had no involvement?  Does it apply only to recent transactions, such as the 2015 transaction described in the Complaint and in which Ms. Zak had no alleged involvement?  *See* Compl. ¶¶ 95 – 111.[4]  Once again, the Complaint does not say. Plaintiff therefore fails to aver that precise and sufficient information that would enable Ms. Zak to "formulate a defense."  *Wagner*, 464 F.3d at 1277.

A defendant cannot be required to engage in discovery just to learn the when, what and where of the allegations against her.  Rule 9(b) demands more. Fed. R. Civ. P. 9(b).  So too does the law of Eleventh Circuit, and the principles of basic fairness that underlie Rule 9(b).  *See*, *e.g.*, *Mizzaro*, 544 F.3d at 1237; *U.S. ex rel. Clausen*, 290 F.3d at 1310; *Wagner*, 464 F.3d at 1277.

---

[4] Even if the 2015 transaction had the requisite specificity, it would not impact Ms. Zak's motion to dismiss because the Complaint fails to allege that Ms. Zak had any involvement with it.

Plaintiff cannot respond by alleging it does not have the necessary details and thus must plead vaguely to start an action to learn the details of the allegedly fraudulent conduct. A corollary to Rule 9(b) is that a complaint cannot be used as a pretext for discovery of unknown wrongs. *Hempfling*, 2005 WL 2334713, at *4 ("Rule 9(b) serves to deter the filing of complaints as a pretext for the discovery of unknown wrongs, to protect [defendants] from the harm that comes from being subject to fraud charges, and to prohibit plaintiffs from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis.") (citations omitted). Therefore, even in a case involving an obvious tax shelter, as opposed to a Congressionally-favored conservation activity, and premised on the same injunction statutes plaintiff has invoked here, the district court in *Hempfling* granted defendant's motion to dismiss the section "6700 claim for failure to comply with Rule 9(b)." *Hempfling*, 2005 WL 2334713, at *6.

Likewise, in *Eastwood*, a tax case that involved just *one transaction* that sounded in civil fraud, the district court dismissed the government's counterclaim because it failed "to allege the time, place, and amount of the conveyance or the injury" suffered by the government. *Eastwood v. U.S.*, 2007 WL 2815560, at *4 (E.D. Tenn. 2007) (ruling that "[w]ithout any specific information regarding the [allegedly fraudulent] transfer, Mr. and Ms. Eastwood cannot adequately defend against Defendants' allegations.").

Similarly here, the allegations under Counts I and IV are materially deficient for purposes of Rule 9(b).  Specifically, with respect to Ms. Zak and the 42 transactions that it alleges she was involved with, the Complaint fails to plead "precisely what [false] statements were made in what documents or oral representations or what omissions were made." *Mizzaro*, 544 F.3d at 1237.  The Complaint fails to allege "the time and place of each such statement and the person responsible for making same." *Id*.  And it fails to plead "the content of such statements and *the manner in which they misled* the listener." *Id*. (emphasis added).  This failure means that Ms. Zak has not been alerted to the "precise misconduct" at issue.  *See U.S. ex rel. Clausen*, 290 F.3d at 1310; *Wagner*, 464 F.3d at 1277.  That information is required under Rule 9(b).

## 2. The need to dismiss Counts I and IV is underscored by the fact that courts have recognized deductions by conservation partnerships.

The Complaint's shortcomings, and the necessity for additional, basic information concerning Counts I and IV, are even more apparent when one considers the current state of the law with respect to conservation partnerships.  The complaint alleges that each conservation easement transaction "hinges upon the use of an entity taxed as a partnership under subchapter K of the Internal Revenue Code."  Compl. ¶ 57.  The Complaint thus rests on the premises that conservation partnerships are improper, and that anyone who allegedly facilitates

them must be stopped.  But the Complaint cites no statute, regulation, or case stating that partnerships may not be used in connection with the charitable contribution of conservation easements.

Instead, without citation to any authority, the Complaint simply declares *ipse dixit* that conservation partnerships "exist solely as a conduit for selling tax deductions," that conservation partnerships "are shams," and that conservation partnerships "lack economic substance."  Compl. ¶ 132.  As discussed above, courts may ignore such unsupported legal conclusions couched as factual allegations.  *See*, *e.g.*, *Iqbal*, 556 U.S. at 678-79.  Moreover, plaintiff's assertions about conservation partnerships are inconsistent with the current law.

