UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-cv-05774-AT |
| | ) | |
| ECOVEST CAPITAL, INC., et al. | ) | |
| | ) | |
| Defendants. | ) | |

**UNITED STATES' BRIEF IN SUPPORT OF MOTION FOR PARTIAL
SUMMARY JUDGMENT**

TABLE OF CONTENTS

INTRODUCTION ...................................................................................7

ARGUMENT ........................................................................................11

I.   DEFENDANTS PROMOTED A SYNDICATED CONSERVATION
EASMENT TAX SHELTER SCHEME...................................................11

A.   Defendants organized and sold syndicated conservation easement
transactions. ..................................................................................12

B.   Defendants' statements regarding the appraisals were false or fraudulent.15

1.   Defendants' false statements that the appraisals were "qualified
appraisals" under the Treasury regulations.....................................16

2.   Defendants' false statements that there were no sales "involving" the
properties within the last three years. .............................................26

C.   Defendants made or furnished their false statements regarding the
appraisals. ....................................................................................28

D.   Defendants knew (or at least had reason to know) that their statements
were false or fraudulent. ................................................................30

E.   Defendants' false statements were material................................33

II.   THE DEFENSE OF LACHES DOES NOT APPLY TO TAX
ENFORCEMENT ACTIONS BROUGHT BY THE UNITED STATES TO
PROTECT THE PUBLIC INTEREST...................................................35

III.   DEFENDANTS' ESTOPPEL DEFENSE ALSO FAILS AS A MATTER OF
LAW................................................................................................40

CONCLUSION ....................................................................................46

TABLE OF AUTHORITIES

<u>Cases</u>

*Abdo v. U.S. IRS*,
  234 F. Supp. 2d 553 (M.D.N.C. 2002) ................................................................12

*Agbanc, Ltd. v. United States*,
  707 F. Supp. 423 (D. Ariz. 1988) .....................................................................29

*Alli v. Comm'r*,
  2014 WL 288969 (T.C. 2014) ...........................................................................21

*Block v. North Dakota*,
  461 U.S. 273 (1983) ...........................................................................................36

*Clearfield Trust Co. v. United States*,
  318 U.S. 363 (1943) ...........................................................................................37

*Columbus City Schs. Board of Educ. v. Franklin Cnty. Bd. of Revision*,
  150 N.E.3d 877 (Ohio 2020) .............................................................................27

*Costello v. Comm'r*,
  2015 WL 2085539 (T.C. 2015) .........................................................................22

*Dial v. Comm'r*,
  968 F.2d 898 (9th Cir. 1992) .............................................................................37

*Ellinger v. United States*,
  470 F.3d 1325 (11th Cir. 2006) .........................................................................41

*Estate of Evenchik v. Comm'r*,
  2013 WL 424791 (T.C. 2013) ...........................................................................22

*F.D.I.C. v. Harrison*,
  735 F.2d 408 (11th Cir.1984) ............................................................................42

*F.T.C. v. Leshin*,
  2007 WL 9703567 (S.D. Fla. 2007) ..................................................................37

*Feldman v. Comm'r*,
  20 F.3d 1128 (11th Cir. 1994) ...........................................................................41

*Franchise Tax Bd. of Cal. v. Hyatt*,
  538 U.S. 488 (2003) ...........................................................................................42

*Gibson v. Resolution Trust Corp.*,
  750 F. Supp. 1565 (S.D. Fla. 1990)............................................................ 41, 43

*Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*,
  467 U.S. 51 (1984) .............................................................................................41

*Hewitt v. Comm'r*,
   166 F.3d 332, 1998 WL 802042 (4th Cir. 1998)....................................................16

*Hill v. Tangherlini*,
   724 F.3d 965 (7th Cir. 2013) ...................................................12

*In re Melgar Enters, Inc.*,
   151 B.R. 34 (Bankr. E.D.N.Y. 1993) ...................................................22

*In re Tamarack Trail Co.*,
   23 B.R. 3 (Bankr. S.D. Ohio 1982) ...................................................22

*INS v. Miranda*,
   459 U.S. 14 (1982) ...................................................44

*Jabbour v. Bassatne*,
   673 A.2d 201 (D.C. 1996) ...................................................22

*Kason Indus., Inc. v. Component Hardware Grp., Inc.*,
   120 F.3d 1199 (11th Cir. 1997)...................................................38

*O.P.M v. Richmond*,
   496 U.S. 414 (1990) ...................................................40

*Palmer Ranch Holdings Ltd. v. Comm'r*,
   812 F.3d 982 (11th Cir. 2016)...................................................20

*Pine Mountain Preserve, LLLP v. Comm'r*,
   978 F.3d 1200 (11th Cir. 2020)...................................................17

*Robert Norris & Assocs., P.C. v. United States*,
   1992 WL 133210 (N.D. Ala. 1992)...................................................42

*Sanz v. U.S. Security Ins. Co.*,
   328 F.3d 1314 (11th Cir. 2003) ...................................................44

*Savoury v. U.S. Atty. Gen.*,
   449 F.3d 1307 (11th Cir. 2006) ........................................... 37, 40

*SEC v. Silverman*,
   328 F. App'x 601 (11th Cir. 2009)........................................... 36, 38

*Segel v. United States*,
   1997 WL 369756 (S.D. Fla. 1997)...................................................42

*Smith v. Comm'r*,
   364 F. App'x 317 (9th Cir. 2009)...................................................16

*Tarpey v. United States*,
   2019 WL 1255098 (D. Mont. 2019)...................................................30

*TOT Prop. Holdings, LLC v. Comm'r*,
   1 F.4th 1354 (11th Cir. 2021)...................................................17

*United States v. Arrow Transportation Co.*,
   658 F.2d 392 (5th Cir. Oct. 8, 1981) ...................................................38

*United States v. Benson*,
   561 F.3d 718 (7th Cir. 2009) .................................................................34
*United States v. Buttorff*,
   761 F.2d 1056 (5th Cir. 1985) .............................................................33
*United States v. Campbell*,
   704 F. Supp. 715 (N.D. Tex. 1988) ....................................................33
*United States v. Campbell*,
   897 F.2d 1317 (5th Cir. 1990) .............................................................33
*United States v. Cartwright*,
   411 U.S. 546 (1973) .................................................................... 16, 20
*United States v. Delgado*,
   321 F.3d 1338 (11th Cir. 2003) ...........................................................37
*United States v. Easements and Rights-of-Way Over a Total of 15.66 Acres of*
   *Land, More or Less, in Gordon Cnty., Ga.*,
   779 F. App'x. 578 (11th Cir. 2019) .....................................................20
*United States v. Elsass*,
   769 F.3d 390 (6th Cir. 2014) ...............................................................15
*United States v. Est. Pres. Servs.*,
   202 F.3d 1093 (9th Cir. 2000) ..................................................... 11, 29
*United States v. Est. Pres. Servs.*,
   38 F. Supp. 2d 846 (E.D. Cal. 1998) ..................................................33
*United States v. Fernon*,
   640 F.2d 609 (5th Cir. 1981) ...............................................................37
*United States v. Killough*,
   848 F.2d 1523 (11th Cir. 1988) ...........................................................41
*United States v. Kirkpatrick*,
   22 U.S. 720 (1824) ...............................................................................36
*United States v. McCorkle*,
   321 F.3d 1292 (11th Cir. 2003) ................................................... 41, 44
*United States v. Meyer*,
   376 F. Supp. 3d 1290 (S.D. Fla. 2019) ...............................................37
*United States v. Miller*,
   2010 WL 2202776 (S.D. Ala. 2010) ...................................................44
*United States v. Mitchell*,
   327 F. Supp. 476 (N.D. Ga. 1971) ......................................................37
*United States v. Music Masters, Ltd.*,
   621 F. Supp. 1046 (W.D.N.C. 1985) ..................................................33

