UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:18-cv-05774-AT |
| | ) | |
| v. | ) | |
| | ) | |
| ECOVEST CAPITAL, INC., et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1(B),

N.D. Ga., the United States files this Statement of Undisputed Material Facts in

support of its Motion for Partial Summary Judgment.

//

//

//

//

//

//

//

# TABLE OF CONTENTS

I.    DEFENDANTS ESTABLISHED A REAL ESTATE COMPANY THAT OFFERED PROJECTS WITH CONSERVATION EASEMENT OPTIONS ...................................................................3

    A.    Conservation Resources, Inc. ("CRI") ....................................4

    B.    EcoVest Capital, Inc. ..............................................................6

    C.    Alan Solon...............................................................................8

    D.    Robert McCullough .................................................................9

    E.    Ralph Teal .............................................................................11

    F.    Claud Clark...........................................................................13

II.   ECOVEST USED PURCHASE AND REDEMPTIONAGREEMENTS TO ACQUIRE AN INTEREST IN THE SUBJECT PROPERTIES FOR THE ECOVEST PROJECT. ......................................................................15

III.  ECOVEST USED CONSERVATION EASEMENT APPRAISALS THAT CLARK PREPARED TO SUBSTANTIATE THE TAX DEDUCTIONS CLAIMED FROM THE ECOVEST PROJECTS ..........................................17

    A.    Statements regarding "qualified appraisals" ........................17

    B.    Statements regarding sales involving the properties ............19

    C.    Clark determined before-values for each unimproved property by applying assumptions and hypothetical conditions. ......................................20

    D.    In the sales comparison analysis Clark attempted to apply in reaching his before-values, Clark searched for sales of fully developed properties....28

    E.    The EcoVest Defendants endorse and explain Clark's before-value methodology ..................................................................32

IV.   THE APPRAISALS AND STATEMENTS REGARDING THOSE APPRAISALS WERE DISTRIBUTED TO BROKER-DEALERS, FINANCIAL ADVISORS AND CUSTOMERS .............................................34

V.    ECOVEST ALLOCATED TAX BENEFITS TO PARTICIPATING INVESTORS AS A RESULT OF THE ECOVEST PROJECTS ..................39

VI.   DEFENDANTS KNEW THE STATEMENTS WERE FALSE. ....................42

VII.  FACTS RELATED TO DEFENDANTS' AFFIRMATIVE DEFENSES ......46

I.    **DEFENDANTS ESTABLISHED A REAL ESTATE COMPANY THAT OFFERED PROJECTS WITH CONSERVATION EASEMENT OPTIONS.**

1.    Defendant EcoVest Capital, Inc. ("EcoVest") refers to itself as a "real estate company."[1]

2.    EcoVest consults on, sponsors, and manages real estate projects that include options for conservation easements ("EcoVest Projects").[2]

3.    EcoVest identifies three potential options for the real properties that are the subject of the EcoVest Projects: (1) develop the property, (2) hold the property for investment, or (3) donate a conservation easement on the property.[3]

4.    Every EcoVest Project resulted in the donation of a conservation easement on the subject real property.[4]

5.    Every EcoVest Project resulted in claimed tax deductions for the charitable contribution of the conservation easement under 26 U.S.C. § 170(h).[5]

---

[1]    EcoVest Parties' Answer to Am. Compl. at 2, ECF No. 241.

[2]    *Id.* at ¶ 45.

[3]    Ex. 563 at 3 (Private Placement Memorandum ("PPM") for Azalea Bay Resort); Ex. 755 at 2 (Arcadian Quay PPM); Ex. 1369 (Manager's Analysis for Azalea Bay Resort project).

[4]    Ex. 1370 (Dep. of Adam Lloyd at 84:5-14, Mar. 4, 2020).

[5]    Ex. 1371 at 1 (Letter from Defendant Robert M. McCullough ("McCullough") to financial advisors regarding Azalea Bay Resort dated Mar. 17, 2016) ("As a result of the donation of land into a conservation easement, investors (continued...)

6.      EcoVest allocated the tax deductions claimed for the charitable contribution of conservation easements to members in the EcoVest Projects based on the number of units each member held in the projects.[6]

7.      EcoVest's efforts are led by Defendant Alan N. Solon ("Solon"), Robert M. McCullough ("McCullough"), and Ralph R. Teal, Jr. ("Teal").[7]

8.      Defendant Claud Clark III ("Clark") prepared the conservation easement appraisals used to substantiate the tax deductions claimed for 70 of the EcoVest Projects.[8]

## A.      Conservation Resources, Inc. ("CRI")

9.      Conservation Resources, Inc. ("CRI") was formed on December 2,

---

in Azalea Bay realized a non-cash charitable donation valued at $42,731,010 or $45,218.00 per Unit."); Ex. 1372 at 1 (Letter from McCullough to financial advisors regarding South Bay Cove dated Mar. 30, 2016); Ex. 1373 at 1 (Letter from McCullough to financial advisors regarding Arcadian Quay dated Apr. 4, 2017); Ex. 1374 at 1 (Letter from McCullough to financial advisors regarding Neuse Harbor); *see also* Ex. 1370 (Dep. of Adam Lloyd at 84:5-13, Mar. 4, 2020).

[6]      *See* Ex. 1371 at 1 (Letter from McCullough to financial advisors regarding Azalea Bay Resort dated Mar. 17, 2016); Ex. 1372 at 1 (Letter from McCullough to financial advisors regarding South Bay Cove dated Mar. 30, 2016); Ex. 1373 at 1 (Letter from McCullough to financial advisors regarding Arcadian Quay dated Apr. 4, 2017); Ex. 1374 at 1 (Letter from McCullough to financial advisors regarding Neuse Harbor).

[7]      EcoVest Parties' Answer to Am. Compl. at 3, ECF No. 241.

[8]      Ex. A to the Joint Stipulation Between the United States and Claud Clark III, ECF No. 297-1.

2010.[9]

10.    Solon served as CRI's President.[10]

11.    According to an Operational Due Diligence Report regarding EcoVest prepared by FactRight LLC and dated August 15, 2017, Solon represented that the idea for CRI grew out of "the goal of offering tax-planning options":[11]

The entity that evolved into EcoVest began as an affiliate of Strategic Financial Alliance Holdings, Inc. (SFAH), named Conservation Resources, Inc. (CRI). SFAH's primary asset is its subsidiary Strategic Financial Alliance Inc. (SFA), a FINRA-registered broker dealer. CRI, formed in 2009 by Alan Solon, Clive Slovin, and Jeffrey Bland, consulted on land offerings similar to those now sponsored by EcoVest. Mr. Solon represents that the idea for CRI grew out of an opportunity SFA identified. He represents that SFA wanted to discuss comprehensive wealth management, including tax planning, with its clients and was looking for investment products toward the goal of offering tax-planning options. If the investors of an investment program vote to grant a conservation easement, its investors are eligible to take a non-cash charitable contribution tax deduction based on the value of the easement, as determined by a qualified appraiser.

12.    Between 2010 and 2012, CRI provided conservation easement consulting services on 10 projects.[12]

---

[9]    Am. Compl. ¶ 30, ECF No. 225; EcoVest Parties' Answer to Am. Compl. ¶ 30, ECF No. 241.

[10]    Am. Compl. ¶ 34, ECF No. 225; EcoVest Parties' Answer to Am. Compl. ¶ 34, ECF No. 241.

[11]    Ex. 649 at 6 (Operational Due Diligence Report Regarding EcoVest dated August 15, 2017).

[12]    Ex. B to the Joint Stipulation Between the United States and the EcoVest Parties Regarding Net Receipts, ECF No. 288-2; EcoVest Parties' Answer to Am. Compl. ¶ 31, ECF No. 241; Decl. of Virginia Brown ("Brown Decl.") ¶¶ 6-34, ECF No. 333-3.

B.   **EcoVest Capital, Inc.**

13.     EcoVest was formed in 2012 and has operated since then.[13]

14.     In 2012, EcoVest consulted on five projects that included options for conservation easements. Between 2013 and 2018, EcoVest sponsored and managed 58 projects that included options for conservation easements.[14]

15.     Adam Lloyd (EcoVest's Chief Operating Officer) confirmed in his deposition that EcoVest organized projects that included options for conservation easements:[15]

```
32: 7        Q.    Okay.  Understood.  So just for purposes
    8   of today, though, there's no dispute that you
    9   understand what I mean when I ask you about a
   10   conservation easement deal.  There's no issue about
   11   that.  Is that fair to say?
   12        A.    I understand what you're referring to,
   13   yes.
   14        Q.    Thank you.  Can you ballpark, Mr. Lloyd,
   15   over the years how many of these deals EcoVest has
   16   organized?
   17        A.    In my time with the organization,
   18   somewhere around -- as a sponsor, I think somewhere
   19   between 60 and 65.
```

16.     In a letter agreement that McCullough (EcoVest's Chief Financial Officer) signed on behalf of EcoVest, EcoVest acknowledged that it "will organize

---

[13]     Am. Compl. ¶ 41, ECF No. 225; EcoVest Parties' Answer to Am. Compl. ¶ 41, ECF No. 241

[14]     Ex. A to the Joint Stipulation Between the United States and the EcoVest Parties Regarding Net Receipts, ECF No. 288-1.; EcoVest Parties' Answer to Am. Compl. ¶¶ 58-59, ECF No. 241; Ex. 1375 (EcoVest Master Entity Chart).

