DocuSign Envelope ID: E2BD3066-DB24-4E70-975A-DE9DA88063FB



# Operational Due Diligence Report



| | |
|---|---|
| **Organization** | EcoVest Capital, Inc. |
| **Office Address** | 3424 Peachtree Road NE, Suite 1550, Atlanta, GA, 30326 |
| **Phone** | (470) 440-3300 |
| **Website** | www.ecovestcap.com |
| **Date** | August 15, 2017 |

**Exhibit**

**649**

LM   4/7/21

ECOVEST-DOJ_1192319

DocuSign Envelope ID: E2BD3066-DB24-4E70-87E4-DE9DA88C663EB

# Contents

**EXECUTIVE SUMMARY**                                            **3**

    Entity & Organization                                       3

    Financial Analysis                                          3

    Prior Performance                                           4

**RISKS & STRENGTHS**                                            **5**

    Risks                                                       5

    Strengths                                                   5

**ORGANIZATIONAL ANALYSIS**                                      **6**

    Organizational Description and History                      6

    Organization Structure & Ownership                          7

    Conclusion                                                  8

**LEGAL AND REGULATORY**                                         **8**

    Legal Matters                                               9

    Regulatory Matters                                          9

    Conclusion                                                  10

**GOVERNANCE**                                                   **10**

    Affiliated Transactions                                     11

    Insurance Policies                                          11

    Conclusion                                                  12

**BUSINESS SUCCESSION AND CONTINUITY**                           **12**

    Conclusion                                                  12

**COMPANY FINANCIAL POSITION**                                   **13**

    Financial Statement Presentation                            13

    Balance Sheet                                               14

    Statement of Operations                                     17

    Cash Flow & Liquidity                                       19

    Management Compensation                                     20

    Related-Party Transactions                                  20

ECOVEST-DOJ_1192320

| | |
|---|---|
| Conclusion | 21 |
| **PRIOR PERFORMANCE** | **21** |
| Conclusion | 25 |
| **OPERATIONAL CONTROL** | **25** |
| Accounting and Financial Reporting | 25 |
| Conclusion | 26 |
| Human Resources | 26 |
| Conclusion | 28 |
| Information Technology | 28 |
| Conclusion | 28 |
| Significant Vendors and Service Providers | 29 |
| Conclusion | 29 |
| **ACQUISITIONS** | **29** |
| **ASSET AND PROPERTY MANAGEMENT** | **34** |
| **PRODUCT SALES & DISTRIBUTION** | **37** |
| Securities Sales | 37 |
| Conclusion | 38 |
| **CERTIFICATION** | **39** |
| **FACTRIGHT, LLC** | **40** |
| **USE AND SCOPE OF THIS REPORT** | **40** |
| **REVIEW PROCESS** | **42** |
| Site Visit Dates | 42 |
| FactRight Reporting Team | 42 |
| Documents Reviewed | 42 |
| **APPENDIX A: ORGANIZATIONAL CHART** | **46** |
| **APPENDIX B: FACTRIGHT SITE VISIT PHOTOGRAPHS** | **47** |

ECOVEST-DOJ_1192321

# Executive Summary

## Entity & Organization

EcoVest Capital, Inc. (EcoVest), an Atlanta, Georgia–based real estate firm formed in 2012, was originally a consulting firm that sprung from an independent broker dealer. Since then, it has evolved into a sponsor of private placements offering land-based real estate programs with multiple investment strategies, including full-scale development projects and the option to preserve the raw, unimproved land via a conservation easement.

As part of its analysis, FactRight reviewed EcoVest's governance structure. The corporation is managed by a board of two affiliated directors supported by a four-member executive management team. It is not required to have an advisory board. Alan Solon, EcoVest's chief executive officer and board chairman, leads the executive management team and the board of directors.

Every organization depends on its senior executives and owners to run its business effectively. Therefore, as part of its review, FactRight and EcoVest's management discussed EcoVest's plan for possible transitions in leadership when the loss of one or more individuals would pose a continuity risk within the organization. EcoVest does not maintain a written business succession plan, and management represents that its executives and key employees are prepared to perform the duties of other members, at least in the interim, should any member of executive management be unable to fulfill his or her role. Additionally, management is in the process of formalizing succession planning, an initiative it anticipates completing in 2017.

As part of its review process, FactRight performs a litigation and regulatory search of all parties incident to an offering, including Triloma Securities, LLC (Triloma), an affiliate of Triloma Financial Group, the managing broker dealer (MBD) for EcoVest's offerings. During the review, nothing came to FactRight's attention that would raise concern or require further investigation.

## Financial Analysis

FactRight based its financial assessment of EcoVest on the audited financial statements for 2014 through 2016. FactRight also reviewed EcoVest's interim financial statement as of June 30, 2017 (prepared by management). The audited financial statements show stockholders' equity attributable to EcoVest as of December 31, 2016, of $15.0 million and cash balances of $21.4 million. Historically, the cash flows of EcoVest have peaked at year-end, since its greatest product demand is generally at the end of the calendar year, which can present liquidity challenges. However, management has taken steps to incentivize investors to commit and fund their investments earlier in the year (see Cash Flow & Liquidity). Management anticipates being cash flow positive by September of this year, which would be the earliest it has achieved positive cash flow within a calendar year. Additionally, management has retained cash in the business to provide liquidity when needed. Management has demonstrated an adeptness of managing cash flow variability while also successfully growing the business.

ECOVEST-DOJ_1192322

Based on FactRight's analysis, EcoVest appears to have the financial capacity to continue its operations and provide support to its sponsored programs. However, it should be noted that the activities of EcoVest have historically concentrated on the development of, and advisory business of private investment programs that depend on, at least in part, the favorable tax treatment to investors generated by the donation of a conservation easement. As such, this creates a concentration that may negatively affect EcoVest's business should Congress change any provisions of the Internal Revenue Code that currently allow for a tax deduction for conservation easements.

**Prior Performance**

As of the date of this report, EcoVest has sponsored 36 investment programs that raised $387.0 million in capital between 2013 and 2016, including one $3.8 million "friends and family" offering. It is also raising capital for three other programs that have not yet closed, and it anticipates raising capital for additional programs in 2017. Prior to EcoVest's formation in 2012, its management consulted on similar land offerings for Conservation Resources Inc. (CRI). In addition, EcoVest acted as a consultant on similar investment programs in 2012. In total, EcoVest, CRI, and its affiliates consulted on 14 offerings between 2010 and 2012, which raised an aggregate amount of approximately $25.6 million in equity.

EcoVest has created investment programs in a manner such that, once the investment program has acquired a controlling interest in the property, investors may elect either to develop the property or to donate a conservation easement on the property to a land trust. If investors choose the conservation easement option, they may realize a charitable contribution deduction, which EcoVest generally estimates to be 4.1 times the investors' total capital contributions. Because each land-use option has different investment objectives, investors should be able to benefit from any of the land-use options in order to be suitable for EcoVest's offerings. Due to the tax benefit that may accrue to prospective investors if the investment program elects the conservation option, prospective investors should consider their tax bracket and individual circumstances. All prior investment programs that EcoVest has sponsored or consulted on from 2012 to date have elected the Conservation Option, resulting in a potential $1.7 billion in aggregate charitable contribution deductions for investors.

Because investment performance is significantly affected by the tax positions of its individual investors, EcoVest does not report or present prior program performance in its offering documents or marketing materials. Instead, management provides investors with a summary of the three land use options and the potential returns to investors after the investment program has acquired a controlling interest in the associated property. FactRight has prepared an investment program offering report on all investment programs sponsored by EcoVest through the broker dealer channel since 2014, which are available upon request to broker dealers through the <u>FactRight Report Center</u>. According to information provided by management for the most recent syndicated and closed investment program, possible returns to investors varied significantly, from over 40% to several hundred percent, depending on the option selected by each investment program and the unique tax position of the individual investors. FactRight therefore recommends that broker dealers carefully review the details of each

ECOVEST-DOJ_1192323

specific offering and ensure a complete understanding of the benefits of each land use option to each individual investor.

In the past few years, EcoVest's investment strategy has broadened to allow the investment company to invest excess working capital into other real estate projects if the investment company pursues the conservation easement option. In order to allow flexibility and diversification, EcoVest forms a fund for excess working capital to be contributed from each offering during the calendar year. As of July 2017 EcoVest managed EVC 2015 Vintage Fund, LLC (the 2015 Vintage Fund) ($11 million of contributed capital), and EVC 2016 Vintage Fund, LLC (the 2016 Vintage Fund) ($22 million of contributed capital). EcoVest has had one liquidity event to date from its excess working capital investments. It sold a parcel of raw land for $2 million after acquiring it for $1.4 million a little over a year before. This investment strategy is still new, and future liquidity needs and returns are unknown at this time. FactRight recommends broker dealers monitor the excess working capital investment funds.

## Risks & Strengths

### Risks

This section highlights those risks that FactRight deems, in its professional opinion, to be inherent to a particular organization or those that may be attributable to the manner in which the organization conducts its business. FactRight also identifies, as it deems appropriate, those practices that the organization implements that may help to mitigate a risk's impact. The risks identified herein are by no means exhaustive and are generally not risks that may be considered "boilerplate." Additionally, the risk's description is limited to identification and may not fully account for all applicable and contributing factors and circumstances. No organization or offering program is without risk. Therefore, the purpose of this section is to assist broker dealers in risk identification, allowing the broker dealer to determine whether such risks are commercially reasonable relative to its business and its client's particular circumstances.

[To be included in final report to clients—Not for Sponsor factual review]

### Strengths

FactRight highlights those strengths that it deems, in its professional opinion, to give the organization an advantage over its competitors. To identify strengths, FactRight assesses the organization's current management, resources, staffing, strategic objectives, and financial strengths. FactRight then analyzes these characteristics in relation to the organization's stated business goals and objectives. The purpose of this section is to assist broker dealers in identifying those organizational strengths that may positively influence an organization's offering program and ultimately the program's investors.

[To be included in final report to clients—Not for Sponsor factual review]

ECOVEST-DOJ_1192324

# Organizational Analysis

The purpose of this section is to provide an understanding of the organization's overall business function and of all the entities materially involved in the planning, execution, and monitoring of offerings. See <u>Appendix A</u> for an organizational chart.

## Organizational Description and History

The headquarters of EcoVest's real estate investment firm is in Atlanta, Georgia. Each investment program acquires a controlling interest in one asset, undeveloped land, and features three investment options for each asset:

- Develop the land in accordance with a fully underwritten development plan (the Development Option)
- Donate a conservation easement on the land (the Conservation Option)
- Hold the undeveloped land for investment (the Deferral Option)

After the investment program acquires the controlling interest, the manager will request an investor vote on which of the three land-use options the investment program should pursue. The investment company will pursue the land-use option that receives the most votes from investors, even if that option does not receive a majority vote.

The entity that evolved into EcoVest began as an affiliate of Strategic Financial Alliance Holdings, Inc. (SFAH), named Conservation Resources, Inc. (CRI). SFAH's primary asset is its subsidiary Strategic Financial Alliance Inc. (SFA), a FINRA-registered broker dealer. CRI, formed in 2009 by Alan Solon, Clive Slovin, and Jeffrey Bland, consulted on land offerings similar to those now sponsored by EcoVest. Mr. Solon represents that the idea for CRI grew out of an opportunity SFA identified. He represents that SFA wanted to discuss comprehensive wealth management, including tax planning, with its clients and was looking for investment products toward the goal of offering tax-planning options. If the investors of an investment program vote to grant a conservation easement, its investors are eligible to take a non-cash charitable contribution tax deduction based on the value of the easement, as determined by a qualified appraiser.

