1

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF GEORGIA
 2                   ATLANTA DIVISION

 3   UNITED STATES,                )
                                   )
 4              Plaintiff,         )
                                   )
 5        vs.                      ) Case No.
                                   )1:18-cv-05774-AT
 6   NANCY ZAK, CLAUD CLARK III,   )
     ECOVEST CAPITAL, INC., ALAN N.)
 7   SOLON, ROBERT M. McCULLOUGH,  )
     RALPH R. TEAL, JR.,           )
 8                                 )
                Defendants.        )
 9
                         - - -
10            Videotaped deposition of RALPH R. TEAL,

11   JR., taken pursuant to notice via videoconference

12   at 2002 Oak Street, Suite 200, Myrtle Beach, South

13   Carolina, on Friday, January 28, 2021, at 9:14

14   a.m., before Lorraine B. Marino, Registered

15   Diplomate Reporter, Certified Realtime Reporter and

16   Notary Public.

17                       - - -
```

**Exhibit 1387**

```
                                                                      2

 1   APPEARANCES: (via videoconference)

 2             ERIN R. HINES, ESQ.
               HARRIS J. PHILLIPS, ESQ.
 3             ERIC M. ABERG, ESQ.
               RICHARD G. ROSE, ESQ.
 4             U.S. DEPARTMENT OF JUSTICE
               TAX DIVISION
 5               555 Fourth Street, N.W.
                 Washington, DC  20001
 6               202-598-5869
                 erin.r.hines@usdoj.gov
 7               harris.j.phillips@usdoj.gov
                 eric.m.aberg@usdoj.gov
 8               richard.g.rose@usdoj.gov
                 for Plaintiff
 9
               NATHAN E. CLUKEY, ESQ.
10             SIDLEY AUSTIN LLP
                 1501 K Street, N.W.
11               Washington, DC 20005
                 202-736-8437
12               nclukey@sidley.com
                 for Defendant Zak
13
               NILES A. ELBER, ESQ.
14             ROSS R. SHARKEY, ESQ.
               CAPLIN & DRYSDALE, CHARTERED
15               One Thomas Circle, N.W.
                 Suite 1100
16               Washington, DC  20005
                 202-862-7827
17               nelber@capdale.com
                 rsharkey@capdale.com
18               for Defendant Clark

19

20

21

22
```

```
 1   APPEARANCES, Cont'd.:  (via videoconference)

 2              BENJAMIN J. RAZI, ESQ.
                SEAN M. AKINS, ESQ.
 3              NICHOLAS PASTAN, ESQ.
                COVINGTON & BURLING, LLP
 4                 One CityCenter
                   850 Tenth Street, N.W.
 5                 Washington, DC  20001
                   202-662-5908
 6                 brazi@cov.com
                   sakins@cov.com
 7                 npastan@cov.com
                   for Defendants EcoVest, Solon,
 8                 McCullough and Teal

 9   ALSO PRESENT: (via videoconference)

10              AMANDA REINKEN,
                Litigation Tech Case Manager
11

12              ISAAC HORNER,
                Videographer
13
                          - - -
14

15

16

17

18

19

20

21

22
```

```
 1        Q.  In what way are you currently affiliated
 2   with EcoVest?  For example, are you an owner, an
 3   employee?  What is your role?
 4        A.  I own a percentage of EcoVest, and I am on
 5   their board.
 6        Q.  Any other role or involvement with
 7   EcoVest?
 8        A.  Not any other role than you would play --
 9   no.  I am an owner and a board member.  You know,
10   I do the things that the owners and board members
11   do.
12        Q.  So to be clear, you are not considered an
13   employee of EcoVest; correct?
14        A.  No.
15        Q.  Mr. Teal, you mentioned you have an
16   ownership interest in EcoVest.  Do you recall
17   sitting here today approximately how much
18   ownership percentage you have?
19        A.  I would think approximately 28 to
20   31 percent, 32 percent, somewhere in that range.
21        Q.  And when did you first become an owner in
22   EcoVest?
```

