1

```
 1         IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF GEORGIA
 2                    ATLANTA DIVISION

 3   UNITED STATES,              )
                                 )
 4              Plaintiff,       )
                                 )
 5         vs.                   ) Case No.
                                 )1:18-cv-05774-AT
 6   NANCY ZAK, CLAUD CLARK III, )
     ECOVEST CAPITAL, INC., ALAN N. )
 7   SOLON, ROBERT M. McCULLOUGH, )
     RALPH R. TEAL, JR.,         ) VOLUME 1
 8                               )
                Defendants.      )
 9
                       - - -
10         Videotaped deposition of CLAUD CLARK

11   III, taken pursuant to notice via videoconference

12   at the law offices of Caplin & Drysdale, One Thomas

13   Circle, N.W., Suite 1100, Washington, D.C., on

14   Wednesday, March 10, 2021, at 9:13 a.m., before

15   Lorraine B. Marino, Registered Diplomate Reporter,

16   Certified Realtime Reporter and Notary Public.

17                     - - -
```

**Exhibit 1393**

```
 1    APPEARANCES: (via videoconference)

 2              RICHARD G. ROSE, ESQ.
                HARRIS J. PHILLIPS, ESQ.
 3              ERIN R. HINES, ESQ.
                ERIC M. ABERG, ESQ.
 4              WILLIAM CHANG, ESQ.
                U.S. DEPARTMENT OF JUSTICE
 5              TAX DIVISION
                   555 Fourth Street, N.W.
 6                 Washington, DC  20001
                   202-598-5869
 7                 richard.g.rose@usdoj.gov
                   harris.j.phillips@usdoj.gov
 8                 erin.r.hines@usdoj.gov
                   eric.m.aberg@usdoj.gov
 9                 william.chang3@usdoj.gov
                   for Plaintiff
10
                NILES A. ELBER, ESQ.
11              ROSS R. SHARKEY, ESQ.
                AMANDA LEON, ESQ.
12              CAPLIN & DRYSDALE, CHARTERED
                   One Thomas Circle, N.W.
13                 Suite 1100
                   Washington, DC  20005
14                 202-862-7827
                   nelber@capdale.com
15                 rsharkey@capdale.com
                   aleon@capdale.com
16                     -and-
                ROBERT C. KHAYAT, JR., ESQ.
17              THE KHAYAT LAW FIRM
              75 14th Street, N.E.
18                 Suite 2750
                   Atlanta, GA  30309
19                 404-978-2750
                   rkhayat@khayatlawfirm.com
20                 for Defendant Clark

21

22
```

3

```
 1   APPEARANCES, Cont'd.: (via videoconference)

 2             SEAN M. AKINS, ESQ.
               AMEE FRODLE, ESQ.
 3             COVINGTON & BURLING, LLP
                 One CityCenter
 4               850 Tenth Street, N.W.
                 Washington, DC  20001
 5               202-662-5908
                 sakins@cov.com
 6               afrodle@cov.com
                 for Defendants EcoVest, Solon,
 7               McCullough and Teal

 8   ALSO PRESENT: (via videoconference)

 9             AMANDA REINKEN,
               Litigation Tech Case Manager
10
               ISAAC HORNER,
11             Videographer

12                       - - -

13

14

15

16

17

18

19

20

21

22
```

1    Q.   And you concluded that a willing buyer
2    would pay it looks like a little over $61 million
3    for Waterway Grove as of December 28, 2016 --
4    correct? -- if the property were not encumbered
5    by a conservation easement?
6        A.   That's the fair market value if developed
7    on the highest and best use.  If the project were
8    built out, yes.
9        Q.   Well, do we agree that the willing buyer
10   in your fair market value definition would be
11   purchasing unimproved land at Waterway Grove?
12       A.   No, we don't agree.
13       Q.   We don't agree.  Okay.  Amanda, could you
14   go to pdf page 8, please.  And toward the bottom
15   of the page in your summary of appraisal it says
16   "Improvements"; correct?
17              MR. ELBER:  Richard, could you blow
18   that up, please?  Thank you.
19              THE WITNESS:  Yes.
20   BY MR. ROSE:
21       Q.   Okay.  So do we have any dispute that the
22   land was unimproved, Mr. Clark?

[3/10/2021] Clark, Claud C. (Vol. 01) (DEPOSITION)

1      A.   The land was unimproved.  The valuation
2   did not value unimproved land.
3      Q.   Can we go back to page 2, Amanda, the
4   bottom of the page.
5           You wrote in your appraisal,
6   Mr. Clark, "The Fee Simple value of the Subject
7   Property"; correct?
8      A.   That's what it says, yes, sir.
9      Q.   So what are you valuing here?
10     A.   Valuing the highest and best use of the
11  subject property.
12     Q.   Your fair market value definition says
13  that fair market value is what a willing buyer
14  would pay and a willing seller would accept;
15  correct?
16     A.   That's the definition that I am required
17  to use.
18     Q.   Is that the definition that you were
19  applying in this appraisal?
20     A.   I think that definition is flawed.
21     Q.   That's the definition that is taken
22  directly from the Treasury regulations; correct?

