1

```
         IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF GEORGIA
                    ATLANTA DIVISION

UNITED STATES,                    )
                                  )
              Plaintiff,          )
                                  )
         vs.                      ) Case No.
                                  )1:18-cv-05774-AT
NANCY ZAK, CLAUD CLARK III,       )
ECOVEST CAPITAL, INC., ALAN N.    )
SOLON, ROBERT M. McCULLOUGH,      )
RALPH R. TEAL, JR.,               ) VOLUME 1
                                  )
              Defendants.         )

                      - - -
         Videotaped deposition of ALAN SOLON,
taken pursuant to notice via videoconference at the
offices of EcoVest Capital, 700 Monarch Tower, 3424
Peachtree Road NE, Atlanta, Georgia, on Tuesday,
April 6, 2021, at 9:46 a.m., before Lorraine B.
Marino, Registered Diplomate Reporter, Certified
Realtime Reporter and Notary Public.
                      - - -
```

**Exhibit 1396**

2

APPEARANCES: (via videoconference)

    HARRIS J. PHILLIPS, ESQ.
    RICHARD G. ROSE, ESQ.
    ERIC M. ABERG, ESQ.
    U.S. DEPARTMENT OF JUSTICE
    TAX DIVISION
      555 Fourth Street, N.W.
      Washington, DC  20001
      202-598-5869
      harris.j.phillips@usdoj.gov
      richard.g.rose@usdoj.gov
      eric.m.aberg@usdoj.gov
      for Plaintiff

    NILES A. ELBER, ESQ.
    CAPLIN & DRYSDALE, CHARTERED
      One Thomas Circle, N.W.
      Suite 1100
      Washington, DC  20005
      202-862-7827
      nelber@capdale.com
      for Defendant Clark

    BENJAMIN J. RAZI, ESQ.
    SEAN M. AKINS, ESQ.
    NICHOLAS PASTAN, ESQ.
    COVINGTON & BURLING, LLP
      One CityCenter
      850 Tenth Street, N.W.
      Washington, DC  20001
      202-662-5908
      brazi@cov.com
      sakins@cov.com
      npastan@cov.com
      for Defendants EcoVest, Solon,
      McCullough and Teal

[4/6/2021] Solon, Alan (Vol. 01) (DEPOSITION)

```
1    ALSO PRESENT: (via videoconference)

2              AMANDA REINKEN,
               Litigation Tech Case Manager
3
               DEWEY NELSON,
4              Videographer

5                      - - -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22
```

1   agreement?
2       A.   Yes.
3       Q.   Can you see at the top that it is executed
4   as of June 8, 2015?
5       A.   That's what it says, yes.
6       Q.   And do you see the reference to the
7   parties being Christian Academy, the seller, and
8   Cypress Cove Marina Holdings, the buyer?
9       A.   I do.
10      Q.   Do you see that?
11      A.   I do.
12      Q.   So is it fair to say that this purchase
13  agreement relates to the Cypress Cove deal?
14      A.   Yes, what would ultimately become Cypress
15  Cove if it went to market, yes.
16      Q.   Got it.  Is it fair to say that this
17  purchase agreement, the purpose of this purchase
18  agreement is for EcoVest to acquire an interest
19  in property that would be used in a core deal?
20      A.   It appears, yes, that is correct.
21      Q.   Would you expect that EcoVest employees
22  would negotiate these purchase agreements in good

1     A.  Okay, thank you.
2     Q.  I will jump in.  I am asking once you get
3  the final work product from Mr. Clark, who, if
4  anyone, is entitled to get a copy of it?
5     A.  So the broker-dealers.  It's disclosed in
6  the PPM.  The broker-dealers have access to it,
7  and the potential investors have access to it.
8  It's not hidden.  It's fully disclosed.
9     Q.  So let's just back up just a touch.  Is
10  the managing broker-dealer -- that would be
11  Triloma or Arque -- do they get a copy of the
12  appraisal Mr. Clark prepares for the core deals?
13     A.  In addition to the rest of the due
14  diligence materials as well.
15     Q.  Now, do the individual broker-dealers that
16  offer the core deals on their platform, do they
17  get a copy of the appraisal that Mr. Clark
18  prepares?
19     A.  Yes, in addition to the rest of the due
20  diligence materials as well.
21     Q.  Do the financial advisors -- those are the
22  ones that are selling the deals to customers --