The Complaint ignores that in multiple published decisions, courts have recognized deductions claimed by conservation partnerships.  In *Kiva Dunes Conservation*, *LLC*, for example, a partnership placed a conservation easement on a golf course in 2002, and shortly thereafter donated the easement to a land trust. *See Kiva Dunes Conserv., LLC v. Comm'r*, T.C.M. Memo. 2009-145.  The partners claimed a valuation of $30.5 million for the conservation easement and took a charitable contribution deduction for the donation.  The IRS challenged the deduction on multiple grounds and imposed accuracy-related penalties.  *Id*. Following a trial on the merits, the U.S. Tax Court found that the fair market value of the easement was $28.6 million, effectively affirming 94% of the original

valuation—which notably was prepared by defendant Clark. *Id*. As a result of the decision, each partner was entitled to his or her distributive share of the charitable deduction for the conservation easement.

*Bosque Canyon Ranch II* involved two partnerships, BCR I and BCR II, which acquired thousands of acres of land in 2003 and 2005 respectively. *BC Ranch II v. Comm'r*, 867 F.3d 547, 549 (5th Cir. 2017). BCR I marketed limited partnership interests to investors beginning in early 2005. The partnership eventually admitted 24 limited partners, and in late-2005 donated a conservation easement with respect to most of the acreage it held. *Id*. at 550. BCR II marketed limited partnership interests to additional investors, eventually admitting 23 limited partners, shortly after which it donated a conservation easement on most of its land in mid-2007. *Id*. The IRS disallowed all of the charitable deductions for the conservation easement contributions with respect to both partnerships and imposed gross valuation misstatement penalties. Following trial, the Tax Court denied the deductions because it concluded that (1) certain reserved rights caused the conservation easement donations to fail the perpetuity requirement, (2) the required "baseline documentation" failed to satisfy the regulatory requirements, and (3) the transactions with the partners involved disguised sales. *Id*. at 551, 555. The Tax Court also imposed gross valuation overstatement penalties. The Fifth Circuit vacated all four holdings, held that the conservation easements satisfied both the

perpetuity and baseline documentation requirements, and remanded the case to the Tax Court for further fact finding consistent with its rulings. *Id*. at 556-60.

Similarly, *Pine Mountain Preserve LLLP* involved a partnership that acquired land and placed three conservation easements on much of that land within a two-year period. *See Pine Mountain Pres. LLLP v. Comm'r*, 151 T.C. No. 14 (2018). Investors bought 300 limited partnership units in the partnership during that two-year period. *Id*. at *2-3. The IRS broadly challenged all three conservation easements. The Tax Court denied two of the conservation easement donations on technical grounds, demonstrating the immense complexity of the conservation easement requirements. *Id*. at 16, 18. The partnership then prevailed on the merits with respect to the third conservation easement, overcoming myriad attacks leveled by the IRS. *Id*. at 20. A separate Tax Court opinion in *Pine Mountain* upheld the valuation of the third conservation easement, which allowed the numerous partners to claim their distributive shares of the full charitable deduction for that conservation easement. *Pine Mountain*, T.C. Memo 2018-214.

*Kiva Dunes*, *BC Ranch II*, and *Pine Mountain* all refute the notion that taxpayers can never use partnerships with multiple investors in connection with conservation easement transactions. They also necessarily undermine the allegations of scienter. The Complaint points to no contrary published cases (nor any statutes or regulations) concerning the validity of conservation partnerships.

Because the Complaint fails to cite a statute, regulation or case that constitutes binding law on this court, this action appears to be an effort by plaintiff to bend the law beyond its current contours, to fit within the IRS's view of what it wishes the law were, not what it is. Put differently, the Complaint is premised on the flawed assertion that Ms. Zak should have known that certain, unspecified statements she allegedly made about the law were incorrect, notwithstanding that such statements are consistent with the applicable judicial authorities.