*United States v. Qurashi*,
   2004 WL 1771071 (M.D. Fla. 2004)....................................................................43
*United States v. RaPower-3*, LLC,
   343 F. Supp. 3d 1115 (D. Utah 2018) ................................................ 15, 26, 32
*United States v. Raymond*,
   228 F.3d 804 (7th Cir. 2000) ........................................................................12
*United States v. Sanders*,
   2007 WL 2493920 (N.D. Ga. 2007)..............................................................11
*United States v. Stover*,
   650 F.3d 1099 (8th Cir. 2011) ............................................... 12, 33, 34
*United States v. Summerlin*,
   310 U.S. 414 (1940) ......................................................................................36
*United States v. United Energy Corp.*,
   1987 WL 4787 (N.D. Cal. 1987)...................................................................29
*United States v. Vonderau*,
   837 F.2d 1540 (11th Cir. 1988) ....................................................................41
*United States v. White*,
   769 F.2d 511 (8th Cir. 1985) ........................................................................34
*United States v. Zolot*,
   2011 WL 13213614 (S.D. Fla. 2011).............................................................44
*Whitaker v. United States*,
   2019 WL 4722465 (N.D. Fla. 2019) ....................................................... 43, 45

Statutes

26 U.S.C. § 170 ................................................................................................ 7, 16
26 U.S.C. § 6700 ........................................................................................... passim
26 U.S.C. § 7402 ..................................................................................................10
26 U.S.C. § 7408 ..................................................................................................10

Regulations

26 C.F.R. § 1.170A–1(c)(2) ............................................................................ 16, 20
26 C.F.R. § 1.170A-13(c)(3).................................................................................16

## INTRODUCTION

Defendants created an elaborate scheme to sell tax deductions to customers based on the appraised value of conservation easements, and they repeatedly made multiple false statements regarding the tax benefits of their scheme. But this motion seeks partial summary judgment on a single, straightforward issue: whether Defendants falsely promised that the appraisals they prepared and furnished could be used for federal tax purposes when, as a matter of law, the appraisals could not be so used.

A conservation easement is an agreement that permanently limits the uses of land (such as restrictions on development) to protect its conservation values. The Internal Revenue Code allows taxpayers who meet strict requirements to claim a tax deduction for donating such easements. 26 U.S.C. § 170(h). But this tax deduction provision has been abused by Defendants, who promise customers they can claim a $4 tax deduction for every $1 invested in Defendants' scheme. That promise, and other statements like it, is based on the bogus conservation easement appraisals that Defendants made and furnished and that are the subject of this motion.

A typical conservation easement appraisal actually contains two appraisals: an appraisal of the subject property before the imposition of the easement (the

"before-value") and an appraisal of the subject property after imposition of the easement (the "after-value"). The difference between the two values is the value of the easement itself. The legal dispute in this motion is the very definition of "before-value."

Defendant Claud Clark prepared 70 of the 73 appraisals that Defendant EcoVest Capital, Inc. ("EcoVest") furnished between 2010 and 2018. In each of those appraisals, Clark concluded that a residential development **could** be built on the subject properties, even though they were indisputably vacant at the time of his appraisals. But Clark did not appraise the vacant land with development potential in his before-value, as he was required to do. Instead, he falsely appraised the land **as if the buildings were already constructed**:

```
329:16      Q.  So are you saying that you prepared this
    17   before value under the hypothetical condition
    18   that the proposed development was fully built out
    19   and sold out?
    20      A.  Yes, sir.
```

In practice, Clark's approach creates artificially inflated values for otherwise unremarkable, unimproved tracts. Take the Cypress Cove Marina project as an example. EcoVest paid $1,040,000 to acquire the unimproved land. Six months later, Clark – assuming eventual construction of a residential development – valued that same property at nearly $40 million, pre-easement. EcoVest's "investors"

divvied up the resulting charitable contribution deduction – a staggering $39.7 million, or the difference between Clark's before-and-after valuations.

There is one additional sleight of hand at work here. That acquisition price (in this example the $1,040,000 EcoVest paid for the unimproved land) is an incredibly inconvenient fact for the Defendants because it simply cannot be reconciled with the fanciful appraisals that fueled their tax shelter promotion. Defendants' approach to this problem was blunt: ignore it and hope no one would notice.

The Treasury regulations, along with a helping of common sense, require a different definition of "before-value." First, the regulations require the appraiser to determine what a hypothetical "willing buyer" would pay for the property as of the date of valuation. No rational buyer would pay Clark's appraised values for these tracts, and Defendants admitted that fact. Second, while the regulations permit the appraiser to consider what the property might be used for and how that might affect what a willing buyer might pay for it, the subject of the appraisal must always be the unimproved land in its current state. As a result, two key statements in the appraisals are undisputedly false: (1) statements that the appraisals were "qualified appraisals" as required by the Treasury regulations; and (2) statements that there had been "no sale[s] involving the tract[s] within the last three years."

9

Because, as explained below, the remaining elements of 26 U.S.C. § 6700 are also satisfied by reference to undisputed facts, the Court should conclude that each Defendant violated 26 U.S.C. § 6700 as a matter of law (section I below).

Finally, the United States also moves for summary judgment on two of Defendants' affirmative defenses (laches and estoppel, sections II and III below, respectively), neither of which are applicable where – as here – the United States has brought an enforcement action in its sovereign capacity to vindicate a public interest.[1]

---

[1] Should the Court grant this motion, the trial in this matter can be streamlined because there would be a pre-trial ruling that – as a matter of law – the Defendants engaged in penalty conduct under 26 U.S.C. § 6700. That is, the United States would not need to present evidence that Defendants failed to prepare and use qualified appraisals, which is an absolute requirement for a taxpayer to claim a tax deduction. While other evidence of Defendants' additional false statements may still be relevant to whether an injunction should issue (under 26 U.S.C. § 7402 and/or § 7408), the scope of any such injunction, and the amount and appropriateness of disgorgement, the presentation of such evidence could be focused as to the remaining issues. In addition, should the Court grant this motion as to Defendants' affirmative defenses, the trial would be further focused, as it should be, on Defendants' actions, not the alleged action or inaction of the government.

# ARGUMENT

## I. DEFENDANTS PROMOTED A SYNDICATED CONSERVATION EASMENT TAX SHELTER SCHEME.

The statute that penalizes tax shelter promoters – 26 U.S.C. § 6700 – is meant to attack abusive tax shelters "at their source: the organizer and salesman." S. Rep. No. 97-494(I), at 266 (1982). To establish penalty conduct under 26 U.S.C. § 6700(a)(2)(A), the United States must show four elements:

> (1) The defendant organized or sold, or participated in the organization or sale of, an entity, plan, or arrangement;
> (2) [The defendant] made, or caused to be made, false or fraudulent statements concerning the tax benefits to be derived from the entity, plan, or arrangement;
> (3) [The defendant] knew or had reason to know that the statements were false or fraudulent; and
> (4) the false or fraudulent statements pertained to a material matter.

*See United States v. Est. Pres. Servs.*, 202 F.3d 1093, 1098 (9th Cir. 2000) (identifying the necessary elements to obtain an injunction based on conduct subject to penalty under § 6700); *United States v. Sanders*, 2007 WL 2493920, at *6 (N.D. Ga. 2007) (same). As set forth below, the undisputed facts readily establish each of these elements (sections I.B. and I.C. address the second element).

**A.     Defendants organized and sold syndicated conservation easement transactions.**

Each Defendant participated in the organization of a tax scheme involving the syndication of conservation easement donations, which is a plan or arrangement within the meaning of § 6700. *See United States v. Raymond*, 228 F.3d 804, 811 (7th Cir. 2000) ("[u]nder § 6700 any 'plan or arrangement' having some connection to taxes can serve as a 'tax shelter'"), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965, 967 n.1 (7th Cir. 2013); *United States v. Stover*, 650 F.3d 1099, 1107-08 (8th Cir. 2011) (the organizing, promoting, or selling element of § 6700 "should be defined broad[ly], and is satisfied simply by selling an illegal method by which to avoid paying taxes") (quotations omitted); *Abdo v. U.S. IRS*, 234 F. Supp. 2d 553, 562 (M.D.N.C. 2002) ("Congress designed Section 6700 as a 'penalty provision specifically directed towards promoters of abusive tax shelters and other abusive tax avoidance schemes'") (citation omitted; emphasis in original).