[15]     Ex. 1370 (Deposition of Adam Lloyd at 32:7-19, Mar. 4, 2020).

and offer" the EcoVest Projects.[16]

17.    EcoVest, through its employees and representatives, signed and filed formation documents for entities used in its projects.[17]

18.    EcoVest, through its employees, signed operating agreements for entities used in its projects.[18]

19.    In a letter agreement that McCullough (EcoVest's Chief Financial Officer) signed on behalf of EcoVest, EcoVest acknowledged that it "will oversee the preparation of a private placement memorandum and related documents" for each of the EcoVest Projects.[19]

20.    Between 2012 and 2018, EcoVest received over $113.9 million in consulting fees and distributions in connection with the EcoVest Projects.[20]

---

[16]    Ex. 1376 at 1 (Letter Agreement between EcoVest and Triloma Financial Group, LLC, dated Feb. 19, 2015).

[17]    Ex. 1377 at 4 (Certificate of Formation for Long Bay Marina Holdings, LLC); Ex. 1378 at 2 (Certificate of Formation for Carolina Bays Resort Holdings, LLC); Ex. 1379 at 2 (Certificate of Formation for Azalea Bay Resort Holdings, LLC).

[18]    Ex. 1380 (Operating Agreement of Azalea Bay Resort Holdings, LLC); Ex. 1381 (Limited Liability Company Operating Agreement of EcoVest Azalea Bay, LLC); Ex. 1382 (Operating Agreement of Azalea Bay Development, LLC); Ex. 1383 (Operating Agreement of Azalea Bay Management, LLC); Ex. 1384 (Amended and Restated Operating Agreement of Azalea Bay Resort, LLC).

[19]    Ex. 1376 at 2 (Letter Agreement between EcoVest and Triloma Financial Group, LLC, dated Feb. 19, 2015).

[20]    Ex. 1385 ¶ 1-2 (EcoVest's Responses to United States' Second Requests for Admission).

21.     Private Placement Memoranda ("PPMs") prepared and distributed for EcoVest Projects represented that Defendants Solon, McCullough, and Teal were part of a group of individuals "most directly responsible for the management" of entities involved in the projects. For example, the PPM prepared for EcoVest's Azalea Bay Resort project stated:[21]

**Controlling Persons**

The individuals most directly responsible for the management of the Company and Property Entity on behalf of the Manager are Messrs. Teal, Solon, McCullough, Linsider, Lloyd and Killen. In addition to Mr. Solon, Mr. Slovin and Mr. Kahn currently serve on the board of directors of the Sponsor. However, Mr. Slovin has agreed to resign from the board of directors by December 31, 2015 in connection with the purchase of his interests in EcoVest by Mr. Solon or his designee. See "Recapitalization Transactions" below. The following provides certain biographical information on Messrs. Teal, Solon, McCullough, Linsider, Lloyd, Killen, Slovin and Kahn.

### C.     **Alan Solon**

22.     Solon is one of the founders of EcoVest.[22]

23.     Solon has served as the President and Chief Executive Officer of EcoVest, and he has also served on EcoVest's Board of Directors.[23]

24.     Prior to 2014, Solon was involved in the development and conservation options for projects offered by CRI and EcoVest.[24]

25.     Prior to 2014, Solon's role with respect to the projects offered by CRI

---

[21]     Ex. 563 at 77 (Azalea Bay Resort PPM); *see also* Ex. 755 at 83-84 (Arcadian Quay PPM).
[22]     EcoVest Parties' Answer to Am. Compl. ¶ 37, ECF No. 241.
[23]     *Id.* at ¶ 28.
[24]     Ex. 1386 at 12 (Solon's Objections and Responses to the United States' First Set of Interrog.).

and EcoVest included working with individuals who were responsible for details of the offerings, such as the creation of development plans and the evaluation of the conservation values and purposes of the property.[25]

26.     Solon answers questions from broker-dealers about, and provides education and training as to the nature of, EcoVest's investment offerings.[26]

27.     Solon has engaged in discussions about the specific nature of EcoVest's offerings with potential investors and their financial advisors.[27]

28.     Solon has been involved with every EcoVest Project.[28]

29.     Between 2012 and 2018, Solon's total net receipts related to the EcoVest Projects exceed $5.7 million.[29]

**D.     Robert McCullough**

30.     McCullough joined EcoVest in 2014.[30]

31.     McCullough has been a senior leader of EcoVest and involved in its operations.[31]

---

[25]     *Id.* at 12.
[26]     *Id.* at 16.
[27]     *Id.*
[28]     *Id.* at 17.
[29]     Joint Stipulation Between the United States and the EcoVest Parties Regarding Net Receipts ¶ 3, ECF No. 288.
[30]     Am. Compl. ¶ 62, ECF No. 225; EcoVest Parties Answer to Am. Compl. ¶ 62, ECF No. 241.
[31]     EcoVest Parties' Answer to Am. Compl. ¶ 63, ECF No. 241.

32.     McCullough has served as EcoVest's Senior Vice President, Chief Financial Officer, Treasurer, and Secretary.[32]

33.     Between 2014 and 2018, McCullough's net receipts related to the EcoVest Projects exceeded $818,000.[33]

34.     McCullough is responsible for EcoVest's general operations and finances. Additionally, with respect to EcoVest offerings, McCullough participates in due diligence, trains and educates broker-dealers, and participates in investor relations.[34]

35.     McCullough answers questions from broker-dealers about, and provides education and training as to the nature of, EcoVest's investment offerings.[35]

36.     McCullough has been involved with every EcoVest Project that has included an option for a conservation easement since he joined EcoVest.[36]

---

[32]     Am. Compl. ¶ 61, ECF No. 225; EcoVest Parties' Answer to Am. Compl. ¶ 61, ECF No. 241.

[33]     Joint Stipulation Between the United States and the EcoVest Parties Regarding Net Receipts ¶ 4, ECF No. 288.

[34]     Ex. 64 at 10-11 (McCullough's Objections and Responses to the United States' First Set of Interrog.).

[35]     *Id.* at 14.

[36]     *Id.* at 15.

### E.   **Ralph Teal**

37.    Since approximately 2015, Teal has been a co-owner of EcoVest.[37]

38.    Teal has also been a member of the board of directors of EcoVest since 2015.[38]

39.    Teal receives $100,000 per year to serve on EcoVest's board of directors.[39]

40.    Teal has been a manager and the Vice Chairman of EcoVest's board of directors.[40]

41.    Between 2013 and 2018, Teal's total net receipts related to the EcoVest Projects exceeded $10.7 million.[41]

42.    Teal's responsibilities with respect to his work with EcoVest included locating land for EcoVest transactions.[42]

---

[37]    Ex. 1387 (Dep. of Ralph Teal at 72:1-5, 72:15-73:4, Jan. 28, 2021); Am. Compl. ¶ 66, ECF No. 225; EcoVest Parties' Answer to Am. Compl. ¶ 66, ECF No. 241.
[38]    Ex. 1387 (Dep. of Ralph Teal at 72:1-5, 72:15-73:4, 100:10-12, 100:16-21, Jan. 28, 2021); Am. Compl. ¶ 66, ECF No. 225; EcoVest Parties' Answer to Am. Compl. ¶ 66.
[39]    Ex. 1387 (Dep. of Ralph Teal at 94:15-17, Jan. 28, 2021).
[40]    Ex. 1388 (Minutes of July 27, 2018 meeting of EcoVest Management, LLC).
[41]    Joint Stipulation Between the United States and the EcoVest Parties Regarding Net Receipts ¶ 5, ECF No. 288.
[42]    Ex. 1387 (Dep. of Ralph Teal at 160:13-161:2, Jan. 28, 2021); *see also id.* at 176:22-177:12); *see also* Ex. 257 (Memorandum from attorney James M. Sack (continued...)

43.    Teal's responsibilities with respect to his work with EcoVest included negotiating the price EcoVest paid to acquire land for EcoVest transactions.[43]

44.    McCullough has identified Teal as EcoVest's "joint-venture development partner."[44]

45.    Teal has worked on every EcoVest Project since 2013 except for one project.[45]

46.    Teal has met with landowners in Myrtle Beach to negotiate real estate deals related to EcoVest Projects.[46]

47.    Teal referred to EcoVest Projects as "the product we are offering."[47]

48.    Teal participated in "all hands" meetings with EcoVest personnel.[48]

---

dated May 2, 2012) ("[Teal's] team is doing much of the legwork that in other deals would have fallen on [Solon's] shoulders"); Ex. 272 at 23 (Teal "uses his knowledge of the marketplace and his network to identify landowners with property that is suitable for EcoVest projects"); Ex. 1389 (Dep. of Virginia Brown at 81:15-20, May 27, 2021) ("Q.  So how does EcoVest learn of real estate that might be a good fit for one of its offerings?  A.  I mean, as I said, Ralph brings us the properties, so that's where they are sourced.");

[43]    Ex. 1387 (Dep. of Ralph Teal at 179:16-20, Jan. 28, 2021).