Beginning in 2010, CRI consulted entities interested in creating investment products. CRI specifically marketed the first product introduced to SFA's executives and a group of affiliated financial advisors selected by CRI. CRI consulted on nine offerings between 2010 and 2012 with similar investment objectives to EcoVest's. These offerings raised approximately $14.3 million in aggregated equity.

In 2012, SFAH's board of directors determined that it was in the best interests of its shareholders for CRI to separate. A variety of independent individuals and SFAH's board of directors invested in the new entity, EcoVest. In 2012, EcoVest consulted on five offerings that raised $11.3 million in equity from investors. Based on this experience, EcoVest determined in 2013 to transition from consulting on conservation easements to issuing private placements, despite the additional operational and financial

ECOVEST-DOJ_1192325

risks. It sponsored five offerings in 2013, four of which were joint ventures with Ralph Teal, Jr., a developer based in Myrtle Beach, South Carolina.

Beginning in mid-2014 and concluding in February 2015, EcoVest converted from a limited liability company to a C corporation, EcoVest Capital, Inc. All limited liability membership interests converted to shares of common stock on a 1:1 basis. The conversion to a C corporation has the added benefit of providing EcoVest with the ability to align itself with its investors. C corporations that invest in programs where investors elect a conservation easement option are eligible to use the non-cash charitable deduction available to investors and offset that against up to 10% of taxable net income. EcoVest sponsored six offerings in 2014.

In late 2015, EcoVest severed its last ties to SFA with the departure of the remaining common ownership. At the same time, Mr. Teal became a minority owner. EcoVest sponsored ten offerings in 2015.

EcoVest continues sponsoring investment programs, issuing 15 in 2016 (including one friends and family offering, currently raising capital for three offerings, and anticipates raising capital for additional offerings in 2017. Additionally, in 2017, various owners of EcoVest, including Mr. Solon and Mr. Teal, formed Real Star Communities, LLC (Real Star Communities), and Real Star Homes, LLC (Real Star Homes), which are lot development and home building companies, respectively, that expect to focus on multi-family development along the Atlantic Coast, from Wilmington, North Carolina to Savannah, Georgia. These entities are not affiliated with EcoVest or its funds, other than through common ownership, and management represents that these entities do not compete with EcoVest for sourcing opportunities or owner's time and resources. However, EcoVest, Real Star Communities, Real Star Homes, and the principals of such have no investment allocation policy that governs which properties' management will allocate to which entity. As such, there is no guarantee that management will allocate the properties with the greatest development potential to EcoVest.

## Organization Structure & Ownership

The objective of this section is to describe the ownership structure and to ascertain the adequacy of the structure relative to each entity's stated business functions.

EcoVest is a C corporation owned by the following shareholders as of July 11, 2017:

**Table 1**

| Name | % Ownership |
|---|---|
| Alan Solon | 60.98% |
| Ralph Teal | 32.88% |
| Ivan Killen | 4.30% |
| Warren Prehmus | 1.84% |
| | 100.00% |

ECOVEST-DOJ_1192326

DocuSign Envelope ID: E2BD3066-DB24-4E70-87E4-DE9DA88663FB

**Subsidiaries and Affiliates**

Until July 2017, EcoVest created offering-specific subsidiaries for each investment opportunity. EcoVest would create a wholly owned special purpose entity (SPE) to act as a holding company for the offering-specific subsidiaries. The holding company owned a majority interest, between 51% and 59%, in two subsidiaries, a development entity and a management entity. Mr. Teal, indirectly through another SPE, owned the remaining minority interests in those entities. The development company and the management company each entered into an agreement with the offering entity.

In March and September 2016, respectively, EcoVest and RRT Services, LLC (RRT Services), an entity entirely owned by Mr. Teal, formed EcoVest Management, LLC (EcoVest Management), and EcoVest Development, LLC (EcoVest Development). In July 2017, all management and development agreements with the offering-specific entities were assigned to EcoVest Management and EcoVest Development. The offering-specific entities will be dissolved by the end of 2017.

EcoVest also creates the offering entity owning the property. EcoVest retains between 0.5% and 1% of the total interests in the offering entity, and retail investors own the remaining interests.

**Conclusion**

EcoVest is a real estate firm created to sponsor private placements that purchase or control undeveloped land and provide investors with the option of developing the land, holding it in its current state, or granting a conservation easement. Its organizational structure is streamlined and flat with about 15 employees.

# Legal and Regulatory

The purpose of this section is twofold. First, this section attempts to identify undisclosed areas of litigation-related contingent liabilities that may affect the organization's financial position. Second, this section attempts to ascertain the likelihood that an organization's officers or key employees may commit fraudulent or risky activity and to identify whether the manner in which an organization conducts its business activities may position the organization for costly litigation. FactRight performs litigation and background searches on officers, certain key employees, and organizational entities using Accurate Information Systems, Lexis Diligence® and CourtLink® from LexisNexis (LexisNexis), Public Access to Court Electronic Records (PACER), FINRA BrokerCheck, and various state-sponsored websites. Additionally, FactRight reviews any exam or audit conducted by an organization's governing body. Although FactRight makes every effort to locate any material criminal or civil matters, liens, judgments, and regulatory events, every background search system has limitations. Thus, not all such matters and events may be disclosed below.

ECOVEST-DOJ_1192327

## Legal Matters

With respect to background checks, FactRight reports only on those matters that it deems to be material using its professional judgment. Generally, FactRight's scope is 10 years, except for certain matters, including but not limited to fraud (including securities-related), license revocations, and other securities-related matters. FactRight deems immaterial isolated incidents of traffic violations, small tax liens, personal domestic matters, and litigation matters with small amounts at issue. With respect to entity background checks, FactRight deems immaterial matters within the ordinary course of business and when the amount in controversy is less than $100,000 of a company's current liquidity.

Biographical information was provided EcoVest. FactRight reviewed the information for reasonableness and verified education and professional licenses. FactRight also spot-checked various other areas of individual biographies to help confirm accuracy. Biographies of EcoVest's executives can be found at http://ecovestcap.com/our-team/.

Background, lien, judgment, and litigation searches were performed on the following individuals and entities using data provided by AIS between December 20 and 22, 2016, and supplemented with data provided by LexisNexis as of August 2, 2017:

- Alan Solon
- Robert McCullough
- Jed Linsider
- Adam Lloyd
- Ralph R. Teal, Jr.
- EcoVest Capital, Inc.

Background, lien, judgment, and litigation searches were performed on Triloma Securities, LLC, using data provided by AIS as of May 16, 2016, and supplemented with data provided by LexisNexis as of August 2, 2017.

Background, lien, judgment, and litigation searches were performed on the following entities using data provided by LexisNexis on August 2, 2017:

- EcoVest Management, LLC
- EcoVest Development, LLC
- RRT Services, LLC

Within the above parameters, FactRight's searches did not reveal any material past or present litigation, liens, or judgments involving the above-listed individuals or entities.

## Regulatory Matters

None of the above-listed individuals or entities have any regulatory issues or history.

ECOVEST-DOJ_1192328

DocuSign Envelope ID: E2BD3066-DD84-4570-87EA-DF9BA88663EB

EcoVest relies on Triloma, as managing broker dealer, for compliance with all applicable securities laws and regulations. For a review of Triloma's written supervisory procedures relating to securities sales, see Product Sales & Distribution.

**Conclusion**

Although past conduct is not necessarily predictive of future activity, nothing came to FactRight's attention that would suggest concern or require further investigation based on these background search results.

# Governance

The objective of this section is to determine the extent to which the organization's current model of direction and control provides an adequate framework to establish and carry out organizational objectives, mitigates risks to reaching its objectives, and ensures conformity with legal and corporate regulatory requirements not specifically addressed elsewhere. Additionally, this section assesses the general integrity and accountability among any governing board members, senior management, and the organization's employees.

As a corporation, a board of directors (Board) governs EcoVest. It does not, and is not required to, have an independent board of directors or advisory board. The Board is currently comprised of two affiliated directors:

- Alan Solon (chairman)
- Ralph Teal, Jr.

Because the Board is comprised of an even number of directors, FactRight inquired about the process for resolving a deadlock. The Board does not have a written procedure, but management states it will work through such an issue if it arises. FactRight reviewed minutes of Board meetings held since 2012 and found no deadlocks. The Board is required to hold its meetings quarterly. It has held a majority of the meetings at EcoVest's offices. The remainder of the meetings either were scheduled conference calls or held via email correspondence. EcoVest's outside counsel is responsible for recording board meeting minutes.

To manage daily operations, EcoVest has appointed officers. Mr. Solon, as president and chief executive officer, has all powers and authority in the management and business affairs of EcoVest, subject to Board oversight. The other officers are as follows:

- Jed Linsider—senior vice president
- Adam Lloyd—senior vice president and chief operating officer
- Bob McCullough—senior vice president, chief financial officer, secretary, and treasurer

ECOVEST-DOJ_1192329

All officers are located in the Atlanta office and are in daily communication either in person, by telephone, or by email. Due to the company's small size, the officers are able to respond to any issues in a timely and efficient manner.

## Affiliated Transactions

EcoVest's operating agreements do not contain language governing affiliated transactions, nor does a separate policy exist. EcoVest utilizes the services of Mr. Teal to assist in property identification and program development (see Acquisitions). As described in Subsidiaries and Affiliates, Mr. Teal is part-owner of the development and management entities, all of which provide significant resources to EcoVest and its sponsored investment programs. Mr. Solon and Mr. Teal executed a 10-year exclusivity agreement on May 19, 2015. EcoVest is not a party to this agreement. While Mr. Solon has acknowledged in the agreement that he is the chief executive officer of EcoVest and that he will commit to working with Mr. Teal on future EcoVest-sponsored programs, Mr. Solon has solely executed the agreement as an individual and not as an officer of EcoVest. However, the agreement is broader in scope. It also applies to any similar offering sponsored by an entity managed or controlled by Mr. Solon. It is implied, but ambiguous, that Mr. Teal's services to EcoVest offerings are only required if Mr. Solon is managing or controlling EcoVest. Therefore, one can interpret that should Mr. Solon leave EcoVest during the term of the agreement, Mr. Teal's services are no longer bound to EcoVest. However, this is not a significant concern because Mr. Teal now owns an indirect ownership interest in the management and development special purpose entities performing services for EcoVest's investment programs.

The exclusivity agreement also refers to a verbal agreement whereby Mr. Teal advanced half of the operational and organizational costs (O&O Costs) for past EcoVest offerings, in exchange for a return of those costs plus a profit (which was vaguely described). Note that the wording in the agreement and management's representation to its auditors differ regarding the unwritten agreement governing O&O Costs (see Company Financial Position). The exclusivity agreement indicates that O&O Costs are equally shared by Mr. Solon, *through EcoVest*, and Mr. Teal. However, the representation to the auditors states that O&O Costs are equally shared by EcoVest, not Mr. Solon, and Mr. Teal.

Since the exclusivity agreement has been executed between Mr. Solon and Mr. Teal, as individuals, FactRight has excluded from this review an assessment of the agreement's validity, scope, and enforceability.

## Insurance Policies

One of the responsibilities of corporate governance is risk mitigation. Proof of insurance is evidence of proactive risk mitigation. FactRight requested proof of current insurance for errors and omissions, directors and officers, and general liability/umbrella policies, as these are standard policies for all businesses.

ECOVEST-DOJ_1192330

FactRight received declaration pages for insurance coverage through early October 2017. EcoVest provided proof of commercial property, general liability, directors and officers, errors and omissions coverage, and cybersecurity. Additionally, it provided the declaration page for a package policy. The package policy includes general coverage as well as for property, employment practices, and umbrella liability. Finally, FactRight also received proof of a financial institution's bond providing various coverages, including employee dishonesty, property loss in the office or in transit, and through forgery.