```
 1      A.   I don't remember the exact year.  Possibly
 2   2015, possibly.  But I don't remember the exact
 3   year.  It may have been late 2014, somewhere in
 4   that range, I believe.
 5      Q.   Okay.  And before you were an owner, did
 6   you have a relationship with EcoVest?
 7      A.   I had a business relationship, yes, yes.
 8      Q.   How far back does that business
 9   relationship with EcoVest go?
10      A.   I met them in late 2011, but there was
11   no -- that was just an introduction.  But we
12   started working together in 2012.
13      Q.   So you worked with them for a few years
14   before you became an owner.  That would be
15   accurate; correct?
16      A.   Yes.
17      Q.   Okay.  What were the circumstances
18   surrounding your decision to buy some shares and
19   become an owner in EcoVest?
20      A.   Alan Solon, who was the CEO of EcoVest,
21   had a chance to buy his partners in EcoVest out
22   of the company, and I participated in that
```

1   it and reviewed it at the time.  I don't remember

2   this particular agreement, but it dates back a

3   while.  So yes, it says what it says.

4        Q.  Okay.  And when you say "Jim," you mean

5   Jim Sack; is that correct?

6        A.  I'm sorry.  Jim Sack.

7        Q.  Let's turn to page 2.  And I want to

8   direct your attention to subparagraph (f) as in

9   Frank.  It looks like this paragraph was setting

10  an annual retainer for you in the amount of

11  $100,000 plus an annual expense account of up to

12  $100,000.  Do you see that?

13       A.  It was -- my recollection of that was it

14  was a board compensation.  I see that.

15       Q.  So you received $100,000 a year to serve

16  on the board of EcoVest?

17       A.  That was the agreement.

18       Q.  And did that start in 2016?

19       A.  I would have to go back and check, but I

20  don't see why it wouldn't have.

21       Q.  And to the best of your recollection, has

22  it been the same since 2016 of $100,000 per year

100

1   Just a board member.

2       Q.  Have you ever served as chairman of the

3   EcoVest board?

4       A.  No.

5       Q.  What about a vice chairman?

6       A.  Yes, I don't know what a vice chairman

7   does.  I was a board member.  And I'm not saying

8   that there hadn't been some definition attached

9   to what I am, but, you know, I don't remember.

10      Q.  Have you been a member of the EcoVest

11  board since 2015 to present?

12      A.  Yes.

13      Q.  How would you describe your role as a

14  member of the EcoVest board?

15      A.  Can you be more specific?  I don't --

16      Q.  What duties or tasks or responsibilities

17  do you have as a member of the EcoVest board?

18      A.  I go to board meetings.  I am involved in

19  the discussions in the direction of the company.

20  I do what other board members would normally, you

21  know:  Advise as to the direction of the company.

22              MS. HINES:  Are you okay, Ben, or do

[1/28/2021] Teal, Ralph R. (DEPOSITION)

1    document shows; right?

2             MR. RAZI:  Objection.  That

3    mischaracterizes the document.

4             THE WITNESS:  Yes, I don't remember

5    a conversation in these contexts.  The context I

6    remember was the overall transaction.  And I

7    don't understand then nor do I understand now how

8    they are priced.  So I'm not sure what he is

9    referring to here.

10            MS. HINES:  Okay.  Let's go ahead

11   and take that down, Amanda.

12   BY MS. HINES:

13       Q.  Mr. Teal, you have talked today about how

14   you are primarily responsible or one of the

15   people primarily responsible for locating land

16   for the EcoVest transactions; correct?

17       A.  Yes, ma'am.

18       Q.  How do you go about finding out about

19   potential land for the EcoVest transactions?

20       A.  In my job with the companies I am involved

21   in, that was my role generally.  One of my roles

22   was acquisition of properties that we ultimately

1   developed.  So through my years of doing it,
2   that's what I do.
3       Q.  So it is part based on your relationships
4   and just knowledge in the industry; is that
5   right?
6       A.  Yes, that's right.  But, you know, that's
7   one component of it.
8       Q.  And what are the other components?
9       A.  You know, through research.  I understand
10  where land is and what -- so I will look at that.
11  I have -- that would be the other component,
12  looking at areas and finding, tracking down
13  landowners for potential transactions.  But
14  brokers bring me land, you know, attorney, you
15  know, different people bring us properties.
16      Q.  Okay.  So you also get referrals about
17  potential land for the EcoVest transactions?
18      A.  Not just EcoVest transactions. Just all
19  the business, all the different land that we do
20  in all our businesses.  I get referrals.  I get,
21  you know, people -- you know, we look for land.
22  We have developed a network of, you know, people

1   the other Alan that we have been talking about
2   today?
3       A.  I'm sorry.  Yes, Allen Paksima.
4           MS. HINES:  Okay.  Let's look at the
5   next document.  It is going to be Exhibit 262,
6   and it has the document ID ECOVEST-DOJ_0431806.
7           (Exhibit No. 262 was marked for
8   identification.)
9   BY MS. HINES:
10      Q.  Mr. Teal, this is a two-page email chain,
11  and Mr. Solon is forwarding you information about
12  attractive land; correct?