59

1    A.  Yes, sir.
2    Q.  And your testimony here today is that that
3    definition of fair market value is flawed?
4    A.  It talks about property, and we are
5    valuing conservation easements.
6    Q.  Are you bound by that definition of fair
7    market value, Mr. Clark?
8    A.  Which definition?
9    Q.  The definition of fair market value that
10   you cited in your appraisal taken from the
11   Treasury regulations.
12           MR. SHARKEY:  Object.  It is vague,
13   Richard.  This is Ross, Lorraine.  You showed him
14   two definitions.
15           MR. ROSE:  Who is objecting on
16   behalf of Mr. Clark here?
17           MR. SHARKEY:  This is Ross.  Sorry;
18   I thought I had said this is Ross.  I object that
19   that's vague.
20           MR. ROSE:  I would appreciate it if
21   we could limit the objections to just one
22   individual.  This is a proceeding that is

1  supposed to proceed as if we were in trial.  I
2  haven't heard of any judge that would permit two
3  attorneys to object on behalf of one witness.  So
4  could we just allow Niles to handle the
5  objections, please.
6              MR. ELBER:  That's fine, Richard.
7  BY MR. ROSE:
8     Q.  Mr. Clark, are you bound to apply the
9  definition of fair market value that is listed in
10 your appraisal at page 2?
11    A.  That's the definition that the Treasury
12 reg says I am supposed to use.
13    Q.  And is that the one that you used in this
14 appraisal?
15    A.  Yes.
16    Q.  So the fair market value of $61 million is
17 what a willing buyer would pay for Waterway
18 Grove; correct?
19             MR. ELBER:  Object to form; asked
20 and answered.
21 BY MR. ROSE:
22    Q.  Go ahead, Mr. Clark.

61

1     A.   If the property were developed to its
2  fullest highest and best use, that's what the
3  fair market value of the property would be.
4     Q.   Well, Mr. Clark, we don't have any dispute
5  that the property was unimproved; correct?  Those
6  are your words.  That's right out of your
7  appraisal.  The property was unimproved; isn't
8  that correct?
9     A.   It was unimproved.  It was a hypothetical
10  condition that it was improved.
11     Q.   So let me just be clear.  Are you applying
12  the definition of fair market value that is
13  listed in your appraisal taken from the Treasury
14  regulations?
15     A.   Yes.
16     Q.   Are you familiar with the concept of fee
17  simple ownership, Mr. Clark?
18     A.   Yes, sir.
19     Q.   And are you familiar with the notion of
20  the bundle of rights that the fee simple owner
21  possesses?
22     A.   Yes, sir.

[3/10/2021] Clark, Claud C. (Vol. 01) (DEPOSITION)

```
 1    Grove, LLC is the fee simple owner of the
 2    property at issue in this appraisal?
 3        A.  No, sir.
 4        Q.  Mr. Clark, is somebody going to pay on
 5    December 28, 2016 what something would be worth
 6    at a later date under its highest and best use?
 7              MR. ELBER:  Objection to form; calls
 8    for speculation.
 9    BY MR. ROSE:
10        Q.  Do you understand my question, Mr. Clark?
11        A.  Please restate it, please.
12        Q.  Sure.  You are suggesting that this
13    $61 million value is based on a hypothetical
14    highest and best use; correct?
15        A.  I am, yes, sir.
16        Q.  But the fair market value definition
17    requires you to determine what a willing buyer
18    would pay as of your valuation date; correct?
19        A.  That's what the definition calls for, yes.
20        Q.  So is someone going to pay as of the date
21    of your valuation what something would be worth
22    at a later date under its highest and best use?
```

[3/10/2021] Clark, Claud C. (Vol. 01) (DEPOSITION)

113

1    piece of property to start with.
2        Q.  So you were not looking for sales of
3    unimproved land with similar development
4    potential?
5        A.  Not to do the before under the highest and
6    best use, no.
7        Q.  Why not?
8        A.  Because the code calls to use highest and
9    best use.
10       Q.  But this is unimproved land -- correct? --
11   with no roads.  It is just vacant.  How is that
12   comparable to a developed property?
13       A.  We made the hypothetical assumption that
14   it was developed and used that as the basis for
15   our before, following the tax code, court cases
16   such as Kiva Dunes, the IRS guidelines to
17   reviewing conservation easement appraisals,
18   experience with IRS appraisers who have used the
19   same methodology of valuing the hypothetical and
20   not the raw land, which I believe is the correct
21   way to go about estimating before value.
22       Q.  Well, let me ask you this.  Were you