216

1    do they get a copy of documents, one of which is
2    the appraisal Mr. Clark prepares?
3        A.  If the appraisal is disclosed in the PPM,
4    which I believe it is, they have access to it
5    there, as do their investors.  But the PPM is the
6    only document that they receive.  Their
7    broker-dealer would control the due diligence
8    box, and they would make that decision whether or
9    not they would want their advisors to have access
10   to some of that.
11       Q.  And what about the customers?  If there is
12   a customer interested in investing in one of the
13   core deals, does that customer have the ability
14   to obtain a copy of the appraisal Mr. Clark
15   prepares?
16       A.  It is my understanding the appraisal
17   itself is disclosed in the PPM.  Therefore,
18   anyone who receives a PPM has that appraisal.  I
19   may be mistaken, but I believe that to be the
20   case.
21       Q.  And what do you mean when you say it is
22   disclosed in the PPM?  Do you mean there is a

217

1 reference in the PPM to this document or do you
2 mean something else?
3     A.  No.  It is printed as an exhibit inside
4 the PPM.
5     Q.  Are you aware of the Box.com Internet
6 platform?
7     A.  Yes.
8     Q.  Is that one of the ways EcoVest made large
9 files available to the broker-dealer community?
10     A.  Yes.
11     Q.  Now, when it came time to vote, are you
12 aware of the fact that customers, in fact, had
13 access to the Box.com interface to look at
14 documents related to the transaction?
15     A.  Yes, purposely.
16     Q.  Okay.  And one of the documents, among
17 others, in there would be the appraisal Mr. Clark
18 prepared.  Would that be correct?
19     A.  Correct.
20     Q.  That's because, is it fair to say, the
21 appraisal is one of the important supporting
22 documents for customers to consult when voting?

[4/6/2021] Solon, Alan (Vol. 01) (DEPOSITION)

218

1        A.    It is one of many important documents.
2        Q.    So basically, every customer who is voting
3   is able to go and pull the qualified appraisal
4   that Mr. Clark prepared from the Box.com
5   platform?
6        A.    Yes, including all the other relevant due
7   diligence materials either for the other
8   strategies as well.
9        Q.    Now, you mentioned counsel was involved in
10  vetting the appraiser?  Did I hear that right?
11       A.    I'm sorry.  Could you just repeat it?  You
12  jumped out for a minute.
13       Q.    Sure.  Did you say earlier that counsel,
14  legal counsel was involved in helping to vet and
15  select the qualified appraiser?
16       A.    Yes.
17       Q.    What lawyers were those?
18       A.    Well, it started when we were with Sirote.
19  It continued when we were with Alston & Bird and
20  subsequently Taylor English.
21       Q.    Any other law firms you relied on to vet
22  the appraiser?

[4/6/2021] Solon, Alan (Vol. 01) (DEPOSITION)

224

1    Q.  And EcoVest was the manager for all the
2    core deals; is that right?
3    A.  Correct.  An entity, a sub of EcoVest, not
4    corporate.
5    Q.  Fair enough.  So an entity that EcoVest
6    owned and controlled was the manager for all the
7    core deals?
8    A.  Correct.
9    Q.  Have you ever heard of the bundle of
10   sticks theory of property ownership?
11   A.  No.
12          (Discussion off the record.)
13   BY MS. PHILLIPS:
14   Q.  Mr. Solon, maybe you didn't hear me.  Did
15   you hear me correct the first time?
16   A.  Yes, bundle of sticks theory.  No, I'm not
17   familiar with that.
18   Q.  When EcoVest engaged Mr. Clark to prepare
19   a conservation easement appraisal, what were you
20   asking him to value?
21   A.  I don't know that we are asking him to
22   value anything other than to prepare a qualified

[4/6/2021] Solon, Alan (Vol. 01) (DEPOSITION)

```
 1     appraisal on that property.  It is not a request
 2     of ours what to value.  We make all of the
 3     information available, as we do for all of our
 4     subcontractors, and it is up to the appraiser to
 5     decide what documents they want to review, rely
 6     on or do their own work.  Outside of that, there
 7     is no relationship about what he is required to
 8     do.
 9        Q.  I am going to stop screen-share because I
10     don't have exhibits for a bit.
11        A.  Okay.  Easier.
12        Q.  What is your understanding of the asset
13     that Mr. Clark was supposed to be valuing in his
14     appraisals?
15        A.  My understanding is that he is giving us a
16     qualified appraisal, and the rules of a qualified
17     appraisal are different than other appraisals.
18     It has different requirements.
19        Q.  Okay.  I am asking you your understanding
20     of for Mr. Clark's appraisal, what was the asset
21     being valued.
22        A.  So he is given all the information to
```

[4/6/2021] Solon, Alan (Vol. 01) (DEPOSITION)