The closest thing to "authority" the Complaint cites for its claim that partnerships may not be used in connection with conservation easements is IRS Notice 2017-10. *See* Compl. ¶ 171. But "IRS notices do not have the force and effect of law." *U.S. v. Busch*, 2017 WL 6987666, at *4 (N.D. Tex. 2017). Rather, IRS Notices are merely announcements or positions of the IRS, are not authoritative, and are not binding on courts. *Id*.; *Guilzon v. Comm'r*, 985 F.2d 819, 822 (5th Cir. 1993).[5] Notices are not subject to any of the legal protections of notice-and-comment rulemaking. Moreover, contrary to Notice 2017-10, the IRS previously allowed the use of a conservation partnership that had newly admitted

---

[5] *See also* Treas. Policy Statement (Mar. 5, 2019) (Subregulatory guidance, such as Notices, are "not intended to affect taxpayer rights or obligations independent from underlying statutes or regulations. Unlike statutes and regulations, subregulatory guidance does not have the force and effect of law."); Treas. Reg. § 1.6011-4 (even if a transaction is reportable due to an IRS Notice, it "shall not affect the legal determination of whether the taxpayer's treatment of the transaction is proper.").

partners.  *See* PLR 200208019 (Feb. 22, 2002) (permitting new members of a partnership that had acquired a farm property to "take into account, as part of the charitable contributions paid by each member, each member's distributive share of the grant by Taxpayer of the conservation easement").[6]

The Complaint also avers that Notice 2017-10 created certain reporting obligations for Ms. Zak starting in December 2016.  Compl. ¶ 172.  The Complaint then alleges that Ms. Zak is *in compliance* with those reporting obligations. Compl. ¶ 173.  Allegations of compliance with the law obviously undercut, rather than support, satisfaction of the Rule 9(b) standard.

Likewise, the Complaint alleges that defendants obtained legal opinions in connection with two of the transactions described in the Complaint and in which it asserts Ms. Zak had some involvement.  The Complaint avers that in the 2009 transaction, a tax opinion advised that "it was 'more likely than not' that Partnership Z would be treated as a partnership for federal tax purposes and that people purchasing units of Partnership Z would thus be entitled to their share of its income, loss, deductions and credits."  Compl. ¶ 73.  Thus, plaintiff asserts a legal opinion advised defendants in 2009 that conservation partnerships were *lawful*. Just as the Complaint is silent as to how Ms. Zak should have "known" that the

---

[6] PLRs, just like IRS Notices, are not precedent, but by regulation they may be cited as "substantial authority" in defense of certain penalties.  *See* Treas. Reg. § 1.6662-4(d)(3)(iii).

23

decided cases were wrong, it offers no explanation of how she could have been aware that the law was supposedly inconsistent with unidentified statements she made, when plaintiff acknowledges that tax lawyers advised her to the contrary.

The Complaint also avows that for a 2012 transaction, a tax opinion advised defendants "that it was 'more likely than not' that Partnership Y would be treated as a partnership for federal tax purposes, and that the customers who purchased ownership interests of Partnership Y would be entitled to a portion of the charitable contribution deduction arising from the conservation easement relative to their ownership interest in Partnership Y."  Compl. ¶ 81.  Although the Complaint claims the advice was based on facts and documents that were incorrect, it does not identify the purportedly incorrect information and why it was supposedly wrong. *Id*.[7]  Such specificity is required under Rule 9(b).

Standing alone, the assertion that defendants obtained legal opinions in connection with these two "example" transactions and that those legal opinions

---

[7] Further, plaintiff offers no basis to support its claim that Clark's valuations are wrong.  More importantly, the complaint fails to provide specificity indicating why Ms. Zak should have known that Clark's valuations were supposedly incorrect.  No published decision has called into question Clark's appraisals—and the Tax Court repudiated the IRS's claims challenging Clark's appraisal in *Kiva Dunes*.  *See, e.g.*, *Kiva Dunes*, T.C.M. Memo. 2009-145 ("We conclude that Mr. Clark's testimony is credible and his assumptions are reasonable"); *see also Conservation Easements, Valuation, & Substantiation*, J. of Real Est. Tax., 2d Qtr. 2010 (discussing Clark's role in *Kiva Dunes* and calling him "the star of this case," and "a kind of Michael Jackson of the appraisal world.").

advised defendants that conservation partnerships are *lawful*, would appear to undermine plaintiff's claim that Ms. Zak subjectively knew or had reason to know that taxpayers cannot avail themselves of conservation partnerships. But the legal opinions do not stand alone. As discussed above, multiple cases have recognized deductions claimed by conservation partnerships. And the Complaint points to no contrary statute, regulation or case. If partnerships may make charitable contributions of conservation easements, and the partners may use the related deductions, then, objectively, statements to that effect are not false.