The undisputed facts show that in 2012, Defendant EcoVest consulted on five projects that included options for conservation easements and, between 2013 and 2018, EcoVest sponsored and managed 58 projects that included options for

conservation easements ("EcoVest Projects").[2] (Statement of Undisputed Material Facts ("SUF") ¶¶ 13-14; *see also* SUF ¶¶ 1-7, 15.) EcoVest formed partnerships and entities that it used to facilitate its projects (SUF ¶¶ 17-18),[3] prepared offering memoranda for each project (SUF ¶¶ 16, 19, 21, 124), and formed relationships with broker-dealers and investment advisors to sell the projects to customers who needed tax deductions. (SUF ¶¶ 26, 34-35, 117, 125.)

Defendant Alan Solon is the founder, president, CEO, and member of the board of directors of EcoVest. (SUF ¶¶ 22-23.) As such, Solon was directly and personally involved in organizing and developing the EcoVest Projects. (SUF ¶¶ 24-28.) Defendant Robert McCullough has been the senior vice president, chief financial officer, treasurer, and secretary of EcoVest, which he joined in 2014, and personally helped organize EcoVest Projects in numerous ways. (SUF ¶¶ 30-32, 34-36.) Defendant Ralph Teal has been a co-owner and director of EcoVest, was

---

[2]     The EcoVest Projects also include 10 transactions upon which a predecessor company, Conservation Resources, Inc. consulted. (SUF ¶¶ 9, 12.) Defendant Alan Solon served as CRI's president and stated that the idea for CRI grew out of the goal of offering tax-planning options. (SUF ¶¶ 10-11, 24-25.)

[3]     That is, in addition to organizing the investments and arrangements at issue (26 U.S.C. § 6700(a)(1)(A)(ii)-(iii)), EcoVest actually organized the entities it used in those investments and arrangements (26 U.S.C. § 6700(a)(1)(A)(i)).

EcoVest's "joint-venture development partner," and has worked on every EcoVest Project since 2013 (except for one). (SUF ¶¶ 37-40, 42-48.)[4]

Defendant Claud Clark prepared 70 of the conservation easement appraisals that were used to substantiate tax deductions for EcoVest's customers. (SUF ¶¶ 8, 49.) Clark was a member of EcoVest's "all hands team" and participated in "pipeline" discussions with EcoVest employees to discuss upcoming projects. (SUF ¶¶ 50-51; *see also* SUF ¶¶ 52-54 (detailing Clark's involvement with EcoVest).) Clark's appraisals were critical to the successful execution of EcoVest's transactions because EcoVest was required to obtain a "qualified appraisal" to substantiate the tax deductions its customers claimed. Clark has received more than $1.1 million in net receipts from preparing appraisals for EcoVest Projects. (SUF ¶ 56; *see also* SUF ¶ 55 (Clark's appraisal firm "has earned over $3.3 million in fees as the result of conservation easement appraisals that Clark prepared for EcoVest Projects"), SUF ¶ 57 (Clark charged a minimum fee of $50,000 "[f]or appraisals used to monetize easements").)

---

[4]     The EcoVest Defendants (EcoVest, Solon, McCullough, and Teal) have profited immensely from these projects. (SUF ¶¶ 20, 29, 33, 41 (EcoVest has received over $113.9 million in fees and distributions, Solon has received more than $5.7 million in net receipts, McCullough has received more than $818,000 in net receipts, and Teal has received more than $10.7 million in net receipts.)

**B.      Defendants' statements regarding the appraisals were false or fraudulent.**

Defendants' conservation easement appraisals are riddled with errors and omissions, but this motion focuses only on (1) false statements that the appraisals were "qualified appraisals" under the Treasury regulations, and (2) false statements that there had been no recent sales involving the subject properties. These representations regarding "qualified appraisal" practice (an absolute requirement for claiming a tax deduction for donating property valued over $5,000), and statements regarding recent sales of the subject property, paved the way for the astronomical valuations that fueled Defendants' tax shelter scheme. Indeed, the statements are directly related to the allowability of the charitable contribution deductions sought by EcoVest's participating investors. *See United States v. Elsass*, 769 F.3d 390, 396 (6th Cir. 2014) ("Section 6700 penalizes, among other things, the making of false or fraudulent statements 'with respect to the allowability of any deduction.'"); *United States v. RaPower-3*, LLC, 343 F. Supp. 3d 1115, 1171 (D. Utah 2018), *aff'd*, 960 F.3d 1240 (10th Cir. 2020). As explained below, these repeated statements, which were critical to the execution of Defendants' tax shelter, were false as a matter of law.

1.   <u>Defendants' false statements that the appraisals were "qualified appraisals" under the Treasury regulations.</u>

To substantiate a donation of property that results in a claimed deduction of more than $5,000 the taxpayer must, among other things, obtain a "qualified appraisal" of that property. 26 U.S.C. § 170(f)(11)(C) and (E). "Congress intended the qualified appraisal requirement to be mandatory." *Hewitt v. Comm'r*, 166 F.3d 332, 1998 WL 802042 at *2 (4th Cir. 1998) (table). The Treasury regulations set forth the requirements for preparing a "qualified appraisal." 26 C.F.R. § 1.170A-13(c)(3). These requirements help ensure a bona fide, reliable determination of fair market value for tax purposes and help the IRS "deal more effectively with the prevalent use of overvaluations." *Smith v. Comm'r*, 364 F. App'x 317, 319 (9th Cir. 2009) (quotation omitted).

Perhaps most importantly, a qualified appraisal must include the "fair market value, within the meaning of § 1.170A-1(c)(2), of the contributed property on the valuation effective date." 26 C.F.R. § 1.170A-17(a)(3)(i)(D). Fair market value is the "price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." 26 C.F.R. § 1.170A–1(c)(2). The "willing buyer-willing seller test of fair market value is nearly as old as the federal income, estate, and gifts taxes themselves." *United States v. Cartwright*, 411 U.S. 546, 551

16

(1973). Applying this definition of fair market value is a requirement of all appraisals submitted for federal tax purposes, including conservation easement appraisals. *See TOT Prop. Holdings, LLC v. Comm'r*, 1 F.4th 1354, 1369 (11th Cir. 2021) ("The correct value of a conservation easement is 'the fair market value of [it] at the time of the contribution.'") (quoting 26 C.F.R. § 1.170A-14(h)(3)(i)).

The fair market value of a conservation easement "is generally calculated based on sales prices of comparable easements, but '[i]f no substantial record of market-place sales is available to use as a meaningful or valid comparison,' the 'before-and-after' valuation method is used." *Id.* (quoting § 1.170A-14(h)(3)(i)). The so-called "before and after" method requires "gauging the difference between the fair market value of the property pre- and post-encumbrance." *Pine Mountain Preserve, LLLP v. Comm'r*, 978 F.3d 1200, 1211 (11th Cir. 2020) (citing 26 C.F.R. § 1.170(A)-14(h)(3)(i)). "To determine the before value—that is, 'the fair market value of the property before contribution of the conservation restriction'—the regulations require a determination of the property's highest and best use before donation." *TOT Prop. Holdings, LLC*, 1 F.4th at 1369; *see also* 26 C.F.R. § 1.170A-14(h)(3)(ii).