[44]    Ex. 1390 (Email from McCullough dated May 18, 2015); *see also* Ex. 632B at 3, 5 (EcoVest Strategic Business Plan dated June 15, 2015) (Teal and EcoVest were on a joint-venture basis regarding most of the projects that took place since 2013).

[45]    Ex. 272 at 24 (Teal's Objections and Responses to the United States' First Set of Interrog.).

[46]    *Id.* 27.

[47]    Ex. 1391 (Email from Teal dated Dec. 16, 2012).

[48]    Ex. 1392 (Email from Teal dated Feb. 23, 2016).

F.    **Claud Clark**

49.    Clark prepared conservation easement appraisals to substantiate tax

deductions relating to the following 70 EcoVest Projects:[49]

| | | |
|---|---|---|
| Arcadian Quay, LLC | Greenway Holdings Acquisitions, LLC | Ocean Grove Resort Holdings, LLC |
| Azalea Bay Resort Holdings, LLC | Hammersmith Landing Holdings, LLC | Piney Cumberland Holdings, LLC |
| Azul Bay Resort Holdings, LLC | Harbor Gate at Seadrift Holdings, LLC | Port Quay Resort Holdings, LLC |
| Beech Springs Resort Holdings, LLC | Hickory Equestrian, LLC | Punta Vista Grande Holdings, LLC |
| Bellavista Grove Holdings, LLC | Hickory Preserve Holdings, LLC | Queen's Cove Holdings, LLC |
| Belle Harbour Resort Holdings, LLC | High Rocks, LLC | Red Oak Equestrian, LLC |
| Birch Equestrian Holdings, LLC | Highway 30, LLC | River Trace Resort Holdings, LLC |
| Birkdale Landing Holdings, LLC | Indigo Sound Holdings, LLC | Riverside Preserve Holdings, LLC |
| Brunswick Highlands Holdings, LLC | Lakeshore Resort Holdings, LLC | Rocky Creek Plantation Acquisitions, LLC |
| Camellia Station Holdings, LLC | Land of the Lakes Holdings, LLC | Sanibel Resort Holdings, LLC |
| Cane Creek Holdings, LLC | Leland Forest Holdings, LLC | Santo Bay Resort Holdings, LLC |
| Carolina Bays Resort Holdings, LLC | Long Bay Marina Holdings, LLC | Seavista Resort Holdings, LLC |
| Cayo Dorado Holdings, LLC | Magnolia Bay Resort Holdings, LLC | Shining Star Properties XI, LLC |
| Cayo Marsopa Holdings, LLC | Maple Equestrian, LLC | South Bay Cove Holdings, LLC |
| Coastavista Palms Holdings, LLC | Meadow Creek Holdings, LLC | Tortuga Trace Holdings, LLC |
| Copano Cove Holdings, LLC | Miramar Pointe Holdings, LLC | Trout Creek, LLC |
| Cottonwood Cove Holdings, LLC | Montego Pointe Holdings, LLC | Tupelo Grove Holdings, LLC |
| Cristobal Key Holdings, LLC | Monterrey Cove Holdings, LLC | Turkey Creek Resort Holdings, LLC |

---

[49]    Joint Stipulation Between the United States and Claud Clark III Regarding Net Receipts ¶ 2, ECF No. 297; Ex. A to the Joint Stipulation Between the United States and Claud Clark III, ECF No. 297-1.

| | | |
|---|---|---|
| Cypress Cove Marina Holdings, LLC | Myers Cove Holdings, LLC | Waterway Grove Holdings, LLC |
| Diamond Grande Resort Holdings, LLC | Myrtle Cove Resort Holdings, LLC | White Oak Equestrian, LLC |
| Dumpling Mountain, LLC | Myrtle West Resort Holdings, LLC | White Sands Village Holdings, LLC |
| Espiritu Shores Holdings, LLC | Neuse Harbor Holdings, LLC | Wilderness Lake Holdings, LLC |
| Garden Lakes Estates Holdings, LLC | New River Preserve Holdings, LLC | |
| Glade Creek, LLC | North Bay Cove, LLC | |

50.    Clark was a member of EcoVest's "all hands team:"[50]

```
255:13       Q. And you are included in this email.  Is it
    14    fair to say that you were considered a member of
    15    the all-hands team?
    16       A.  Yes, sir.
```

51.    Clark participated in "pipeline" discussions with EcoVest employees to discuss upcoming projects:[51]

```
255:16       Q.  So with respect to the core deals, the
    17    conservation easement transactions that this case
    18    is all about, Mr. Clark, he was in the pipeline
    19    discussions?
    20       A.  Yes.
```

52.    Clark participated in a March 2017 conference with EcoVest employees as a panelist to discuss "the conservation option" in EcoVest Projects.[52]

53.    Clark referred to EcoVest Projects as "our programs."[53]

---

[50]    Ex. 1393 (Dep. of Claud Clark Vol. 1 at 255:13-16, Mar. 10, 2021).
[51]    Ex. 1394 (Dep. of Jed Linsider at 255:16-20, Jan. 12, 2021); *see also* Ex. 433 (Emails from Jed Linsider and Clark dated May 24, 2016 regarding "a number of our upcoming deals").
[52]    Ex. 434 (Agenda for Due Diligence Conference on Mar. 15-16, 2017).
[53]    Ex. 435 (Email from Clark dated Jan. 24, 2017).

54.     In an email to EcoVest employees, Clark stated that he had received a call from another company and asked, "Am I allowed to work with them?"[54]

55.     Since 2010, Claud Clark III, P.C., f/k/a Clark-Davis, P.C has earned over $3.3 million in fees as the result of conservation easement appraisals that Clark prepared for EcoVest Projects.[55]

56.     Clark's total net receipts related to appraisals he prepared for EcoVest Projects are $1,125,685.76.[56]

57.     On June 28, 2013, Clark started charging a minimum fee of $50,000 "[f]or appraisals used to monetize easements, my fee will be a minimum of $50,000."[57]

## II.     ECOVEST USED PURCHASE AND REDEMPTIONAGREEMENTS TO ACQUIRE AN INTEREST IN THE SUBJECT PROPERTIES FOR THE ECOVEST PROJECT.

58.     EcoVest executed a Membership Interest Purchase Agreement ("MIPA") or Redemption Agreement for 69 of the EcoVest Projects.[58]

---

[54]     Ex. 444 (Email from Clark dated Jan. 27, 2017).
[55]     Ex. 1395 ¶ 1 (Clark's Objections and Responses to United States' First Requests for Admission).
[56]     Joint Stipulation Between the United States and Claud Clark III Regarding Net Receipts ¶ 2, ECF No. 297.
[57]     Ex. 648 (Email from Clark dated June 28, 2013).
[58]     Ex. 1398 at columns B-C (United States' summary exhibit regarding purchase and redemption agreements).

59.   EcoVest used the MIPA to acquire an interest in the land used for

EcoVest Projects:[59]

```
60: 3        Q.  Can you see at the top that it is executed
    4    as of June 8, 2015?
    5        A.  That's what it says, yes.
    6        Q.  And do you see the reference to the
    7    parties being Christian Academy, the seller, and
    8    Cypress Cove Marina Holdings, the buyer?
    9        A.  I do.
   10        Q.  Do you see that?
   11        A.  I do.
   12        Q.  So is it fair to say that this purchase
   13    agreement relates to the Cypress Cove deal?
   14        A.  Yes, what would ultimately become Cypress
   15    Cove if it went to market, yes.
   16        Q.  Got it.  Is it fair to say that this
   17    purchase agreement, the purpose of this purchase
   18    agreement is for EcoVest to acquire an interest
   19    in property that would be used in a core deal?
   20        A.  It appears, yes, that is correct.
```

60.   EcoVest's MIPAs and similar agreements identified a particular piece

of real property.[60]

61.   The purchase price set forth in the MIPAs for EcoVest's Projects

reflected what EcoVest was willing to pay as the buyer:[61]

---

[59]     Ex. 1396 (Dep. of Alan Solon Vol. 1 at 60:3-20, Apr. 6, 2021). *See also* Ex. 1394 (Dep. of Jed Linsider at 49:21-50:11, Jan. 12, 2021); Ex. 1397 (Dep. of McCullough Vol. 1 at 113:7-15, Apr. 29, 2021).

[60]     Ex. 620 at 1 (Cypress Cove Marina MIPA) ("twenty-eight and 04/100th (28.04) acres of land in Little River Township, Horry County, South Carolina"); Ex. 562 (Azalea Bay Resort MIPA) ("Two Hundred Sixty Nine and 41/100 acres (269.41) acres of land in the City of North Myrtle Beach, Horry County, South Carolina").