## Conclusion

EcoVest has created a framework that clearly defines managerial leadership, authority, and accountability. As a corporation, the Board governs EcoVest overall and is supported by the executive management team that manages the corporation's day-to-day responsibilities. Additionally, EcoVest's management has provided adequate risk mitigation evidenced by the existence of multiple insurance policies, including cybersecurity. However, FactRight recommends the creation of an affiliated transaction policy as a way to strengthen risk management.

# Business Succession and Continuity

The objective of this section is to determine the reasonableness of the organization's plan to contend with the loss of senior executives with ownership interests or key managerial responsibility.

Because EcoVest is a C corporation with named directors and officers, ownership and daily management are separate. Therefore, a change in EcoVest's ownership may not result in a change management, and vice versa. Regarding ownership succession, EcoVest has a right of first refusal on all share transfers.

EcoVest does not have a formal business succession plan regarding management. Succession planning at the ownership level is a priority of ownership and the Board, who are actively working with consultants and law firms. Overall, the Board manages EcoVest. Directors are elected to one-year terms pursuant to the governance documents.

Regarding daily operations, management represents that all of EcoVest's officers have the necessary experience to assume the duties of another should the need arise due to the death or incapacitation of another. In the last 24 months, EcoVest has built out various departments, including accounting, with middle and junior team members. Finally, EcoVest has created a strategic business plan, reviewed annually, which management is able to use as a planning tool.

## Conclusion

FactRight is encouraged by ownership and management's commitment to strengthening its business succession. The separation of ownership and management helps mitigate interruptions in business

ECOVEST-DOJ_1192331

operations due to a change in ownership. Additionally, each of EcoVest's officers has the experience to assume any significant managerial duties, if necessary, due to the sudden death or incapacitation of a fellow officer.

## Company Financial Position

The purpose of this section is to assess the overall financial health of the organization under review. FactRight's goal is to identify red flags or risks to the organization's financial position, particularly those that could affect its responsibilities and obligations to those entities to which it provides financial support. FactRight accomplishes this through a detailed review of financial statements and inquiries of management and by obtaining other information that FactRight deems appropriate. FactRight's financial statement review encompasses operational trends, current capitalization, transparency, disclosure adequacy, and other factors, as appropriate. FactRight's financial assessment relies on its experience and knowledge of specific industry practices and general characteristics of good financial management. FactRight asks questions of management to gain an understanding of the organization's unique operations, as well as to gauge management's level of transparency.

Each organization FactRight reviews is unique. Management uses significant judgment when determining how it meets its financial reporting obligations. FactRight does not audit financial statements, nor does it assess the quality of financial reporting. However, FactRight notes any information that it believes to be significant to the reader and/or is determined, in FactRight's judgment, to be an identifiable risk. Risk is subjective. Therefore, FactRight determines significance and risk in light of the expected impact on the organization's ability to perform its obligations to the entities and offering programs that it supports.

### Financial Statement Presentation

EcoVest Capital, Inc., and its subsidiaries (collectively referred to herein as EcoVest) sponsor private, unregistered real estate investment programs. To date, each investment offering have acquired one property through its core investment strategy and have other indirect excess working capital investments. Consolidated subsidiaries manage EcoVest's investment programs. During 2014, EcoVest converted from an LLC to a C corporation. To conduct its analysis, FactRight's reviewed EcoVest's consolidated audits for the years 2014 through 2016, which were performed by Frazier & Deeter (Frazier) and for which EcoVest received unqualified audit opinions. This means the auditors opined that the financial statements were fairly stated in all material respects. FactRight also reviewed the internally prepared interim financial statements as of June 30, 2017.

Frazier is a Public Company Audit Oversight Board (PCAOB)–registered, category A and C, public accounting firm headquartered in Atlanta, Georgia. It is the fifty-eighth largest accounting firm in the

ECOVEST-DOJ_1192332

DocuSign Envelope ID: E2BD3066-DD84-4F70-87FA-DF0BA88C63EB

United States based on annual net revenues, according to *Inside Public Accounting*'s most recently (2016) published ranking.

Table 2 summarizes EcoVest's audited financial statements as of December 31 of 2014 through 2016 and the management-prepared interim statement as of June 30, 2017.

**Table 2**

|  | December 31, XXXX | | | |
|  | 2014 | 2015 | 2016 | 6/30/17 |
|---|---|---|---|---|
| **Balance Sheets** | | | | |
| Assets | $10.3 | $20.0 | $26.4 | $14.0 |
| Liabilities | $6.3 | $11.5 | $11.7 | $4.7 |
| Equity attributable to EcoVest Capital, Inc. | $4.2 | $9.0 | $15.0 | $9.2 |
| **Statements of Operations** | | | | |
| Total Revenue | $17.9 | $34.0 | $53.5 | $1.1 |
| Net income | $10.2 | $16.8 | $26.2 | ($5.4) |
| **Statements of Cash Flows** | | | | |
| Cash provided by (used in) | | | | |
| Operating activities | $17.0 | $18.6 | $27.6 | *client* |
| Investing activities | ($0.5) | ($0.2) | ($0.1) | *did not* |
| Financing activities | ($11.5) | ($10.7) | ($21.5) | *provide* |
| Cash and equivalents, end of period | $7.7 | $15.4 | $21.4 | |

**Balance Sheet**

**Assets**

As of 2016 year-end, EcoVest assets had increased to $26.4 million, representing growth of 32% from a balance of $20.0 million at 2015 year-end. The composition of EcoVest assets at the end of 2016 is shown in chart 1.

ECOVEST-DOJ_1192333

## Chart 1



Cash was the largest component of total assets as of 2016 year-end, representing 81% of the total and amounting to $21.4 million. EcoVest's cash balance typically increases significantly at year-end as a consequence of collecting fees on syndicated offering and investment activity, which historically has occurred near the end of the calendar year. A portion of this cash will be paid to other parties associated with the investment programs as evidenced by the corresponding $5.0 million accounts payable and accrued expenses, and $3.5 million income tax payable balances, which is discussed below in the Liabilities section. Management has retained cash in the business during the past few years in order to help fund growth and cover cash shortfalls during the months EcoVest is not cash flow positive.

Assets also included a deferred tax asset of $2.2 million, representing 8% of total assets. This represents the portion of available charitable expense deduction associated with EcoVest's investment in two investment programs. Although EcoVest does not typically directly invest in its investment programs, it has $0.5 million in aggregate on its balance sheet related to its investment in two investment programs at the end of 2014, which it made to ensure each program had the sufficient cash with which to acquire the identified assets.

## Liabilities

As of 2016 year-end, total liabilities increased 2% to $11.7 million, compared to the 2015 year-end balance of $11.5 million. The composition of liabilities as of 2016 year-end is summarized in chart 2.

ECOVEST-DOJ_1192334

## Chart 2



- ▓ Accounts payable and accrued expenses
- ▓ Income taxes payable
- ▓ Deferred revenue
- ▓ Note payable

The largest component of liabilities is accounts payable and accrued expenses, which amounted to $5.0 million, or 43%, as of 2016 year-end. This primarily includes payables associated with the offerings closed during the last few months of 2016 and bonus accruals.

Liabilities also include income taxes payable of $3.5 million, or 30% of total liabilities, and deferred revenue of $2.0 million, or 17% of total liabilities. EcoVest also had an outstanding $1.1 million note payable to Mr. Teal at 2016 year-end related to the recapitalization. This note was repaid in February 2017.

EcoVest historically has not utilized third party debt. During 2016 management sought a line of credit in order to provide additional liquidity for the business. In April 2017, EcoVest received a commitment for a one-year, $2.5 million revolving line of credit from SunTrust Bank NA. The interest rate is LIBOR + 2.50%. EcoVest expects to close on this facility during the third or fourth quarter of 2017.

### Equity

As further detailed in Organizational Description and History, EcoVest was formed in 2012 as a limited liability company (LLC) with an initial equity capital of $0.3 million. As an LLC, management's policy was to distribute approximately 55% of operating income to cover members' tax liabilities on EcoVest profits. Then, in 2014, EcoVest converted to a C corporation. According to management, the purpose of the structural change was primarily to encourage the company to retain capital for growth, which it has done. As of 2016 year-end, EcoVest had $15.0 million in stockholders' equity net of distributions of $18.5 million during 2016. As part of EcoVest's recapitalization, it repurchased shares for $1.5 million to be held in treasury. The company has used some of these shares for the restricted stock grant made to Mr. Solon and for stock options awarded to members of the management team.

ECOVEST-DOJ_1192335

DocuSign Envelope ID: E2BD3066-DD84-4570-87EA-DF0BA88663EB

## Statement of Operations

EcoVest's 2016 revenues of $53.5 million grew 57% from $34.0 million in 2015. Historically, 100% of EcoVest's revenues have been derived from its sponsored investment programs. EcoVest's growth is attributable to the increase in the number and size of investment programs syndicated during the year (see <u>Prior Performance</u>). EcoVest's revenues include fees for management, arrangement, development, development termination, and from reimbursable expenses related to organization and offering costs (O&O) of sponsored investment programs.

Chart 3 shows the specific type of fee revenue EcoVest generated during 2014–2016.

## <u>Chart 3</u>

(*millions*)



Fees earned by EcoVest are described in the related FactRight offering reports, which are available on <u>FactRight's Report Center</u>. Development termination fees are EcoVest's largest source of revenue to date. Such fees are one-time in nature and are earned when investors in the sponsored investment programs elect the conservation easement option. Historically, investors in all of EcoVest's investment programs have elected the conservation easement option.

Development termination fees are calculated as a percentage of the net present value of the development fee revenue stream and the disposition management fee that would be earned according to the pro forma development plan. The fee, which is non-refundable and does not require any future services to be provided, represents compensation that a developer would typically receive after investing time, effort, and resources to prepare a development plan for a subject property that was later abandoned. Revenue is recognized at the time the decision is made to formally terminate the development plan. This decision has always made in the same calendar year in which the offering was syndicated, although the land-use selection is not required to be made during the same calendar year. EcoVest's audit includes a concentration of credit risk, noting that because revenues are nonrecurring,

ECOVEST-DOJ_1192336

EcoVest's ability to generate future revenues depends upon its success in finding appropriate real estate transactions each year.

EcoVest earns an arrangement fee for services provided in connection with the investigation, selection, purchase, financing, development planning, and conservation planning of a property prior to its syndication. EcoVest also receives an annual management fee of 1.75% of the purchase price of the investment company's interest in the property, which it earns over the contract period (according to the audit this ranges from five to six years). EcoVest may earn development fees if investors elect the Development Option in future investment programs. To date, EcoVest has not earned any development fees.

EcoVest is also reimbursed for actual out-of-pocket expenses as permitted in the offering documents.

EcoVest's operating expenses have increased during the last few years as the number and size of programs have increased, as illustrated in chart 4.

**Chart 4**

(*millions*)



Employee compensation and benefits expense represented 60% of total operating expenses in 2016, increasing approximately 82% to $14.6 million from $8.0 million during 2015. The number of employees approximately doubled during the year as EcoVest expanded its employee base to keep pace with the growth in the business. During 2016 EcoVest syndicated 15 programs with an average amount closed per offering of $11.6 million, compared to 10 programs with an average closed amount of $10.4 million in 2015 (see Prior Performance).

O&O expenses represented 25%, or $6.0 million, of total operating expenses for 2016. This represents an increase from $4.0 million during 2015, which corresponds to the growth in the number of offerings syndicated.

ECOVEST-DOJ_1192337

**Interim Financial Statements—June 30, 2017**

EcoVest's internally prepared financial statements showed a cash balance of $9.9 million and stockholder' equity of $9.2 million as of June 30, 2017. EcoVest incurred a loss of $5.4 million during the first six months of 2017, which is consistent with historical time periods, since this is a slow time of year for EcoVest's syndications. Management did note that expenses were higher during the first several months of 2017 when compared to the same time period during previous years, as EcoVest had greater compliance costs related to the December 2016 IRS listing notice (see Asset and Property Management). As of the time of this report, management was anticipating being cash flow positive by September 2017, given the amount and size of offerings in EcoVest's pipeline.