13      A.  Could you blow that up, please?
14      Q.  Just the top part or do you want the
15  whole --
16      A.  I mean, I can't --
17      Q.  Amanda, can you blow up the initial email
18  first, and then if you want to scroll, Mr. Teal,
19  we can scroll.  No.  Sorry, Amanda; the one at
20  the top.
21      A.  Yes, I see that.  Thank you.
22      Q.  Okay.  And, Mr. Teal, was it common for

1    EcoVest folks or Mr. Solon to also get leads on
2    potential land opportunities?
3        A.  Alan Solon would send me periodically land
4    opportunities that people contacted him with.  I
5    don't know if anybody else at EcoVest ever sent
6    anything.  But Alan, I do remember him sending,
7    you know, some correspondence from time to time.
8        Q.  And in terms of deciding whether to pursue
9    land for an EcoVest transaction, was your process
10   any different when you knew of the lead versus
11   when Alan Solon knew of the lead?
12       A.  No.
13       Q.  So we have seen now you got land leads
14   from a few different places:  From your
15   experience in the industry, from your network,
16   people reaching out with land opportunities
17   either to you directly or through folks you knew
18   or EcoVest.  Once you get an inquiry, what is
19   your next step?
20       A.  An EcoVest property that you referred to
21   is no different than a Realstar property or any
22   other land that we ultimately do.  You know, it

179

1   without a price.  I assume we never have done it,
2   but I can't remember or imagine that happening.
3   You know, we have done a lot of land transactions
4   over the years, and I don't remember all of them.
5   But that's typically -- you understand the
6   pricing, and that's part of the LOI component.
7       Q.   Mr. Teal, what is your role in determining
8   that price?
9       A.   Usually the seller has a price in mind,
10  and usually that's the part that gets things
11  started, but not always.  And there may be times
12  when the seller wants us to tell them first what
13  we will pay for it.  But generally, there is an
14  understanding of what the price is.  But most
15  often the seller has a price in mind.
16      Q.   And are you primarily the person
17  negotiating that price for the land for EcoVest
18  transactions?
19      A.   I am primarily initially the person doing
20  that for all the land our companies buy.
21      Q.   And in general would you describe that
22  process as a negotiation?

[1/28/2021] Teal, Ralph R. (DEPOSITION)

1   agreement is going to lay out what the price is
2   that you are going to pay; right?
3       A.  Yes, ma'am.
4       Q.  And so in the EcoVest transactions, that
5   first agreement usually took the form of a
6   membership interest purchase agreement; is that
7   right?
8       A.  That's right.
9       Q.  And that purchase price set forth in the
10  membership interest purchase agreement was a
11  price that you were willing to pay as the buyer;
12  right?
13      A.  Yes, those MIPAs were all prepared by our
14  lawyer, and that wasn't -- I got it to the point
15  to due diligence and the MIPA and the information
16  in the MIPA was all prepared by the attorneys,
17  but I would think that the price that's in there
18  was what was negotiated, and I am certain that it
19  was, but I didn't prepare a MIPA.
20      Q.  Did you ever sign a MIPA on behalf of
21  EcoVest?
22      A.  I don't remember that I would or didn't.

261

1   there is a description of this property, 28.04
2   acres; correct?
3       A.  Okay, I see that.
4       Q.  And now I would like to scroll back up to
5   page 2 of the pdf.  And, Amanda, if you can zoom
6   in on the bottom there after the italics.  Yes,
7   that works.
8               And in this document Mr. Clark has
9   valued the property, that 28.04 acres, in the
10  before condition of $39,960,013.  Do you see
11  that?
12      A.  Yes, I see that.
13      Q.  Mr. Teal, would you have paid 39-
14  plus-million dollars for that 28 acres of land?
15      A.  From my understanding from, you know, my
16  attorneys and different accountants, I don't
17  believe Claud is appraising the land for
18  39 million.  I think he is appraising the
19  easement value, you know, the extinguishing all
20  the development rights in perpetuity.  But I'm
21  not an expert on conservation easement, you know,
22  but I don't believe he is appraising the land at

[1/28/2021] Teal, Ralph R. (DEPOSITION)

1    that price.  I think he is appraising, I am told
2    by my attorney, the easement and extinguishing
3    all the development rights in perpetuity.
4        Q.  So it is your understanding that this
5    $39 million is not value attributable solely to
6    the land; is that correct?
7        A.  My understanding is that it is the value
8    of the extinguishing all the development rights
9    and all the entitlements and everything that go
10   with the property in perpetuity.
11       Q.  So is the extinguishing the development
12   rights outlined in this appraisal document as the
13   potential development option?
14       A.  I have never seen that appraisal document,
15   to my knowledge, and I didn't write it, so I
16   don't -- it was reviewed, I'm sure, by EcoVest
17   attorneys and the different people, all the
18   people through the process.  So I don't know if
19   it is right or wrong, but it is not something, a
20   work product that I work in, and I don't remember
21   seeing it.  I am not saying I haven't.
22       Q.  But you would not have paid $39 million