[3/10/2021] Clark, Claud C. (Vol. 01) (DEPOSITION)

1    looking for sales of fully developed resort-style
2    multi-family product?
3        A.   Clarify "product."
4        Q.   Excuse me?
5        A.   Product would be a condominium unit.
6        Q.   Okay, that's fair.  My question is this.
7    When you were doing this search -- you said, "I
8    made a search" -- were you looking for the sale
9    of fully developed resort-style multi-family
10   developments?  Is that what you were looking for;
11   sales of fully developed --
12       A.   Yes.
13       Q.   Okay.  You weren't looking for retail
14   sales of individual units, obviously; correct?
15       A.   Retail sales did go into the discounted
16   cash flow.
17       Q.   Right.  But I am talking about the before
18   value.  I am sorry.  I am talking about the
19   search you made for the sales comparison.
20       A.   No, I did not look at retail sales except
21   to include those in further developing the before
22   value.

```
 1    that would prohibit development; the zoning,
 2    planning.
 3        Q.   And you said "fully developed"; correct?
 4        A.   Yes.
 5        Q.   And that means fully built out and sold
 6    out, occupied; correct?
 7        A.   Generally, yes.
 8        Q.   When you searched on LoopNet, were you
 9    searching for closed sales values or listings?
10        A.   Probably both.
11        Q.   Is one more valuable than the other?
12        A.   They are both good information to be
13    considered.
14        Q.   Yes, I understand that.  But my question
15    was is one considered more valuable or a better
16    indicator of value than the other, in your
17    experience in many years of appraisal practice.
18        A.   A closed sale.
19        Q.   And so as you state in your report, you
20    were not able to search for development
21    parcels -- I am sorry.  You were not able to find
22    any development parcels in the normal course of
```

[3/10/2021] Clark, Claud C. (Vol. 01) (DEPOSITION)

```
 1    record for just one second?
 2              MR. ROSE:  Sure.
 3              THE VIDEOGRAPHER:  Going off the
 4    record at 11:59.
 5              (Recess taken.)
 6              THE VIDEOGRAPHER:  Going on the
 7    record at 12:00 p.m.
 8    BY MR. ROSE:
 9        Q.  All right, Mr. Clark, we have got what has
10    been marked as Exhibit 423 for identification
11    purposes only on the share screen.  This is a
12    membership interest purchase agreement.  Do you
13    see that?
14        A.  Yes, sir, I see that title, yes.
15        Q.  And you are familiar with the membership
16    interest purchase agreement document as a general
17    matter that EcoVest executed?
18        A.  This one specifically or as a general?
19        Q.  Just as a general matter.
20        A.  I know that they acquired a membership
21    interest.
22        Q.  I guess my question is did you see this or
```

1   review this particular MIPA, M-I-P-A, prior to
2   preparing your appraisal of Waterway Grove.
3        A.   I knew that there was a MIPA.
4        Q.   And if we take a look at the first page,
5   what is on your screen there, in Section A it
6   says, "The Company is the current fee simple
7   title owner of approximately 30.41 acres in Horry
8   County"; correct?
9        A.   Yes, sir.
10       Q.   And the paragraph above identifies the
11   company as Waterway Grove, LLC; correct?
12       A.   Yes.
13       Q.   And that was the entity or the LLC for
14   which you were preparing the Waterway Grove
15   appraisal; correct?
16       A.   Correct, yes.
17       Q.   And then in paragraph D the buyer is
18   acquiring 95 percent of the units in the company,
19   and that would be Waterway Grove; correct?
20       A.   Yes.
21       Q.   So you said you were aware that there was
22   a MIPA as a general matter, but I am still not

1    Q.  -- this is -- sorry?
2    A.  I said yes, sir.  I said yes, sir.
3    Q.  Oh.  This is an email, Exhibit 429, an
4    email, and it originates -- the first page, the
5    first email is from Jed Linsider at the very
6    bottom, Amanda.  It is -- yes, this is an email
7    from Jed Linsider to a number of different folks
8    suggesting that he would like to get an all-hands
9    meeting scheduled in Atlanta for pipeline
10   planning meeting in 2017.  Do you see that,
11   Mr. Clark?
12   A.  Yes, sir.
13   Q.  And you are included in this email.  Is it
14   fair to say that you were considered a member of
15   the all-hands team?
16   A.  Yes, sir.
17   Q.  And do you recall attending the all-hands
18   meetings?
19   A.  Not specifically, but I never missed one.
20   Q.  And was that an opportunity for the
21   EcoVest folks and the other members of the team
22   to share updates?

[3/10/2021] Clark, Claud C. (Vol. 01) (DEPOSITION)