At a minimum, all of this further emphasizes the need to dismiss Counts I and IV under Rule 9(b) because of the Complaint's failure to apprise Ms. Zak of important basic information concerning precisely what false statements she supposedly made, in what documents or oral representations they were made, the time and place of each such statement, the content of such statements, and the manner in which they were misleading—especially given the current state of the law, which has recognized deductions claimed by conservation partnerships. *See Mizzaro*, 544 F.3d at 1237; Fed. R. Civ. P. 9(b). Under these circumstances, the failure to dismiss would be grossly unfair, would run counter to Rule 9(b)'s "important purpose" of alerting Ms. Zak to the "precise misconduct" alleged, and would contravene Rule 9(b)'s requirement that she be provided with "sufficient information to formulate a defense." *U.S. ex rel. Clausen*, 290 F.3d at 1310.

### D.  Count V Requires Dismissal Because Disgorgement is Unavailable.

#### 1.  The five year statute of limitations under 28 U.S.C. § 2462 applies to claims for disgorgement in tax cases.

Section 2462 of Title 28 imposes a general five-year period of limitation with respect to any federal "action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise."  28 U.S.C. § 2462.  This provision applies to the disgorgement remedy sought in Count V.

Recently, a unanimous Supreme Court ruled in *Kokesh* that the five-year statute of limitations under section 2462 applies to claims for disgorgement imposed as a sanction for violating the federal securities laws.  *Kokesh v. SEC*, 137 S.Ct. 1635, 1639 (2017).  The Court had to determine whether disgorgement fit within the definition of a penalty.  It answered affirmatively, holding "[d]isgorgement in the securities-enforcement context is a 'penalty' within the meaning of 28 U.S.C. § 2462, and so disgorgement actions must be commenced within five years of the date the claim accrues."  *Id*.  The Court explained that disgorgement in SEC cases constitutes a penalty because: (1) it seeks to deter infractions of "public laws," (2) it is imposed for "punitive purposes," and (3) the recovered funds ordinarily are returned to the Treasury and often are not compensatory.  *Id.* at 1643-44.

The important purposes served by statutes of limitation provided the foundation for the Court's ruling: "Statutes of limitations set a fixed date when

exposure to the specified Government enforcement efforts end.  Such limits are *vital to the welfare of society* and rest on the principle that even wrongdoers are entitled to assume that their sins may be forgotten."  *Kokesh*, 137 S.Ct. at 1641-42 (internal punctuation and citations omitted) (emphasis added).

The vital purposes served by statutes of limitation apply equally to tax cases. Moreover, disgorgement in tax cases, like in SEC matters, seeks to deter infractions of public laws, is imposed for punitive purposes, and the recovered funds are returned to the Treasury and are not compensatory.  Indeed, plaintiff alleges that disgorgement is necessary here because defendants violated the federal tax laws, and in so doing supposedly received "ill-gotten gains," which should be "disgorge[d] to the United States . . . ."  Compl. ¶¶ 225-27.  Accordingly, under the reasoning of *Kokesh*, the disgorgement sought by plaintiff in this case constitutes a penalty for purposes of 28 U.S.C. § 2462.  Therefore the five year statute of limitations under 28 U.S.C. § 2462 applies to plaintiff's claims for disgorgement.

Because the five year statute of limitations under 28 U.S.C. § 2462 applies to plaintiff's claims for disgorgement, Count V must be dismissed, with prejudice, as to all allegations that are based on purported conduct that occurred more than five years ago.  Compl. ¶ 223 – 227.  That would include, for instance, the allegations regarding the two transactions specifically identified as having occurred in 2009 and 2012, as well as the 12 transactions that took place sometime between

2009 and 2011.  No other dates were provided for the remaining 28 transactions, and therefore those allegations also should be dismissed.