Defendants concede that when Clark prepared his 70 conservation easement appraisals for EcoVest Projects, all 70 of the subject properties were unimproved,

17

vacant land. (SUF ¶ 72; *see also* SUF ¶¶ 73, 80, 84, 89, 92, 104, 106, 108, 110 (providing examples).) But Clark did not attempt to value unimproved, vacant land with development potential (which is what existed on the easement donation dates) when determining his before-values. (SUF ¶ 68 ("Clark would not value the property 'as is' in the before-value of his conservation easement appraisals").) Rather than determine what a willing buyer would pay for the unimproved, developable land as of the date of his valuation, Clark instead falsely valued the land as if residential developments were fully constructed, based on his conclusion that the "highest and best use" for all 70 of the subject properties would be some form of residential development. (SUF ¶ 74; *see also* SUF ¶ 75 (providing example).) Clark's decision to determine a before-value under a hypothetical, "as-if developed" condition flatly violated the "qualified appraisal" regulations because he was ***not*** valuing unimproved land with development potential – which is indisputably what existed on the donation date, and he was ***not*** valuing what a willing buyer would pay on the donation date.

Indeed, Clark explicitly assumed in each of his 70 appraisals that the subject properties contained improvements that did not exist. (SUF ¶ 76; *see also* SUF ¶ 77 (providing example).) In addition, Clark repeatedly imposed a hypothetical condition that certain improvements had been made to the subject property that did

18

not exist as of his valuation date. (SUF ¶ 78; *see also* SUF ¶ 79 (providing

example).) For example, Clark stated that, in reaching his before-value for the

Belle Harbor project, he assumed that "the proposed development was fully built

out and sold":

```
329:16      Q.  So are you saying that you prepared this
    17   before value under the hypothetical condition
    18   that the proposed development was fully built out
    19   and sold out?
    20      A.  Yes, sir.
```

(SUF ¶ 82.) Clark made a similar admission for the Waterway Grove project when

he assumed that "it was developed":

```
113:10      Q.  But this is unimproved land -- correct? --
    11   with no roads.  It is just vacant.  How is that
    12   comparable to a developed property?
    13      A.  We made the hypothetical assumption that
    14   it was developed and used that as the basis for
    15   our before, following the tax code, court cases
    16   such as Kiva Dunes, the IRS guidelines to
    17   reviewing conservation easement appraisals,
    18   experience with IRS appraisers who have used the
    19   same methodology of valuing the hypothetical and
    20   not the raw land, which I believe is the correct
    21   way to go about estimating before value.
```

(SUF ¶ 86.) Although the properties Clark appraised were unimproved and vacant,

Clark repeatedly admitted, as he must, that a "willing buyer" would never pay his

massively inflated before-values for those properties. Instead, Clark explained that

a willing buyer would only pay his before-values (*e.g.*, $59 million for the Belle

Harbour Resort project and $61 million for Waterway Grove) ***if the subject***

***properties were already developed***. (SUF ¶¶ 81, 83, 85, 87-88; *see also* SUF ¶¶ 92-

94 (Clark appraised the unimproved property for the Espiritu Shores project at approximately $78 million but did not identify the profile of a market participant that would actually pay $78 million for the Espiritu Shoes property as of his valuation date), SUF ¶¶ 90-91 (same; Birkdale Landing).)[5] In short, Clark's before-values completely ignored the applicable valuation standard. 26 C.F.R. § 1.170A–1(c)(2); *Cartwright*, 411 U.S. at 551.

Clark's application of a hypothetical, "as-if developed" condition, and his failure to apply the correct definition of fair market value, infected his entire analysis. For example, in 42 of the appraisals, Clark claims he could not find any "comparable sales" to assist in determining a before-value for any of the vacant properties.[6] (SUF ¶ 102; *see also* SUF ¶ 103 (providing example).) But that result

---

[5]    At his deposition, Clark attempted to elide his admitted failure to determine what a willing buyer would pay by suggesting the fair market value definition in the Treasury regulations is somehow "flawed." (SUF ¶ 67.) Regardless of his personal views, Clark was bound to apply the "willing buyer" definition set forth in the Treasury regulation.

[6]    The comparable sales approach "entails considering sales of similarly situated parcels and using those sales, with adjustments to account for any relevant differences, to evaluate the value of the subject property." *United States v. Easements and Rights-of-Way Over a Total of 15.66 Acres of Land, More or Less, in Gordon Cnty., Ga.*, 779 F. App'x. 578, 582 (11th Cir. 2019) (citing *Palmer Ranch Holdings Ltd. v. Comm'r*, 812 F.3d 982, 987 (11th Cir. 2016)). (*See also*

(continued...)

was empowered – or, perhaps, fated – by his decision to value the parcels as if they were already developed. That is, in attempting to locate sales of property comparable to the Birkdale Landing property (which was vacant at the time of his appraisal), Clark did not look for sales of vacant land with similar development potential; instead, he looked for sales of fully developed properties:

```
359:22      Q.  And, Mr. Clark, on page 29 of the Birkdale
360: 1   appraisal you state that "I made a search for
     2   development parcels similar to the Subject
     3   Property"; correct?
     4      A.  Yes, sir.
     5      Q.  And my question is when you conducted that
     6   search, what was it you were looking for.
     7      A.  Properties that were developed similar to
     8   the highest and best use of this property.
     9      Q.  So you were not looking for sales of
    10   unimproved land with similar development
    11   potential?
    12      A.  No, sir.
```

(SUF ¶ 105; *see also* SUF ¶¶ 107, 109, 111 (additional testimony where Clark admitted he did not look for sales of vacant land with similar development potential but, instead, looked for sales of fully developed properties).)

Contrary to Clark's approach, however, qualified appraisal practice requires the appraiser to determine the fair market value of the asset ***in its current state***. *See Alli v. Comm'r*, 2014 WL 288969, at *11 (T.C. 2014) ("The Jones appraisal's

---

SUF ¶ 101 (Clark acknowledged that the sales comparison approach is a method for valuing vacant land).)

21

primary deficiency is that it is not an appraisal of the contributed property but is rather an appraisal of a hypothetical, fully renovated version of the contributed property."); *Estate of Evenchik v. Comm'r*, 2013 WL 424791, at *3 (T.C. 2013) ("Not appraising what was actually donated is a big problem."); *Costello v. Comm'r*, 2015 WL 2085539, at *10 (T.C. 2015) ("Because Mr. Dumler's original appraisal values 'the fee simple interest' in Rose Hill before and after a hypothetical sale of development rights, it does not value the correct asset, namely, the land preservation easement conveyed to Howard County.").[7] Clark's appraisals suffered from the same flaw that infected the appraisals at issue in these other cases: he did not reach a fair market value conclusion of the property in its condition at the time of donation. In all cases, the subjects of Clark's easement

---

[7]     Courts routinely confirm this basic principle that the subject of the appraisal must be the asset in its current condition. *E.g.*, *In re Melgar Enters, Inc.*, 151 B.R. 34, 42 (Bankr. E.D.N.Y. 1993) (concluding that vacant land "must be valued in its present state which is as vacant land" and that an appraisal valuing the property as if it had zoned finished lots was "of little or no value"); *In re Tamarack Trail Co.*, 23 B.R. 3, 5-6 (Bankr. S.D. Ohio 1982) (holding that "the law requires us to value the project as it stands today" and rejecting the debtor's argument that fair market value should be based on a completed condominium development where the debtor only partially completed construction on some buildings on the land); *Jabbour v. Bassatne*, 673 A.2d 201, 203 (D.C. 1996) ("[t]he prudent, well informed buyer would know the current condition of the land and pay a reasonable price for the land, not a price that assumed the land to be in a 'different' or 'more developed' condition").

22

appraisals were unimproved, vacant land with development potential – but instead of seeking to determine a before-value for vacant, developable land, he improperly valued the property as if residential communities were fully constructed.