[61]     Ex. 1387 (Dep. of Ralph Teal at 182:9-19, Jan. 28, 2021).

```
182: 9        Q.  And that purchase price set forth in the
     10   membership interest purchase agreement was a
     11   price that you were willing to pay as the buyer;
     12   right?
     13        A.  Yes, those MIPAs were all prepared by our
     14   lawyer, and that wasn't -- I got it to the point
     15   to due diligence and the MIPA and the information
     16   in the MIPA was all prepared by the attorneys,
     17   but I would think that the price that's in there
     18   was what was negotiated, and I am certain that it
     19   was, but I didn't prepare a MIPA.
```

## III.   ECOVEST USED CONSERVATION EASEMENT APPRAISALS THAT CLARK PREPARED TO SUBSTANTIATE THE TAX DEDUCTIONS CLAIMED FROM THE ECOVEST PROJECTS.

### A.   Statements regarding "qualified appraisals"

62.   In each of the 70 conservation easement appraisals that Clark prepared

to substantiate a tax deduction for an EcoVest Project, he stated that he had

prepared a "qualified appraisal" as that term is defined in the Treasury

regulations.[62]

63.   In his conservation easement appraisal for the Azalea Bay Resort

project, Clark stated:[63]

I am a Qualified Appraiser as defined under Section 1.170A-13(c) (5).

The attached report is a "qualified appraisal report" as that term is defined in applicable Internal Revenue Service regulations (Section 1.170A-12(c) (3)) and was prepared for your use.

64.   In each of the 70 conservation easement appraisals that Clark prepared

---

[62]   Ex. 1399 at ii, column G (United States' summary exhibit regarding Clark's appraisals).

[63]   *Id.* at 21 (United States' summary exhibit regarding Clark's appraisals).

17

to substantiate a tax deduction for an EcoVest Project, he stated three opinions of fair market value: the value of the subject property *before* the imposition of a conservation easement, the value of the subject property *after* the imposition of a conservation easement, and the value of the conservation easement itself.[64]

65.    In each of the 70 conservation easement appraisals that Clark prepared to substantiate a tax deduction for an EcoVest Project, he stated that the definition of value he purported to apply for each of his valuation opinions was "fair market value" as that term is defined in the Treasury regulations.[65]

66.    In his appraisal for the Azalea Bay Resort project, Clark stated that the definition of value for each of his valuation opinions was "fair market value" as that term is defined in the Treasury regulations:[66]

> This report has been prepared, to the best of my knowledge, to the standards and requirements of the Internal Revenue Service. The definition of fair market value as set forth in Treasury Reg. 1.170A-1(c) (2) is as follows: Fair market value, as defined in section 1.170A-1(c) (2) of the Income Tax Regulations is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts.
>
> * * *
>
> I made a study of the parcel that is legally described in the easement documents for estimating the *fair market value* of the *fee simple ownership interest*, *"before"* and *"after"* the establishment of a perpetual Conservation Easement thereon.

67.    According to Clark, the definition of "fair market value" as set forth

---

[64]    *Id.* at ii, column F.
[65]    *Id.* at ii, column E.
[66]    *Id.* at 20.

in the Treasury regulations is flawed:[67]

```
58:12      Q.  Your fair market value definition says
  13    that fair market value is what a willing buyer
  14    would pay and a willing seller would accept;
  15    correct?
  16      A.  That's the definition that I am required
  17    to use.
  18      Q.  Is that the definition that you were
  19    applying in this appraisal?
  20      A.  I think that definition is flawed.
  21      Q.  That's the definition that is taken
  22    directly from the Treasury regulations; correct?
59: 1      A.  Yes, sir.
   2      Q.  And your testimony here today is that that
   3    definition of fair market value is flawed?
   4      A.  It talks about property, and we are
   5    valuing conservation easements.
```

68.     Clark would not value the property "as is" in the before-value of his

conservation easement appraisals:[68]

```
357:17      Q.  You couldn't have appraised it as is and
   18    then subtracted the value of the property after
   19    an easement was placed on the property?
   20      A.  That would not be correct.  No, sir, I
   21    wouldn't do that.
```

**B.     Statements regarding sales involving the properties**

69.     In 46 conservation easement appraisals that Clark prepared to

substantiate a tax deduction for an EcoVest Project, Clark stated the following with

respect to the subject property:[69]

---

[67]     Ex. 1393 (Dep. of Claud Clark Vol. 1 at 58:12-59:5, Mar. 10, 2021).
[68]     Ex. 1400 (Dep. of Claud Clark Vol. 2 at 357:17-21, Mar. 11, 2021).
[69]     Ex. 1399 at ii, column L (United States' summary exhibit regarding Clark's
appraisals).

*Prior Sales History*

There is no sale involving the tract within the last three years. The Subject is not listed for sale.

70.     EcoVest executed a MIPA or similar agreement in connection with the 46 EcoVest Projects for which Clark stated "there is no sale involving the tract within the last three years."[70]

71.     With respect to the 46 conservation easement appraisals that Clark prepared containing the statement "there is no sale involving the tract within the last three years," EcoVest executed a MIPA or similar agreement between 10 and 391 days (with an average time of approximately 129 days) prior to the date of those appraisals.[71]

## C.     <u>Clark determined before-values for each unimproved property by applying assumptions and hypothetical conditions</u>

72.     In each of the 70 conservation easement appraisals that Clark prepared to substantiate a tax deduction for an EcoVest Project, the real property at issue in that appraisal was vacant land.[72]

73.     On the date of Clark's appraisal for the Azalea Bay Resort project, the

---

[70]     Ex. 1398 at column B (United States' summary exhibit regarding purchase and redemption agreements).
[71]     *Id.* at column I.
[72]     Ex. 1399 at ii, column M (United States' summary exhibit regarding Clark's appraisals).

subject property was vacant land and did not contain any on-site improvements:[73]

Site Improvements:

There are no on-site improvements on the Subject Property, as it is vacant land.

74.    In each of the 70 conservation easement appraisals that Clark prepared to substantiate a tax deduction for an EcoVest Project, Clark determined that the "highest and best use" of the real property at issue in the appraisal (before encumbering the property with a conservation easement) was residential development.[74]

75.    In Clark's appraisal for the Azalea Bay Resort project, Clark stated that his highest and use conclusion in the before-value was "residential development:[75]

| High and Best Use of Site as Though Vacant: | Before: | Residential Development |
|---|---|---|
| | After: | Recreational / Green Space |

76.    In determining a before-value for each of the 70 conservation easement appraisals that Clark prepared to substantiate a tax deduction for an EcoVest Project, Clark he assumed that the subject property contained

---

[73]    *Id.* at 34.
[74]    *Id.* at ii, column H.
[75]    *Id.* at 26.

improvements that did not exist.[76]

77.    In developing the estimate of value for the Azalea Bay Resort project,

Clark stated that he assumed that the subject property contained improvements that

did not exist:[77]



Assumptions for Proposed Improvements

If the property being appraised contains any proposed improvements or repairs, whether on site or off of the site, these improvements and/or repairs are expected to be completed in a good and workmanlike and timely manner and according to information submitted and/or considered by the appraiser. In cases of proposed construction, the appraised value and conditions are subject to change upon inspection of the property after construction is completed, if any material differences are found to exist. The estimate of Market Value is as of the date shown in the report, as proposed, and as if completed and operating at the levels shown and projected in the report.

In order to fully disclose all pertinent data and ensure that the reader and/or user of the report is fully aware that the
a. The improved Subject Property does not yet, in fact, exist as of the date of the appraisal;
b. The analysis performed to develop the estimate of value is based on a hypothesis, specifically that the improved Subject Property is assumed to exist when, in fact, it does not exist;
c. Certain events need to occur, as disclosed in the report, before the property appraised with the proposed improvements will in fact exist; and
d. The appraisal does not address unforeseeable events that could alter the proposed property improvements and/or the market conditions reflected in the analyses.

78.    In determining a before-value for 50 of the conservation easement

appraisals that Clark prepared to substantiate a tax deduction for an EcoVest

Project, Clark imposed a hypothetical condition that certain improvements had

been made to the subject property that did not exist as of his valuation date.[78]

79.    Regarding the Belle Harbor project, Clark stated:[79]

---

[76]    *Id.* at ii, column I.
[77]    *Id.* at 29.
[78]    *Id.* at ii, column D.
[79]    *Id.* at 97.

This appraisal is made under a hypothetical condition that certain improvements are made to the Subject Property that are assumed to be in place when in fact they are not.

Hypothetical Condition is defined as: a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis.