**Cash Flow & Liquidity**

EcoVest's business model has historically experienced seasonality, because the greatest demand for its products has occurred during the end of the calendar year, when individuals tend to focus on tax planning. Management is cognizant of the negative impact this can have on cash flow. EcoVest typically advances several hundred thousand dollars of reimbursable O&O costs per investment program. It can take three to five months to bring an investment program to market. Historically management has had significant cash invested in pending investment programs during the first nine to eleven months of the year. There has been no positive cash flow until the last quarter of the calendar year, upon the programs' closings, at which time EcoVest generated large cash inflows in the form of O&O cost reimbursements and program fees, which can range from approximately $1.3 million to $1.7 million per investment program.

Beginning in 2015, management implemented sales and marketing changes to try to create investor demand for its investment programs throughout the calendar year and, therefore, generate a more consistent cash flow. These changes have been somewhat successful, as evidenced by two of its 2015 programs closing as early as August and October, respectively. During 2016, management closed its earliest programs to date with two offerings closing in July of that calendar year. Despite these successes, EcoVest still has not been cash flow positive until the fourth quarter of any calendar year. However, management reported that based on the current 2017 forecast EcoVest should be cash flow positive by September 2017.

In addition to these efforts, management has also retained cash in the business from year to year and is closing a $2.5 million, third party line of credit. Both of these initiatives provide liquidity to cover cash shortfalls during the year.

A review of the interim financial statements shows that on June 30, 2017, the actual cash balance was $9.9 million. Additionally, as of the date of this report, EcoVest was raising capital for three investment programs that had not yet closed. FactRight recommends broker dealers include a review of sponsor liquidity as part of its ongoing financial review.

ECOVEST-DOJ_1192338

## Management Compensation

This section describes the forms and amounts of management compensation, with a particular focus on how retail programs affect management compensation. Management compensation and structure should not create serious conflicts of interest and should demonstrate that management's interests are aligned with investors. This section should be read in conjunction with the <u>Governance</u> and <u>Operational Control</u> sections of this report.

The executive managers of EcoVest have historically been paid a base salary plus a bonus equal to a negotiated percentage of EcoVest's operating income, which varies based on the individual executive manager. As part of its recent recapitalization, EcoVest also implemented an employee stock option plan enabling members of management to gain additional ownership in EcoVest over time. Management stated that employee retention is a top priority. They believe that it is beneficial to the investors to have the same team working on the real estate project pre- and post-offering.

Beginning in 2014, EcoVest has retained a minor (between 0.5% and 1%) interest in the offering entities. However, it has not made a significant investment in its investment programs and it does not anticipate doing so going forward. Therefore, EcoVest would not have as strong an economic incentive to avoid losses as compared to a sponsor that has made significant equity investments in its sponsored investment programs. This has not been applicable for EcoVest to date given that investors have elected the Conservation Option for all investment programs to date. EcoVest and its partner, Mr. Teal, did make a small equity contribution in two of the investment programs at the end of 2014 in order to ensure each program had the sufficient cash with which to acquire identified assets. As EcoVest continues to grow and generate a more steady cash flow stream, it will be in a better position to provide cash for an investment should there be a shortfall in meeting the minimum investment program amount or should another need arise, although there is no obligation to do so.

EcoVest receives a 0.53% interest in each of its investment programs for which it makes no capital contribution, which entitles it to a pro rata share of each investment program's distributions and/or charitable deduction.

## Related-Party Transactions

Stakeholders are sensitive to transactions with affiliated parties, particularly those between a sponsored investment program and its advisor, manager, or sponsor. These transactions can increase risk if formal processes to mitigate conflicts of interest are not in place. The purpose of this section is to ensure related-party transactions between the sponsor and its affiliates are clearly and appropriately identified. Furthermore, FactRight reviews policies and procedures to ensure transactions between affiliated parties are identified in a timely manner and are appropriately reviewed and authorized. In the case where independent directors are at issue, related-party transactions are also reviewed to determine whether relationships exist that may impair independence. This section should be read in conjunction with the <u>Governance</u> and <u>Operational Control</u> sections of this report.

ECOVEST-DOJ_1192339

EcoVest's audited financial statements disclosed various related-party arrangements related to the following:

❧ Fees paid to SFAH for rent in addition to shared administrative and infrastructure support (prior to recapitalization)
❧ Various transactions related to the 2015 recapitalization
❧ EcoVest's share buyback and related promissory note in late 2015

EcoVest severed its remaining ties to SFAH as part of the recapitalization; therefore, no fees were paid to SFAH during 2016 and none will be paid going forward.

As part of its review process, FactRight examined the management representation letter issued by management to the independent auditors at the conclusion of the most recent audit. EcoVest represented to Frazier that a verbal agreement regarding O&O expense reimbursement existed between EcoVest and Mr. Teal. The terms of the verbal agreement, according to management and the representation letter, provide for each of EcoVest and Mr. Teal (as joint-venture partner) to share equally in both the obligation and reimbursement of O&O expenses incurred on behalf of sponsored investment programs. If a sponsored investment program does not close, neither party is entitled to recover O&O costs from the other party.

**Conclusion**

Based on FactRight's review and analysis of EcoVest's audited financial statements, it appears EcoVest has the financial capacity to continue operations and provide support to the various sponsored investment programs.

# Prior Performance

The purpose of this section is to assess the prior performance of the organization under review. An organization's management uses its judgment when determining which programs it presents, as well as the manner in which it presents its record of accomplishment, including investor return calculations, the value of dispositions, and other performance information. FactRight does not audit the organization's prior performance but samples select information for further testing. FactRight's goal is to note any information that it believes to be significant to the reader and/or is determined, in FactRight's judgment, to be contradictory, not consistent with transparent reporting, or misleading to investors. FactRight accomplishes this through interviews with senior management, a review of offering documents and/or financial statements, and other information that FactRight deems appropriate, such as foreclosures, impairments, and distribution coverage. The prior performance of the programs discussed below may not be predictive of future performance.

FactRight's review included summary information provided by management relating to the 41

ECOVEST-DOJ_1192340

programs EcoVest has managed since its inception, which totaled $398.3 million in equity proceeds and $1.7 billion in aggregate charitable deductions.

Table 3 summarizes the real estate programs for which EcoVest was a consultant (2012) and is a sponsor/manager (2013–2016.)

**Table 3**

|  | 2012* | 2013 | 2014 | 2015 | 2016** |
|---|---|---|---|---|---|
| Number of closed offerings | 5 | 5 | 6 | 10 | 15 |
| Total closed amount | $11,279,032 | $38,589,263 | $70,718,471 | $104,294,635 | $173,437,071 |
| Total acreage | 1,975 | 3,658 | 5,349 | 1,167 | 3,050 |
| Total value of charitable deduction | $49,281,000 | $165,611,000 | $291,723,438 | $434,042,450 | $762,947,000 |
| Average closed amount per offering | $2,255,806 | $7,717,853 | $11,786,412 | $10,429,464 | $11,562,471 |
| Average acreage per offering | 395 | 732 | 891 | 117 | 203 |
| Average value of charitable deduction per offering | $9,856,200 | $33,122,200 | $48,620,573 | $43,404,245 | $50,863,133 |
| Close dates range | 11/30–12/27 | 11/21–12/27 | 10/31–12/29 | 8/21–12/29 | 7/21–12/20 |
| Average number of investors per offering | 37 | 78 | 140 | 116 | 115 |

*During 2012, EcoVest acted in a consulting capacity to property owners as manager of investment programs.
**During 2016, EcoVest sponsored one friends and family offering that raised $3.8 million.

As discussed in Organizational Description and History, prior to the formation of EcoVest, members of management consulted on similar land offerings for CRI that raised a total of approximately $14.3 million in equity. Investment programs where members of management acted in an advisory or consulting capacity prior to forming EcoVest have been described for background purposes only and were not subject to further review by FactRight.

Beginning in 2012, EcoVest acted as the consultant on five investment programs, managing all aspects of property identification and selection, land use assessment, and syndication. In 2013, EcoVest syndicated its first investment program as a sponsor entity. As of the date of this report, EcoVest has sponsored 36 investment programs since 2013 and has three offerings currently in the market for which it is raising equity capital.

FactRight has prepared detailed due diligence reports on all of EcoVest's investment programs that have been sold through the broker dealer channel since 2014, which are available through the FactRight Report Center.

ECOVEST-DOJ_1192341

DocuSign Envelope ID: E2BD3066-DD84-4570-87FA-DF0BA88C63EB

Each investment program was structured in a similar manner. The programs acquired, or will acquire when fully syndicated, a majority interest (typically 95%) in a single-purpose entity (the Property Entity) that wholly owns unimproved land (the Property). The unaffiliated seller of the Property typically retains the remaining 5% ownership in the Property Entity. Upon closing, an entity owned by EcoVest and Mr. Teal becomes the manager (the Manager), responsible for managing the investment program and the Property Entity. The Manager pursues the land-use options that receives the most votes from investors (see <u>Organizational Description and History</u>).

Each of the land-use options has distinct investment objectives. If members pursue the Development Option, the anticipated hold period may range from approximately 4 to 10 years. According to management, the anticipated hold period under the Conservation Option is 5 to 6 years (although under this option members would potentially receive the economic benefit from the tax deduction in the year in which the contribution is made). If members pursue the Deferral Option, the Property will continue to be held for investment until the manager requests another member vote and the members pursue a specific option or the Property is sold. To date, investor members have elected the Conservation Option for all investment programs. Collectively, these conservation grants have created over $1.7 billion in possible charitable contribution deductions for investors.

FactRight compared the annual amount of capital raised reported by management to the disclosures in the audited financial statements and noted the audit included a slightly lower amount. Management clarified that the audit disclosure refers only to equity raised through the independent broker dealer channel. EcoVest sponsored an additional offering of approximately $3.8 million during 2016 that was syndicated directly to private family and friends and not included in the audit disclosure.

Management does not disclose specific investment performance for investors in investment program documents or in marketing materials. However, after an investment program closes and the investors are admitted as members to the LLC, the manager will present investors a detailed description of the three land-use options. FactRight reviewed the manager analysis letter dated December 22, 2016, that was sent to Waterway Grove Holdings, LLC, investors upon the closing of the investment program. In this correspondence, management summarized the three land-use options available to investors, the steps necessary to execute each option, and the associated potential IRRs based on each scenario. Management's investor letter indicated potential IRRs for the property ranging from 49.4% under the Development Option, assuming a four-year development period, to 342.3% under the Conservation Option (inclusive of tax benefits). FactRight relied on information provided by management and did not review the calculations of potential returns nor confirm actual returns achieved, because these will be determined by each individual's unique tax position.

ECOVEST-DOJ_1192342

**Excess Working Capital Investment Funds**

During the end of 2014 EcoVest expanded its strategy to allow investments that pursue the Conservation Option to invest excess working capital into real estate projects that are unrelated to the properties in their core investment programs. EcoVest's investment programs have excess working capital under the Conservation Option because upfront working capital generated from offering proceeds must be sufficient to pursue any of the land-use options. The Development Option requires working capital in an amount greater than the other options.