```
 1      for 28 acres of land, would you?
 2          A.   For pure land value or just for the land?
 3      No.  You would have to have, you know,
 4      developable -- you have to make money with the
 5      land, and the land is just a component.  So, you
 6      know, there would be no room in there to develop
 7      and make any money on, so --
 8          Q.   And I am going to represent to you that
 9      the price in the MIPA for Cypress Cove was a
10      little bit less than $1.1 million.  Mr. Teal, how
11      can you account for the difference between
12      $1.1 million paid in the MIPA versus a
13      $39 million value that Mr. Clark put forth about
14      six to eight months later?
15          A.   You know, Claud is an expert, has been
16      doing that for a long time.  He understands what,
17      I believe, and my attorneys believe he
18      understands the process to value these
19      conservation easements and the extinguishing of
20      all the development rights.  You know, I didn't
21      write the appraisal, but I believe in Claud and
22      the process and the people, the due diligence
```

1 | every one had it, but I believe every one did,
2 | but I want to clarify that.
3 |     Q.  Let's assume that the Cypress Cove Marina
4 | had the entitlements and the zoning in place.
5 | What else could have happened to the land between
6 | the time of the MIPA and the time of this
7 | appraisal when the property was previously valued
8 | at almost 1.1 million and now Mr. Clark's
9 | appraisal says unencumbered at almost 40 million?
10 |             MR. RAZI:  Objection.
11 | BY MS. HINES:
12 |     Q.  How do you account for that increase in
13 | value?
14 |             MR. RAZI:  Objection.  That
15 | mischaracterizes the document.  Asked and
16 | answered.  But you can answer.
17 |             THE WITNESS:  Yes, I think the
18 | land -- I think my understanding from my
19 | attorneys through this process is the land value
20 | is what you pay for the land.  But what he is
21 | appraising here is not the land.  It is the
22 | extinguishment of the development rights that you

1   are taking away forever and the benefits you
2   would get from that.  So I don't think they have
3   anything to do with one another.  But, you know,
4   I believe that -- and my attorneys and the
5   accountants and everybody that were involved in
6   this, the process, and checked behind Claud, and
7   I believe Claud knows his business and what he is
8   doing, and I believe it to be correct, that it
9   follows the law.
10  BY MS. HINES:
11      Q.  So, Mr. Teal, do you need a lawyer to
12  explain Mr. Clark's work to you?
13      A.  I don't look at Mr. Clark's work.
14      Q.  But sitting here today, you are saying you
15  would rely on them to explain this appraisal
16  document.
17      A.  I absolutely would, yes.
18              MS. HINES:  Okay.  Let's go ahead
19  and take another break.  And when we go off the
20  record, Isaac, can you give us a time check,
21  please?
22              THE VIDEOGRAPHER:  Going off the