### 2. Count V also requires dismissal because it fails to satisfy Rule 9(b)'s particularity requirement.

The Complaint further fails to allege with specificity conduct by Ms. Zak that could serve as the basis for disgorgement, and thus Count V also should be dismissed pursuant to Rule 12(b)(6), based on the failure to satisfy the pleading requirements of Rule 9(b).  Plaintiff's claim for disgorgement under Count V incorporates by reference the vaguely alleged facts that comprise Counts I and IV, which, as discussed above, sound in fraud.  Compl. ¶¶ 223.  The few paragraphs that actually set forth plaintiff's disgorgement claim reveal little additional information, except that defendants supposedly received "ill-gotten gains," that "hinged upon the improper and overvalued tax deductions," and which should be "disgorge[d] to the United States . . . ."  Compl. ¶¶ 225-27.  Accordingly, to the extent plaintiff's meager allegations assert a claim for disgorgement, the claim sounds in fraud and must satisfy the pleading requirements for Rule 9(b).

Even after considering the facts incorporated by reference, Count V fails to apprise Ms. Zak of important elementary information concerning the supposed "ill-gotten gains," including "the who, what, when, where, and how" of the alleged conduct.  *See Mizzaro*, 544 F.3d at 1237.  Plaintiff's claim for disgorgement—like Counts I and IV—thus fails to allege precisely what fraudulent conduct occurred,

the time and place it occurred, and the manner in which it was misleading.  *See id.*
This failure means that Ms. Zak has not been alerted to the "precise misconduct"
with which she is charged, and Count V should be dismissed pursuant to Rule 9(b).
*See U.S. Ex. rel. Clausen*, 290 F.3d at 1310; *Wagner*, 464 F.3d at 1277.

### 3. Plaintiff's disgorgement allegations exceed plaintiff's authority because they seek to circumvent the statutory penalty regime and constitute an excessive fine in violation of the Eighth Amendment.

Count V also requires dismissal because allowing disgorgement here would
circumvent Congress' carefully constructed penalty regime.  Although the
Complaint ostensibly asserts section 7402 as authority to obtain disgorgement,
virtually all, if not all, of the conduct in the Complaint that arguably could permit
disgorgement relates to supposed violations of section 6700, as set forth in Count I.

As originally drafted, section 6700 imposed a penalty "equal to the greater
of $1,000 or 20 percent of the gross income derived or to be derived by such
person from such activity."  IRC § 6700 (original flush lang.)  Thus the original
penalty set a $1,000 floor, but had no ceiling.  In 1989, Congress revised the
operation and amount of the section 6700 penalty.  The new penalty was "equal to
$1,000 or, if the person establishes that it is *lesser*, 100 percent of the gross income
derived (or to be derived) by such person from such activity."  IRC § 6700 (flush
lang., 1st sent.) (emphasis added); Pub. L. No. 101-239, § 7734(a), 103 Stat. 2403
(1989).  Thus the new penalty set a $1,000 ceiling, but no floor.  Congress revised

the section 6700 penalty regime once again in 2004. *See* Pub. L. No. 108-357, § 818(a), 118 Stat. 1584 (2004). The 2004 amendment left in place the 1989 revision and the $1,000 ceiling for gross valuation overstatements, but increased the penalty for activities that involve a false or fraudulent statement under section 6700(a)(2)(A). In those cases, the amount of the penalty is "equal to 50 percent of the gross income derived (or to be derived) from such activity by the person on which the penalty is imposed." IRC § 6700 (flush lang., 3d sent.). Thus, in the event plaintiff could prove that the alleged misconduct of defendants occurred and involved false statements, the statutory regime would explicitly limit the penalty the IRS could impose to 50% of the gross income defendants derived.

In *Loving v. IRS*, the D.C. Circuit considered the carefully articulated system for regulating tax-return preparers in ruling that the IRS had exceeded its statutory authority by promulgating new regulations governing the conduct of tax return preparers. *Loving v. IRS*, 742 F.3d 1013, 1015 (D.C. Cir. 2014).

The court provided the following rationale as one basis for the decision:

> [A]ccepting the IRS's view of Section 330(a)(1) *would effectively gut Congress's carefully articulated existing system* for regulating tax-return preparers. Over the years, Congress has enacted a number of targeted provisions specific to tax-return preparers, covering precise conduct ranging from a tax-return preparer's failing to sign returns to knowingly understating a taxpayer's liability. Each of those statutory proscriptions comes with corresponding civil penalties. Congress has continued to revise those statutes.