The Treasury regulations undoubtedly require the appraiser to consider the property's "highest and best use" in determining value, *i.e.*, what might the property be used for and how that might affect what a willing buyer might pay for it. 26 C.F.R. § 1.170A-14(h)(3)(ii). But that requirement does not replace or modify application of "fair market value" (*i.e.*, what a willing buyer would pay and what a willing seller would accept). Nor does it allow an appraiser to value something other than the donated property as it exists on the date of donation. *See TOT Prop. Holdings, LLC*, 1 F.4th at 1369 (quoting 26 C.F.R. § 1.170A-14(h)(3)(i)) ("The correct value of a conservation easement is 'the fair market value of [it] at the time of the contribution.'"). In other words, although the appraiser must consider how various uses affect the property's current value, the appraiser may not value the property ***as if those uses are already achieved***.

The EcoVest Defendants have embraced Clark's bogus method of valuing the vacant properties at issue in the EcoVest Projects, and they understand that Clark's before-values were not the amounts that willing buyers would pay for the properties but, instead, were what buyers might pay if developments were already

23

fully constructed on those properties. For example, in submissions to the IRS, EcoVest has confirmed that Clark's appraisals used this impermissible "as if developed" approach. (SUF ¶ 113; *see also* SUF ¶ 114 (EcoVest has stated that a determination of the before-value for a conservation easement appraisal "must assume the property is in its highest and best use state").) One of EcoVest's consultants, in a strategy memo to Solon, Teal, and McCullough (among others), echoed the very same; *i.e.*, that the "before-value" for EcoVest's projects was supported by an "'as built' Development Model." (SUF ¶ 112; *see also* SUF ¶ 98 (Teal stating "what he is appraising here is not the land").)

McCullough provided a further explanation of Clark's false approach to the before-value and gave the following example to illustrate this point: if a landowner had a "traditional fair market value appraisal" stating a parcel was currently worth $1 million, and a developer could buy the land for $1 million, develop the land at a cost of $4 million, then sell the development for $15 million, the before-value would be $10 million (*i.e.*, the $15 million sales price minus the $5 million in costs). (SUF ¶ 115.) McCullough, like Clark, **assumes** that a development has been constructed to reach his before-value of $10 million. But, of course, the before-value in McCullough's example is $1 million – the "fair market value" of the property as set forth in the "traditional fair market value appraisal." The absurd

values set forth in Clark's appraisals and EcoVest's offering documents are driven by their strange notion that there are two different fair market values. But, as the Treasury regulations and caselaw establish, there is one and only one definition of fair market value for federal income tax purposes.

Teal, the defendant most responsible for acquiring and negotiating the purchase price for the land used in the EcoVest Projects, testified that he would not have paid the before-value that Clark set forth in his appraisal for the Cypress Cove Marina project – nearly $40 million – because "you have to make money with the land, and the land is just a component. So, you know, there would be no room in there to develop and make any money on." (SUF ¶ 97; *see also* SUF ¶ 98 ("what he is appraising here is not the land").)

The EcoVest-controlled partnership that acquired the parcel for the Carolina Bays project paid $4.6 million for the vacant land. (SUF ¶ 99.) Approximately four months later, Clark concluded that the unimproved land at Carolina Bays was worth approximately $53 million. (SUF ¶ 99.) When confronted with Clark's valuation at his deposition, Jed Linsider, EcoVest's Chief Investment Officer, admitted, as he must, that $50 million would not be a "fair price" for the property at issue in the Carolina Bays project. (SUF ¶ 100.)

In short, Defendants' statements that Clark's appraisals were "qualified

appraisals" were false because those appraisals did not apply the correct definition of fair market value and did not determine what a willing buyer would pay for the contributed property on the donation date.

### 2. Defendants' false statements that there were no sales "involving" the properties within the last three years.

To facilitate its syndicated conservation easement donation scheme, EcoVest executed (in all but one instance) a sale involving the subject property, on average, 129 days prior to Clark's appraisal date. (SUF ¶ 71.) The acquisition price associated with that sale – which was negotiated by EcoVest and reflected what EcoVest was "willing to pay as the buyer" (SUF ¶ 61) – cannot be reconciled with Clark's inflated valuations of the same properties prior to imposition of any easement. So, the Defendants decided to ignore the transaction. As a result, as explained below, the appraisals falsely stated that there was "no sale involving the tract within the last three years." *See RaPower-3, LLC*, 343 F. Supp. at 1172 ("A promoter who does not tell customers all of the facts relevant to whether the customers may lawfully claim a deduction or credit has made a false statement.")

It is undisputed that EcoVest used a transaction, typically called a "Membership Interest Purchase Agreement," to acquire the subject property for its projects. (SUF ¶¶ 58-59.) Nevertheless, Clark made, and both Clark and EcoVest furnished, a false statement in 46 appraisals that there was "no sale involving the

tract within the last three years." (SUF ¶ 69.) This was false because the MIPA was, of course, a sale "involving" the tract – the MIPAs for each EcoVest Project clearly identified the property and set forth a purchase price. (SUF ¶¶ 60-61.) And EcoVest had executed a MIPA in those 46 projects. (SUF ¶¶ 70-71.) Moreover, Clark admitted he actually knew that EcoVest used a MIPA in connection with the properties he appraised. (SUF ¶¶ 143-44.)

Defendants may argue that, under appraisal rules, Clark was not required to affirmatively disclose the MIPA price in his appraisals. The United States forcefully disagrees with this position. *See TOT Prop. Holdings, LLC v. Comm'r*, 1 F.4th at 1371 (the MIPA price should be presumed to constitute the value of the real estate at issue). However, this motion is not about whether Clark's purposeful omission of the MIPA price constituted a violation of the appraisal rules. Instead, this motion establishes that Clark made a false statement 46 times when he said there was no sale "involving" the subject property. *See Columbus City Schs. Board of Educ. v. Franklin Cnty. Bd. of Revision*, 150 N.E.3d 877, 886 (Ohio 2020) ("the contract takes the classic form of a purchase agreement for commercial real estate by identifying as the subject matter of the transaction the specific real property").

**C.    Defendants made or furnished their false statements regarding the appraisals.**

Each Defendant "made or furnished" false statements regarding the conservation easement appraisals within the meaning of 26 U.S.C. § 6700.

First, with respect to Clark, there is no dispute he prepared 70 conservation easement appraisals for EcoVest Projects and furnished them to EcoVest (or one of its subsidiaries or agents). (SUF ¶¶ 49, 116.) In each of those 70 appraisals, Clark falsely stated that he had prepared a "qualified appraisal" as that term is defined in the Treasury regulations. (SUF ¶¶ 62-63.) In 46 of those 70 appraisals, Clark falsely stated that there had not been a sale "involving" the property within the last three years. (SUF ¶¶ 60-61, 69-71.)

Second, EcoVest directly furnished Clark's appraisals to broker-dealers, financial advisors, and some customers. (SUF ¶ 117.) In addition, EcoVest made the appraisals available to customers. (SUF ¶ 118.) In addition to furnishing Clark's appraisals, EcoVest also falsely claimed Clark's appraisal was a "qualified appraisal" in letters it sent to financial advisors (SUF ¶ 119), memoranda provided to customers (SUF ¶ 120), and tax calculators provided to customers (SUF ¶¶ 121-22). And EcoVest falsely claimed it would obtain a "qualified appraisal" in the offering memoranda that it prepared and furnished to broker-dealers, financial advisors, and customers. (SUF ¶ 123-27.)