80.     On the date of Clark's appraisal for the Belle Harbor project, the subject property was vacant land and contained no on-site improvements.[80]

81.     In the appraisal he prepared for the Belle Harbor project, Clark stated that the before-value of the subject property was approximately $59 million.[81]

82.     In reaching his before-value set forth in the appraisal for the Belle Harbor project, Clark assumed that a proposed development was fully built out and sold out:[82]

```
329:16          Q.  So are you saying that you prepared this
    17      before value under the hypothetical condition
    18      that the proposed development was fully built out
    19      and sold out?
    20          A.  Yes, sir.
```

83.     Clark explained that a willing buyer would pay the before-value he determined for the Belle Harbor Resort project ($59 million) only if the subject property were developed:[83]

---

[80]   *Id.* at 112.
[81]   *Id.* at 98-99.
[82]   Ex. 1400 (Dep. of Claud Clark Vol. 2 at 329:16-20, Mar. 11, 2021).
[83]   Ex. 1400 (Dep. of Claud Clark Vol. 2 at 324:2-9, Mar. 11, 2021).

```
324: 2        Q.  And speaking regarding the before value,
     3   Mr. Clark, you concluded that a willing buyer
     4   would pay approximately $59 million as of
     5   December 15, 2015 if the Belle Harbour property
     6   were not encumbered by a conservation easement;
     7   is that correct?
     8        A.  And developed under its fullest highest
     9   and best use, yes, sir.
```

84.    On the date of Clark's appraisal for the Waterway Grove project, the subject property was vacant land and contained no on-site improvements.[84]

85.    In the appraisal prepared for the Waterway Grove project, Clark stated that the before-value of the subject property was approximately $61 million.[85]

86.    In reaching his before-value set forth in the appraisal prepared for the Waterway Grove project, Clark assumed that the subject property was developed:[86]

```
113:10        Q.  But this is unimproved land -- correct? --
     11   with no roads.  It is just vacant.  How is that
     12   comparable to a developed property?
     13        A.  We made the hypothetical assumption that
     14   it was developed and used that as the basis for
     15   our before, following the tax code, court cases
     16   such as Kiva Dunes, the IRS guidelines to
     17   reviewing conservation easement appraisals,
     18   experience with IRS appraisers who have used the
     19   same methodology of valuing the hypothetical and
     20   not the raw land, which I believe is the correct
     21   way to go about estimating before value.
```

87.    Clark explained that the $61 million before-value he determined for the Waterway Grove project was the value of the subject property if the proposed

---

[84]    Ex. 1399 at 1263 (United States' summary exhibit regarding Clark's appraisals).
[85]    *Id.* at 1249-1250.
[86]    Ex. 1393 (Dep. of Claud Clark Vol. 1 at 113:10-21, Mar. 10, 2021).

development were built out, and that it was not the value of unimproved land:[87]

```
57: 1        Q.  And you concluded that a willing buyer
    2    would pay it looks like a little over $61 million
    3    for Waterway Grove as of December 28, 2016 --
    4    correct? -- if the property were not encumbered
    5    by a conservation easement?
    6        A.  That's the fair market value if developed
    7    on the highest and best use.  If the project were
    8    built out, yes.
57: 9        Q.  Well, do we agree that the willing buyer
   10    in your fair market value definition would be
   11    purchasing unimproved land at Waterway Grove?
   12        A.  No, we don't agree.
                                    ***
57:21        Q.  Okay.  So do we have any dispute that the
   22    land was unimproved, Mr. Clark?
58: 1        A.  The land was unimproved.  The valuation
    2    did not value unimproved land.
```

88.    Clark explained that a willing buyer would only pay $61 million for

the Waterway Grove property if it were fully developed:[88]

```
60:16        Q.  So the fair market value of $61 million is
   17    what a willing buyer would pay for Waterway
   18    Grove; correct?
   19            MR. ELBER:  Object to form; asked
   20    and answered.
   21    BY MR. ROSE:
   22        Q.  Go ahead, Mr. Clark.
61: 1        A.  If the property were developed to its
    2    fullest highest and best use, that's what the
    3    fair market value of the property would be.
```

89.    On the date of the appraisal that Clark prepared for the Birkdale

Landing project, the subject property was vacant land and contained no on-site

improvements.[89]

---

[87]    *Id.* at 57:1-12, 57:21-58:2.
[88]    *Id.* at 60:16-61:3.
[89]    Ex. 1399 at 147 (United States' summary exhibit regarding Clark's appraisals).

90.     In the appraisal that he prepared for the Birkdale Landing project, Clark stated that the before-value of the subject property was approximately $39 million.[90]

91.     Clark admitted that the unimproved land that was the subject of the Birkdale Landing project was not worth $39 million on the date of his appraisal:[91]

```
355:22      Q.  Do you agree that the unimproved land at
356:1   Birkdale is not worth $39 million?
     2      A.  The land itself?  It's not.
     3      Q.  You wouldn't pay $39 million for what was
     4   at Birkdale Landing on the day of your site
     5   visit; correct?
     6      A.  For the vacant land only, no, sir.
```

92.     On the date of the appraisal that Clark prepared for the Espiritu Shores project, the subject property was vacant land and contained no on-site improvements.[92]

93.      In the appraisal that he prepared for the Espiritu Shores project, Clark stated that the before-value of the subject property was approximately $78 million.[93]

94.     Clark did not identify the profile of a market participant that would

[90]     *Id.* at 133.
[91]     Ex. 1400 (Dep. of Claud Clark Vol. 2 at 355:22-356:6, Mar. 11, 2021).
[92]     Ex. 1399 at 420 (United States' summary exhibit regarding Clark's appraisals).
[93]     *Id.* at 402-403.

actually pay $78 million for the Espiritu Shoes property as of his valuation date:[94]

```
418:17        Q.  So my question was did you identify a
   18    profile of a market participant that would pay
   19    $78 million for the subject property as of
   20    December 17, 2018.
   21        A.  No, I did not.
```

95.    The MIPA executed for the Cypress Cove Marina project dated June 8, 2015, explicitly stated that the value of the real property was $1,092,000.[95]

96.    In the conservation easement appraisal that Clark prepared for the Cypress Cove Marina project dated December 15, 2015, he stated that the before-value of the subject real property was $39,960,013.[96]

97.    Teal would not have paid the before-value that Clark set forth in his appraisal for the Cypress Cove Marina project – $39.9 million – because "you have to make money with the land, and the land is just a component. So, you know, there would be no room in there to develop and make any money on."[97]

98.    When asked about the before-value that Clark determined in the appraisal he prepared for the Cypress Cove Marina project, Teal testified that "my understanding from my attorneys through this process is the land value is what you

---

[94]    Ex. 1400 (Dep. of Claud Clark Vol. 2 at 418:17-21, Mar. 11, 2021).
[95]    Ex. 620 at 1 (Cypress Cove Marina MIPA).
[96]    Ex. 1399 at 351-352 (United States' summary exhibit regarding Clark's appraisals).
[97]    Ex. 1387 (Dep. of Ralph Teal at 262:22-263:7, Jan. 28, 2021).

pay for the land. But what he is appraising here is not the land."[98]

99.   The MIPA for the Carolina Bays project is dated September 4, 2014, and sets forth a purchase price of $4,638,000. On December 30, 2014, Clark prepared a conservation easement appraisal for the Carolina Bays project and reported a before-value of $53,180,304.[99]

100.   Jed Linsider, EcoVest's Chief Investment Officer, did not believe that $50 million would be a fair price to acquire an interest in the property at issue in the Carolina Bays project:[100]

```
302: 4        Q.    When you negotiated the MIPA, you
      5    thought 4.6 million was a fair price to pay.  Do
      6    you agree with me on that?
      7        A.    I do.
      8        Q.    You agree with me that 50 million would
      9    not have been a fair price to pay?
     10        A.    Yes.
     11        Q.    Okay.
```

**D.**   **In the sales comparison analysis Clark attempted to apply in reaching his before-values, Clark searched for sales of fully developed properties**

101.   In each of the 70 conservation easement appraisals that Clark prepared to substantiate a tax deduction for an EcoVest Project, he acknowledged that the

---

[98]   *Id.* at 267:3-268:9; *see also id.* at 261:13-262:10.
[99]   Ex. 1398 at row 13 (United States' summary exhibit regarding purchase and redemption agreements).
[100]   Ex. 1394 (Dep. of Jed Linsider at 302:4-11, Jan. 12, 2021).

sales comparison approach is a method for valuing vacant land.[101]

102.   In 42 of the conservation easement appraisals that Clark prepared to substantiate a tax deduction for an EcoVest Project, he stated that he was unable to find development parcels similar to the real property at issue in the appraisal.[102]

103.   In the appraisal he prepared for the Birkdale Landing project, Clark stated that he "made a search for development parcels similar to the Subject Property" and that he "was not able to find any in the normal course of business:"[103]

I made a search for development parcels similar to the Subject Property.  I was not able to find any in the normal course of business.  I used databases, such as LoopNet; I interviewed developers; and I looked for new developments on the ground and on the internet and found none.