Management has stated that it would target low-risk, value-add opportunities to generate cash flow for its investors, focusing on geographical areas and product types where its principals have demonstrated experience. See Acquisitions for more information regarding EcoVest's acquisition process for excess working capital investments. The first such investment was made during mid-2015 when EcoVest, on behalf of Long Bay Marina Holdings, LLC, investors, invested $1.4 million in 41 acres of fully entitled raw land located close to conversation easement land and in a master planned community in the Myrtle Beach area. The acquired land was to be developed into a residential subdivision. Another developer made an offer and the parcel of land was sold for $2.0 million within a little more than a year of the acquisition. Management reported that the net distribution to investors was approximately 5.2% of investors' original gross investment amount and would be taxable at long-term capital gain rates. During December 2016, EcoVest reinvested approximately $875,000 in the acquisition of 90.2 acres of fully entitled raw land located in this same area. This parcel of land is zoned for mid-rise multifamily residential, which includes multifamily attached and single-family detached dwellings. EcoVest is currently pursuing various options for development.

In order to maximize investment flexibility and diversification, EcoVest decided to pool the excess working capital from each year's offerings into a new annual investment partnership. The amount of excess working capital to be contributed from each offering is determined through a detailed analysis and budgeting process in order to ensure there is sufficient capital for the management of the properties.

As of July 2017 EcoVest managed the following excess working capital funds in addition to its conversation easement investment programs:

- The 2015 Vintage Fund—$11 million of capital contributed. $10 million was invested in four properties, including a senior housing community, a garden apartment development, single-family lots, and raw land for development. Management kept $1 million in reserve for any potential liquidity needs.
- The 2016 Vintage Fund LLC—$22 million of capital contributed. $8 million has been invested in the development project of an independent living and memory care community.

The excess working capital investment strategy is still new, and returns are unknown at this time. FactRight recommends broker dealers monitor the excess working capital investment funds going forward.

ECOVEST-DOJ_1192343

**Conclusion**

Since 2012, EcoVest has sponsored or consulted on 41 conservation easement investment programs that have raised $398.3 million in capital and generated $1.7 billion in charitable deductions. Investors have elected the conservation easement option for all investment programs to date. Additionally, more recently EcoVest has expanded its program to permit excess working capital to be invested in order to generate potential returns for investors. As of July 2017 EcoVest managed two excess working capital investment funds with a total of $33 million in capital.

## Operational Control

For the purpose of this section, Operational Control describes those functional areas necessary for a business to run effectively: accounting, human resources (HR), information technology (IT), and vendor management. This section first discusses oversight of operational control and then discusses each specific operational area, presenting an analysis of the function's control structure. FactRight reviews policies, processes, and procedure upon which management represents that it relies and for which the organization under review has direct control. Internal controls are the procedures put in place to help achieve the objectives of the organization relating to financial, strategic, and investment initiatives. Good controls encourage efficiency, compliance with laws, regulations, and organization policies, and seek to eliminate fraud and abuse. FactRight comments on control concerns it identifies during its review process. However, testing on control effectiveness and comprehensive due diligence on third party providers are outside the scope of this review.

### Accounting and Financial Reporting

Traditionally, accounting controls include a combination of the following:

- Segregation of duties (i.e., the act of restricting from one individual both access to assets and the accountability for those assets)
- Management approval of transactions prior to processing
- Post-transaction review
- Use of an accounting application that supports industry-specific accounting needs and provides the ability to control and limit access

Generally, an organization's control process should provide "reasonable assurance" that transactional error is mitigated and assets are protected from fraud. "Reasonable assurance" is subjective and may differ based on the organization's risk tolerance as well as an organizational-specific cost-benefit analysis. In other words, reaching zero risk may not be beneficial when compared with the cost.

EcoVest's accounting department is headed by Mr. McCullough, senior vice president and chief financial officer. The accounting department consists of the CFO, a vice president/controller, a director of accounting, a corporate analyst, and an accounts payable specialist. As a private entity, neither

ECOVEST-DOJ_1192344

DocuSign Envelope ID: E2BD3066-DD84-4570-87EA-DF9DA88C63EB

EcoVest nor its affiliates are required to comply with Sarbanes-Oxley. However, EcoVest relies on various key controls and has in place a structure that emphasizes internal controls. Specifically, EcoVest has an accounting controls matrix in place related to cash disbursements and bank reconciliations. FactRight reviewed the matrix, which clearly identifies items of matter, delineates responsibilities, and provides for oversight through authorizations and approval functions; however, there are no formal written policies related to financial reporting and fixed asset controls. FactRight also requested policies and procedures related to the organization's bank accounts, including check and wire writing and approval authorizations. FactRight reviewed this information, noting that its procedures adequately separate the initiation and authorization functions. Per management, the accounting department is in process of completing a Great Plains accounting policy manual and updating the cash management policy.

In September 2016, EcoVest switched from Sage to Great Plains for its accounting system in order to get a more robust application package. In addition, EcoVest is in phase two of installing additional Great Plains applications, which include automating the accounts payable and expense reporting functions. EcoVest engaged Frazier as the auditors for the 2016 year-end financials and corporate tax accounting and engaged the Elliott Davis Decosimo, LLC, firm as the tax accountants for the investment fund entities. As of FactRight's review, EcoVest completed financials quarterly, which were reviewed by the CFO. Management represented that it is in the process of producing monthly financials and that it anticipates doing so going forward.

**Conclusion**

Based on FactRight's review, it appears that EcoVest's accounting control processes have appropriate segregation of duties over the creation, authorization, and recording of cash movements. Generally, EcoVest's accounting control processes appear to be adequately designed to provide reasonable assurance that financial reporting will be accurate and that its assets are reasonably protected from both human error and fraud. However, it should be noted that as the organization grows, it should consider expanding its documentation of the financial reporting processes and accounting policies, such as cash management and fixed asset controls.

**Human Resources**

Generally, an organization's HR function serves multiple purposes, including but not limited to providing consistent guidance on organizational policies and performance expectations, ensuring compliance with state and federal regulations applicable to HR issues, and protecting the employer from employee-instigated litigation. To execute its purpose, HR utilizes multiple controls that include, but are in no way limited to, the following:

- Providing an employee handbook
- Performing background checks of key or all employees
- Establishing tools to evaluate and track employee performance

ECOVEST-DOJ_1192345

DocuSign Envelope ID: E2BD3066-DD84-4570-87EA-DF0DA88C63EB

- Establishing tools and procedures to help ensure proprietary information remains confidential
- Establishing communication regarding permissions for valid employees to access IT networks, databases, and applications

Larger organizations generally rely on the HR function to manage and monitor global organizational matters and processes and to provide assistance and tools to managers on HR issues that are unique to managers' direct reports. The smaller the organization, the less HR is perceived as necessary; however, HR issues regarding state and federal regulations and employer protection from employee litigation are always applicable.

Mr. McCullough oversees the entire HR function and uses TriNet to assist with the day-to-day HR and payroll functions. TriNet is a professional employment organization (PEO) and, as is typical in a PEO relationship, TriNet acts as the employee of record and assumes a level of risk related to HR obligations. According to the customer service agreement, TriNet also provides EcoVest with the following services:

- Payroll
- Withholding and remittance of employee taxes
- Benefits
- Human resource risk management services
- Communication policies

TriNet is not responsible for the hiring and firing of EcoVest staff, though it does provide tools to assist its clients in all aspects of HR functions related to these responsibilities. TriNet also provides ongoing support to the employees through HRPassport®, its online self-service portal.

Management asserts that turnover has been minimal. In addition, management anticipates growth in its employee base of approximately one to two positions to help grow the core business.

FactRight reviewed EcoVest's employee handbook that, according to management, is distributed to every EcoVest employee. Upon hire, each employee is required to execute a form acknowledging receipt and understanding of the contents of the handbook. EcoVest's handbook appears comprehensive, and its areas of coverage include but are not limited to the following:

- Ethical business practices
- General employment matters (including background and credit check policies)
- Wage and salary administration information
- Benefits overview
- Time off and vacation policies
- Safety matters
- Grievance procedures
- Separation

To help protect the organization, management runs a thorough background check on each potential employee prior to finalizing the hiring process. EcoVest utilizes various recruiting firms, such as ExecuSource, Inc., who run the necessary background checks.

ECOVEST-DOJ_1192346

**Conclusion**

Based on FactRight's interviews with employees regarding HR processes and a review of EcoVest's handbook and the service agreements with Tri-Net, EcoVest's HR control function appears to be appropriately structured and designed to protect its human assets.

## Information Technology

Generally, the IT function is engrained in all processes and departments of any organization through a myriad of functions, including, but not limited to, both internal and external communication, transaction processing and report generation, and storage of data considered both confidential and public. The larger an organization, generally the more complicated its business purpose and structure. Therefore, as an organization's size increases, the more feasible it is to have dedicated IT staff attending to various IT functions, including, but not limited to the following:

- Designing and implementing an organizational-specific IT structure
- Monitoring, evaluating, and updating that structure
- Designing and implementing policies and procedures related to those systems

While smaller or more simply structured organizations require various IT functions, the extent and customization of particular functions are generally borne out of a cost-benefit analysis relative to an organization's size and purpose. IT control functions need to address, at a minimum, the following:

- Access to information internally
- Network and system protection from external intruders
- Business continuity and disaster recovery (i.e., an organization's ability to recover from business interruptions and/or loss of information due to natural disaster or otherwise)

EcoVest's IT function is outsourced to a third party service provider, 5Q Partners, for full IT management and support services. 5Q Partners monitors and maintains network devices, servers, and individual workstations. 5Q Partners performs daily incremental and full backups of all server data via a cloud-based backup.

FactRight reviewed EcoVest and 5Q Partners policies and procedures, which include but are not limited to, an acceptable use policy, a change management policy, an application access audit policy, and a business continuity/disaster recovery policy. The disaster recovery policy is comprehensive and tested on a regular basis.

**Conclusion**

Based on FactRight's review of EcoVest's IT-related function, including its disaster recovery policy and its relationship with 5Q Partners, EcoVest's operational control function over IT appears to be adequate and designed to protect its information-related assets.

ECOVEST-DOJ_1192347

## Significant Vendors and Service Providers

Organizations are increasingly relying on third parties to provide critical services to sponsors, advisors, managers, and investment programs. The purpose of this section is to identify significant vendors and service providers (VSPs) and provide an understanding of the Sponsor's (or organization's) ability to successfully exercise initial and ongoing due diligence of VSPs. FactRight will identify risks, control, and/or compliance concerns that it identifies during the review process. Topics outside the scope of this review include (i) testing of third party review process control effectiveness and (ii) comprehensive due diligence of third party providers.

FactRight identifies VSPs through a request for information provided at the start of a FactRight due diligence review, as well as through interviews with various members of management. FactRight may also identify VSPs during the preparation of other sections of this report, such as <u>Legal and Regulatory</u> and <u>Company Financial Position</u>. VSPs may also be identified through a review of offering documents.

EcoVest and its affiliated entities utilize unaffiliated third parties to assist it, directly and indirectly, in providing investment management and related services (such as prime brokers, clearing brokers, fund administrators, IT and other consultants, data vendors, accounting firms, law firms, etc.). When entering into agreements with these third party service providers, management carefully reviews the relevant agreements to ensure that there is agreement regarding what specific services are required and what specific services are to be provided. Failure of a third party service provider to meet its contractual obligations could not only cause the sponsor to fail to provide required services or violate applicable laws, rules, and regulations, but could also subject the sponsor and its clients to unnecessary risks.

### Conclusion

EcoVest does not have a written policy in place that governs procedures for the initial and annual review of third party providers. However, per management, any significant vendors are thoroughly researched and reviewed to ensure proficiency and fair pricing. These material vendors are presented to the president and CEO for initial approval prior to engagement. Vendors are reviewed at least annually, including a discussion by management, to ensure services are satisfactory. For vendor contracts that are complicated or necessitate a term in excess of one year, the contract will be reviewed, at a minimum, by the CEO as well as the outside counsel, where appropriate.