> Under the IRS's view here, however, *all of Congress's statutory amendments would have been unnecessary.*  The IRS, by virtue of its heretofore undiscovered carte blanche grant of authority from Section 330, would already have had free rein to impose an array of penalties on any tax-return preparer who 'is incompetent,' 'is disreputable,' 'violates regulations prescribed under' Section 330, or 'with intent to defraud, willfully and knowingly misleads or threatens the person being represented or a prospective person to be represented.' *And that would have already covered all (or virtually all) of the conduct that Congress later spent so much time specifically targeting in individual statutes* regulating tax-return preparers.

*Id*. at 1020 (emphasis added) (citations omitted).  The D.C. Circuit went on to hold that the IRS "may not unilaterally expand its authority through such an expansive, atextual, and ahistorical reading of Section 330." *Id*. at 1022.  That is because, as the Supreme Court has directed, the "fox-in-the-henhouse syndrome is to be avoided . . . by taking seriously, and applying rigorously, in all cases, statutory limits on agencies' authority."  *Id*. (*citing Arlington v. FCC*, 133 S. Ct. at 1874).

Similar limits on agency authority must be applied in this case.  Here plaintiff relies on section 6700 as the principal basis for an injunction under sections 7402 and 7408.  Even though the conduct the IRS seeks to enjoin is directly related to section 6700, the IRS has not sought to impose the section 6700 statutory penalties, and they curiously comprise no part of the Complaint.

Instead of imposing the lesser penalties set forth in the statute it expressly invokes, plaintiff seeks to enforce an "equitable" penalty, disgorgement.  If allowed to succeed, plaintiff's assertion of disgorgement would effectively impose

a penalty of 100% of the gross income derived by the person from the activity. That is *double* the maximum statutory amount established by Congress in its targeted, thrice amended penalty provision.  *See* IRC § 6700 (and it potentially dwarfs the smaller section 6700 penalty for gross valuation overstatements).  If plaintiff may impose such a penalty here, then "all of Congress's statutory amendments would have been unnecessary."  *Loving*, 742 F.3d at 1020.  That is hardly equitable or just.

Where Congress has enacted "targeted provisions," "covering precise conduct," and an agency expressly invokes one or more of those provisions, as plaintiff has done here, then the Court must take "seriously, and [apply] rigorously, in all cases, statutory limits on [the agency's] authority."  *Loving*, 742 F.3d at 1020, 1022.  That would include compelling the agency to follow the statutory limits set forth in the specific provisions that the agency itself has invoked.  To do otherwise would run roughshod over the statutory scheme, and embolden, rather than avoid, "the fox-in-the-henhouse syndrome." *Id*. at 1022.

Congress's statutory amendments likewise would have been unnecessary under another widely applied canon of statutory interpretation, the presumption against superfluity.  That canon provides that the words of a statute should be interpreted so as to give each word meaning, and that interpretations that render certain provisions superfluous should be avoided.  *See*, *e.g.*, *Clark v. Rameker*, 134

S. Ct. 2242, 2248 (2014) (applying the rule of statutory construction "that 'a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous.'").  Plaintiff's claim for disgorgement would not only double the maximum statutory amount established by Congress through multiple amendments, it would render the entire section 6700 penalty "inoperative or superfluous, void or insignificant," in violation of this basic canon of statutory construction.  *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (citations omitted).

Moreover, the Supreme Court in *Kokesh*, beyond imposing a statute of limitations, alluded to potentially broader concerns with the use of disgorgement as a remedy and appeared to invite challenge to the practice.[8]  The unanimous decision by Justice Sotomayor noted, "Nothing in this opinion should be interpreted as an opinion on whether courts possess authority to order disgorgement in SEC enforcement proceedings or on whether courts have properly

---

[8] We call to the Court's attention the fact that courts in the Eleventh Circuit have allowed disgorgement in a variety of contexts, although many of those decisions preceded the Supreme Court's ruling in *Kokesh*.  While an unpublished Eleventh Circuit decision recently affirmed disgorgement in an injunction suit premised on sections 6701, 7402, and 7408, that case is distinguishable, as neither the circuit court nor the trial court ruled on the arguments raised herein.  *U.S. v. Stinson*, 729 Fed. Appx. 891 (11th Cir. 2018); *U.S. v. Stinson*, 239 F. Supp. 3d 1299 (M.D. Fla. 2017) (noting that "[o]ut of Stinson's two-hundred plus pages of post-trial briefing, he dedicated approximately two pages to the issue of disgorgement").