28

For purposes of 26 U.S.C. § 6700, EcoVest's furnishing conduct is imputed to Defendants Solon, McCullough, and Teal, who all have been senior executives, board members, and/or owners of EcoVest. *See Est. Pres. Servs.*, 202 F.3d at 1104-05 (holding that because the taxpayer was "deeply involved" in the goings-on of the company, he was not excused from liability simply because he may not have personally made or furnished the false statements at issue); *United States v. United Energy Corp.*, 1987 WL 4787, at *12 (N.D. Cal. 1987) ("It would frustrate the congressional purpose if a person who funded an enterprise, acted as one of its officers and directors, and profited from it, could insulate him or herself merely by employing salespeople who actually made the false statements."); *Agbanc, Ltd. v. United States*, 707 F. Supp. 423, 427 (D. Ariz. 1988) (denying tax shelter promoter's motion for summary judgment in a § 6700 penalty refund suit and concluding that one defendant "cannot escape liability just because all actual offerings containing the alleged overvaluation statements were in" another defendant's name). The undisputed facts show that Solon, McCullough, and Teal were deeply involved in the work of EcoVest. (*See infra* Section I.A.) As company officers and directors, they "voted their approval" for (and immensely benefited from) EcoVest's dissemination of these false statements. *Est. Pres. Servs.*, 202 F.3d at 1105.

**D.     Defendants knew (or at least had reason to know) that their statements were false or fraudulent.**

To be liable for a penalty under 26 U.S.C. § 6700(a)(2)(A), the Defendants must have known or had reason to know the statements set forth in Clark's appraisals were false. There is no doubt that they did.

First, Clark actually knew that his statements that each of his appraisals satisfied the qualified appraisal rules in the Treasury regulations were false. Clark vowed familiarity with those rules and requirements, including the requirement that he apply the definition of fair market value as that term is defined in the Treasury regulations. (SUF ¶¶ 141-42; *see also* SUF ¶¶ 62-66.) In fact, in each appraisal, Clark identified the definition of fair market value set forth in the Treasury regulations as the definition he was bound to apply, but he later testified that definition was "flawed." (SUF ¶ 67.) In other words, Clark admitted he was aware of the qualified appraisal requirements yet continued to prepare appraisals that failed to conform to them. There could scarcely be a clearer indication that Clark knew, or at a minimum had reason to know, his appraisals were not "qualified appraisals." *See Tarpey v. United States*, 2019 WL 1255098, at *7 (D. Mont. 2019) ("Tarpey's acknowledgment that he knew the regulations and his repeated appraisals for DFC demonstrates that he knew or had reason to know that his statements were false.").

In addition, Clark knew that his statements that there were "no sale[s] involving the tract within the last three years" were false because he had actual knowledge of the MIPA transactions. (SUF ¶ 143.) Clark even discussed with an EcoVest attorney the need "to have a logical and explainable basis which accounts for the 'spread' between the MIPA Purchase Prices and the anticipated highest and best use appraisal values." (SUF ¶ 144.) There is thus no question Clark knew, or at least had reason to know, that there was a sale "involving" the properties he appraised for EcoVest Projects.

Second, the EcoVest Defendants actually knew that Clark's appraisals contained false statements. There is no dispute that the EcoVest Defendants are aware of the willing buyer-willing seller requirement in the Treasury regulation definition of fair market value. Their lawyers advised them on this very point in legal opinions regarding the EcoVest Projects, (SUF ¶¶ 135-40), and they engaged Clark to prepare "qualified appraisals." (SUF ¶ 134.) Yet Clark's appraisals invoke assumptions and make statements that are incompatible with the willing buyer-willing seller requirement. In his appraisals, Clark did not value what a willing buyer would be buying (vacant, unimproved land with development potential), but instead valued something that did not exist (multifamily housing as if already developed). (*See infra* Section I.B.1.) There is no dispute that the EcoVest

Defendants were aware that each of the parcels at issue was vacant, developable land. (SUF ¶ 72.) Moreover, as market participants themselves, and having recently negotiated the acquisition of these parcels, the EcoVest Defendants were actually aware that no willing buyer would pay the appraised values in Clark's before-value scenarios. They admitted EcoVest would not pay those values to acquire the land. (SUF ¶¶ 95-100.)

For similar reasons, the EcoVest Defendants were also aware of the falsity of Clark's repeated statements that there were no sales of the tracts of land in the previous three years. The EcoVest Defendants identified the properties at issue in Clark's appraisals and executed the transaction documents in order to acquire those properties. (SUF ¶¶ 42-43, 58-61.) They were simultaneously aware that Clark was ignoring those transactions by stating there were "no sale[s] involving the tract within the last three years."

Moreover, the EcoVest Defendants held themselves out to the public as having significant real estate development experience and touted their track record in sponsoring real estate investment opportunities. Accordingly, they at least had reason to know about the Treasury regulation's definition of fair market value, including its requirement of identifying the price that a willing buyer would pay and a willing seller would accept. *See RaPower-3, LLC*, 343 F. Supp. at 1172

("Promoters are charged with knowledge of the law governing the tax benefits they promote"); *see also United States v. Campbell*, 704 F. Supp. 715, 725 (N.D. Tex. 1988); *United States v. Music Masters, Ltd.*, 621 F. Supp. 1046, 1055 (W.D.N.C. 1985); *Stover*, 650 F.3d at 1110 ("Given Stover's years of tax and accounting experience and his significant education in the area, he had reason to know that such schemes were invalid."). Put simply, the EcoVest Defendants actually knew the correct definition of fair market value and, at a minimum, were sufficiently experienced for that knowledge to be imputed to them for purposes of the scienter requirement in 26 U.S.C. § 6700(a)(2)(A).

### E.   Defendants' false statements were material.

Statements pertaining to the "availability of tax deductions, credits, or other mechanisms for reducing tax liability . . . clearly qualify as 'material'" under § 6700. *United States v. Est. Pres. Servs.*, 38 F. Supp. 2d 846, 855 (E.D. Cal. 1998), *aff'd*, 202 F.3d 1093 (9th Cir. 2000). "Material matters are those which would have a substantial impact on the decision-making process of a reasonably prudent investor and include matters relevant to the availability of a tax benefit." *United States v. Campbell*, 897 F.2d 1317, 1320 (5th Cir. 1990); *United States v. Buttorff*, 761 F.2d 1056, 1062 (5th Cir. 1985). "There is no matter more material to the sale of a tax avoidance package than whether the package effectively allows

customers to avoid taxes." *United States v. Benson*, 561 F.3d 718,724 (7th Cir. 2009); *see Stover*, 650 F.3d at 1111 (affirming district court's finding that a promoter's promises of numerous tax advantages induced customers to purchase his tax arrangements). As explained in *United States v. White*, "[t]he taxpayers who have been or are now being audited by the IRS or are involved in litigation because they relied upon [the promoters'] representations should certainly have been informed about their complete lack of merit." 769 F.2d 511, 515 (8th Cir. 1985).

Here, there is no dispute that the statements Clark and EcoVest made and furnished regarding the appraisals pertained to the availability of charitable contribution deductions to be used by investors in the syndicated conservation easement transactions. Representations regarding "qualified appraisal" practice (an absolute requirement for claiming a tax deduction for donating property valued over $5,000), and statements regarding recent sales of the subject property, would undoubtedly affect a prudent investor who sought a tax deduction from Defendants' scheme. Indeed, analyses prepared for EcoVest Projects stated the expected tax benefit members would receive from the donation of a conservation easement was "based on the Appraisal." (SUF ¶ 128.) EcoVest even calculated the "Charitable Deduction Value per Unit" based on the deduction value set forth in Clark's appraisals. (SUF ¶ 129.) Moreover, EcoVest touted the tax savings that

could be generated by relying on Clark's appraisal. (SUF ¶ 130 (email from Solon stating that "a max of 60%" offset to AGI was the most an investor could achieve from one of the EcoVest Projects), SUF ¶ 133 (email from Clark to Solon; "[n]eed to offset some income"); *see also* SUF ¶¶ 131-32.) Because the result of Defendants' statements regarding the appraisals was tax avoidance, the appraisals were material.

* * *

In sum, in 70 separate instances, Defendants made or furnished the false statement that the appraisals used in their projects were "qualified appraisals." In 46 additional instances, Defendants made or furnished the false statement that there were "no sale[s] involving the tract within the last three years." As a result, the Court should enter judgment as a matter of law that EcoVest, Solon, McCullough, Teal, and Clark each engaged in conduct subject to penalty under 26 U.S.C. § 6700.