104.   On the date of the appraisal that Clark prepared for the Birkdale Landing project, the subject property was vacant land and contained no on-site improvements.[104]

105.   In attempting to locate sales of property comparable to the Birkdale Landing property, Clark did not look for sales of vacant land with similar

---

[101]   Ex. 1399 at ii, column J (United States' summary exhibit regarding Clark's appraisals).
[102]   *Id.* at ii, column K.
[103]   *Id.* at 145.
[104]   *Id.* at 147.

development potential but, instead, he looked for sales of fully developed

properties:[105]

```
359:22      Q.  And, Mr. Clark, on page 29 of the Birkdale
360: 1   appraisal you state that "I made a search for
     2   development parcels similar to the Subject
     3   Property"; correct?
     4      A.  Yes, sir.
     5      Q.  And my question is when you conducted that
     6   search, what was it you were looking for.
     7      A.  Properties that were developed similar to
     8   the highest and best use of this property.
     9      Q.  So you were not looking for sales of
    10   unimproved land with similar development
    11   potential?
    12      A.  No, sir.
```

106.    On the date of the appraisal that Clark prepared for the Waterway

Grove project, the subject property was vacant land and contained no on-site

improvements.[106]

107.    In attempting to locate sales of property comparable to the Waterway

Grove property, Clark did not look for sales of vacant land with similar

development potential but, instead, he looked for sales of fully developed

properties:[107]

---

[105]    Ex. 1400 (Dep. of Claud Clark Vol. 2 at 359:22-360:12, Mar. 11, 2021).
[106]    Ex. 1399 at 1263 (United States' summary exhibit regarding Clark's
appraisals).
[107]    Ex. 1393 (Dep. of Claud Clark Vol. 1 at 114:6-12, 116:3-7, Mar. 10, 2021).

```
114: 6        Q.  Okay, that's fair.  My question is this.
     7   When you were doing this search -- you said, "I
     8   made a search" -- were you looking for the sale
     9   of fully developed resort-style multi-family
    10   developments?  Is that what you were looking for;
    11   sales of fully developed --
    12        A.  Yes.
                             * * *
116: 3        Q.  And you said "fully developed"; correct?
     4        A.  Yes.
     5        Q.  And that means fully built out and sold
     6   out, occupied; correct?
     7        A.  Generally, yes.
```

108.   On the date of the appraisal that Clark prepared for the Belle Harbor

project, the subject property was vacant land and contained no on-site

improvements.[108]

109.   In attempting to locate sales of property comparable to the Belle

Harbor property, Clark did not look for sales of vacant land with similar

development potential but instead, he looked for sales of fully developed resort-

style multi-family developments:[109]

---

[108]   Ex. 1399 at 112 (United States' summary exhibit regarding Clark's
appraisals).
[109]   Ex. 1400 (Dep. of Claud Clark Vol. 2 at 333:17-334:6, Mar. 11, 2021).

```
333:17        Q.  And my question is what did you look for.
    18        A.  I would be looking for property that was
    19   developed in a method similar to the highest and
    20   best use of this subject property.
    21        Q.  So you were not looking for sales of
    22   unimproved land with similar development
334: 1   potential; is that fair?
     2        A.  That is fair.
     3        Q.  You were looking for the sale of a fully
     4   developed resort-style multi-family development;
     5   is that correct?
     6        A.  Yes, that's correct.
```

110.   On the date of the appraisal that Clark prepared for the Myrtle West

project, the subject property was vacant land and contained no on-site

improvements.[110]

111.   In attempting to locate sales of property comparable to the Myrtle

West property, Clark looked for sales of developed properties:[111]

```
391:20        Q.  Now, in this appraisal you also state that
    21   you made a search for development parcels similar
    22   to the subject property.  And I am asking again
392: 1   the question what was it that you were looking
     2   for when you made that search.
     3        A.  Properties developed to the highest and
     4   best use similar to the subject property.
```

**E.   The EcoVest Defendants endorse and explain Clark's before-value methodology**

112.   EcoVest's consultant Larry Kohler wrote a memo to Solon, Teal, and

---

[110]   Ex. 1399 at 847 (United States' summary exhibit regarding Clark's appraisals).
[111]   Ex. 1400 (Dep. of Claud Clark Vol. 2 at 391:20-392:4, Mar. 11, 2021).

McCullough (among others) stating that the "before value" for EcoVest Projects was supported by an "'as built' Development Model."[112]

113.   EcoVest, through its attorneys, takes the position that the before-value determined for a conservation easement appraisal is "what the value of the land would be if it were in its highest and best use state" before the easement is placed:[113]

> **IV.   Fair Market Value Is Not Calculated Based on Purchase of Partnership Interest**
>
> As an additional alternative argument, RAR #3 takes the position that the conservation easement should be valued by reference to the amount AQH paid to acquire its interest in AQ. This argument is flawed.  Under the applicable regulations and case law, conservation easements are not valued based on the value of acquired partnership interests or based on the assets held by a partnership.  Rather, conservation easements are valued based on the difference between what the value of the land would be if it were in its highest and best use state before and after the easement is placed.  In any event, the fair market value of land cannot be determined based on one sale between private parties.

114.   EcoVest, through its attorneys, takes the position that a determination of the before-value for a conservation easement appraisal "must assume the property is in its highest and best use state:"[114]

---

[112]   Ex. 604B at 2 (Memorandum from Larry Kohler dated Jan. 10, 2015).
[113]   Ex. 1401 at 93 (Protest letter dated Jan. 14, 2021 regarding Arcadian Quay).
[114]   *Id.* at 94.

contribution and after contribution of the easement.  Critically, the before and after values must assume the property is in its highest and best use state.  Treas. Reg. § 1.170A-14(h)(3)(ii).

115.   McCullough explained that he believed the before-value for a conservation easement appraisal is different than a "traditional fair market value appraisal." He gave the following example to illustrate this point: if a landowner had a "traditional fair market value appraisal" stating his land was worth $1 million, and a developer believed he could buy the land for $1 million and build the product for $4 million and sell the product for $15 million, then the before-value would be $10 million ($15 million sales price minus $5 million in costs).[115]

## IV.   THE APPRAISALS AND STATEMENTS REGARDING THOSE APPRAISALS WERE DISTRIBUTED TO BROKER-DEALERS, FINANCIAL ADVISORS AND CUSTOMERS.

116.   The conservation easement appraisals that Clark prepared to substantiate tax deductions for EcoVest Projects were addressed to EcoVest or its subsidiaries or agents.[116]

117.   EcoVest made Clark's appraisals available to the broker-dealers and

---

[115]   Ex. 1402 at 26:11-28:15 (Transcription of audio file with file name "BobM_sales_pitch_100317").
[116]   Ex. 1399 at ii, column C (United States' summary exhibit regarding Clark's appraisals).

to financial advisors that helped sell the transactions to customers:[117]

```
215: 9      Q.  So let's just back up just a touch.  Is
     10  the managing broker-dealer -- that would be
     11  Triloma or Arque -- do they get a copy of the
     12  appraisal Mr. Clark prepares for the core deals?
     13      A.  In addition to the rest of the due
     14  diligence materials as well.
     15      Q.  Now, do the individual broker-dealers that
     16  offer the core deals on their platform, do they
     17  get a copy of the appraisal that Mr. Clark
     18  prepares?
     19      A.  Yes, in addition to the rest of the due
     20  diligence materials as well.
     21      Q.  Do the financial advisors -- those are the
     22  ones that are selling the deals to customers --
216: 1  do they get a copy of documents, one of which is
      2  the appraisal Mr. Clark prepares?
      3      A.  If the appraisal is disclosed in the PPM,
      4  which I believe it is, they have access to it
      5  there, as do their investors.  But the PPM is the
```

118.   EcoVest made Clark's appraisals available to customers that invested

in the transactions:[118]

---

[117]    Ex. 1396 (Dep. of Alan Solon Vol. 1 at 215:9-216:5, Apr. 6, 2021). *See also* EcoVest Parties' Answer to Am. Compl. ¶¶ 165, 173, ECF No. 241; Ex. 563 at 57 (Azalea Bay Resort PPM) ("A copy of such appraisal report is available from the Manager upon request.").

[118]    Ex. 1396 (Dep. of Alan Solon Vol. 1 at 217:11-218:8, Apr. 6, 2021); Ex. 1403 (Email from McCullough dated Nov. 14, 2016); Ex. 1404 (Email from Pat McQueen dated Nov. 5, 2018); Ex. 1405 (Email from McCullough dated Mar. 4, 2015); Ex. 1406 (Email from McCullough dated June 30, 2016).

```
217:11        Q.  Now, when it came time to vote, are you
    12    aware of the fact that customers, in fact, had
    13    access to the Box.com interface to look at
    14    documents related to the transaction?
    15        A.  Yes, purposely.
    16        Q.  Okay.  And one of the documents, among
    17    others, in there would be the appraisal Mr. Clark
    18    prepared.  Would that be correct?
    19        A.  Correct.
    20        Q.  That's because, is it fair to say, the
    21    appraisal is one of the important supporting
    22    documents for customers to consult when voting?
218: 1        A.  It is one of many important documents.
     2        Q.  So basically, every customer who is voting
     3    is able to go and pull the qualified appraisal
     4    that Mr. Clark prepared from the Box.com
     5    platform?
     6        A.  Yes, including all the other relevant due
     7    diligence materials either for the other
     8    strategies as well.
```

119.   In communications sent to financial advisors and members, EcoVest

identified Clark's appraisals as "Qualified Appraisal[s]:"[119]

In an effort to streamline your client's tax-filing process we have also made many of the documents available through a secure data room.  The documents in the secure data room include:

- Form 8283, Noncash Charitable Contributions, from the property partnership including summary information
- The Qualified Appraisal, including a copy of the executed conservation easement and the baseline documentation
- The contemporaneous written acknowledgement of the conservation contribution from North American Land Trust

---

[119]   Ex. 1371 at 2 (Letter from McCullough to financial advisors regarding Azalea Bay Resort dated March 17, 2016); *see also* Ex. 1373 at 2 (Letter from McCullough to financial advisors regarding Arcadian Quay dated Apr. 4, 2017); Ex. 1407 at 1 (Letter from McCullough to members of Azalea Bay Resort Holdings, LLC, regarding transmittal of Schedule K-1 packages); Ex. 1408 at 1 (Letter from McCullough to members of Azalea Bay Resort Holdings, LLC, regarding transmittal of Schedule K-1 packages).