# Acquisitions

The acquisition process can be considered one of the most important functions of a real estate investment firm. Typically, acquisition activities include the following:

❂ Sourcing

ECOVEST-DOJ_1192348

- ❀ Due diligence and property evaluation
- ❀ Deal negotiation/structuring
- ❀ Deal closing

The means by which an acquisition team conducts these activities are unique to each organization, and, importantly, no set formula of activities will guarantee acquisition success. However, based on FactRight's experience and judgment, certain characteristics and underlying core principles are commonly present in those acquisition teams that have experienced success. Therefore, the purpose of this section is to ascertain the presence and extent of the following characteristics and principles:

- ❀ Delineated roles and responsibilities
- ❀ Team member experience and existing relationships
- ❀ Clearly articulated investment strategies and objectives
- ❀ Defined underwriting processes and procedures

Mr. Solon oversees all acquisition functions at EcoVest. However, acquisitions is a team effort, and all of the management team may be involved in the acquisition process in one aspect or another. Mr. Linsider, senior vice president of investments, and Mr. Lloyd, chief operating officer and senior vice president, lead the acquisition process along with Mr. Solon. Mr. Lloyd started with EcoVest on a contract basis in 2013 and formally joined during 2014, and Mr. Linsider joined the company in January 2014, each after working for approximately 10 years at Wells Real Estate Funds. In addition to acquisitions, Mr. Lloyd and Mr. Linsider are also involved in investment strategy and asset management, among other responsibilities at EcoVest. As the number of properties that EcoVest manages has grown over the last few years, Mr. Lloyd has focused more on asset management (see Asset and Property Management), and Mr. Linsider has focused on the front-end evaluation of pro forma modeling, fund structuring, and financing. Ian Chrystall, director of operations, and Virginia Brown, corporate counsel, also support the acquisition team in various capacities. According to management, the EcoVest team is adequately staffed to handle the acquisition process now. However, it may look to add another analyst as the company continues to grow.

The EcoVest team works closely with developer and homebuilder Mr. Teal, vice chairperson of the Board. Mr. Teal was most recently the principal and sales and marketing advisor of Citizen Homes (which was sold to UCP, Inc., in 2014), which developed master-planned communities along the South Carolina coast. His recent planning and development projects include four planned communities near Myrtle Beach, South Carolina. Mr. Teal has represented that he has a 30-year track record of land development and home building, specifically developing more than 13,000 properties in the coastal Carolina area during that time period.

EcoVest sources most of its opportunities through the relationships Mr. Teal and his group (the Teal Group) have developed during his 30 years in the real estate business. The EcoVest team and the Teal Group meet regularly and hold formal pipeline meetings every couple of months to evaluate the development potential of the projects. Each project must have a good balance between development potential and conservation purpose. According to Mr. Lloyd, EcoVest-sponsored programs acquire

DocuSign Envelope ID: E2BD3066-DD84-4570-87EA-DE0BA88C63EB

approximately 25% of the opportunities it reviews and turns down approximately 25% of the opportunities after the initial review. EcoVest may turn down a property because of physical characteristics, market demand for development, or issues satisfying the conservation purpose requirement, among other reasons.

On July 10, 2017, FactRight participated in an aerial tour of the Myrtle Beach area with Mr. Teal. During the aerial tour, FactRight confirmed that many of EcoVest's properties are located adjacent to, or in close proximity to, the Atlantic Intracoastal Waterway and approximately two miles from the Atlantic Coast. Additionally, FactRight confirmed significant development in the area, including multifamily development completed by the Teal Group. (See Appendix B: Site Visit Photographs.) FactRight believes the location of the North Myrtle Beach properties gives validity to EcoVest's development strategy and the appraiser's highest and best use analysis under its conservation strategy for its properties located in this area.

Mr. Linsider and Mr. Chrystall model the property-level pro forma, with input from the Teal Group, from a development perspective to see the land meets EcoVest's criteria. EcoVest also engages Green Stripe, Ltd., as a conservation easement consultant on a deal-by-deal basis to recommend third party professionals, organize data, and provide strategic advice regarding the conservation easement strategy. Per management, Larry Kohler, the owner of Green Stripe, is generally responsible for coordinating the market study, qualified appraisal, and land trust review.

If EcoVest, the Teal Group, and Mr. Kohler come to a consensus regarding a property, EcoVest issues a letter of intent. At this point, EcoVest authorizes funds for preliminary due diligence and the North American Land Trust (NALT), the qualified organization that holds the conservation easement, is brought in to evaluate the property from a conservation easement standpoint. It is also at this point that Mr. Lloyd, Mr. Linsider, and/or Mr. Chrystall physically inspect the property. Typically, they meet onsite with a market study expert, the qualified appraiser, and tax counsel.

While the team members at EcoVest understand their roles and responsibilities in the acquisition process, EcoVest has not documented any acquisitions procedures. Typically, the PPM and Mr. Chrystall's due diligence folder serve as a checklist. In addition, the list of criteria that attorneys at Alston & Bird, LLP, must have in order to sign off on the tax opinion for the offering serves as a check against missing items.

EcoVest does not use a formal investment committee process for its core investment product. The decision to move ahead on an opportunity is made by consensus of the management team. Once the team has committed, full due diligence commences. In conjunction with the Teal Group, the acquisition team coordinates all the consultants, attorneys, and third party service providers EcoVest works with on its investment programs. These include market and environmental studies for the development piece and a qualified appraisal for the conservation easement piece. Additionally, NALT engages a biologist or biogeographer to evaluate the conservation values on the property, including plants, animals, and ecosystems.

ECOVEST-DOJ_1192350

DocuSign Envelope ID: E2BD3066-DD84-4570-87FA-DF0DA88C63EB

To date, EcoVest has relied on NALT as the qualified organization for all of its investment programs. EcoVest has looked at other qualified organizations; however, it believes that most land trusts cannot provide the scope of services that NALT can provide because many land trusts are small regional entities that may be opposed to any limited development of reserved rights on conserved properties. Mr. Kohler has worked closely with NALT for 20 years and has a strong understanding of what property characteristics are acceptable from NALT's viewpoint.

Appraising conservation easements is a highly specialized undertaking and a limited number of appraisers in the United States have the required training. To date, EcoVest has relied on Clark-Davis, PC (Clark-Davis), for substantially all of its qualified conservation easement appraisals. Clark-Davis is a full service commercial and residential appraisal and consulting company that was established in 1991. FactRight believes that Clark-Davis's experience with conservation easement appraisals and with the IRS are a benefit to EcoVest's offerings. EcoVest has engaged Weibel & Associates, Inc. (Weibel), to provide appraisals for at least two of its 2017 offerings. Management stated that it engaged Weibel in order to diversify its service providers and reduce its reliance on Clark-Davis.

EcoVest has worked with the consulting firm Ralph Stewart Bowden, Inc. (RSB), for market studies on a majority of its projects to date. Bowden was established in 1987 and specializes in providing preliminary and ongoing strategic planning services, based upon market research and analysis, to master-planned and recreationally oriented developments.

**Excess Working Capital Investments**

As discussed in <u>Prior Performance—Excess Working Capital Investment Funds</u>, investment programs that pursue the Conservation Option may invest excess working capital into other real estate projects. EcoVest sources excess working capital investments through the relationships it has developed with real-estate developers and sponsors. EcoVest established an investment committee to make decisions regarding excess working capital investments, which consists of Mr. Solon, Mr. Linsider, and Mr. Lloyd. The investment committee is responsible for underwriting, evaluating, and executing excess working capital investments and meets as necessary when it has excess working capital investments to approve.

Management stated that if its investment programs coinvest alongside other syndicated EcoVest programs, each program would receive equal terms as a member under the operating agreement of such pooled investment; however, this is not required under the offering documents for any of the affiliated investment programs. EcoVest stated it would not invest excess working capital in its other syndicated core investment programs; however, the investment programs may invest in other affiliated investment programs as seed capital, net of any fees and commissions.

EcoVest has pooled all of the excess working capital from its 2015 and 2016 offerings into the 2015 Vintage Fund and the 2016 Vintage Fund (the Vintage Funds). The investment guidelines for the Vintage Funds state that the entities may invest in the following:

ECOVEST-DOJ_1192351

DocuSign Envelope ID: E2BD3066-DD84-4570-87EA-DE9BA88663EB

- Debt or equity interest in real estate assets, property management, development, or other real estate–related businesses
- Interests in a joint venture with a real estate developer with the objective of developing, holding, or selling real property
- Non–real estate assets that are part of, or incidental to, the above investment types
- Other investments

The Vintage Funds appear to have invested within the prescribed investment guidelines. For more information on the Vintage Funds' current investments, see <u>Prior Performance</u>.

The Vintage Funds may engage in affiliated transactions, provided the investment committee approves the transaction as being fair and reasonable and made on terms that are no less favorable than terms available from unaffiliated third parties. Management explained that the Vintage Funds may invest in joint ventures alongside Real Star Communities, through which the Vintage Fund would provide 90% to 97% of the capital to acquire the land, with Real Star Communities providing the other 3% to 10%. The joint venture entity would then obtain a development loan, collateralized by land and guaranteed by the principals of Real Star Communities. After the lots are developed, the joint venture would sell properties to Real Star Homes at a fixed price (with escalators over three to four years), which would lock in the value for the joint venture entity, and thereby the Vintage Fund, and the underlying core investment programs. The 2015 Vintage Fund has made two investments totaling approximately $3.3 million under this type of structure, and management anticipates making additional investments under this structure in the future. The terms of these transactions may be less beneficial to the Vintage Funds than would be available from transactions with unrelated parties.

EcoVest has represented that it is not charging any additional layer of fees to the Vintage Funds for acquisitions, dispositions, or management, other than the fees that EcoVest charges under the core offering product documents.

EcoVest does not have any policy governing the allocation of investment opportunities between its investment programs. However, management represented that it expects that each vintage fund will fully deploy its capital before the following year's vintage fund has available capital, and therefore no investment allocation policy is necessary.

**Conclusion**

EcoVest management is highly experienced in both real estate and real estate offerings and has collaborated with established service providers, including development partners, land trust organizations, and appraisers. To date, EcoVest, as a sponsor organization, has successfully brought 36 programs to market, not including the programs currently being offered. Management has not formalized an approval process or documented any procedures as they relate to the acquisition process. Additionally, investors may receive additional returns if their investment program invests excess working capital under the Conservation Option. However, management anticipates that investment programs will enter into affiliated transactions with Real Star Communities and Real Star

ECOVEST-DOJ_1192352

Homes, which EcoVest's management team owns. Such transactions may be on terms that are less beneficial to the investment programs than what would be available from transactions with unrelated parties.

## Asset and Property Management

The asset and property management departments monitor and maintain the real estate assets acquired by a real estate investment company. It should add value to the overall portfolio by executing a specific property-level strategy. Effective asset management departments typically have a strategy grounded in cost-effective and systematic processes for operating, maintaining, upgrading, and disposing of real estate assets. Additionally, to best position the portfolio for success, the asset management function requires experienced individuals that have a clear understanding of the risks that exist in their business derived from operating and owning the particular type of real estate asset. The purpose of this section is to ascertain the asset management team's capacity to optimize the portfolio value by examining various characteristics, including but not limited to the following:

- Experience of asset and property management personnel, focusing on experience in the targeted asset type
- Extent to which asset management is involved in various investment processes, including acquisitions, financing, dispositions, and property-level decision-making
- Existence and adequacy of policies and procedures
- Frequency and method of asset valuation

As of this report, EcoVest has over 13,000 acres of land under management. None of the investment programs to date have chosen the Development Option. Therefore, as raw land holdings, EcoVest's asset and property management needs are minimal at this point but are actively being pursued. Generally, asset management includes managing the working capital from each offering and managing the properties in a way that drives value for the investors. Mostly, this involves protecting the asset and analyzing the highest and best use of the reserved development rights that the conservation easement deed permits.