applied disgorgement principles in this context." *Kokesh*, 137 S.Ct. at 1642 n.3.[9]

Finally, disgorgement in this case would be an excessive fine in violation of the Eighth Amendment. A unanimous Supreme Court in *Timbs v. Indiana*, ruled just weeks ago in a similar case that the Excessive Fines Clause prohibited a civil forfeiture that exceeded the maximum available criminal penalty. *Timbs v. Indiana*, No. 17–1091, slip op. (U.S. Feb. 20, 2019). Justice Ginsberg elaborated that the Constitution's prohibition on excessive fines is "a well-established and fundamental right of citizenship." *Id*. at 10. This fundamental right "traces its venerable lineage back to at least 1215," and "guards against abuses of government's punitive or criminal law-enforcement authority." *Id*. at 4, 2. Here, because disgorgement exceeds the maximum statutory amount established by Congress, it would facilitate an abuse of the government's punitive authority that the Eighth Amendment was specifically designed to guard against, and would thereby constitute a prohibited excessive fine. *Id*.; *cf. U.S. v. Bajakajian*, 524 U.S. 321, 334–337 (1998) (invalidating disproportionate forfeiture as unconstitutional).

---

[9] This comports with the Supreme Court's recent trend of invalidating broad punitive provisions on due process and overbreadth grounds. *See Timbs v. Indiana*, No. 17–1091, slip op. (2019) (discussed *infra*); *Marinello v U.S.*, 138 S. Ct. 1101 (2018) (circumscribing "wide-ranging" criminal tax provision and stressing import of providing "fair warning" to citizens); *Johnson v. U.S.*, 135 S. Ct 2551 (2015) (holding residual clause of criminal statute unconstitutionally vague because it created "grave uncertainty about how to estimate the risk" of a crime).

Accordingly, Count V should be dismissed for the additional reason that it exceeds plaintiff's statutory authority because it seeks to circumvent Congress' penalty regime, renders pointless the section 6700 penalty principally relied on by plaintiff in this action, and violates the Eighth Amendment's prohibition against excessive fines.

**WHEREFORE**, Ms. Zak respectfully requests that the Court dismiss all counts in the Complaint that relate to Ms. Zak for the reasons stated herein.

Dated: March 22, 2019.                    Respectfully submitted,


 _/s/  S. Fenn Little, Jr._
S. FENN LITTLE, JR.                       NATHAN E. CLUKEY
S. FENN LITTLE, JR., PC                   SIDLEY AUSTIN LLP
1490 Mecaslin St., NW                     1501 K Street, N.W.
Atlanta, GA  30309                        Washington, D.C. 20005
(404) 815-3100                            (202) 736-8949
fennlaw@fennlittle.com                    nclukey@Sidley.com
Georgia Bar No. 454360                    (*pro hac vice* application pending)

                                          MATTHEW D. LERNER
                                          SIDLEY AUSTIN LLP
                                          1501 K Street, N.W.
                                          Washington, D.C. 20005
                                          (202) 736-8983
                                          mlerner@Sidley.com
                                          (*pro hac vice* application pending)


*I certify that this document was formatted in Times New Roman 14 pt., in compliance with Local Rule 5.1C.

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that the foregoing document was electronically filed this day with the Clerk of the Court through the CM/ECF system, which will send notice of the electronic filing to all counsel of record, and that I caused a copy of the foregoing docket-stamped documents to be mailed first class mail, postage prepaid to the following:

Matthew Hicks
Caplin Drysdale
One Thomas Circle, N.W.
Washington, D.C. 20005
Attorney for Claud Clark, Ill

This 22nd day of March, 2019.

 _/s/_  S. Fenn Little, Jr.
S. FENN LITTLE, JR.
S. FENN LITTLE, JR., PC
1490 Mecaslin St., NW
Atlanta, GA  30309
(404) 815-3100
fennlaw@fennlittle.com
Georgia Bar No. 454360