## II.    THE DEFENSE OF LACHES DOES NOT APPLY TO TAX ENFORCEMENT ACTIONS BROUGHT BY THE UNITED STATES TO PROTECT THE PUBLIC INTEREST.

Defendants have pleaded an affirmative defense – laches – that does not apply in this case as a matter of law. "The common law has long accepted the principle '*nullum tempus occurrit regi*' – neither laches nor statutes of limitations

will bar the sovereign." *Block v. North Dakota*, 461 U.S. 273, 294 (1983)

(O'Connor, J., dissenting); *see also United States v. Summerlin*, 310 U.S. 414, 416

(1940) ("the United States is not bound by state statutes of limitation or subject to

the defense of laches in enforcing its rights"). The reasons for this rule are

straightforward. "The government can transact its business only through its agents;

and its fiscal operations are so various, and its agencies so numerous and scattered,

that the utmost vigilance would not save the public from the most serious losses, if

the doctrine of laches can be applied to its transactions." *United States v.*

*Kirkpatrick*, 22 U.S. 720, 735 (1824). As Justice O'Connor pointed out, these

considerations require a "special rule" rendering laches inapplicable to the

government. *Block*, 461 U.S. at 294 ("The public interest in preserving public

rights and property from injury and loss attributable to the negligence of public

officers and agents, through whom the public must act, justified a special rule for

the sovereign.").

The Eleventh Circuit and the district courts within it have repeatedly applied

this so-called "*Summerlin* rule," particularly in the context of government

enforcement actions (like this one) brought to protect the public interest. *E.g.*, *SEC*

*v. Silverman*, 328 F. App'x 601, 605 (11th Cir. 2009) (where "a government

agency brings an enforcement action to protect the public interest, laches is not a

defense"); *United States v. Fernon*, 640 F.2d 609, 612 (5th Cir. 1981); *United States v. Mitchell*, 327 F. Supp. 476, 485 (N.D. Ga. 1971); *United States v. Meyer*, 376 F. Supp. 3d 1290, 1296 (S.D. Fla. 2019).[8]

Despite Defendants' arguments to the contrary (ECF No. 43 at 6, ECF No. 148 at 7), the Eleventh Circuit has said that "[n]either this Court nor the Supreme Court has ever indicated that laches applies against the government." *Savory v. U.S. Atty. Gen.*, 449 F.3d 1307, 1320 (11th Cir. 2006). The Eleventh Circuit has stated only that there "have been rare exceptions to this rule in certain civil cases." *United States v. Delgado*, 321 F.3d 1338, 1349 (11th Cir. 2003).[9] More specifically, "in this Circuit laches has been applied to defeat relief that the E.E.O.C. was seeking on behalf of individuals and others similarly situated." *F.T.C. v. Leshin*, 2007 WL 9703567, at *3, *3 n.8 (S.D. Fla. 2007) (collecting EEOC cases).

---

[8]    *See also Dial v. Comm'r*, 968 F.2d 898, 904 (9th Cir. 1992) ("laches is not a defense to the United States' enforcement of tax claims").

[9]    In addition, the United States is subject to laches in certain restricted contexts, such as commercial suits, that are inapplicable here. *Clearfield Trust Co. v. United States*, 318 U.S. 363, 369 (1943) (United States is not exempt from laches in commercial context because it "does business on business terms").

But efforts to extend the rule applying laches in EEOC cases into other contexts have failed. In *United States v. Arrow Transportation Co.*, 658 F.2d 392, 392-93 (5th Cir. Oct. 8, 1981), for example, the appeals court reversed a district court decision applying laches to a suit by the United States in admiralty to recover the cost of removing a barge from the bottom of the Tennessee River. The court could not "find a single Fifth Circuit case, not involving the E.E.O.C., which has changed the law to apply laches against the United States." *Id.* at 395. In short, the court wrote, "[w]e do not reverse lightly" but the "law remains unchanged: laches is unavailable as a defense against the United States in enforcing a public right." *Id.* As recently as 2009, in *S.E.C. v. Silverman*, the Eleventh Circuit reiterated the continuing validity of the *Summerlin* rule in the context of government enforcement actions brought in the public interest. 328 F. App'x. at 605.

Finally, even if laches could apply to a tax enforcement action brought by the United States, the undisputed facts are clear that the defense fails here. For Defendants to prevail on their affirmative defense of laches, they must establish the following elements by a preponderance of the evidence: "(1) a delay in asserting a right or a claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the party against whom the claim is asserted." *Kason Indus., Inc. v. Component Hardware Grp., Inc.*, 120 F.3d 1199, 1203 (11th Cir. 1997).

Here, even assuming for purposes of this motion (only) that there was a delay and it was inexcusable, the evidence of any undue prejudice is insufficient as a matter of law. For example, it is not the case that, as result of any delay, witnesses have been rendered unavailable or documents have been lost or destroyed. Defendants collectively took the depositions of every IRS employee they sought to depose (18 total) (SUF ¶ 145) and participated in an additional 32 depositions of nonparty witnesses. (SUF ¶ 146.) As Defendants have repeatedly reminded this Court, they have produced countless documents in discovery, and have never once claimed that a single document (whether to be produced or received) has been destroyed, lost, or gone missing.[10]

Moreover, any purported delay has actually inured to the Defendants' benefit. Each Defendant has profited handsomely from their conduct. (SUF ¶ 20 (EcoVest, more than $113 million), SUF ¶ 29 (Solon, more than $5.7 million), SUF ¶ 41 (Teal, more than $10.7 million), SUF ¶ 33 (McCullough, more than

---

[10]    Clark has produced 13,312 documents (consisting of 424,957 pages). (SUF ¶ 147.) The EcoVest Defendants have produced 196,001documents (consisting of over 1.8 million pages), excluding documents they received in response to subpoenas issued to nonparties. (SUF ¶ 148.) And the United States has produced at least 51,274 documents (consisting of over 966,000 pages), plus an additional 676,001 documents (consisting of over 5.7 million pages) that it received from nonparties. (SUF ¶¶ 149-50.)

$818,000), and ¶ 56 (Clark, more than $1.1 million).) Perhaps even more importantly, the EcoVest Defendants have been able to avoid costly ancillary litigation (such as class action investor lawsuits) precisely because this suit, and audits related to the transactions in this suit, are not yet resolved. Against this backdrop, Defendants have obtained a windfall, not suffered prejudice, from any delay. *See Savoury*, 449 F.3d at 1319 ("Instead of suffering a detriment, Savoury has enjoyed a windfall.").

## III.   DEFENDANTS' ESTOPPEL DEFENSE ALSO FAILS AS A MATTER OF LAW.

Defendants have also asserted an estoppel defense, but the "immediate, serious problem that crops up, of course, is that it is far from clear that the doctrine of equitable estoppel may even be applied against a government agency. The Supreme Court has never held that it may be." *Id.* at 318. In any event, equitable estoppel does not apply to suits brought by the United States as it does to suits brought by private citizens. *See*, *e.g.*, *O.P.M v. Richmond*, 496 U.S. 414, 419 (1990) ("[f]rom our earliest cases, we have recognized that equitable estoppel will not lie against the Government as it lies against private litigants"). The Supreme Court has explained the rationale for this rule: "When the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined."

*Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 60 (1984). Thus, the defense of equitable estoppel may succeed against the United States "only in a rather narrow possible range of circumstances." *Id.* at 68 (Rehnquist, J., concurring). *See Ellinger v. United States*, 470 F.3d 1325, 1336 n.9 (11th Cir. 2006) ("the burden of establishing an equitable estoppel claim against the government is" "daunting"); *Feldman v. Comm'r*, 20 F.3d 1128, 1134 (11th Cir. 1994) (holding that "equitable estoppel will lie against the government only in the most extreme circumstances").