120.   EcoVest prepared memoranda titled "Manager's Analysis" that were addressed to members in EcoVest Projects and identified Clark's conservation easement appraisals as "Qualified Appraisals.[120]

121.   EcoVest's Manager's Analyses identified "Conservation Option Return Calculators" as an "Additional Resource" available to members in the project.[121]

122.   EcoVest's "Conservation Option Return Calculators" identified Clark's appraisals as "Qualified Appraisals."[122]

123.   EcoVest prepared offering memoranda (such as a PPM) for 69 of the 70 EcoVest Projects for which Clark prepared conservation easement appraisals.[123]

---

[120]   Ex. 164B at 4 (Manager's Analysis and Recommendation for Hickory Preserve project); Ex. 382 at 7 (Manager's Analysis for Sanibel Resort project); Ex. 1182 at 6 (Manager's Analysis for Myrtle West Resort project); Ex. 1369 at 6 (Manager's Analysis for Azalea Bay Resort project).

[121]   Ex. 164B at 6 (Manager's Analysis and Recommendation for Hickory Preserve project); Ex. 382 at 7 (Manager's Analysis for Sanibel Resort project); Ex. 1182 at 6 (Manager's Analysis for Myrtle West Resort project); Ex. 1369 at 7 (Manager's Analysis for Azalea Bay Resort project).

[122]   Ex. 1409 (Conservation Option Return Calculator for Myrtle West Resort project) Ex. 1410 (Conservation Option Return Calculator for Arcadian Quay project); Ex. 1411 (Conservation Option Return Calculator for Azalea Bay Resort project); Ex. 1412 (Conservation Option Return Calculator for Cypress Cove Marina project); Ex. 1413 (Conservation Option Return Calculator for Neuse Harbor project).

[123]   Ex. 1398 at column F (United States' summary exhibit regarding purchase and redemption agreements).

124.   EcoVest's PPMs contained disclosures regarding the EcoVest

Projects.[124]

125.   EcoVest provided PPMs to broker-dealers, and the PPMs were

distributed to financial advisors and customers:[125]

```
77: 2        Q.    Are the PPMs distributed to anybody?
    3        A.    Yes, this is what -- as part of the
    4    diligence process, they would be distributed to the
    5    various diligence entities that we talked about, but
    6    ultimately, any investor in an EcoVest program would
    7    have a private placement memorandum.
    8        Q.    Is that based on some sort of rule or
    9    regulation?
   10        A.    Yes, that's my understanding.
   11        Q.    So your understanding is that there are
   12    rules that actually require that a PPM be furnished
   13    to customers interested in joining the deals?
   14        A.    That's my understanding, yes.
```

126.   EcoVest employees sent PPMs.[126]

127.   The PPMs prepared and distributed for EcoVest projects stated that a

"qualified appraisal" would be obtained prior to the donation of the conservation

easement. For example, the PPM for the Azalea Bay Resort project stated:[127]

---

[124]   Ex. 1370 (Dep. of Adam Lloyd at 75:8-76:5, Mar. 4, 2020).
[125]   Brown Decl. ¶¶ 6, 36-37, 54-55, ECF No. 333-3; Ex. 1370 (Dep. of Adam Lloyd at 77:2-14, Mar. 4, 2020); Ex. 1414 (Email from Pat McQueen dated Dec. 10, 2014).
[126]   Ex. 1362 (Email from Pat McQueen dated Sept. 28, 2012); Ex. 1363 at 1 (Email from McCullough dated Dec. 15, 2017); Ex. 1364 (Email from Pat McQueen dated Apr. 9, 2018); Ex. 1415 (Email from Evelyn Saavedra dated Nov. 10, 2016); Ex. 1416 (Email from Solon dated Dec. 10, 2018).
[127]   Ex. 563 at 74 (Azalea Bay Resort PPM).

> If the amount claimed or reported as a charitable contribution deduction exceeds $5,000, the deduction must be substantiated through a "qualified appraisal" by a "qualified appraiser" under §1.170A-13(c) of the Regulations. Prior to the donation of any such easement, the Property Entity would obtain a supportable qualified appraisal to estimate the difference between the fair market value of the Property before the conservation easement would be donated and the fair market value of the Property afterwards.  PROSPECTIVE MEMBERS SHOULD RECOGNIZE

## V.   ECOVEST ALLOCATED TAX BENEFITS TO PARTICIPATING INVESTORS AS A RESULT OF THE ECOVEST PROJECTS.

128.   Manager's Analyses prepared for EcoVest Projects stated the expected tax benefit members would receive from the donation of a conservation easement "based on the Appraisal:"[128]

> If the Conservation Option is selected, based on the Appraisal, it is expected that the Members would receive a charitable contribution deduction in an amount approximately 4.11 times their gross investment in the Company ($39,914,464/$9,714,786 = 4.11).

129.   EcoVest's Conservation Option Return Calculators calculated the "Charitable Deduction Value per Unit" based on the deduction value set forth in Clark's appraisals:[129]

---

[128]   Ex. 1182 at 5 (Manager's Analysis for Myrtle West Resort project); Ex. 382 at 5 (Manager's Analysis for Sanibel Resort project); Ex. 164B at 4-5 (Manager's Analysis and Recommendation for Hickory Preserve project); Ex. 1369 at 5 (Manager's Analysis for Azalea Bay Resort project).

[129]   Ex. 1409 (Conservation Option Return Calculator for Myrtle West Resort project); Ex. 1410 (Conservation Option Return Calculator for Arcadian Quay project); Ex. 1411 (Conservation Option Return Calculator for Azalea Bay Resort project; Ex. 1412 (Conservation Option Return Calculator for Cypress Cove Marina project); Ex. 1413 (Conservation Option Return Calculator for Neuse Harbor project).

| B | C | D | E |
|---|---|---|---|
| **Myrtle West Resort Holdings, LLC** | | | |
| | | | |
| | | | |
| | Total Charitable Deduction Value per Qualified Appraisal | | $    42,238,000 |
| | | | |
| X | Investor Ownership Percentage | | 94.499% |
| | | | |
| = | Charitable Deduction Value to Investors | | $    **39,914,464** |
| | | | |
| divided by | Total # of Units Sold | | 943 |
| | | | |
| = | Charitable Deduction Value per Unit | | $    42,327 |

130.   In an email dated September 26, 2018, Solon stated "a max of 60%"

offset to AGI was the most an investor could achieve from one of the EcoVest

Projects:[130]

---

**From:**    asolon@ecovestcap.com
**Sent:**    Wed, 26 Sep 2018 12:38:49 -0400 (EDT)
**To:**    "Vaughn, Eric" <eric.vaughn@Jpmorgan.com>
**Cc:**    "O'Leary, Kevin" <kpo@marvincpa.com>; "Koecheler, John" <john.koecheler@jpmorgan.com>; bennettjim1126@gmail.com
**Subject:** Re: Quick question regarding Jim's potential conservation easement -- max AGI offset?

50% for non cash charitable deduction plus an additional 10% for cash donations to a max of 60%.
Who would be my point of contact to move this along? I'm available via cell: 404-316-2425 and able to meet in NYC the week of the 15th. The calendar is not our friend and would need to make some quick decisions in order to move forward.

Please let me know a convenient time to chat.

Best,

Alan Solon
Chairman, CEO

---

[130]    Ex. 1417 at 1 (Email from Solon dated Sept. 26, 2018).

131.   On August 1, 2018, Michael Sievert of Exclusive Advisors LLC sent

an email to his client Lester Jackson with the subject line "Ecovest Conservation

Easement Deduction":[131]

| From: | Michael Sievert <mjsievert@exclusiveadvisors.com> |
|---|---|
| To: | Lester Jackson <ljackson@safetouch.com> |
| Sent: | 8/1/2018 5:12:51 PM |
| Subject: | EcoVest Conservation Easement Deduction |

Lester:

I've got the EcoVest guy coming in town for a lunch tomorrow and a tentative dinner at Capital Grille later that night.  This is another tax deduction strategy, but very different than the energy programs.  With this program for every $50,000 invested it will save you from paying $80,000 in Federal taxes. Essentially a 4 to 1 write off.  I've got Mike Schnell and Eric Griggs coming for the lunch.  Eric is bringing a few others including David Fletcher.  Eric thought it would be a good idea for you to come and he wanted me to let you know he invited Peter Reynolds.  If you've got time, come to the lunch…or let me know if the dinner would be better.