Mr. Lloyd is responsible for the asset and property management functions at EcoVest and is supported by Patty Kennedy, director of conservation management. Ms. Kennedy has more than 20 years of experience in conservation and environmental planning. Prior to joining EcoVest, Ms. Kennedy was the director of conservation and a member of the board of directors at NALT, where she created and implemented conservation management strategies for encumbered properties including developing reserved rights for several communities. FactRight believes that Ms. Kennedy's land stewardship experience and relationship with NALT is a significant strength in EcoVest's asset management process.

Ms. Kennedy stated that she meets with NALT before EcoVest enters into any purchase agreement to ensure that the property will have sufficient conservation values to satisfy NALT's conservation purpose

ECOVEST-DOJ_1192353

requirements. Additionally, if there is any concern regarding conservation values, Ms. Kennedy and NALT conduct a site visit of such property prior to acquisition.

According to management, numerous options are available to increase investor returns through the development of reserved rights. These may include agricultural activity, harvesting timber, renewable energy, and the limited development of single-family dwellings, recreational buildings, and resort buildings. Management stated that it essentially has three options with respect to the limited development permitted under the reserved rights, including the following:

- Selling individual lots at market rates
- Aggregating lots with common roads and road signs
- Creating a master-planned development of contiguous properties with the reserved rights, which may include more intense development in certain areas complimented with recreational activities in other areas.

Mr. Solon, Mr. Lloyd, and the EcoVest team are still determining what the market opportunity might be for the reserved rights on the majority of its properties. However, management stated that is getting ready to break ground on the development of 16 single-family dwellings on its Queen's Cove Property.

EcoVest does not have any formal inspection-reporting process. Generally, with limited immediate developments under way, property management at EcoVest involves protecting the raw land and enhancing the conservation purposes of the property. Mr. Lloyd and/or Ms. Kennedy attempt to visit each property on a monthly basis. In addition, EcoVest engages caretakers (such as a retired game warden or hunting clubs) to monitor and perform routine maintenance work on some of the properties under management. One of EcoVest's biggest challenges in managing the vacant properties is illegal dumping and trespassing. In such instances, EcoVest will engage a caretaker to more regularly monitor the property.

NALT is responsible for the stewardship of the conservation easement and is required to conduct a physical easement inspection at least annually. Ms. Kennedy sends conservation plans to NALT and conducts weekly calls with NALT to discuss property management. Mr. Lloyd stated that EcoVest has previously engaged NALT to provide conservation management planning support, such as mapping, as necessary, but that such support is not NALT's responsibility.

Ms. Kennedy stated that EcoVest has engaged biological research groups to do biological inventories on some of the properties. This process can provide more evidence of environmentally significant factors beyond what NALT identified in the initial baseline documentation, such as a new animal species. EcoVest represented that it may use additional biological factors to support the conservation purpose if the IRS were to challenge the conservation purpose of an easement in the future, but noted that additional factors may not carry as much weight as those identified in the original baseline documentation.

Ms. Kennedy prepares an annual property update and budget for each of the properties. FactRight reviewed a sample budget for the South Bay Cove Holdings, LLC, program. The budget includes actual

ECOVEST-DOJ_1192354

line items for 2016 expenditures and projected expenditures from 2017 through 2021, including for the following:

- Site maintenance—caretaker services, security gates, routine mowing
- Land management—new trails, habitat enhancement, meadow management, waterfront clearing, and herbicide
- Biological studies—biological inventories
- Site improvements—view sheds, permits, and docks

Mr. Solon, Mr. Teal, Mr. Linsider, Mr. McCullough, and Mr. Lloyd must approve the budget and sizeable expenditures. Mr. Lloyd approves all other expenditures.

On August 8, 2017, FactRight conducted a site visit with Ms. Kennedy and Mr. McCullough of various EcoVest properties located in the North Myrtle Beach area; see Appendix B: Site Visit Photographs. As part of the site visit, FactRight walked the Long Bay Marina Property and confirmed that the property was located adjacent to the Atlantic Intracoastal Waterway. During the site visit, FactRight also verified that EcoVest has taken measures to secure the properties, for example by placing a fence adjacent to a public roadway along one of the properties. EcoVest also stated that it is in the process of widening a roadway in order to allow police access to deter trespassers. FactRight also verified that EcoVest has taken steps toward developing the reserved rights of some of the properties by visually confirming that EcoVest has cleared a home site at the Camellia Station Property. Additionally, FactRight viewed a location on the Long Bay Marina Property where EcoVest had recently removed kudzu (a non-native, invasive plant), which the conservation easement deed required EcoVest to remove.

EcoVest works with Strategic Risk Advisors, LLC, an independent risk management consultant, for its insurance needs. The properties are covered under general liability policies. Property taxes are paid out of each offering's working capital. Mr. Lloyd reviews and signs off on insurance and tax expenses before they are paid.

As a result of IRS Listing Notice 2017-10 (the Listing Notice), which the IRS issued on December 23, 2016, entities and investors who participate in a syndicated conservation easement transaction (as proposed under the conservation easement option) will be treated as having participated in a listed transaction under Section 6111 and 6112 of the Internal Revenue Code and Section 1.6011-4(b)(2) of the Treasury Regulations. A "listed transaction" is a type of "reportable transaction" that the IRS has determined to be a tax avoidance transaction. Members and material advisors, including broker dealers and registered investment advisors, involved in a listed transaction will be subject to federal (and possibly state) tax reporting requirements. While the Listing Notice does not invalidate syndicated conservation easement transactions or prohibit investors from participating, it expressly states the IRS's intention to challenge tax benefits based on the valuation of the easement. FactRight is unable to comment on the additional resources that the IRS may allocate to auditing syndicated conservation easement transactions or the investors who participate in such programs. However, it appears to FactRight that the IRS intends to apply a broader and increased level of scrutiny in challenging such transactions in the future. FactRight believes that EcoVest has been extremely thorough in researching

ECOVEST-DOJ_1192355

reporting requirements associated with the Listing Notice and in assisting investors and material advisors with meeting such requirements.

### Conclusion

As of the date of this report, EcoVest has minimal asset and property management needs. EcoVest does not have any formal property management process. However, FactRight believes that EcoVest has taken actions that show that management is committed to stewarding the conservation values on the properties while also trying to maximize investor returns through the development of reserved rights. Specifically, FactRight believes that Ms. Kennedy's land stewardship experience and relationship with NALT is a significant strength in EcoVest's asset management process. Furthermore, the asset management team, consisting of Mr. Lloyd and Ms. Kennedy, are involved in the acquisition process, along with NALT, which helps ensure that EcoVest is acquiring properties that will satisfy NALT's conservation purpose requirements.

## Product Sales & Distribution

This section covers numerous topics related to the Sponsor's sales of securities. The main purpose of this section is to provide an understanding of the Sponsor's (or organization's) ability to successfully market and sell its securities products. In addition, it addresses the reasonableness of systems and procedures to ensure compliance with FINRA and SEC rules and regulations related to the handling of prospective investor information. When a managing broker dealer (MBD) is involved, this section also assesses the quality and experience of the MBD, as well as the background and expertise of the sales team and its relationship with the MBD. Finally, FactRight also comments on control and/or compliance concerns, if any, that it identifies during its review process. Topics outside the scope of this review include (i) testing of sales process control effectiveness and (ii) comprehensive due diligence of third party providers involved in the sales process.

### Securities Sales

Triloma Securities, LLC (Triloma), a FINRA member firm unaffiliated with EcoVest, acts as managing broker dealer by raising capital and providing distribution and capital market functions. Triloma is a Florida-based company and, according to FINRA BrokerCheck, currently conducts six types of businesses, including but not limited to real estate syndicator, broker or dealer selling oil and gas interests, broker or dealer selling securities and tax shelters or limited partnerships, and private placement of securities. According to FINRA BrokerCheck, Triloma is registered with the SEC, one self-regulatory organization (SRO), and 52 U.S. states and territories. It should be noted that Triloma was formed and registered with FINRA as of April 2015 and therefore has not yet had a FINRA cycle exam. Per management, EcoVest began its relations with Triloma over 12 years ago, as executives from both

ECOVEST-DOJ_1192356

firms have previously worked together. Triloma has a dedicated team, led by Larry Goff, CEO, and Nick Dolya, president, which conducts distribution and capital markets functions exclusively for EcoVest's product offerings.

According to management and confirmed by the managing broker dealer agreement, Triloma provides both compliance and operations services. Triloma reviews EcoVest's offering and marketing materials for potential regulatory or compliance issues. Additionally, Triloma holds each of the dedicated team member's licenses. EcoVest has an investor relations representative to work with DST Systems, Inc. (DST), the transfer agent. Once a representative/advisor has identified an investor, DST handles the transaction processing and DST's platform tracks and processes the subscription documents. Triloma abides by written supervisory procedures (WSPs), which are maintained and kept current with new rules and regulations. According to management, the WSPs are updated as necessary, but no less frequently than annually. The WSPs provided to FactRight were last updated October 12, 2016. Triloma's net capital requirement is $5,000, pursuant to SEC Rule 15c3-1. According to the latest financials reviewed, as of December 2016, Triloma was in excess of its net capital requirement.

Triloma's distribution team is divided among 12 territories throughout the country. Triloma currently has an external and an internal wholesaler dedicated to each territory. According to management, each new hire to the distribution team must go through product and company training. The training consists of an on-site session with the EcoVest executives, as well as webinars and travel with other wholesalers. In addition, there are weekly sales calls and due diligence meetings, and every couple of months the distribution team will meet in person for continuing education/testing. All EcoVest sales team members are licensed through Triloma with a minimum Series 7 and 63 and/or 66 licenses. FactRight reviewed FINRA BrokerCheck reports for nine members of the Triloma wholesaling team and found one person with a disclosure event that had no merit and was resolved. Triloma indicated that compensation for the wholesaling team is based on commission; however, some positions include a base salary plus commissions.

FactRight has not conducted a completed due diligence review of DST but notes that it has conducted due diligence on several investment product issuers that utilized DST for transfer agent activity. FactRight notes that each issuing organization, including EcoVest and Triloma, negotiates and interacts with DST based upon its own distinct contract for services.

**Conclusion**

Based on FactRight's review of EcoVest's and Triloma's operations and procedures, it appears that EcoVest's sales function is adequately designed to maintain operational control over its sales functions. Specifically, EcoVest and Triloma have processes and procedures in place to ensure compliance with various regulatory bodies' rules and regulations, and both organizations maintain internal operations and due diligence departments to conduct due diligence and training on the offering products.

ECOVEST-DOJ_1192357

# Certification

The undersigned understands that the attached report was prepared from statements both written and oral that were provided by representatives of EcoVest to FactRight up to August 15, 2017. The undersigned further understands that persons performing ongoing due diligence on EcoVest and the investment products offered for distribution by EcoVest will rely on the accuracy of those representations. The attached report was reviewed by the undersigned on _____8/22/2017_____ for material misstatements.

The undersigned certifies that EcoVest has provided FactRight with all information responsive to its requests. The undersigned also certifies the attached report—Risks and Strengths omitted—is accurate in all material aspects.

Date:                8/22/2017

Name:                Robert McCullough

Signature:           *Robert McCullough*
                     DocuSigned by:
                     F6273C2D991142E...

Title:               SVP/CFO

Signed on behalf of  EcoVest Capital, Inc.

ECOVEST-DOJ_1192358

# FactRight, LLC

FactRight, LLC (FactRight), is a third party risk management firm serving the investment marketplace. FactRight and its affiliated companies provide in-depth due diligence reports on alternative investment offerings (product due diligence), and on organizations that issue investment programs (operational due diligence), as well as provide investment committee recommendations, arbitration/litigation support, ongoing program monitoring, regulatory compliance, education and training, and other custom services.