"The Eleventh Circuit has applied a three-fold test to parties seeking to apply estoppel against the Government: (1) the government must have acted in its proprietary capacity rather than in its sovereign capacity; (2) the traditional elements of estoppel must be present; and (3) the government officer or agent making the representation relied on must have acted within the scope of his authority." *Gibson v. Resolution Trust Corp.*, 750 F. Supp. 1565, 1573 (S.D. Fla. 1990) (citing *United States v. Killough,* 848 F.2d 1523 (11th Cir. 1988); *United States v. Vonderau*, 837 F.2d 1540 (11th Cir. 1988)). In addition, a party must adduce evidence of "affirmative misconduct by the Government." *United States v. McCorkle*, 321 F.3d 1292, 1297 (11th Cir. 2003).

41

Defendants' estoppel defense fails as a matter of law for at least two reasons. First, there is no dispute that the United States has brought this tax enforcement action in its public or sovereign capacity. "Activities undertaken by the government primarily for the commercial benefit of the government or an individual agency are subject to estoppel while actions involving the exercise of exclusively governmental or sovereign powers are not." *F.D.I.C. v. Harrison*, 735 F.2d 408, 411 (11th Cir. 1984). Promulgating, interpreting, and enforcing tax laws are sovereign functions. *See Franchise Tax Bd. of Cal. v. Hyatt*, 538 U.S. 488, 498 (2003); *Harrison*, 735 F.2d at 411 (citing *Auto. Club of Mich. v. Comm'r.*, 353 U.S. 180 (1957)). And those are precisely the claims at issue in this case.

Applying these rules, district courts in the Eleventh Circuit have repeatedly refused to permit an estoppel defense in suits involving the IRS because enforcement of the tax laws is a uniquely public function. *E.g.*, *Segel v. United States*, 1997 WL 369756, at *7 (S.D. Fla. 1997) (rejecting an estoppel defense where the IRS "was clearly acting in its public capacity with respect to the assessment of federal tax liabilities, and not in a private or proprietary capacity"); *Robert Norris & Assocs., P.C. v. United States*, 1992 WL 133210, at *4 (N.D. Ala. 1992) (where there was "no question that the United States was acting in its public or sovereign capacity in its efforts to collect delinquent employment taxes"

42

"plaintiff cannot show that the government was acting in its private or proprietary capacity"); *Whitaker v. United States*, 2019 WL 4722465, at *10 (N.D. Fla. 2019) (rejecting estoppel defense, noting "the power to promulgate and enforce tax laws is an essential attribute of sovereignty").

In sum, to dispose of Defendants' estoppel defense, the Court need not address the elements of estoppel. As a matter of law, estoppel is simply inapplicable where, as here, the United States acted in its sovereign capacity in bringing an enforcement action. *Gibson*, 750 F. Supp. at 1573 ("Proprietary governmental functions include essentially commercial transactions involving the purchase or sale of goods and services and other activities for the commercial benefit of a particular government agency . . . . Conversely, in its sovereign role, the government carries out unique governmental functions for the benefit of the whole public."). Because "[t]axing is a sovereign function" "[e]quitable estoppel cannot be applied" against the United States in this case. *United States v. Qurashi*, 2004 WL 1771071, at *2-3 (M.D. Fla. 2004).

Second, Defendants' estoppel defense fails as a matter of law because any alleged improprieties by individual IRS employees in this case fall well short of the "affirmative and egregious misconduct" required for an estoppel defense to lie against the United States. As the Eleventh Circuit has stated "if estoppel is

43

available against the Government, it is warranted only if affirmative and egregious misconduct by government agents exists." *Sanz v. U.S. Security Ins. Co.*, 328 F.3d 1314, 1319 (11th Cir. 2003). *See also INS v. Miranda*, 459 U.S. 14, 17-18 (1982) (mere negligence by the government does not constitute affirmative misconduct necessary to support an estoppel against the United States); *McCorkle*, 321 F.3d at 1297 ("Affirmative misconduct requires more than governmental negligence or inaction; otherwise, prong two and prong four would be redundant."). Perhaps not surprisingly, in light of this heavy burden, "[n]either the Supreme Court nor the Eleventh Circuit has ever found affirmative misconduct sufficient to support a claim of equitable estoppel against the government." *United States v. Miller*, 2010 WL 2202776, at *4 (S.D. Ala. 2010).

In *Miller*, the taxpayer asserted the government was "equitably estopped to take enforcement action" because, according to the taxpayer, a letter she received from the IRS indicated the revenue officer had decided not to recommend seizure of the taxpayer's home. *Id.* Because "affirmative misconduct requires more than negligence," the defense failed because, among other things, there was "no evidence" that the revenue officer "desired to trick [the taxpayer] into believing her home would not be seized while all the time knowing it would be." *Id.* at *5. *See also United States v. Zolot*, 2011 WL 13213614, at *5 (S.D. Fla. 2011) ("the

Supreme Court nor the Eleventh Circuit has ever found affirmative misconduct sufficient to support a claim of equitable estoppel against the government based upon much more compelling facts than those presented here"); *Whitaker*, 2019 WL 4722465, at *10 ("Considered in the light most favorable to Plaintiff, he has failed to create a genuine issue as to whether the IRS committed misconduct warranting estoppel.").

The same is true here. Defendants have not identified any statements made by a government employee that rise to the level of affirmative misconduct. Instead, in an interrogatory response, Defendants listed a smattering of statements, publications, and remarks attributable to the IRS, as well as deposition testimony that purportedly shows "bias" on the part of an IRS appraiser. But none of these rises to the level of misconduct. Indeed, given their level of sophistication, it strains credulity to suggest the IRS could ever "trick" these Defendants regarding the syndicated conservation easement transactions they created, organized, sponsored, and promoted. And even if it were established that an IRS employee was, in fact, biased when the IRS was – years later – auditing the Defendants' completed transactions, it would be absurd and illogical to suggest that the Defendants relied to their detriment on that "bias" back when they were promoting their schemes to customers. The Defendants were not – and could not have been –

aware of this alleged bias when they conceived of and organized their abusive tax scheme. For this reason, too, the defense of equitable estoppel is subject to summary judgment.

## CONCLUSION

For the foregoing reasons, the United States' motion should be granted. Specifically, the United States is entitled to judgment as a matter of law with respect to the following three issues: (1) each Defendant violated 26 U.S.C. § 6700 by (a) falsely promising that the conservation easement appraisals they prepared and furnished could be used for federal tax purposes and (b) falsely stating there were no sales "involving" the subject properties within three years of the valuation date; (2) laches is not available as a defense in this case; and (3) estoppel is not available as a defense in this case.

//

//

//

//

//

//

//

Dated: February 15, 2022        Respectfully submitted,

DAVID A. HUBBERT
Deputy Assistant Attorney General

/s/ Harris J. Phillips
ERIN R. HINES
Florida Bar No. 44175
GREGORY VAN HOEY
Maryland Bar
RICHARD G. ROSE
District of Columbia Bar No. 493454
HARRIS J. PHILLIPS
Massachusetts Bar No. 675603
JAMES F. BRESNAHAN II
Virginia Bar No. 80164
ERIC M. ABERG
District of Columbia Bar No. 1044111
LAUREN A. DARWIT
Illinois Bar No. 6323788
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 7238, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 514-2901

Local Counsel:
KURT ERSKINE
United States Attorney
NEELI BEN-DAVID
Assistant U.S. Attorney
Georgia Bar No. 049788
Office of the United States Attorney
Northern District of Georgia
600 U.S. Courthouse
75 Ted Turner Drive, SW, Suite 600
Atlanta, GA 30303
Telephone: (404) 581-6303

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this document was formatted in Times New Roman 14 pt., in compliance with Local Rule 5.1C.

<u>/s/ Harris J. Phillips</u>
Harris J. Phillips
Trial Attorney
U.S. Department of Justice