Mike

Michael J. Sievert, CFP®
President

132.   On November 4, 2016, Adam Lloyd (EcoVest's Chief Operating

Officer) received an email from his accountant stating that, "After factoring in your

other itemized deductions and assuming a 6 to 1 ratio for the conservation

easement, the minimum amount you will want to invest in order to eliminate your

remaining federal tax liability (liability after federal withholding), will be $50,000

which would generate a noncash charitable contribution of $300,000."[132]

---

[131]   Ex. 90 at 1 (Email from Michael J. Sievert, CFP, dated Aug. 1, 2018).
[132]   Ex. 36 at 1 (Email to Adam Lloyd dated Nov. 4, 2016).

133.   On July 18, 2014, Clark sent an email to Solon with the subject line

"Do you have any deals that I am not the appraiser?" and stating he "Need[s] to

offset some income:"[133]



## VI.   DEFENDANTS KNEW THE STATEMENTS WERE FALSE.

134.   EcoVest (directly or indirectly) engaged Clark to prepare a "qualified

appraisal" for 70 of the EcoVest Projects:[134]

---

[133]   Ex. 460 (Email from Clark dated July 18, 2014).
[134]   Ex. 1396 (Dep. of Alan Solon Vol. 1 at 224:18-225:8, Apr. 6, 2021); *see
also* Ex. 1402 at 24:15-25:3 (Transcription of audio file with file name
"BobM_sales_pitch_100317"); Joint Stipulation Between the United States and
Claud Clark III Regarding Net Receipts ¶ 2, ECF No. 297; Ex. A to the Joint
Stipulation Between the United States and Claud Clark III, ECF No. 297-1.

```
224:18        Q.  When EcoVest engaged Mr. Clark to prepare
     19    a conservation easement appraisal, what were you
     20    asking him to value?
     21        A.  I don't know that we are asking him to
     22    value anything other than to prepare a qualified
225: 1    appraisal on that property.  It is not a request
      2    of ours what to value.  We make all of the
      3    information available, as we do for all of our
      4    subcontractors, and it is up to the appraiser to
      5    decide what documents they want to review, rely
      6    on or do their own work.  Outside of that, there
      7    is no relationship about what he is required to
      8    do.
```

135.   On December 10, 2014, Sirote & Permutt issued a legal opinion letter regarding the Dumpling Mountain project.[135]

136.   The legal opinion letter that Sirote & Permutt issued for the Dumpling Mountain project stated that, if approved by a majority of the members in Dumpling Mountain, LLC, the proposed transaction structure would result in the company claiming "a Contribution Deduction pursuant to Code Sections 170(a) and (h) in an amount equal to the fair market value of the Conservation Easement" and that the deduction value "must be established and documented by a 'qualified appraisal.'"[136]

137.   The legal opinion letter that Sirote & Permutt issued for the Dumpling Mountain project explained that "the fair market value of the perpetual conservation restriction represented by the Conservation Easement is the difference

---

[135]   Ex. 1418 at 1 (Tax opinion letter regarding Dumpling Mountain project).
[136]   *Id.* at 3, 17.

between the fair market value of the Company Property before granting the Conservation Easement and its fair market value after the Conservation Easement is granted, and after subtracting the value of any enhancement to the value of certain other property."[137]

138.   On October 10, 2014, Alston & Bird issued a legal opinion letter regarding the New River Preserve project.[138]

139.   The legal opinion letter that Alston & Bird issued for the New River Preserve project cited Treas. Reg. § 1.170A-1(c)(2) for the rule that the amount of a tax deduction for the charitable contribution of property is "usually determined by the fair market value of the property donated, that is, the price at which the property would change between a willing buyer and a willing seller on the date of the gift."[139]

140.   The legal opinion letter that Alston & Bird issued for the New River Preserve project stated that, under "a methodology for valuing conservation easements," "[t]he court will compare the fair market value of the property before the conveyance of the easement with the fair market value of the property after the

---

[137]    *Id.* at 21.
[138]    Ex. 1419 at 1 (Tax opinion letter regarding New River Preserve project).
[139]    Ex *Id.* at 14.

easement is conveyed."[140]

141.   In each of the 70 conservation easement appraisals that he prepared to substantiate a tax deduction for an EcoVest Project, Clark was required to apply the definition of "fair market value" as that phrase is defined in the Treasury regulations:[141]

```
60: 8        Q.  Mr. Clark, are you bound to apply the
     9    definition of fair market value that is listed in
    10    your appraisal at page 2?
    11        A.  That's the definition that the Treasury
    12    reg says I am supposed to use.
```

142.   The definition of "fair market value" requires Clark to determine what a willing buyer would pay as of his valuation date:[142]

```
63:16        Q.  But the fair market value definition
    17    requires you to determine what a willing buyer
    18    would pay as of your valuation date; correct?
    19        A.  That's what the definition calls for, yes.
```

143.   Clark knew that EcoVest had executed a MIPA or similar agreement in connection with the EcoVest Projects:[143]

---

[140]   *Id.* at 15.
[141]   Ex. 1393 (Dep. of Claud Clark Vol. 1 at 60:8-12, Mar. 10, 2021); *see also* Clark's Answer to Am. Compl. at ¶ 224, ECF No. 246.
[142]   Ex. 1393 (Dep. of Claud Clark Vol. 1 at 63:16-19, Mar. 10, 2021).
[143]   *Id.* at 128:9-129:3.

```
128: 9        Q.  All right, Mr. Clark, we have got what has
     10   been marked as Exhibit 423 for identification
     11   purposes only on the share screen.  This is a
     12   membership interest purchase agreement.  Do you
     13   see that?
     14        A.  Yes, sir, I see that title, yes.
     15        Q.  And you are familiar with the membership
     16   interest purchase agreement document as a general
     17   matter that EcoVest executed?
     18        A.  This one specifically or as a general?
     19        Q.  Just as a general matter.
     20        A.  I know that they acquired a membership
     21   interest.
     22        Q.  I guess my question is did you see this or
129: 1   review this particular MIPA, M-I-P-A, prior to
      2   preparing your appraisal of Waterway Grove.
      3        A.  I knew that there was a MIPA.
```

144.    On April 11, 2014, Clark discussed with an attorney that represented EcoVest the need "to have a logical and explainable basis which accounts for the 'spread' between the MIPA Purchase Prices and the anticipated highest and best use appraisal values."[144]

## VII.    FACTS RELATED TO DEFENDANTS' AFFIRMATIVE DEFENSES.

145.    Defendants collectively took the depositions of 18 IRS employees and six expert witnesses.[145]

146.    Defendants participated in an additional 32 depositions of nonparty witnesses (including 26 nonparty fact depositions and 6 expert depositions).[146]

147.    In this case, Clark has produced 13,312 documents that consist of

---

[144]    Ex. 271 (Email from attorney Bill Sylvester dated May 22, 2014).
[145]    Decl. of Eric M. Aberg ¶¶ 87-88.
[146]    *Id.* ¶ 89.

424,957 imaged pages.[147]

148.   In this case, the EcoVest Defendants have produced 196,001 documents that consist of 1,867,481 imaged pages, excluding documents they received in response to subpoenas issued to nonparties.[148]

149.   In this case, the United States has produced IRS-sourced documents, as well as documents collected during the investigation that led to this suit and the pendency of this suit, which total 51,274 documents consisting of 966,912 imaged pages.[149]

150.   In this case, the United States has produced 676,001 documents that consist of consisting of 5,765,423 imaged pages that it received from nonparties.[150]

//

//

//

//

//

//

---

[147]   *Id.* ¶ 90.
[148]   *Id.* ¶ 91.
[149]   *Id.* ¶ 92.
[150]   *Id.* ¶ 93.

Dated: February 15, 2022      Respectfully submitted,

DAVID A. HUBBERT
Deputy Assistant Attorney General

/s/ Harris J. Phillips
ERIN R. HINES
Florida Bar No. 44175
GREGORY VAN HOEY
Maryland Bar
RICHARD G. ROSE
District of Columbia Bar No. 493454
HARRIS J. PHILLIPS
Massachusetts Bar No. 675603
JAMES F. BRESNAHAN II
Virginia Bar #: 80164
ERIC M. ABERG
District of Columbia Bar No. 1044111
LAUREN A. DARWIT
Illinois Bar No. 6323788
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 7238, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 514-2901

Local Counsel:
KURT ERSKINE
United States Attorney
NEELI BEN-DAVID
Assistant U.S. Attorney
Georgia Bar No. 049788
Office of the United States Attorney
Northern District of Georgia
600 U.S. Courthouse
75 Ted Turner Drive, SW, Suite 600
Atlanta, GA 30303
Telephone: (404) 581-6303