Because each organization/issuer relies on expertise from professionals to syndicate a product offering to the market, FactRight relies on its professionals from each relevant discipline to evaluate the offerings and issuers from a multidimensional perspective. Accordingly, FactRight's financial, legal, securities, business operations, and asset-specific experts bring their expertise to bear on every report FactRight provides to the investment community.

# Use and Scope of This Report

***Use of This Report:*** This report is not intended for use by investors and may not be shared with investors. Rather, this report is intended only for financial professionals who give investment advice. This report is not a recommendation to purchase or sell any investment. This report is largely based on information received from the sponsor that the sponsor has represented to be true and correct. FactRight may also have obtained information from outside sources. Although every effort has been made to ensure this report is reasonably accurate, FactRight makes no guarantees or warranties in that regard. Furthermore, information may change quickly, and FactRight assumes no responsibility for updating this or any other report. This report is therefore provided "as is" and might contain errors, inaccuracies, or outdated information. This report is intended to supplement your efforts in conducting due diligence, not to replace those efforts. This report is subjective and contains information that FactRight has deemed to be material. Information that you deem material may not be included in this report. This report should not be the sole source of information upon which you base your investment recommendations.

***Investment Risk:*** FactRight does not warrant the success of the product and/or sponsor discussed in this report. Risk of loss is inherent in all investments. This report cannot possibly address all potential investment risks, which may change over time. For a more comprehensive discussion of the particular risks of this product or program, please see the sponsor's offering document. By highlighting certain risks in this report, FactRight does not intend to minimize other risks that might be described in the offering document. It is important that you understand the strengths and weaknesses of both the sponsor and the product before making an investment recommendation. This report is simply one tool to use in that process.

ECOVEST-DOJ_1192359

**Suitability of Product:** You must evaluate whether this product or program is suitable for any individual investor under the suitability standards set by FINRA and the SEC and in accordance with the policies and procedures of your supervising broker dealer or investment advisor firm. FactRight makes no attempt to determine suitability of a product for any particular investor or type of investor.

**Conflicts of Interest:** The sponsor or issuer discussed in this report, though not a client of FactRight, has paid a fee to FactRight to prepare this report. The sponsor was provided a draft of this report to review for *factual accuracy*. However, the sponsor was *not* given an opportunity to review the Strengths and Risks sections of this report, nor was the sponsor given any editorial authority over this report. FactRight may perform similar due diligence reporting on other products and sponsors and for other investment professionals.

**No Investment, Legal, or Tax Advice:** FactRight is not a broker dealer, registered investment advisor, legal advisor, tax advisor, or any other form of financial advisor. Accordingly, FactRight is not authorized to give investment advice, legal advice, tax advice, or any other form of financial advice. You should consult your own investment advisor, tax advisor, and/or attorney to the extent you deem necessary.

**Additional Information:** If you have questions regarding this report, please contact FactRight at 10125 Crosstown Circle, Suite 300, Eden Prairie, MN 55344. Further information on the product and/or sponsor might be available through other sources or in a FactRight report. If you want FactRight to obtain additional information or provide a more in-depth review than given in this report or on FactRight's website, please contact FactRight to discuss the terms and parameters of a supplemental review.

ECOVEST-DOJ_1192360

# Review Process

## Site Visit Dates

As part of its operational due diligence review process, FactRight will visit a sponsor's main office of operations and conduct in-person interviews with management and key executives. FactRight may also examine specific documents and/or perform walk-throughs of certain processes for testing purposes.

FactRight conducted its onsite visit of EcoVest and some of its properties under management on July 10 and July 11, 2017.

## FactRight Reporting Team

> **Kathryn Stephany, Esq. (847) 805-6236** Kate@FactRight.com
>
> **Ashley Hunecke (847) 805-6243** Ashley@FactRight.com
>
> **Russell Putnam (847) 805-6120** Russell@FactRight.com
>
> **Brenda Schowalter (949) 440-5402** Brenda@FactRight.com
>
> **Tish Borkowski (312) 286-4165** Tish@FactRight.com

## Documents Reviewed

FactRight compiled the information contained in the Organizational Analysis, Governance, and Business Succession and Continuity sections through interviews with Mr. McCullough. Additionally, FactRight reviewed the following documents and information:

- Certificate of Incorporation of EcoVest Capital, Inc., dated February 24, 2015
- Organizational chart for entities
- Organizational chart for employees
- Certificate of Conversion (from a limited liability company to a corporation), dated February 24, 2015
- Resolutions of the Managers of EcoVest Capital, LLC, various dates
  - Resolutions of the Board of Directors of EcoVest Capital, Inc., various dates, and spreadsheet listing meeting dates and attendees
- Bylaws of EcoVest Capital, Inc., dated February 24, 2015
- Various declaration pages and a spreadsheet documenting insurance policy number, type, amount, and effective dates for EcoVest Capital, Inc., from October 2016 to October 2017
- Recapitalization Agreement Between EcoVest Capital, Inc., Mr. Kahn, Mr. Slovin, Mr. Solon, and Mr. Teal, dated May 22, 2015

ECOVEST-DOJ_1192361

- Bill of Sale Between Alan Solon and Jeffrey Bland, dated June 1, 2015
- Exclusivity Agreement Between Alan Solon and Ralph Teal, dated May 19, 2015, executed
- SFA Lease Termination Notice, dated June 29, 2015

FactRight compiled the information contained in the <u>Legal and Regulatory</u> section through a review of the following documentation and information:

- Any exam or audit conducted by a governing body such as FINRA or the SEC
- Litigation and background searches using:
  - Accurate Information Systems, LLC
  - Lexis Diligence® and CourtLink® from LexisNexis
  - Public Access to Court Electronic Records (PACER)
  - FINRA BrokerCheck
  - various state-sponsored websites

FactRight reviewed the following documents in connection with information contained in the <u>Company Financial Position</u> section:

- EcoVest Capital, Inc.'s and subsidiaries' consolidated 2014, 2015, and 2016 financial statements audited by Frazier & Deeter LLC
- Internally prepared interim financial statements as of March 31, 2017 and June 30, 2017
- 6-30-16 – EVC Financials – Reconciliations – Board Meeting Minutes, dated August 12, 2016
- EcoVest Board Meeting Minutes, dated May 11, 2017
- EVC Recapitalization Table
- EcoVest Management Representation Letter, executed May 9, 2017
- Promissory Note from Ralph Teal, dated March 3, 2016
- Bank commitment letter (signed)
- Management-prepared five-year projections
- Various management-prepared schedules

FactRight reviewed the following documents in connection with information contained in the <u>Prior Performance</u> section:

- Management-prepared Prior Programs summary chart
- Waterway Grove Holdings, LLC, Manager's Analysis and Recommendation Letter, dated December 22, 2016
- Monterrey Cove Holdings, LLC, Private Placement Memorandum
- Del Mar Vista Dunes Private Placement Memorandum, dated July 2017 (redlined)
- EcoVest Capital, Inc., power point used for broker dealers
- Financial Advisor 2015 Vintage Fund Communication, dated May 21, 2017

FactRight compiled the information contained in the <u>Operational Control</u> section through interviews with Mr. McCullough. Additionally, FactRight reviewed the following documents:

- Draft Great Plains/accounting policy

ECOVEST-DOJ_1192362

- Bank account schedule
- List of master corporate service providers
- EcoVest management representation letter with Frazier & Deeter, LLC, executed May 9, 2017
- EcoVest Employee Handbook
- TriNet Passport Service Requisition with EcoVest, dated December 4, 2015
- 5Q Partners Statement of Work, dated July 6, 2017
- EcoVest and 5Q Partners IT Acceptable Use Policy, dated January 1, 2017
- EcoVest and 5Q Partners IT Employee Acceptance Policy, dated December 10, 2016
- EcoVest and 5Q Partners IT Change Management Policy, dated October 25, 2016
- EcoVest and 5Q Partners IT Application Access Audit Policy, dated December 10, 2016
- EcoVest and 5Q Partners IT Business Continuity and Disaster Recovery Policy, dated October 20, 2016
- EcoVest and 5Q Partners IT system backup screenshots

FactRight compiled the information contained in the Acquisitions section through interviews with Mr. Solon, Mr. Teal, Mr. McCullough, Mr. Lloyd, Mr. Linsider, Mr. Chrystall, and Ms. Kennedy. Additionally, FactRight reviewed the following documents:

- 2015 Vintage Fund LLC Agreement, not dated
- 2016 Vintage Fund LLC Agreement, not dated
- 2015 Vintage Fund Certificate of Formation, dated February 5, 2016
- 2016 Vintage Fund Certificate of Formation, date February 24, 2017
- Sample Member Vote Solicitation, South Bay Cove Holdings, LLC, dated December 29, 2015
- Sample Member Vote Result Letter, South Bay Cove Holdings, LLC, dated December 30, 2015
- Sample Green Stripe, Ltd., engagement letter for Waterway Grove, LLC, dated April 18, 2016
- 2015 Vintage Fund Excess Working Capital Financial Advisor Letter, dated March 21, 2017
- 2015 Vintage Fund Marketing Presentation, not dated
- Sample Excess Working Capital File, not dated
- NALT 2016 Property Listing
- Sample Closing File for Waterway Grove Holdings, LLC, Ocean Grove Resort Holdings, LLC, and South Bay Cove Holdings, LLC, various dates
- 2015 Vintage Fund Consents, various dates

FactRight compiled the information contained in the Asset and Property Management section through interviews with Mr. Solon, Mr. Teal, Mr. McCullough, Mr. Lloyd, Mr. Linsider, Mr. Chrystall, and Ms. Kennedy. Additionally, FactRight reviewed the following documents:

- Sample Budget for South Bay Cove Holdings, LLC, authorized April 2017
- Private Placement Memorandum for Del Mar Vista Dunes Holdings, LLC, dated June 22, 2017
- Sample Form 8886 Instructions for Waterway Grove Holdings, LLC, dated April 5, 2017
- Sample Form 8886 for Waterway Grove Holdings, LLC
- Investor Tax Communication, dated March 23, 2017
- Sample Document Checklist for Del Mar Vista Dunes Holdings, LLC

ECOVEST-DOJ_1192363

FactRight compiled the information contained in the <u>Product Sales & Distribution</u> section through interviews with Mr. McCullough and Mr. Dolya. Additionally, FactRight reviewed the following documentation:

- Dealer manager agreement (DMA) and first amendment to DMA between EcoVest and Triloma, dated May 26, 2015
- EcoVest and Triloma Term Sheet Amendment, dated April 6, 2016
- Triloma Securities—Written Supervisory Procedures, as of October 12, 2016
- 2015 and 2016 Annual Triloma Focus Reports
- 2017 Triloma Team and Territory Map
- Transfer Agent Agreement between DST and EcoVest, dated August 24, 2015
- Subscription document instructions and checklist
- Sample investor/financial advisor communications, dated December 28, 2016
- FINRA BrokerCheck

ECOVEST-DOJ_1192364

# Appendix A: Organizational Chart



All ownership 100% unless indicated
Gold = Sponsor
Purple = Offering entity
Green = Individual owner
Blue = Wholly owned subsidiary
Red = Subsidiary

ECOVEST-DOJ_1192365

## Appendix B: FactRight Site Visit Photographs



Myrtle Beach Area and EcoVest Properties along the Atlantic Intracoastal Waterway



Myrtle Beach Area

ECOVEST-DOJ_1192366



Myrtle Beach Area and Atlantic Coast

Intracoastal Waterway from Long Bay Marina

ECOVEST-DOJ_1192367



Long Bay Marina



Lakeshore Resort

ECOVEST-DOJ_1192368

DocuSign Envelope ID: E2BD3066-DD34-4570-87EA-DF0DA88663EB



Lakeshore Resort and Adjacent Property

Timber Rattlesnake

ECOVEST-DOJ_1192369