# COVINGTON

BEIJING  BRUSSELS  DUBAI  FRANKFURT  JOHANNESBURG
LONDON  LOS ANGELES  NEW YORK  PALO ALTO
SAN FRANCISCO  SEOUL  SHANGHAI  WASHINGTON

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
T  +1 202 662 6000

January 14, 2021

**BY FEDERAL EXPRESS**

Mr. Paul D. Mason
Internal Revenue Service
TEFRA East TSC 342
1270 Pontiac Road, Suite 100
Pontiac, MI 48340

RE:     **Protest to Proposed Adjustments to Arcadian Quay, LLC for Tax Year Ending December 31, 2016**

Dear Mr. Mason:

Arcadian Quay, LLC ("AQ") protests the adjustments proposed in the Revenue Agent's Report ("RAR") dated November 16, 2020, with respect to AQ's Federal income tax return for the tax year ending December 31, 2016 (the "2016 tax year"). A copy of the power of attorney (Form 2848) authorizing representation of AQ by the undersigned is attached as Attachment 1.

AQ respectfully requests a conference with the IRS Appeals Office on this matter.

Name and Address of Taxpayer
Arcadian Quay Holdings, LLC as Tax Matters Partner for
Arcadian Quay, LLC
3424 Peachtree Road, NE
Suite 700
Atlanta, GA 30326

Taxpayer Identification Number
████████

Tax Form
1065

**Exhibit**
1401

**COVINGTON**

<u>Date and Symbol of Examination Letter</u>
November 16, 2020
Letter 1827-F (11-2014)

<u>Tax Period Involved</u>
Calendar Year Ending December 31, 2016

As set forth in greater detail below, AQ contests the proposed adjustments for its 2016 tax year with respect to AQ's reporting of a charitable deduction claimed in connection with a qualified conservation contribution to the North American Land Trust.

The RAR contains factual errors, not all of which are discussed in this protest, and which AQ reserves the right to address further if necessary.  In addition, AQ reserves the right to contest any computational errors or penalties that may be discovered or asserted after the filing of this protest.

USPROD-0846531

**COVINGTON**

## Table of Contents

EXECUTIVE SUMMARY ................................................................................................ 1

BACKGROUND ........................................................................................................... 3

    A.    AQ acquires the Property ............................................................... 3

    B.    Description of the Property ............................................................ 3

    C.    AQ sought investment to fund potential development of the Property ................. 9

    D.    Investors in AQH could decide how to use the Property ..................................... 10

        1.    The Development Option .................................................................. 11

        2.    The Conservation Option .................................................................. 18

        3.    The Deferral Option ........................................................................ 22

    E.    Investors in AQH voted to conserve the Property ................................................ 23

    F.    AQ placed a conservation easement on the Property ........................................... 23

    G.    AQ reported a charitable deduction for the Contribution ..................................... 23

THE RAR'S POSITION ............................................................................................... 24

ANALYSIS ................................................................................................................. 24

I.    AQ's Contribution was a qualified conservation contribution .......................................... 25

    A.    The Contribution is a "qualified real property interest" ....................................... 25

        1.    Baseline Documentation ................................................................... 25

        2.    "Deemed Consent" ........................................................................... 27

    B.    AQ donated the Contribution to a "qualified organization" .................................. 31

    C.    AQ made the Contribution exclusively for conservation purposes ........................ 32

        1.    The Contribution protects a relatively natural habitat of plants and wildlife ........................................................................................... 33

        2.    The Contribution preserves open space for the scenic enjoyment of the general public and will yield a significant public benefit .................. 41

iii

**COVINGTON**

|   | 3. | The Contribution preserves open space pursuant to clearly delineated governmental policies and will yield a significant public benefit | 45 |
|   | 4. | Inconsistent Use | 50 |

II. Arcadian Quay's deduction is supported by a "qualified appraisal" conducted by a "qualified appraiser." .......... 52

   A. The Appraisal was prepared by a qualified appraiser .......... 52

   B. The Appraisal was prepared in accordance with generally accepted appraisal standards .......... 54

   C. The Appraisal meets each of the additional requirements of Treasury Regulation section 1.170A-17(a) .......... 56

   D. The Appraisal properly applied the "before and after method" to establish the FMV of the Contribution .......... 58

      1. The Appraisal correctly determined the "highest and best use" of the unencumbered Property .......... 59

      2. The Appraisal correctly estimated the "before" FMV of the unencumbered Property .......... 61

      3. The Appraisal correctly applied the "after" analysis to determine the FMV of the encumbered Property .......... 66

   E. Conclusion .......... 67

III. Sale vs. Contribution .......... 68

   A. Introduction .......... 68

   B. The substance-over-form doctrine does not apply .......... 71

      1. The transaction has substantial non-tax business purpose .......... 71

      2. The transaction meaningfully changed the parties' economic positions .......... 73

      3. Case law confirms that the substance-over-form doctrine does not apply .......... 76

IV. Fair Market Value Is Not Calculated Based on Purchase of Partnership Interest .......... 93

   A. The methodology for valuing conservation easements and fee simple interests in land are not interchangeable .......... 93

iv

USPROD-0846533

**COVINGTON**

| | B. | Amount paid for partnership interest is not proof of fair market value of land | 95 |
| | C. | The policy underlying section 170(e) does not limit the amount of the deduction | 97 |
| V. | | The Penalty RAR erroneously asserts that penalties apply | 98 |
| | A. | The penalty for substantial or gross valuation misstatement does not apply | 98 |
| | B. | The penalty for a reportable transaction understatement does not apply | 101 |
| | C. | The penalty for negligence or disregard of rules and regulations does not apply | 102 |
| | D. | The penalty for substantial understatement of income tax does not apply | 105 |
| CONCLUSION | | | 106 |

USPROD-0846534

## List of Exhibits

**Exhibit 1** - Arcadian Quay Holdings, LLC, *Private Placement Memorandum* ("PPM")

**Exhibit 2** - North American Land Trust, *Baseline Documentation Arcadian Quay* ("Baseline Doc.")

**Exhibit 3** - Ralph Stewart Boden, Inc., *Arcadian Quay Strategic Planning Market Analysis* ("Market Analysis")

**Exhibit 4** - Conservation Ecology, LLC, *Wildlife Conservation Values Assessment* ("Conservation Assessment")

**Exhibit 5** - *Arcadian Quay Development Agreement* ("Development Agreement")

**Exhibit 6** - North American Land Trust, *Conservation Management Plan Arcadian Quay* ("Conservation Management Plan")

**Exhibit 7** - Clark ~ Davis, PC, *Arcadian Quay Conservation Easement Appraisal* ("Appraisal")

**Exhibit 8** - Raymond E. Veal, *External Appraisal Review* ("Appraisal Review")

**Exhibit 9** - Ronald A. Levitt, *Independent Appraisal Review - Legal Opinion*, Sirote & Permutt, P.C., Discussing Appraisal Review ("Independent Appraisal Review Legal Opinion")

**Exhibit 10** - *Conservation Easement and Declaration of Restrictions and Covenants* ("Easement")

**Exhibit 11** - Form 8283 Filed with Return for Tax Year Ended Dec. 31, 2016

**Exhibit 12** - Letter from Andrew Johnson, North American Land Trust, Serving as Contemporaneous Written Acknowledgement

**Exhibit 13** - Gary McGurrin, *Appraisal Review of Arcadian Quay Conservation Easement* ("McGurrin Review")

**Exhibit 14** - Member Interest Purchase Agreement ("MIPA")

USPROD-0846535

## EXECUTIVE SUMMARY

For over 40 years, Congress has asked taxpayers to donate easements on properties for conservation purposes, offering a tax deduction in exchange. Over time, the requirements associated with these Congressionally authorized benefits have evolved, but never the purpose for granting them. As the Senate Finance Committee explained: "The committee believes that the preservation of our country's natural resources and cultural heritage is important, and the committee recognizes that conservation easements now play an important role in preservation efforts." S. Rep. No. 96-1007, at 9 (1980). In light of this important need, legislation extending these tax benefits passed with an overwhelming majority of Congress, "in the hope of adding untold thousands of acres of primarily rural property for various conservation purposes—acreage that would never become available for conservation if land-owning potential donors were limited to the traditional method of conveyance, i.e., transferring the full fee simple of such properties." *BC Ranch II, L.P. v. Comm'r*, 867 F.3d 547, 553–554 (5th Cir. 2017).

Taxpayers are permitted to avail themselves of these benefits when donating a conservation easement provided that: (i) it constitutes "a qualified real property interest, [made] to a qualified organization, exclusively for conservation purposes," section 170(h)(1); (ii) its value is established through a "qualified appraisal" provided by a "qualified appraiser," section 170(f)(11); and (iii) it is adequately documented, section 170(f)(8).[1]

AQ satisfied each of these requirements when, in 2016, it donated to the North American Land Trust ("NALT") a qualifying conservation easement on approximately 30.27 acres of valuable real estate situated in Horry County, South Carolina (the "Property"). The donated

---

[1] Except where noted, references to "section," "Code," and "regulations" are to the Internal Revenue Code of 1986, as amended, and the regulations thereunder.

USPROD-0846536

easement (the "Contribution") placed a number of stringent restrictions on AQ's future use of the Property, including restricting in perpetuity general development of the Property for residential, commercial, industrial, or agricultural use and barring alterations of the Property that would interfere with its scenic and natural states.

AQ's Contribution was both economically and ecologically valuable. Economically, the Contribution forwent development opportunities valued by a qualified appraiser in the millions of dollars, and these opportunities were real and immediate. More importantly, however, the Property offers substantial ecological and social benefits. The Contribution helps to ensure the Property's water quality remains pristine and protects breeding and foraging habitat for plant and animal species that would otherwise be lost to development.

As preserved, the Property provides the natural ecological requirements for at least fifty species of plants and habitat for at least eight bird species considered Species of Regional Importance by the Partners In Flight Species Assessment Database. Further, the area is highly visible from the Atlantic Intracoastal Waterway (the "AIW") and as such protects a beautifully scenic view for the general public. Absent the Contribution, none of these important protections would exist.

In light of the foregoing, and consistent with Congress' intent, AQ claimed a charitable deduction equal to the value of the Contribution on its 2016 Federal income tax return. Despite the fact that AQ satisfied all of the necessary legal requirements, the Revenue Agent's Report ("RAR") denies AQ's deduction in its entirety. The RAR's contentions are based upon a mixture of factual misunderstandings, unsupported disagreements with the professional judgment of an experienced qualified appraiser, and strained analogies to inapposite cases. Because the RAR's impressions are divorced from both the facts and the law, they must be rejected.

2

In short, AQ made a valid and valuable contribution of a conservation easement to NALT. In doing so, it complied with both the letter and spirit of section 170(h), and is therefore fully consistent with Congressional intent to provide a charitable deduction for qualifying conservation contributions. Accordingly, AQ's deduction should be permitted and the RAR's proposed adjustment reversed.

## BACKGROUND

### A.    AQ acquires the Property

The Property was originally acquired by Permenter Brothers Holdings, LLC, a South Carolina limited liability company ("Permenter"), on April 20, 2007. PPM, p. 8, Exhibit 1. AQ is a Delaware limited liability company initially formed on August 25, 2016. *Id.* Permenter contributed a portion of the Property to AQ, pursuant to a limited warranty deed dated August 8, 2016, in exchange for a 5.5% membership interest in AQ, and Wampee Plantation Limited Partnership, L.P., a South Carolina limited partnership ("Wampee") contributed a portion of the Property to AQ pursuant to the Permenter-Wampee Deed in exchange for a 89.5% membership interest in AQ. Permenter and Wampee transferred ownership of the Property pursuant to the Deed as a contribution to the capital of AQ pursuant to section 721, in exchange for membership interests in AQ. *Id.* Additionally, Seavista Partners, LLC, a South Carolina limited liability company ("Seavista Partners"), made a cash contribution to AQ in exchange for a 5% membership interest in AQ. *Id.*

### B.    Description of the Property

The Property is located south of Carolina Bays Parkway and north of the Intracoastal Waterway, in North Myrtle Beach, Horry County, South Carolina. The general region of the Property is situated immediately north of North Myrtle Beach, which is one of the most densely developed coastal areas in the state of South Carolina. Baseline Documentation ("Baseline

3

USPROD-0846538

Doc.") § B, p.1, Exhibit 2.  The Property is situated southwest of the Highway 31 and Robert

Edge Parkway interchange, and north of the Intracoastal Waterway in North Myrtle Beach,

Horry County, South Carolina.  PPM, p. 48, Exhibit 1.  Additionally, the Property is located

fewer than two miles from the Atlantic Coast of South Carolina and approximately ten miles

from Myrtle Beach proper.  A portion of the Property adjoins the AIW.



The area is a strong, established tourist destination, and has a competitive edge with

respect to development potential due to its location along the AIW as well as its proximity to

major roadways and Myrtle Beach.  In addition, the Property is located near the Grand Strand

beaches; the North Myrtle Beach Park & Sports Complex; and significant shopping,

entertainment and recreational facilities, including golf.  This location feature serves as a

defining development characteristic because the sports facility encourages demand for short-

term-occupancy, family-oriented resort residential accommodations.  Arcadian Quay Market

Analysis ("Market Analysis"), p. i, Exhibit 3.  Further, the Property offers immediate access to

4

an extensive coastline and the associated beaches and resort destinations, as well as major cities. *Id.* The Property is approximately a two-hour drive from both Charleston, South Carolina and Fayetteville, North Carolina.  Raleigh and Charlotte, North Carolina are both within a three-hour drive of the Property.



Property Location & Maps

5

USPROD-0846540

The Property's location on the AIW is considered excellent and well-served by the Robert Edge Parkway, a main connector road to the Grand Strand beaches and a variety of restaurants, entertainment, and recreational amenities.  Market Analysis, p. 2, Exhibit 3.  The land directly across the AIW from the site is dominated by three golf courses:  Possum Trot, Beachwood, and Azalea Sands Golf Clubs, providing the Property with golf views and readily accessed public golf.  *Id.*  The North Myrtle Beach Sports Complex is located across the Carolina Bays Parkway (SR 31).  *Id.*  The facility is host to hundreds of teams in numerous different sports and has become a powerful demand generator of room nights by large groups of associated people.  *Id.*



USPROD-0846541



Approximately 900 linear feet of the southern property line borders and is highly visible from the AIW. Baseline Doc. § B, p. 3, Exhibit 2. The significant visibility of this area to the AIW provides a clear and consistent scenic view to the general public. *Id.* § F, p. 2. The Property consists of 27.9 acres of open field with various flora, such as game-based legume, senna (*Senna sp.*) and ruderal species, while the remaining 2.3 acres is forested land that runs south-southeasterly from the northeastern corner. *Id.*

Intense, high-density development is encroaching upon the Property and those that surround it, threatening the water quality of the intra-coastal waterway, the breeding and foraging habitats for animal species, and the natural habitats of plant species. *Id.* § B, p. 3 The Property's relationship to other protected lands and scenic value in an area of intense development increases the tract's conservation value. *Id.* For instance, the property is in the

7

USPROD-0846542

immediate area of the NALT 2015 easements of Seavista Resort, Sanibel Resort, and South Bay Cove. *Id.* § F, p. 2. Additionally, the Property itself provides natural ecological requirements for at least fifty additional species of plant life as well as habitat for at least eight bird species. *Id.* § B, p. 2-3.



USPROD-0846543



C.    AQ sought investment to fund potential development of the Property

Because of its valuable location, nearby amenities, and the growing real estate demand in

the region, the Property had significant development potential.  As described in the Market

Analysis and Development Recommendation Report ("Market Analysis"), prepared by Strategic

Solutions Alliance[2] and dated September 2016:

> The Myrtle Beach market area has 500+/- hotels providing
> approximately 90,000 guest accommodations.  The 250,000 square
> foot Myrtle Beach Convention Center opened in 2003 featuring a
> 400-room Sheraton resort hotel.  Tourist attractions are copious
> along the Grand Strand, including miles of beaches and navigable
> waterways, and more than 100 golf courses.  More than 3.0 million
> rounds of golf are played across the Grand Strand in an average
> year.  The area also boasts a number of amusement parks, an

---

[2] Strategic Solutions Alliance is a specialized strategy consulting services firm for real estate,
specializing in consumer intelligence, strategy, and planning and product segmentation
strategies.

9

USPROD-0846544

> aquarium, and Myrtle Waves, one of the largest water parks on the eastern seaboard. The Carolina Opry is another popular attraction, featuring various musical, comedy, dance, and entertainment events including Good Vibrations (best of the 1960s, 1970s, and 1980s) and "LIGHT—a Laser Extravaganza." The Myrtle Beach Boardwalk has been recognized as the #3 boardwalk in the country by National Geographic magazine, and one of the best US boardwalks by Travel + Leisure. The market area hosts a variety of special conventions, events, and musical concerts, boasts over 1,900 restaurants, dinner theaters and nightclubs, and provides a significant number of shopping opportunities. These attractions, events and accommodations serve to provide a solid foundation for a sustainable tourism based economy.

Market Analysis, p. 8, Exhibit 3.

The Myrtle Beach economy enjoys a strong tourism sector because the area offers a variety of recreation, entertainment, and dining activities to visitors, residents, and investors. Notably, the tourism is largely year-round: Conference business occurs during off-peak periods and sports tourism is a year-round tourist activity. *Id.* p. 24. Accordingly, the area is "in the early stages of expansion" which "will escalate significantly as the edges of the greater Myrtle Beach marketplace continue to extend." *Id.*

To capitalize on this potential, Arcadian Quay Holdings, LLC ("AQH") sought outside investment, on September 21, 2016, through a private offering of membership interests in AQH (the "Offering"). The Offering was successful, and the investment funds were allocated to acquiring an interest in AQ, funding a working capital reserve that could be used to begin developing the Property, and paying various expenses and consulting and investigative fees associated with exploring potential uses for the Property. PPM at p. i, 6, 39-40, Exhibit 1.

D.    Investors in AQH could decide how to use the Property

An investment in the Offering presented more than just the potential to develop the Property. As described in the PPM, investors had three options with respect to the Property after

10

the Offering closed.  PPM, p. 59-64, Exhibit 1.  Investors could elect any of the three following

options:

> 1 - <u>Development Option</u>:  Develop the Property into as many as 533 multi-family
>   residential units for sale to the public;
> 2 - <u>Conservation Option</u>:  Donate a qualified conservation easement to an
>   organization qualified to conserve the Property in perpetuity; or
> 3 - <u>Deferral Option</u>:  Defer action and continue to hold the Property for future
>   investment purposes.

As described below, AQH diligently investigated and researched each of these options and

described its findings in the PPM.

1.      The Development Option

Development of the Property was a viable and lucrative option for two reasons.  First, the

Property's location, along with the growing demand for real estate, made it ideally suited for

development.  Second, AQ was well-positioned to best utilize these conditions as it had created a

workable development plan (the "Development Plan"), confirmed the existence of necessary

entitlements and zoning permits, and secured funding through the Offering sufficient to obtain

building permits and break ground.

a)      The Property was uniquely suited for development

The location, nearby amenities, physical characteristics, and zoning designation of the

Property made it ideal for development as a master-planned resort-style residential multi-family

community.  To begin with, South Carolina has long been a popular and productive tourist

destination due to its 47 state parks and an abundance of coastal recreation.  Market Analysis, p.

6, Exhibit 3.  The tourism industry plays an integral role in South Carolina's commerce and

serves to attract permanent and part-time residents once they have visited.  *Id.*  In fact, nearly

$743 million was spent on tourism-related private capital investment in 2013, and the

government spent $414 million in support of tourism in 2014.  *Id.*

11

USPROD-0846546

The Grand Strand itself (where the Property is situated) is located in this coastal region and consists of a large stretch of beaches extending from Little River to Georgetown. *Id.* It is approximately 60 miles along an essentially uninterrupted arc of beach land. *Id.* The Grand Strand is well-recognized as one of the nation's leading beach and golf vacation destinations, and it attracts more than 17 million visitors annually to its beaches, waterways, resorts, and golf courses. *Id.* p. 7. The economy of the Grand Strand is dominated by the tourism industry, and it hosts over 14.6 million visitors and brings in millions of dollars each year. PPM, p. 55, Exhibit 1. Hotels, motels, resorts, restaurants, attractions, and retail developments exist in abundance. *Id.* The area's attractions include its beaches and numerous golf courses, as well as a number of amusement parks, an aquarium, an IMAX Theater, retail developments, and over 1,900 restaurants. *Id.* p. 54. The area has many dinner theaters, nightclubs, and tourist shops. *Id.* Collectively, the amenities and attractions make the Property an obvious and attractive development opportunity. The largest influx of visitors occurs during the spring and summer seasons, although it is also very popular during the winter months. *Id.*

As mentioned above, the Property offers enviable access to nearby major and secondary roadways, the beaches of the Atlantic Ocean, and the major cities of Hilton Head and Savannah. The Property is well-located in a strong, established tourist destination, and has a competitive edge due to its AIW frontage and close proximity to the nearby North Myrtle Beach Sports Complex and beach access roadway that leads to a variety of existing entertainment and recreational tourism-generating amenities. Market Analysis, p. 6, Exhibit 3. In addition, the Property is approximately 171 miles from Charlotte, NC; 193 miles from Raleigh, NC; 227 miles from Savannah, GA; 364 miles from Atlanta, GA; and 426 miles from Daytona Beach, FL, all within a day's drive. *Id.* p. 7.

12

The regional housing market in Horry County was also uniquely well positioned in 2016. Sales within the Primary Market Area[3] were robust with respect to single-family properties, jumping 77.2% year-over-year.  Market Analysis, p. 20, Exhibit 3.  While the market had navigated the earlier recession of 2008 and beyond, the practical effect had been to discourage new multi-family development before 2015.  Within the multi-family segment, sales were relatively flat due to the absence of new construction and a preponderance of dated inventory, both being conditions that served to constrain pricing.  *Id.*  Thus, by 2016, the Primary Market Area had just begun to grow into its surroundings.  *Id.*  The existing supply of multi-family developments had largely been constructed prior to 2008, "as the market has strived to absorb its distressed inventory" from the previous recession.  *Id.* p. 53.  Accordingly, the Property would appear to be well positioned for success: "The convergence of strong growth trends among the demand groups associated with retirement, second home ownership, tourism – particularly sports tourism, short-term personal occupancy and vacation home investment provide a particularly strong platform for real estate that is in alignment with these demand forces." *Id.* pp. 34-35.

Finally, demand for second-home/vacation properties is average to good in the Property's neighborhood.  *Id.*  The analysis also revealed unprecedented growth in the older, more affluent demand segments, particularly in the pre-retirement / empty nester and retirement categories. Retirees make up a large percentage of the ownership in the area, the climate plays a very significant role in the demand, and the Northeast is only a day's drive, which makes it more convenient to return home for visits to family.  *Id.*  The analysis found that "[t]he growth of these

---

[3] The Primary Market Area is defined as that area that "lies within the 29566 postal Zip Code [i.e., Horry County], has an estimated population of approximately 15,180 full time residents within an area of 30.38 square miles, reflecting density of 500+/- people per square mile." *See* Market Analysis, p. 17, Exhibit 3.

13

USPROD-0846548

segments bodes extremely well for second home, vacation home, and investment home purchases. Based on the predominantly moderate real estate environment within the Myrtle Beach marketplace, it is unlikely that the supply side of the market is prepared for these unprecedented surges in demand." *Id.* p. 41. Given that the Property is zoned for multi-family housing products, developing the Property that would have accommodated second home buyers, retirees, investors, and vacationing tourists.

Finally, the Property has features that make it attractive to developers. Most developers prefer an adequately sized parcel with adequate utilities that can be developed into lots, which could then be sold to area builders. PPM, p. 54, Exhibit 1. The parcels in the Property's immediate neighborhood are already developed, and most other vacant tracts available for development are located much farther away from the beach. *Id.* In addition, all utilities were currently available or could be made available to the Property and no hazardous materials or environmental problems were known to exist. *Id.* p. 53. The Property is considered to have good views both within the Property and of surrounding properties because of the Property's proximity to the AIW, which offers views of the canal. Because the Property was one of the remaining undeveloped tracts in a very popular residential and resort market area, the Property itself was uniquely and highly suited for development.

> b)    AQ created a Development Plan that was tailor-made for the Property's unique advantages

AQH prepared for the development of the Property by hiring experts to advise on and create the Development Plan. This Development Plan was tailor-made for the Property's unique characteristics and the local real estate market, and included a capacity plan that determined the ideal placement of structures on the Property. *See* PPM at introduction ("Conceptual Development Plan"), Exhibit 1. The Market Analysis assessed development demand and

14

identified the type of development most suitable in light of local and national market conditions, as well as the unique characteristics of the Property, including its convenient location, high quality views, nearby recreational amenities, and other relevant data.  Market Analysis, pp. 76-79, Exhibit 3.

The Development Plan anticipated construction of up to three different types of units, in two "towers" ("Residential Tower & Structured Parking," and "Building B") to best respond to market demand in the area and the Property's unique characteristics and views.  The plan included:

### Residential Tower & Structured Parking

**(Nine floors residential)**

| Category | Descriptor | Number of Units | Parking Required |
|----------|-----------|-----------------|------------------|
| Residential | 2-Bedroom Units | 81 | 1.5 Spaces/Unit |
| Residential | 3-Bedroom Units | 198 | 2 Spaces/Unit |
| Residential | 4-Bedroom Units | 54 | 2.5 Spaces/Unit |

### Building B

**(Ten Four-Story Buildings)**

| Residential | 2-Bedroom Units | 4 x 10 (Bldgs) = 40 | 1.5 Spaces/Unit |
|-------------|-----------------|---------------------|------------------|
| Residential | 3-Bedroom Units | 12 x 10 (Bldgs) = 120 | 2 Spaces/Unit |
| Residential | 4-Bedroom Units | 4 x 10 (Bldgs) = 40 | 2.5 Spaces/Unit |

PPM at introduction ("Conceptual Development Plan"), Exhibit 1.

15

# Conceptual Development Plan



**SITE DATA:**

| | |
|---|---|
| Existing Zoning | R4I |
| Total Upland: | ±30.13 Acres |
| Total Wetland: | ±00.14 Acres |
| **Total Site:** | **±30.27 Acres\*** |

*Inclusive of those portions of the right-of-way on site.

**Minimum Building Setbacks:**
Perimeter buffer of 25' required

**Parking Required:**

| | |
|---|---|
| 2-Bedroom Unit: | 1.6 Spaces/Unit |
| 3-Bedroom Unit: | 2 Spaces/Unit |
| 4-Bedroom Unit: | 2.5 Spaces/Unit |

**DENSITY:**

| | | |
|---|---|---|
| 333 Units Per 9-Story Building X 1 Building | = | 333 Units |
| 20 Units Per 4-Story Building X 10 Buildings | = | 200 Units |
| **Total Units** | | **533 Units** |

533 Total Units / ±30.13 Total Upland Acres ≈ ±17.7 Units Per Upland Acre

533 Total Units / ±30.27 Total Site Acres ≈ ±17.6 Units Per Site Acre

**BUILDING DATA:**
Residential Tower (9-Story)
9 Floors Residential

| Total: | | | | 1 Building |
|---|---|---|---|---|
| 2-Bedroom Units: | 081 | X | 1 | 081 Units |
| 3-Bedroom Units: | 198 | X | 1 | 198 Units |
| 4-Bedroom Units: | 054 | X | 1 | 054 Units |
| **Total Units:** | **333** | **X** | **1** | **333 Units** |

Total Parking Required: 653 Spaces
Total Parking Provided: 653 Spaces

Building A (4-Story)
4 Floors Residential

| Total: | | | | 10 Buildings |
|---|---|---|---|---|
| 2-Bedroom Units: | 04 | X | 10 | 040 Units |
| 3-Bedroom Units: | 12 | X | 10 | 120 Units |
| 4-Bedroom Units: | 04 | X | 10 | 040 Units |
| **Total Units:** | **20** | **X** | **10** | **200 Units** |

Total Parking Required: 400 Spaces (40 Spaces/Building)
Total Parking Provided: 400 Spaces (40 Spaces/Building)

*Conceptual development plan of Arcadian Quay, LLC Property is for illustrative purposes only. The Developer, subject to approval by the Company, may adjust the type, number and mix of residential units contemplated in the proposed development plan contemplated under the Development Option. Further discussion of the development plan on pages 59-61.*

The Market Analysis fully supported this anticipated use of the Property.

16

USPROD-0846551

c)    AQ ensured its Development Plan was consistent with all legal restrictions on and entitlements associated with the Property

The Property had appropriate entitlements with necessary zoning in place. The Development Plan included plans for the presence of a marina that would create two parcels to accommodate two midrise condominium buildings with AIW/marina frontage. Market Analysis, p. iv, Exhibit 3. These sites have superior locations relative to the towers, which increases the value of the midrise buildings relative to the higher tower unit price per square foot level. *Id.*

The Manager engaged a civil engineer with knowledge of the Property to review the Development Plan, and the civil engineer confirmed that the existing water and sewer mains near the Property had adequate capacity for the proposed development. PPM, p. 56, Exhibit 1. The civil engineer also confirmed that electrical power and natural gas are available to the Property. *Id.*

d)    AQ could begin development at a moment's notice

In preparation for presenting the three options to the investors, AQH ensured that AQ could begin development at a moment's notice. In addition to ensuring that the Development Plan best utilized the Property's features and that it was consistent with all legal restrictions on the Property, AQH confirmed the suitability and capacity of necessary utilities. Moreover, at the time of the Offering, AQH had negotiated a development agreement and engaged a developer that stood ready and able to initiate development per the terms of the Development Plan. PPM, pp. 69-61, Exhibit 1; *see also* Arcadian Quay Development Agreement ("Development Agreement"), Exhibit 5. Finally and perhaps most importantly, AQ was sufficiently capitalized to initiate development work immediately upon a vote by the investors to do so. PPM, p. 36, n.19, Exhibit 1. As acknowledged in the RAR, AQ had already started "engaging construction professionals including an engineer firm, architect firm, real estate counselor, artist, financer, etc.

17

pursuant to due diligence work for consideration of developing the land" in August 2016.  RAR

#1, p. 12.

### 2. The Conservation Option

Conservation of the Property was also an option available for investors in AQH.  Under

the Conservation Option, AQ would place a perpetual conservation easement on the Property

that would be deeded to NALT.  NALT, a section 501(c)(3) tax exempt conservation

organization recognized as such by the IRS, has operated nationwide since 1992 and is dedicated

to conservation and stewardship of properties with ecological, historical, or cultural significance.

NALT protects open natural spaces by advising on conservation easements and closely

monitoring compliance of those easements.  It employs experts in conservation biology, land use

planning, resource management, and conservation easement stewardship while working with a

network of local experts to further its mission.  NALT monitors properties under its conservation

easement programs by conducting ongoing physical reviews and inspections ("boots on the

ground"), and by using aerial photography and satellite and drone imagery.

NALT worked with AQ to identify the conservation value of placing a conservation

easement on the Property.  NALT found that with respect to the Property:

- The Conservation Area provides the natural ecological requirements for at least fifty species of plants.
- The Conservation Area is highly visible from the AIW, providing a natural scenic view to the general public.
- The Conservation Area includes habitat for at least eight bird species considered Species of Regional Importance by the Partners In Flight Species Assessment Database:  Eastern Wood Pewee (Contopus virens), Ruby-throated Hummingbird (Archilochus colubris), Tufted Titmouse (Baeolophus bicolor), Yellow-throated Warbler (Dendroica dominica), Chimney Swift (Chaetura pelagica), Red-bellied Woodpecker (Melanerpes carolinus), Eastern Kingbird (Tyrannus tyrannus), and Brown Thrasher (Toxostoma rufum).
- The Conservation Area is in close proximity to the Seavista Resort, Sanibel Resort, and South Bay Cove Conservation Areas previously conserved by Conservation Easement donations to the Holder.  This Conservation Area would enhance protected areas and

18

USPROD-0846553

their associated habitats, thus contributing to the overall preservation of land and water quality preservation in Horry County.

- The Conservation Area would contribute to the conservation efforts of NALT. Since 2014, NALT has been working in the northern region of Horry County, termed the Atlantic Intracoastal Waterway Conservation Corridor. In this 6-mile conservation corridor, NALT has conserved over 814 acres within 2 miles north of the AIW. South Carolina allocated 2015 fiscal year funding of $500,000 to AIW preservation efforts.
- The Conservation Area would support the following government conservation policies:
  - South Carolina Code Annotated 48-59-20 et seq., which states that "rapid land development and economic growth which has benefited the state's people and economy, but has also led to the loss of forestlands, farmlands, wildlife habitats, outstanding natural areas, beaches and public areas for outdoor recreation; and has impacted the health of the state's streams, rivers, wetlands, estuaries, and bays, all of which impacts the quality of life of the state's current and future citizens and may jeopardize the well-being of the state's environment and economy if not addressed appropriately";
  - Promotion of the Horry County Parks and Open Space Plan objectives, namely: a) the preservation of open space, scenic areas and vistas, greenways, squares and village greens; b) the protection and conservation of environmental or natural resources; and
  - One of the five Areas for Conservation Action Opportunities with Urban and Developing lands as recognized within Chapter 3 of the South Carolina State Wildlife Action Plan ("SC SWAP").

Baseline Doc., § B, p. 2-4, Exhibit 2.

Further, Conservation Ecology, LLC[4] published its Wildlife Conservation Values Assessment for Arcadian Quay ("Conservation Assessment") on March 14, 2019, which provides an assessment of the wildlife conservation values for the Property. Conservation Assessment, p. 2, Exhibit 4. The Conservation Assessment confirms and reinforces the initial baseline report information by finding that on the Property or contiguous to it:

- 86 vertebrate species were documented on the Property.
- 64 total bird species were observed.

---

[4] Conservation Ecology, LLC is a company that provides ecological inventory, conservation planning, and applied research services to clients involved in land conservation projects. Its stated purpose is to identify what makes a conservation property biologically unique, how property can contribute to biodiversity, and how to make meaningful conservation happen. The company is based in the Blue Ridge mountains of western North Carolina and has ongoing projects throughout the continental U.S. *See We Are*, Conservation Ecology, http://conservationecologyllc.com (last visited Dec. 8, 2020).

USPROD-0846554

- 54 observed bird species are likely/potential breeders and include:
  - 24 SC SWAP Priority Species (2 Highest; 8 High; 14 Moderate)
  - 17 ACJV Priority Species (1 Highest; 8 High; 8 Moderate)
  - 3 USFWS BCC2008 Species.
- The most notable conservation priority bird species breeding or potentially breeding on the Property are:  Painted Bunting, Green heron, Eastern Meadowlark, Brown-headed Nuthatch, and Red-headed Woodpecker.
- 15 mammal species were observed, including:
  - Southern Fox Squirrel and Eastern Woodrat (both SC SWAP Priority Species)
  - Eastern Red Bat, Northern Yellow Bat, Seminole Bat, and Tri-colored Bat (all ranked "Highest Priority" by the SC SWAP).

Conservation Assessment, p. 2, Exhibit 4.  A conservation easement would protect these values by preserving the Property as a relatively natural habitat and as open space that would both provide scenic enjoyment and advance governmental conservation policies and that would produce a significant public benefit (the "Conservation Purposes").  Baseline Doc. § B, p. 2, Exhibit 2.

To assist with protecting the Conservation Purposes, NALT surveyed the Property over a period of time to document its existing condition, highlight the important conservation purposes and values it would seek to advance should it accept a donation of the Property, and communicate its policies and processes of monitoring and enforcing conservation easements (the "Baseline Documentation").  The Baseline Documentation chronicled the Property through photographs, reports, and maps to establish an accurate depiction of the Property and enable future NALT representatives to quickly compare data and photographs to determine whether the condition of the Property had changed.[5]

Because Congress affords a tax deduction under section 170(h) for a qualified conservation contribution, AQ had the conservation easement valued by a qualified appraiser,

---

[5] The Baseline Documentation was reviewed and acknowledged as accurate by both NALT and AQ on December 15, 2016.  Baseline Doc., § A, p.1, Exhibit 2.

USPROD-0846555

Claud Clark III, of Clark-Davis, P.C. (the "Appraisal"). As of the date of the Appraisal, Clark

was a certified appraiser in seven states, including South Carolina. He has been appraising

properties for 30 years, has received many hours of training on appraisal methods, and has been

qualified as an expert on property values by Federal and state courts, including the United States

Tax Court. Appraisal, p. 154, Exhibit 7.

To appraise the proposed easement (the "Easement"), Clark conducted a search for

comparable easement sales and, finding none, employed the "before-and-after" method of

determining the value of the Easement. To determine the value of the Property before the

encumbrance, Clark determined that the Property's highest and best use was residential

development. *Id.* p. 52. He estimated the net income from such development and determined the

present value of that income stream. Based on his analysis, he concluded that the value of the

unencumbered land was $61,850,730. *Id.* Clark then determined the encumbered value of the

Property by identifying comparable sales of encumbered properties and making certain

adjustments to account for the characteristics of the Easement. He estimated the value of the

encumbered land to be $198,432. *Id.* The difference between these two values, $61,652,000,

was the value of the Easement itself. *Id.*

Although not required to do so, AQ next confirmed the accuracy of the Appraisal by

engaging Ronald A. Levitt of Sirote & Permutt, P.C. ("Sirote"), who in turn engaged Raymond

E. Veal ("Veal") of Integra Realty Resources[6] to perform an independent assessment. Veal,[7]

---

[6] Integra Realty Resources has operated for two decades, and is currently the largest independent appraisal company in North America. It has over fifty local offices in the United States and the Caribbean.

[7] Veal is also certified under the *Government Auditing Standards*, which standards are issued by the Comptroller General of the United States ("Yellow Book Certification"), a certification that

21

also a certified appraiser and member of the Appraisal Institute[8] with thirty-five years of experience, independently reviewed the Appraisal and gave it top ratings for completeness, accuracy, use of appropriate methods and techniques, and the reasonableness of its analysis, conclusions, and opinions ("Appraisal Review"). Following his review, Veal concluded, without qualification, that the Appraisal's market value conclusions were reasonable and that the report was a viable basis for decision making. Appraisal Review, p. 2, Exhibit 8. And finally, Mr. Levitt conducted an external legal review of the Appraisal Review ("Independent Appraisal Review Legal Opinion") and concluded that there was no reason to consider the Appraisal to be compromised or inadequate in its assumptions and conclusions. Independent Appraisal Review Legal Opinion, p. 1, Exhibit 9.

### 3.   The Deferral Option

If neither the development nor conservation option were selected, the AQH investors could also elect to defer any decision, choosing instead to take a wait-and-see approach. PPM, p. 59, Exhibit 1. This option would have permitted the investors to gauge how the real estate market developed over time, but also risked missing valuable opportunities to develop or conserve the Property immediately.

---

ensures his appraisals comply with government appraisal standards. He has testified as an expert in the U.S. Tax Court on multiple occasions.

[8] "The Appraisal Institute is a global professional association of real estate appraisers, with nearly 18,000 professionals in almost 50 countries throughout the world. Its mission is to advance professionalism and ethics, global standards, methodologies, and practices through the professional development of property economics worldwide." *About Us*, APPRAISAL INSTITUTE, https://www.appraisalinstitute.org/about/ (last visited December 5, 2020). The institute has been the world's leading organization of professional real estate appraisers for more than 85 years. *Id.*

USPROD-0846557

E.     Investors in AQH voted to conserve the Property

Investors who purchased shares of AQH were entitled to vote to determine which of the three options to pursue. As stated in the PPM, "providing multiple viable investment strategies for a given property equips investors with the ability to react appropriately to micro and macro changes in the real estate market in order to achieve certain investment objectives." PPM, p. 45, Exhibit 1. A majority of the investors in AQH voted to conserve the Property.

F.     AQ placed a conservation easement on the Property

Consistent with the vote of the AQH investors, AQ filed the Conservation Easement and Declaration of Restrictions and Covenants with Horry County, South Carolina, effectively contributing the Easement to NALT (the "Contribution"). The Contribution covered 30.27 acres (the "Conservation Area"). Conservation Easement and Declaration of Restrictions and Covenants ("Easement") § 1.1, Exhibit 10. The Contribution severely restricts AQ and any subsequent owner of the Property (the "Owner") from many activities, including developing it for residential, commercial, institutional, industrial, or agricultural use. *Id.* § 3.1. It also forbids the owner from removing live trees or water, changing the topography of the land, and constructing almost any structures or roads on the Property. *Id.* §§ 3.2, 3.3, 3.4, 3.5, 3.9. To ensure compliance with these restrictions and requirements, the Contribution granted NALT and any subsequent Easement holder (the "Holder") the rights to enter and inspect the Property, to approve or disapprove the exercise of rights retained by the Owner, and to enforce restrictions imposed by the Contribution. *Id.* §§ 2, 4.21.2, 5.1, 6.

G.     AQ reported a charitable deduction for the Contribution

In accordance with section 170(h) and its regulations, AQ reported a $61,652,000 charitable deduction on its 2016 Federal income tax return. In reporting this deduction, AQ complied with each of the documentation requirements set forth in the Code and regulations,

23

attaching, among other things, Form 8283,[9] a contemporaneous written acknowledgement of the Contribution from NALT,[10] the Appraisal, and the Baseline Documentation.

## THE RAR'S POSITION

The RAR does not dispute that AQ satisfied many elements necessary to qualify the Contribution as a deductible qualified conservation contribution. Instead, the RAR asserts various arguments contesting the charitable deduction, none of which has merit. First, the RAR faults AQ's conservation purpose for preserving the land, RAR #1, pp. 1-26, and the Appraisal's valuation amount and status as a qualified appraisal, *id.* pp. 26-28. Next, the RAR postulates, as an alternative position, that AQ does not have a long-term holding period in the Property, and therefore it is not entitled to use fair market value in establishing the amount of the charitable deduction. RAR #2, pp. 1-20. Finally, the RAR contends that the fair market value of the Easement should be no greater than the amount paid for the purchase of membership interests in AQ, RAR #3, pp. 1-6, and that, in the alternative, the IRS' valuation represents the true fair market value of the Easement, RAR #4, pp. 1-5.

## ANALYSIS

AQ properly deducted the value of the Contribution on its 2016 Federal income tax return. The deduction was proper because it satisfied the three overarching requirements of section 170 and its regulations. First, the Contribution was a "qualified conservation contribution." Section 170(h)(1). Second, AQ established the value of the Contribution through

---

[9] RAR #1, p. 22, contends that the substantiation requirement was not met because AQ's Form 8283 did not complete the information requested in lines 5(d) and 5(e). However, that information was clearly included in a supplement submitted with the Form 8283. *See* Form 8283, Exhibit 11.

[10] *See* Letter from Andrew Johnson, North American Land Trust, Serving as Contemporaneous Written Acknowledgement, Exhibit 12.

24

USPROD-0846559

a "qualified appraisal" prepared by a "qualified appraiser." Section 170(f)(11). Third, AQ documented the Contribution and attendant deduction in a complete and timely manner. *See* section 170(f)(8); Treas. Reg. § 1.170A-16(e)(1)(iii); Treas. Reg. § 1.170A-13(c)(2); Treas. Reg. § 1.170A-14(g)(5)(i).

**I.     AQ's Contribution was a qualified conservation contribution**

To qualify as a "qualified conservation contribution," a contribution must be: (i) a "qualified real property interest," (ii) made to a "qualified organization," (iii) exclusively for conservation purposes. Sec. 170(h)(1). The Contribution satisfied each of these requirements.

A.     The Contribution is a "qualified real property interest"

In relevant part, a qualified real property interest includes "a restriction (granted in perpetuity) on the use which may be made of the real property." Section 170(h)(2). "A perpetual conservation restriction is a qualified real property interest" and includes "an easement or other interest in real property that under state law has attributes similar to an easement," Treas. Reg. § 1.170-14(b)(2), so long as the easement's restrictions are legally enforceable and limit any use of the property that would be inconsistent with the conservation purpose, Treas. Reg. § 1.170A-14(g)(1). This latter requirement may be met by recording the easement in the land records of the jurisdiction in which the property is located. *Id.*

Here, the Contribution contains a perpetual restriction in the form of a conservation easement that was recorded in the land records of Horry County, where the Property is located. Accordingly, the Contribution constitutes a "qualified real property interest" within the meaning of section 170(h)(1)(A). **The RAR does not dispute this conclusion**.

1.     Baseline Documentation

As discussed above, generally an easement's restrictions must limit any use of the property that would be inconsistent with the conservation purpose. Treas. Reg. § 1.170A-

USPROD-0846560

14(g)(1). But, where the donor retains rights that could potentially impair the conservation

values on the property, then the donor must provide the donee with documentation that

establishes the condition of the property at the time of the gift, or "Baseline Documentation."

Treas. Reg. § 1.170A-14(g)(5).

> The regulations explain that acceptable documentation *may* include:
>
>> (A) The appropriate survey maps from the United States Geological Survey, showing the property line and other contiguous or nearby protected areas;
>>
>> (B) A map of the area drawn to scale showing all existing man-made improvements or incursions (such as roads, buildings, fences, or gravel pits), vegetation and identification of flora and fauna (including, for example, rare species locations, animal breeding and roosting areas, and migration routes), land use history (including present uses and recent past disturbances), and distinct natural features (such as large trees and aquatic areas);
>>
>> (C) An aerial photograph of the property at an appropriate scale taken as close as possible to the date the donation is made; and
>>
>> (D) On-site photographs taken at appropriate locations on the property. If the terms of the donation contain restrictions with regard to a particular natural resource to be protected, such as water quality or air quality, the condition of the resource at or near the time of the gift must be established. The documentation, including the maps and photographs, must be accompanied by a statement signed by the donor and a representative of the donee clearly referencing the documentation and in substance saying 'This natural resources inventory is an accurate representation of [the protected property] at the time of the transfer.'[]

Treas. Reg. § 1.170A-14(g)(5)(A)-(D).  The regulations list examples of documentation to help

establish the condition of the property at the time of donation.

AQ voluntarily provided extensive documentation and photographs as envisioned by the

regulations and accepted by recent case law to establish the condition of the Property.  The

Baseline Documentation in the immediate matter consists of:  1) donor information;

2) explanations of the Conservation Purposes, Conservation Values, Reserved Rights,

26

Conservation Management, and Monitoring Policy; 3) Existing Conditions Report;

4) photographic documentation; 5) supportive mapping - location map, base map, topography,

soils map, aerial photograph; and 6) the Conservation Easement Plan.  Baseline Doc. § B, E, F,

G, H, Exhibit 2.

  Moreover, the adequacy of the Baseline Documentation is confirmed by the fact that

NALT—the entity in charge of monitoring the Property and ensuring the Conservation Purposes

are protected—accepted such documentation as sufficient to establish the Property's condition.

*See Pine Mountain Preserve, LLLP v. Commissioner*, 126 AFTR 2d 2020-6617 (11th Cir. 2020)

("NALT is a sophisticated land-conservation organization, and we have little doubt that when it

comes to negotiating conservation easements, it is well positioned and equipped to look after

conservation interests.").  Therefore, the Baseline Documentation provided was more than

sufficient under the Code and regulations to establish the condition of the Property prior to the

donation of the easement.

    2.  "Deemed Consent"

  Section 170(h)(2)(C) directs that a deductible qualified conservation contribution must be

granted with restrictions, in perpetuity, on how the property may be used.  Treasury regulation

section 1.170A-14(g) explains that if the donor of the property reserves any interests in the

property, such interests must be subject to legally enforceable restrictions that will prevent uses

of the retained interests which are inconsistent with the conservation purposes of the donation.

  RAR #1, p. 23, appears to alleges that the easement on the land is not protected in

perpetuity because of a "deemed consent" provision in the Deed.   More specifically, the RAR

briefly states:  "By the owner being able to proceed with actions on the Property, if the holder

does not respond to owner's requests, [Deed of Easement Section 4.20.8], the easement does not

protect the conservation values in perpetuity."  (Brackets in original).

27

The RAR appears to be referencing a single provision of the Easement which states:

> In the event that Holder's approval is required and Holder fails to respond within the time period specified above [30 days] and further fails to respond within ten days after a second written request by Owner to Holder, then the Holder shall be deemed to have granted Approval (as defined above) unless the activity for which approval is required is plainly prohibited by this Conservation Easement.

Easement § 4.20.8, Exhibit 10. In support of its argument, the RAR appears to rely on *Hoffman Properties II, LP v. Commissioner*. *See* RAR #1, p. 28 (citing but not analyzing *Hoffman*).

In *Hoffman Properties II, LP v. Commissioner*, No. 14130-15 (Tax Court Order July 12, 2017), a clause in the subject deed stated that if the donee failed to expressly reject a proposal within 45 days of receiving such, Hoffman was automatically, by default, granted approval to "undertake the proposed activity in accordance with the plan or request submitted." *Id.* The consent provision in *Hoffman* is materially different from the NALT approval process set forth in the easement deed here. One critical difference between the *Hoffman* deed and the Easement is that the consent provision in *Hoffman* was designed to allow the taxpayer to take action *inconsistent* with the conservation purposes if the charitable organization did not disallow such action within a prescribed time. The Easement language here expressly prohibits any such action, thereby ensuring that the conservation purposes are protected in perpetuity.

More specifically, the "key language" in the deed allowed Hoffman to exercise reserved rights that were "contrary to the Secretary's Standards" on the rehabilitation of historic buildings.[11] In other words, if the charitable organization did not deny Hoffman's request within

---

[11] *Hoffman Properties v. Commissioner*, 125 AFTR 2d 2020-2485 (6th Cir. 2020) ("That Paragraph describes certain '[c]onditional [r]ights'—actions that Hoffman could take so long as AAHP approved. For instance, Hoffman reserved the right to '[a]lter, reconstruct or change the appearance [of the façade] ... contrary to the Secretary's Standards' or to '[a]lter or change the

USPROD-0846563

a certain time, Hoffman was expressly permitted under the terms of the deed to take action inconsistent with the underlying conservation purposes.

The Easement operates entirely differently. Article 4 of the Easement deed states that the parties "intend that these Reserved Rights . . . may be conducted as described below *without having an adverse effect on the Conservation Purposes*." (Emphasis added.) Thus, the Reserved Rights are actions that the parties have already determined will not impact the conservation purposes of the Easement. Under the deed, NALT's approval for Reserved Rights is a belt-and-suspenders approach to ensuring the protection of the conservation purposes that are already adequately protected by the deed. It is not an escape clause that would ever allow the taxpayer to take an action "contrary to" the conservation purposes, like the consent provision in *Hoffman*.

To further ensure that the conservation purposes are perpetually protected, NALT's consent never can be deemed granted if "the activity for which approval is required is plainly prohibited by this Conservation Easement." Easement, § 4.20.8, Exhibit 10. The explicit purpose of the deed is to "accomplish the Conservation Purposes," which are set forth in the deed, in perpetuity:

> Owner hereby voluntarily, unconditionally and absolutely grants and conveys unto Holder, its successors and assigns, the easements, covenants, prohibitions, and restrictions set forth in this Conservation Easement, in perpetuity, *to accomplish the Conservation Purposes. Holder hereby accepts the grant of such easement and the right to enforce such covenants, prohibitions and restrictions and agrees to hold such easements and rights exclusively for the Conservation Purposes and to enforce the terms of the covenants, prohibitions and restrictions set forth in this Conservation Easement.*

---

appearance of the Air Space in a manner contrary to the Secretary's Standards.' (For reference, the 'Secretary's Standards' are regulations issued by the Secretary of the Interior on the rehabilitation of historic buildings. 36 C.F.R. § 67.7.).") (internal citations omitted).

USPROD-0846564

*Id.* at post-script to Article I, p. 5 (emphasis added.)

Anything that undermined the conservation purposes would be "plainly prohibited" by the deed, and therefore NALT cannot be deemed to consent to any such action. These material differences between the *Hoffman* and AQ deeds showcase how the AQ deed protects the conservation purposes in perpetuity, while the provisions in the *Hoffman* deed failed to do so.

Further, section 4.20.5 of the deed provides that the Holder (NALT) "shall not be obligated to accept or respond to any request for approval of a Reserved Right if the Owner is then in violation of this Conservation Easement in any material respect." Clause 5(b) clarifies that:

> Approve Owner's proposed exercise of a Reserved Right in accordance with the materials submitted by Owner but subject, however, to such qualifications and conditions as Holder may impose in its notice of approval. Such qualifications and conditions shall be limited to those which Holder deems necessary to: assure compliance by Owner with any of the express covenants or restrictions of this Conservation Easement, preserve and protect the Conservation Purposes or restrict Owner's exercise of the Reserved Rights to that which Owner has represented to Holder. Approval on such terms shall constitute a covenant by Owner to exercise the Reserved Right, if at all, only in accordance with the notice and other information submitted to Holder, as modified or supplemented by the qualifications and conditions that Holder imposed; which covenant shall be enforceable by Holder as fully as if stated in this Conservation Easement.

*Id.* § 4.20.5(b).

Thus, the Owner could not undertake an activity unless and until a request was submitted to NALT *pursuant to the approval process.* Moreover, the activity would have to be consistent with the conservation easement in any material respect. Such language was not present in *Hoffman.*

Finally, Section 6.14 of the Easement explains that:

30

USPROD-0846565

> No Waiver of Rights of Enforcement. The failure of Holder to exercise any of its rights under this Conservation Easement on any occasion *shall not be deemed a waiver of said rights* and Holder retains the right in perpetuity to require full compliance by Owner of the covenants and restrictions in this Conservation Easement.

(Emphasis added.)

This language, which was not present in the *Hoffman* easement deed, clarifies that NALT *cannot ever waive its rights of enforcement under the Easement Deed. See also Pine Mountain Preserve*, No. 19-11795 (slip op. at 18 n.4) ("[R]ecall that NALT has extensive advance-approval rights under these easement contracts. NALT is a sophisticated land-conservation organization, and we have little doubt that when it comes to negotiating conservation easements, it is well positioned and equipped to look after conservation interests."). Therefore, the concept of a prohibited deemed consent that could possibly run afoul of the Easement, simply does not exist with the AQ Easement.[12]

B.     AQ donated the Contribution to a "qualified organization"

NALT is a "qualified organization" pursuant to section 170(h)(3). In relevant part, an organization is qualified to accept a conservation contribution, and is therefore a "qualified organization," if it is a "charitable organization described in section 501(c)(3) that meets the public support test of section 509(a)(2)." Treas. Reg. § 1.170A-14(c)(1)(iii). The organization must also have "a commitment to protect the conservation purposes of the donation, and have the resources to enforce the restrictions." Treas. Reg. § 1.170A-14(c)(1). "A conservation group organized or operated primarily or substantially for one of the conservation purposes specified in

---

[12] Even if *Hoffman* were analogous, which it is not, the case was decided by order without a trial, without oral argument on appeal, and without any adjudication of the parties' fact-intensive positions. For these reasons, the persuasive value of *Hoffman* is highly questionable even in cases with analogous facts.

31

USPROD-0846566

section 170(h)(4)(A) will be considered to have the commitment required" to protect the conservation purposes of a donation. *Id.*

NALT is a charitable organization under section 501(c)(3) and is recognized as a charitable organization in the State of Pennsylvania. Baseline Doc. § C, p. 2–6, Exhibit 2. Consistent with section 170(h)(4)(A), NALT was established and is operated in order to preserve and conserve scenic landscapes, natural habitats, and environmentally sensitive areas for charitable, scientific, and educational purposes. Easement § 1.2, Exhibit 10. Its mission is to "promote long-term stewardship of our natural and cultural heritage by implementing successful private land conservation projects and promoting innovative land conservation techniques." Baseline Doc. § B, p. 8, Exhibit 2. Accordingly, NALT is, and has been repeatedly recognized by courts and the Service as, a "qualified organization" for purposes of section 170(h). *See, e.g.*, *Champions Retreat Golf Founders, LLC v. Comm'r*, T.C. Memo. 2018-146 at 21 ("The parties agree . . . that NALT is a qualified organization."), *aff'd*, 959 F.3d 1033 (11th Cir. 2020); *Bosque Canyon Ranch v. Comm'r*, T.C. Memo. 2015-130 at 4, 8 (donation of easements to NALT); *Atkinson v. Comm'r*, T.C. Memo. 2015-236 at 6–7 (same); *Kiva Dunes Conserv. LLC v. Comm'r*, T.C. Memo. 2009-145 (same); *PBBM-Rose Hill, Ltd. v. Comm'r*, No. 26096-14 at 1 (T.C. Oct. 07, 2016) (same). **The RAR does not dispute this conclusion**. Therefore, AQ properly donated the contribution to a "qualified organization."

      C.      AQ made the Contribution exclusively for conservation purposes

AQ's Contribution was made exclusively for conservation purposes because it encumbered the Property with an easement that protects in perpetuity three separate, valid conservation purposes. "A contribution is treated as made exclusively for conservation purposes if it satisfies one of the conservation purposes listed in section 170(h)(4)." *Champions Retreat*

USPROD-0846567

*Golf Founders, LLC v. Comm'r*, T.C. Memo. 2018-146, at 21, *aff'd* 959 F.3d 1033 (11th Cir.

2020).  These purposes are:

> (i) the preservation of land areas for outdoor recreation by, or the education of, the general public,
>
> (ii) the protection of a relatively natural habitat of fish, wildlife, or plants, or similar ecosystem,
>
> (iii) the preservation of open space (including farmland and forest land) where such preservation is—
>
>> (I) for the scenic enjoyment of the general public, or
>>
>> (II) pursuant to a clearly delineated Federal, State, or local governmental conservation policy, and will yield a significant public benefit, or
>
> (iv) the preservation of an historically important land area or a certified historic structure.

Section 170(h)(4)(A)(i)–(iv); *see also* Treas. Reg. § 1.170A-14(d)(1).

Although the Contribution need satisfy only one conservation purpose, it furthers no

fewer than three of the conservation purposes Congress sought to advance when it enacted

section 170(h).  The Contribution satisfies section 170(h)(4)(A)(ii), (iii)(I), and (iii)(II):  It

protects a relatively natural habitat of plants and wildlife, section 170(h)(4)(A)(ii); it preserves

open space for the scenic enjoyment of the general public, section 170(h)(4)(A)(iii)(I); and it

preserves open space pursuant to a clearly delineated governmental policy, section

170(h)(4)(A)(iii)(II).  The RAR argues that the Easement fails to adequately protect these

conservation purposes in perpetuity.  *See* RAR #1 at p. 23.  These arguments are unavailing and

are further addressed below.

> 1.   <u>The Contribution protects a relatively natural habitat of plants and wildlife</u>

Donations that protect a "significant relatively natural habitat in which a fish, wildlife, or

plant community, or similar ecosystem normally lives" serve a valid conservation purpose.

33

USPROD-0846568

Treas. Reg. § 1.170A-14(d)(3)(i); section 170(h)(4)(A)(ii).[13]  This is true even if the habitat has been changed to some extent by humans so long as wildlife continues to exist there in a relatively natural state.  Treas. Reg. § 1.170A-14(d)(3)(i).  Natural landscapes that "allow[] for the creation or promotion of the habitat" satisfy this test.  *See Glass v. Comm'r*, 124 T.C. 258, 262 (2005), *aff'd*, 471 F.3d 698 (6th Cir. 2006).

The Easement protects a "significant relatively natural habitat" because the Easement provides natural ecological requirements for at least fifty species of plants.  Baseline Doc. § B, p. 2, Exhibit 2.  In addition, the Easement supports at least eight bird species considered Species of Regional Importance:[14]  Eastern Wood Pewee (*Contopus virens*), Ruby-throated Hummingbird (*Archilochus colubris*), Tufted Titmouse (*Baeolophus bicolor)*, Yellow-throated Warbler (*Dendroica dominica*), Chimney Swift (*Chaetura pelagica*), Red-bellied Woodpecker

---

[13] Notably, section 170(h)(4)(A)(ii) seeks only "the protection of a relatively natural habitat of fish, wildlife, or plants, or similar ecosystem."  Notwithstanding this clear language, the regulations introduce the requirement that the donation protect a "significant relatively natural habitat in which a fish, wildlife, or plant community, or similar ecosystem normally lives."  Because the statute is clear on its face, and the regulations add terms not contemplated by the statute, the regulations' statement that a donation must protect a "significant" natural habitat is without merit.  *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842-43 (1984) (establishing that if Congress has "directly spoken to the precise question at issue", i.e., the intent of Congress is clear, then "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress"); *cf. Kisor v. Willie*, 139 S. Ct. 2400, 2415 (2019) (unequivocally explaining that a court should not apply *Auer* deference, i.e., yield to an agency's interpretation of an ambiguous regulation, unless a regulation is "genuinely ambiguous" because if there is no uncertainty, then "there is no plausible reason for deference.  The regulation then just means what it means—and the court must give it effect, as the court would any law.") (citing to *Auer v. Robbins*, 519 U.S. 452 (1997)); *see also Champions Retreat*, 959 F.3d 1033 (explaining that this regulation cannot be "construed to mean more than the Code will support").

[14] The species are designated as such and monitored by the Partners In Flight Species Assessment Database.  "These databases were developed from the voluntary collaboration of more than one hundred ornithological experts to provide a standardized and transparent system that allows the comparison of conservation status and population estimates at multiple geographic scales for North American landbirds."  *PIF Databases*, Partners in Flight, https://partnersinflight.org/what-we-do/science/databases/ (last visited Dec. 16, 2020).

USPROD-0846569

(*Melanerpes carolinus*), Eastern Kingbird (*Tyrannus tyrannus*), Brown Thrasher (*Toxostoma rufum*). *Id.*

The Contribution ensures that the critical ecological values of its significant relatively natural habitat are protected through several mechanisms. First, the Contribution places restrictions on the Property Owner to ensure that the habitat is preserved. The Owner may not generally develop the Property or remove water, minerals, or live trees. Easement §§ 3.1, 3.3, 3.5, 3.7, Exhibit 10. The Contribution also prohibits alteration of the topography of the Property and the general building of roads and structures. *Id.* §§ 3.2, 3.4, 3.9. It further prohibits dumping of ashes, trash, or garbage in the Conservation Area and the discharge of any chemicals, wastewater, or other pollutants within the Conservation Area and associated water courses. *Id.* § 3.8. It establishes enhanced protections for the "Wetland and Riparian Protection Area," defined as any part of the Conservation Area that lies within, or within 100 feet of, any body of water or permanent or intermittent watercourse, or governmentally defined wetland area. *Id.* § 3.11. And it requires activity in the Conservation Area to be "conducted so as to avoid the occurrence of soil erosion and sedimentation of streams or other water courses" as guided by "the soil conservation practices then established or recommended by the Natural Resources Conservation Service of the United States Department of Agriculture." *Id.* § 3.12.

Second, the Owner must also submit to monitoring by the Holder, to ensure compliance with these requirements. *Id.* § 2. If the Holder finds any violations, it can require remediation of the violating actions. *Id.* § 6.

Finally, the Contribution provides the overarching restriction that the exercise of reserved rights is subject to NALT approval on grounds that there will be "no material adverse effect on the Conservation Purposes or on the Conservation Values or other significant environmental

35

features of the Conservation Area." *Id.* § 4.21.2. All of these restrictions and protections ensure that the Contribution protects and will continue to protect a "significant relatively natural habitat." Although the RAR argues that the Property is merely "ordinary" and has not "significant" ecological value, the above facts establish that the Property in fact protects an ecologically diverse area.

> a)    Significant Habitat for Plant and Wildlife Communities

A taxpayer may satisfy the conservation purpose requirement if its contribution protects "a relatively natural habitat of fish, wildlife, or plants, or a similar ecosystem." Section 170(h)(4)(A)(ii). Under the regulations, such a habitat must be a "significant relatively natural habitat in which a fish, wildlife, or plant community, or similar ecosystem normally lives." Treas. Reg. § 1.170A- 14(d)(3)(i). A habitat is "'[t]he area or environment where an organism or ecological community normally lives or occurs' or '[t]he place where a person or thing is most likely to be found.'" *Glass*, 124 T.C. at 281-282 (quoting American Heritage Dictionary of the English Language 786 (4th ed. 2000)).

The Easement preserves the ecological needs of at least 50 plant species and at least 8 bird species, including some that are classified as priority species. The Baseline Documentation lists the many plant, bird, and reptile species observed on the property. *See* Baseline Doc. § F, pp. 4-6. These facts alone are sufficient to establish a valid conservation purpose. Moreover, several of the bird species have been identified in the Partners in Flight Species Assessment Database and are considered Species of Regional Importance. Baseline Doc. § F, Exhibit 2.

Indeed, noting that there is no definition of rare, threatened, or endangered species, the Eleventh Circuit has held that any species that "reasonably warrant[s] protection" qualifies under the regulations. *Champions Retreat*, No. 18-14817, *8. Further, that court explained: "Of critical importance . . . is not precisely which [species] ranks precisely where on one or

USPROD-0846571

more of these lists, but the more general question whether the presence of these many species, including some of substantial conservation concern, shows that the property is a significant habitat for 'rare, endangered, or threatened species.'"  The Baseline Documentation answers that question with a resounding "yes."

Moreover, the Baseline Documentation *under-reported* the value of the Property as a wildlife habitat.  A Wildlife Conservation Values Assessment (the "Conservation Assessment"), conducted several years after the Donation, demonstrates that the Property serves as a significant habitat for even more wildlife than the species included in the Baseline Documentation. Conservation Assessment, Exhibit 4.

Christopher Wilson of Conservation Ecology LLC conducted the Wildlife Assessment by reviewing available Geographic Information System layers and visiting the Property several times to assess existing rare species records and habitats.  He noted that the "Eastern Meadowlark is a priority species under the SC SWAP and ACJV and nests within the grasslands" and that "grassland birds in general have suffered long-term population declines across the country, including the Eastern Meadowlark which has experienced a 3.2% annual rate of decrease from 1966 through 2003 in South Carolina." *Id.* p. 6.  In relevant part, grassland bird areas that are potentially suitable for the Eastern Meadowlark are present on the Property. *Id.*

Specifically, Mr. Wilson observed dozens of bird species, 24 of which are on the SC SWAP Priority Species list,[15] 17 that are on the ACJV-Piedmont priority species list,[16] and 3 that

---

[15] SC SWAP emphasizes a cooperative, proactive approach to conservation between various state wildlife agencies.

[16] The Atlantic Coast Joint Venture (ACJV) is a partnership of Federal, regional and state agencies and organizations focused on the conservation of habitats for native bird species in the Atlantic Flyway region of the United States, while the Piedmont Bird Conservation Region

USPROD-0846572

are on the USFWS BCC 2008 species list,[17] as well as various other mammal species of wildlife (e.g., the Southern Fox Squirrel, Bobcat, Eastern Gray Squirrel, Marsh Rabbit, Northern Flying Squirrel, White-tailed deer, the Eastern Red Bat, the Northern Yellow Bat, Seminole Bat, Evening Bat, and the Tricolored Bat) on neighboring properties. *Id.* pp. 13-14. He explained that "the wildlife found on any one property are likely to occur on the neighboring properties." *Id.* p. 2.

The RAR contends that during a property site inspection, which was approximately one hour, "there were no special species of birds or wildlife directly observed" and that "no animals were seen during the inspection." RAR #1, pp. 20, 24. However, a one-hour inspection by an IRS agent is no substitute for the detailed, professional survey of the Property conducted by Williams Gandy, a NALT biogeographer, during which he observed and documented the numerous species discussed above. Baseline Doc., § F, Exhibit 2. As indicated by the Conservation Assessment, the Property provides a significant natural habitat for plant and wildlife. RAR #1, p. 25, also asserts that there must have been ongoing monitoring of any rare and endangered species and a written plan, including biologist recommendations, on how to protect the species. But there is no ongoing monitoring requirement in addition to the monitoring performed by NALT, and in any case, the Conservation Management Plan, Exhibit 6, provides exactly such a plan to protect the habitat.

Finally, the RAR argues that "the landscaping on the Property decreased the area available for significant habitat and converted the Property to an ordinary tract of land." RAR #1, p. 24.

---

(BCR 29) Implementation Plan includes a list of Priority Bird Species for the region, categorized as Highest, High, and Moderate priorities.

[17] "The 1988 amendment to the Fish and Wildlife Conservation Act mandates the U.S. Fish and Wildlife Service (USFWS) to 'identify species, subspecies, and populations of all migratory nongame birds that, without additional conservation actions, are likely to become candidates for listing under the Endangered Species Act (ESA) of 1973.'" Birds of Conservation Concern (BCC) 2008 is the most recent effort to carry out this mandate.

USPROD-0846573

First, the Eleventh Circuit has already rejected the argument that landscaping precludes eased property from qualifying as a relatively natural habitat. *See Champions Retreat*, 959 F.3d 1033. In that case, the eased property was 80-percent covered by a golf course and was held to be a relatively natural habitat. The deduction was allowed because "[t]he Code requires only a 'relatively natural habitat . . . or similar ecosystem,' not that the land itself be relatively natural. The regulation, in turn, says a deduction is available even if the land 'has been altered to some extent by human activity,' so long as 'the fish, wildlife, or plants continue to exist there in a relatively natural state.'" (Internal citation omitted). It therefore does not matter whether the Property contains a landscaped portion because it provides a relatively natural habitat for numerous plant and animals.

Second, the Property offers high quality habitat for grassland species, which may appear to be "ordinary," but "[n]ative grasslands are one of the most endangered ecosystems in the South. Historically, the region contained vast acreages of native grassland and savannas with scattered trees and shrub cover, which was maintained by fire. Today, that acreage has been replaced with non-native grasses (e.g., tall fescue, orchardgrass and bermudagrass), agricultural crops, forest cover and suburban development. As a result, several wildlife species dependent upon quality early successional habitat have experienced significant declines in population." *See* Conservation Management Plan, p. 12, Exhibit 6. In addition, according to NALT, the Property's river buffer consists of trees that provide vital habitat for both waterway and grasslands, and could easily be used by bald eagles or osprey. *Id.*

b)   Significant Natural Area

The second type of significant relatively natural habitat includes "natural areas which are included in, or which contribute to, the ecological viability of a local, state, or national park, nature preserve, wildlife refuge, wilderness area, or other similar conservation area." Treas. Reg. § 1.170A-14(d)(3)(ii). The Property also qualifies as this type of habitat.

39

The Property is in a relatively natural state, with various native grasses and shrubs as well as areas of hardwoods and pine trees. Due to its proximity to the AIW, the Property has vegetation typical of the area. Further, as the RAR acknowledges, the Property is part of a significantly larger tract that is also subject to conservation easements that serve and protect important conservation purposes. The Property is included in and contributes to the ecological viability of this larger tract and is therefore a significant natural habitat under the regulations. The plain language of the regulations makes clear that the contribution to the ecological viability of any "other similar conservation area"—such as land subject to a conservation easement—is sufficient for a property to qualify as a significant habitat. Further, there is no requirement that such area have public access, as the RAR suggests. *See* RAR #1, p. 24. Indeed, the opposite is true. *See* Treas. Reg. § 1.170A-14(d)(4)(iv)(A)(4) (providing that a public benefit of conservation includes "[t]he consistency of the proposed open space use with existing private conservation programs in the area, as evidenced by other land, protected by easement or fee ownership by organizations referred to in §1.170A-14(c)(1), in close proximity to the property").

In addition to contributing to the conservation of the larger tract, the protection and conservation of the Property contributes to the viability and protection of various nature preserves and state parks within a 50-mile radius from Horry County. For example, nearby Heritage Shores Natural Preserve is one of the most unique parks in the city, with seven acres of walking paths. The park is located on an island that extends into the Cherry Grove Marsh. This land is preserved in its natural state and is accessible via a series of elevated boardwalks and observation docks.[18]

---

[18] *See* North Myrtle Beach Parks and Recreation – Heritage Shores Nature Preserve, https://parks.nmb.us/167/City-Parks (last visited Dec. 16, 2020).

USPROD-0846575

Moreover, nearby Lake Waccamaw State Park contains one of the most unique bodies of water in the world and one of the greatest geological mysteries—the phenomenon of Carolina Bays containing species of aquatic life found nowhere else. A 700-foot boardwalk reaching into the shallow, tea-colored water accommodates wildlife-viewing and fishing, and more than seven miles of trails allow hikers to explore multiple ecosystems and rare plants. Fifty-two species of game and non-game fish are also present in Lake Waccamaw.[19]

Further, the nearby Russell Burgess Coastal Preserve is named for a former City Councilman devoted to preservation and maintenance of the marsh. The preserve provides a scenic overview of the picturesque Cherry Grove Marsh and paved parking and foot access to the inlet.[20] There is also Myrtle Beach State Park, which sits among oceanfront maritime forest along the far-reaching stretch of the Grand Strand coastline and provides, among other things, educational opportunities and a nature trail.[21] This is only a short list of the extensive natural parks and sites in the region. The Property supports all of these and therefore is a significant relatively natural habitat.

2. The Contribution preserves open space for the scenic enjoyment of the general public and will yield a significant public benefit

a) Scenic Enjoyment of the General Public

Donations to preserve open space serve a valid conservation purpose when they are made "[f]or the scenic enjoyment of the general public and will yield a significant public benefit."

---

[19] See North Carolina State Parks – Lake Waccamaw State Park, https://www.ncparks.gov/lake-waccamaw-state-park/home (last visited Dec. 16, 2020).

[20] See North Myrtle Beach Parks and Recreation – Russell Burgess Coastal Preserve, https://parks.nmb.us/167/City-Parks (last visited Dec. 16, 2020).

[21] See South Carolina State Parks – Myrtle Beach State park, https://southcarolinaparks.com/myrtle-beach (last visited Dec. 16, 2020).

41

Treas. Reg. § 1.170A-14(d)(4)(i)(B); section 170(h)(4)(A)(iii). If "development of the property would impair the scenic character of the local urban or rural landscape," then it may be preserved for scenic enjoyment. Treas. Reg. § 1.170A-14(d)(4)(ii)(A). "Scenic enjoyment" is evaluated based on the facts and circumstances of the land and its surroundings. *Id.* Factors such as "[r]elief from urban closeness," "[t]he compatibility of the land use with other land in the vicinity," "[t]he degree of contrast and variety provided by the visual scene," "[t]he harmonious variety of shapes and textures," and "[t]he openness of the land" are considered in making this evaluation. Treas. Reg. § 1.170A-14(d)(4)(ii)(A)(1)–(8). To satisfy this purpose, visual access to or across the property is sufficient. Treas. Reg. § 1.170A-14(d)(4)(ii)(B).

The entire southern boundary of the property (approximately 900 linear feet) borders the AIW. Baseline Doc. § F, p. 2, Exhibit 2. Approximately 27.9 acres of the Easement is open field, while the remaining 2.3 acres is forested land that runs south-southeasterly from the northeastern corner. *Id.*

The RAR asserts that this is insufficient. Specifically, the RAR states that "you can slightly see the property when traveling along the roadway" but that the "property was not accessible by the general public in regard to open space." RAR #1, p. 24. Additionally, the RAR contends that the Property "is in a private, locked, gated area that is not accessible to the public." *Id.* p. 25. However, public access is not a requirement of deductibility, *see* Treas. Reg. § 1.170A-14(d)(3) & (4), and in any event, the Property will be accessed by a future right of way. PPM at p. 51, Exhibit 1. Currently, there are public roads that are two-lane roads comprised of asphalt or tar and chip, and these roads are considered adequate and provide sufficient access to the Property. *Id.* Accordingly, the "overall access of the Property is above

42

average." *Id.* In addition, the Property is located south of Carolina Bays Parkway and north of the Intracoastal Water, proving outstanding scenic quality. *Id.*

Further, the Eleventh Circuit in *Champions Retreat*, 959 F.3d 1033, has held that the absence of development that an eased property provides is sufficient to provide scenic enjoyment. In that case, a riverbank between the eased property and a river was up to ten feet high, with only trees visible from a canoe or kayak. The court held that the eased property provided the public with visual access and served a public interest: "When compared to a condominium building or even private homes, the easement property qualifies as open space providing scenic enjoyment. And preserving relatively natural views along these two rivers— views free of development on the other side as well because of the national forest—serves a public interest." *Id.* at *18. Indeed, the AIW is "one of the state's most congested waterways" and a "major tourist destination."[22] *See also* RAR #1, at p. 24 ("[T]here are residential properties directly across from the [AIW] which are in an existing development."). The AIW's proximity to the Property and the visual access that it provides to the Property means that the Property provides scenic enjoyment to the public. *See also* Treas. Reg. § 1.170A-14(d)(4)(ii)(A) ("Preservation of land may be for the scenic enjoyment of the general public if development of the property . . . would interfere with a scenic panorama that can be enjoyed from . . . waterbody, . . . and such area or transportation way is open to, or utilized by, the public.").

In addition, the *Champions Retreat* court explained that the "[t]he regulation says scenic enjoyment must be evaluated based on all the circumstances and with flexibility." In that case,

---

[22] *See* Grand Strand The Lifestyle Magazine for the Myrtle Beach Area – History and Life Along the Grand Strand's Intracoastal Waterway,
https://grandstrandmag.com/feature/history_and_life_along_the_grand_strand_s_intracoastal_wa
terway (last visited Dec. 16, 2020).

USPROD-0846578

the property as a whole provided scenic enjoyment to the public because the natural areas of the property provided scenic enjoyment, despite the presence of a golf course on 80% of the land, especially "when compared to a condominium building or even private homes." *Id.* Here, the Property's open and natural landscapes and dense bordering tree lines provide a better view to the public than the residential buildings that the Easement protects against. There is little question that these views would have been eliminated but for the Contribution, as the Property was primed to be developed to the highest and best use of the land. As the Property is currently open, natural, and undeveloped, the Contribution ensures it will remain that way thus continuing to protect the scenic view for the benefit of the public.

b)      Significant Public Benefit

Donations to preserve open space for the scenic enjoyment of the general public must also yield a significant public benefit. Treas. Reg. § 1.170A-14(d)(4)(i)(B). Whether a contribution yields a "significant public benefit" is evaluated based on a variety of factors. Treas. Reg. § 1.170A-14(d)(4)(iv)(A). These factors include "[t]he likelihood that development of the property would lead to or contribute to degradation of the scenic, natural, or historic character of the area," "[t]he opportunity for the general public to use the property or to appreciate its scenic values," "[t]he intensity of land development in the vicinity of the property (both existing development and foreseeable trends of development)," "[t]he consistency of the proposed open space use with public programs," and "[t]he cost to the donee of enforcing the terms of the conservation restriction." Treas. Reg. § 1.170A-14(d)(4)(A)(1)–(11).

Treas. Reg. § 1.170A-14(d)(4)(iv)(B) explains that:

> The preservation of an ordinary tract of land would not in and of itself yield a significant public benefit, but the preservation of ordinary land areas in conjunction with other factors that demonstrate significant public benefit or the preservation of a unique land area for public employment would yield a significant

44

> public benefit. . . . The following are other examples of
> contributions which would . . . yield a significant public
> benefit: . . . the preservation of woodland along a public highway
> pursuant to a government program to preserve the appearance of
> the area so as to maintain the scenic view from the highway . . . .

The RAR states that the Property is an "ordinary tract of land." RAR #1, p. 24.  This

conclusion is erroneous.  Among other elements previously discussed, the Easement also yields

significant public benefit because, in the absence of a conservation easement on the Property, the

Property was extremely likely to have been developed.  The RAR itself acknowledges as such

when it states that "the examination team members drove 1-2 miles radius of the property area"

touring Pelican Bay, which had "an estimated 100 built homes with some spec homes" and many

properties for sale.  *Id.* p. 20.  Indeed, a significant amount of work toward development of the

Property had already taken place, and further development would have contributed to the

degradation of the scenic and natural character of the area.  Given the high desirability of the

Property in conjunction with the significant market demand, it was inevitable that the Property

would have become heavily developed were it not for the placement of the Easement.

    3.      The Contribution preserves open space pursuant to clearly delineated
governmental policies and will yield a significant public benefit

Donations to preserve open space serve a valid conservation purpose when they are made

"[p]ursuant to a clearly delineated Federal, state, or local governmental conservation policy and

will yield a significant public benefit."  Treas. Reg. § 1.170A-14(d)(4)(i)(A); section

170(h)(4)(A)(iii).  The governmental policy an easement seeks to serve need not be a

certification related to the particular land at issue, but rather may be a "specific, identified

conservation project, such as . . . the protection of the scenic, ecological, or historic character of

land that is contiguous to, or an integral part of, the surroundings of existing recreation or

conservation sites."  Treas. Reg. § 1.170A-14(d)(4)(iii)(A).

USPROD-0846580

Easements need to meet only one governmental conservation policy to satisfy this standard, but in this instance the Easement meets at least three. The Contribution was made pursuant to the following Federal, state, and local governmental policies: (i) the South Carolina Environmental Protection and Conservation section of the South Carolina Conservation Bank Act, located in the South Carolina Code Annotated at § 48-59-20; (ii) the Horry County Comprehensive Plan; and (iii) the SC SWAP.

The RAR contends that there is "no evidence" that the Easement is part of these governmental policies. RAR #1, p. 23. All that is required under the plain language of the regulations to have a qualifying policy pursuant to which an easement is made, however, is a "specific, identified conservation project," and all three governmental programs are specific conservation policies. Therefore, the Contribution preserves open space pursuant to clearly delineated governmental policies and will yield a significant public benefit.

        a)      South Carolina Environmental Protection and Conservation Section of the South Carolina Conservation Bank Act

The South Carolina legislature enacted the South Carolina Conservation Bank Act (the "Conservation Bank Act") because

> rapid land development and economic growth which has benefited the state's people and economy, but has also led to the loss of forestlands, farmlands, wildlife habitats, outstanding natural areas, beaches and public areas for outdoor recreation; and has impacted the health of the state's streams, rivers, wetlands, estuaries, and bays, all of which impacts the quality of life of the state's current and future citizens and may jeopardize the well-being of the state's environment and economy if not addressed appropriately.

South Carolina Code Annotated 48-59-20 et seq.

South Carolina Code Annotated 48-59-20(5) also notes that

> the protection of open space by acquisition of interests in real property from willing sellers is essential to ensure that the State continues to enjoy the benefits of wildlife habitats, forestlands,

46

> farmlands, parks, historical sites, and healthy streams, rivers, bays, and estuaries; for recreational purposes, for scientific study, for aesthetic appreciation, for protection of critical water resources, to maintain the state's position as an attractive location for visitors and new industry, and to preserve the opportunities of future generations to access and benefit from the existence of the state's outstanding natural and historical sites.

Further, S.C. Code Ann. § 48-59-20(6) (2002) concludes: "It is critical to encourage cooperation and innovative partnerships among landowners, state agencies, municipalities, and nonprofit organizations, which must work together in order to meet these objectives." Accordingly, S.C. Code Ann. § 48-59-20 is a clearly delineated state conservation policy that strongly encourages and contemplates exactly the kind of innovative partnership among landowners and non-profit organizations as is exemplified by the Easement. **The RAR does not dispute this fact.**

As discussed in detail above, the Contribution permanently protects various wildlife habitats, wetlands, and riparian aspects on the Property. Therefore, the Easement contributes directly to the South Carolina state legislature's clearly delineated conservation policies, at no cost to the state.

b)      Horry County Comprehensive Plan

The local Horry County government has developed the Horry County Comprehensive Plan (the "HCCP"), called "Envision 2025," which emphasizes conservation across the county and its associated regions of South Carolina, including the Northern Coastal region that the Property belongs to. *See* Horry County Comprehensive Plan, "Envision 2025", https://www.horrycounty.org/Portals/0/Docs/PlanningAndZoning/Envision2025/Comprehensive Plan.pdf (last visited December 24, 2020). In particular, pursuant to the HCCP experts identify current wildlife and conservation needs, which then results in conservation actions at the species, habitat, and regional level. *Id.* As a result, the HCCP establishes policies to help "Horry County

USPROD-0846582

and its residents and visitors share responsibility for this delicate ecosystem and doing their part to ensure that its health is maintained." *Id.* Therefore, the HCCP is a clearly delineated local governmental conservation policy. **The RAR does not dispute this fact.**

The Easement helps fulfill critical HCCP land and water policies. In particular, goals of the HCCP include protecting and conserving forests, agriculture, and plant and animal habitat, enhancing the forestlands of Horry County, and encouraging native species. The Easement furthers all of these goals by providing for and protecting natural ecological requirements for various plant species and preserving important habitat for wildlife. *See* Baseline Doc. § B, p. 2-3, Exhibit 2. In addition, the Easement furthers specific water resource needs of the HCCP, including preserving the water quality for waterbodies in Horry County, providing for pollution filtering and groundwater recharge, and mitigating the impacts on water quality. In fact, the Property's proximity to the AIW, along with the conservation purposes and goals of the Easement help further the water preservation goals of the HCCP. Accordingly, the Easement is made pursuant to the HCCP, a clearly delineated local government policy.

c)     South Carolina's Forest Legacy Program

The Property supports one of the five Areas for Conservation Action Opportunities with Urban and Developing lands as recognized within Chapter 3 of the SC SWAP. The SC SWAP plan lists "protection of habitat through acquisition and easements" as a primary conservation action. The Conservation Area supports this policy through permanent protection of land and important natural resources within a highly populated county that continues to face accelerated development pressure. **The RAR does not challenge the SC SWAP as a clearly delineated state conservation policy.**

48

USPROD-0846583

d)      Significant Public Benefit

Contributions that preserve open space pursuant to a governmental conservation policy must also yield a "significant public benefit." Section 170(h)(4)(A)(iii)(II); Treas. Reg. § 1.170-14(d)(4)(iv)(A). Whether a contribution provides a significant public benefit is analyzed using the factors discussed above. *See* Treas. Reg. § 1.170A-14(d)(4)(iv)(A). For the reasons described above, the Contribution satisfies the public benefit requirement.

Although the public benefit requirement is independent of the governmental policy itself, the more specific the governmental policy served by the contribution, the more likely that the governmental policy demonstrates that a significant public benefit is served by a contribution. Treas. Reg. § 1.170A-14(d)(4)(vi)(A). Here, the South Carolina and the Horry County governments have established specific policies to manage conservation areas and to preserve the natural state of undeveloped lands, the development of which would threaten sensitive ecosystems and the sustainability of water and air qualities. According to the regulations,

> The requirement that the preservation of open space be pursuant to a clearly delineated Federal, state, or local governmental policy is intended to protect the types of property identified by representatives of the general public as worthy of preservation or conservation. . . [A] governmental conservation policy need not be a certification program that identifies particular lots or small parcels of individually owned property. This requirement will be met by donations that further a specific, identified conservation project, such as . . . the protection of the scenic . . . character of land that is contiguous to, or an integral part of, the surroundings of existing recreation or conservation sites.

Treas. Reg. § 1.170A-14(d)(4)(iii)(A). The RAR, in its assertions that the Easement must be accepted, certified, and in some cases funded by the government policy, has conflated the above requirement with another rule, Treas. Reg. § 1.170A-14(d)(4)(B)(iii)(B), which does require actual acceptance into a federal or state conservation program, but is inapplicable in this case.

49

USPROD-0846584

Thus, because the Contribution furthers the above specific governmental policies, there is strong evidence of a significant public benefit. *See* Treas. Reg. § 1.170A-14(d)(4)(vi)(A).

        4.    <u>Inconsistent Use</u>

As explained by Treas. Reg. § 1.170A-14(e)(2), "a deduction will not be allowed if the contribution would accomplish one of the enumerated conservation purposes but would permit destruction of other significant conservation interests." In interpreting this, the RAR #1, p. 23, argues that:

> The reserved rights allow the Owner to conduct development on the conservation area that directly conflict with the conservation purpose. For example, they can build structures totaling 2,500 square feet [Deed of Easement Section 4.4] they can farm the land [Deed of Easement Section 4.6] and they can build roads and driveways [Deed of Easement Sections 4.2, 4.7, and 4.8]. Since these reserved rights conflict with the conservation purposes if acted upon they negate the perpetuity clause and conservation purpose(s). . . . In addition, the establishment of the building zone of 2.66 acres is inconsistent with preservation of conservation values. Thus, the deduction is not allowable.

The RAR does not explain how these Reserved Rights conflict with the Conversation Purposes, but as explained below, they do not.

The Easement contains myriad provisions that protect its conservation purposes in perpetuity. In addition to the specific restrictions previously discussed above, the parties to the Easement agreed that "the purpose of this Conservation Easement is to preserve the Conservation Values of the Conservation Area and to fulfill the Conservation Purposes in accordance with 26 U.S.C. § 170(h)." Easement § 3.16, Exhibit 10. Accordingly, "any right, use, or activity which is not reserved in Article 4 of this Conservation Easement and which is inconsistent with the Conservation Purposes or which materially threatens the Conservation Purposes *is prohibited*." *Id.* (emphasis added).

50

USPROD-0846585

Additionally, the Reserved Rights in Article 4 are carefully tailored to ensure the conservation purposes remain protected in perpetuity. The Reserved Rights that the RAR identifies as problematic are, in reality, painstakingly drafted to protect the deed's conservation purposes. *See* Easement § 4.2 (allowing for a driveway only to access the Building Zone and only to the specifications minimally required by law or sound engineering); § 4.4 (allowing the construction of picnic shelters up to 2,500 square feet, which is fully consistent with the conservation purpose of preserving natural land); § 4.6 (allowing agricultural activities only in limited areas and only in accordance with USDA soil conservation practices); § 4.7 (allowing for unpaved vehicle trails "for limited vehicular access to the areas of the Conservation Area otherwise inaccessible by vehicle for use in maintenance, emergency access, and other permitted uses of the Conservation Area" only if in accordance with restrictions and upon NALT approval); § 4.8 (allowing for "trails or paths for nature education and outdoor recreation purposes" only if in accordance with restrictions and upon NALT approval). None of these Reserved Rights conflicts or impedes the Conservation Purposes, and the RAR tellingly does not identify any way in which they could.

Quite simply, if the exercise of a Reserved Right would be inconsistent with a conservation purpose of the Easement, it would not be allowed under the plain language of the Easement. The Reserved Rights are permitted only to the extent that they can be undertaken without impeding the conservation purposes. And once again, any attempt to exercise Reserved Rights must first receive approval by NALT, which may not approve any action if it is inconsistent with the conservation purposes. Therefore, if the exercise of a Reserved Right would impede, be inconsistent with, or materially violate the conservation purposes in any way, it cannot receive approval.

51

**II.     Arcadian Quay's deduction is supported by a "qualified appraisal" conducted by a "qualified appraiser."**

To claim a deduction in excess of $5,000, the donor of a conservation easement must substantiate the value of its contribution with a "qualified appraisal." Section 170(f)(11)(C), (D); Treas. Reg. §§ 1.170A-16(d), -14(i). Section 170 and the accompanying regulations define a qualified appraisal as any appraisal that (1) is conducted by a "qualified appraiser" (2) in accordance with generally accepted appraisal standards, and (3) satisfies the additional requirements enumerated in Treas. Reg. § 1.170A-17(a). Section 170(f)(11)(E)(i); Treas. Reg. § 1.170A-16(d)(1).

A.     The Appraisal was prepared by a qualified appraiser

A qualified appraiser is an individual who (i) "has earned an appraisal designation from a recognized professional appraiser organization or has otherwise met minimum education and experience requirements" and (ii) "regularly performs appraisals for which the individual receives compensation." Section 170(f)(11)(E)(ii); *see also* Treas. Reg. § 1.170A-17(b). At the time of the Appraisal, Clark was employed by Clark-Davis, PC, was licensed as an appraiser in seven states, had worked as an appraiser for over 30 years, had been qualified as an expert witness in federal and state courts on the issue of property values, and had received countless hours of training on appraising real property. *See* Appraisal at pp. 154–56, Exhibit 7. Indeed, Clark's work has been praised by the Tax Court in *Kiva Dunes Conservation, LLC v. Commissioner*, T.C. Memo. 2009-145, and his valuations were upheld even more recently, in *Pine Mountain v. Commissioner*, T.C. Memo. 2018-214, *rev'd in part on other grounds*, 978

52

USPROD-0846587

F.3d 1200 (11th Cir. 2020), where the IRS acknowledged that Clark is a qualified appraiser.[23]
Accordingly, Clark is a "qualified appraiser."

While the RAR does not directly dispute that Clark is a qualified appraiser, the RAR # 1, at pp. 21, 26, raises unrelated points that attempt to call into question Clark's qualifications and credibility. For example, the RAR states that Clark voluntarily surrendered his Alabama appraiser license in April 2019. This fact has no bearing, however, as to whether the Appraisal is qualified or whether Clark was a qualified appraiser when he appraised the Property. The Property is not located in Alabama, and in any case, Clark held his Alabama license at the time of the Appraisal. *See* RAR #1, p. 26 ("Examiner researched Mr. Clark's certification's through Office of Professional Responsibility (OPR) and South Carolina Department of Labor, Licensing and Regulation - Mr. Clark maintained a valid license and had no infractions through 12/31/2018."). Moreover, the Alabama complaint was never adjudicated, but rather settled via a consent order. The RAR therefore makes an impermissible inference that Clark engaged in wrongdoing on this basis of his voluntary surrender of his Alabama license.[24]

In addition, the RAR#1, p. 21, notes that Clark is the subject of information requests from the Senate Finance Committee. Congress, however, does not license appraisers or determine whether an appraiser is qualified, which is the province of the states. Any Congressional inquiry has no bearing on whether Clark is a qualified appraiser.[25]

---

[23] Notably, in *Pine Mountain*, the Tax Court concluded that the conservation easement in that case was valued at an amount greater than that which even Clark had appraised it.

[24] *See* Ala. R. Evid. Rule 408 (providing that evidence of the compromise of a claim may not be used to prove liability for the claim).

[25] Significantly, despite being critical of so-called "syndicated" conservation easement transactions generally, the recently released report summarizing the Senate Finance Committee's investigation implicitly approved of Clark's appraisal in *Kiva Dunes Conservation, LLC v.*

USPROD-0846588

B.    <u>The Appraisal was prepared in accordance with generally accepted appraisal standards</u>

A qualified appraisal must be conducted "in accordance with generally accepted appraisal standards," defined as the "substance and principles of the Uniform Standards of Professional Appraisal Practice, ["USPAP"] as developed by the Appraisal Standards Board of the Appraisal Foundation." Treas. Reg. § 1.170A-17(a)(1). The Appraisal was prepared in accordance with USPAP, as Clark certified. *See* Appraisal at pp. 1, 7, Exhibit 7. As a licensed appraiser with decades of appraisal experience, Clark is intimately familiar with USPAP.[26] To ensure that Clark's knowledge of USPAP remains current, he completes coursework on USPAP offered by the Appraisal Institute every few years. *See id.* at pp. 155–56.

In addition, although not required to do so, Arcadian Quay confirmed the accuracy of the Appraisal by engaging Sirote, which in turn engaged Raymond E. Veal of Integra Realty Resources to perform an independent appraisal review in conformity with USPAP. At the time of the appraisal review, Veal was a licensed appraiser in three states, had over 35 years of experience in the commercial real estate industry, and was a specialist in the valuation of conservation easements, having served as an expert witness in at least two Tax Court cases

---

*Commissioner*, T.C. Memo. 2009-145. *See* STAFF OF S. COMM. ON FIN., 116TH CONG., SYNDICATED CONSERVATION-EASEMENT TRANSACTIONS 20–23 (Comm. Print 2020).

[26] "The Uniform Standards of Professional Appraisal Practice (USPAP) is the generally recognized ethical and performance standards for the appraisal profession in the United States. USPAP was adopted by Congress in 1989, and contains standards for all types of appraisal services, including real estate, personal property, business and mass appraisal. Compliance is required for state-licensed and state-certified appraisers involved in federally-related real estate transactions. USPAP is updated every two years so that appraisers have the information they need to deliver unbiased and thoughtful opinions of value." *What is USPAP?*, THE APPRAISAL FOUNDATION, https://www.appraisalfoundation.org/imis/TAF/Standards/Appraisal_Standards/ Uniform_Standards_of_Professional_Appraisal_Practice/TAF/USPAP.aspx (last visited May 28, 2020).

54

involving conservation easements. *See, e.g., Pine Mountain Preserve*, T.C. Memo. 2018-214; *PPBM Rose Hill, Ltd. v. Commissioner*, 900 F.3d 193 (5th Cir. 2007). Veal rated the Appraisal as of the highest quality—a five out of five rating—with respect to its completeness, accuracy, use of appropriate methods and techniques, and the reasonableness of its analysis, conclusions, and opinions. Following his review, Veal concluded, without qualification, that the Appraisal's market value conclusions were reasonable and that the report was a viable basis for decision making. *See* Appraisal Review at p. 2, Exhibit 8. In addition, on more than 250 specific review dimensions, Veal determined the Appraisal to be more than adequate.[27] *See id.* at pp. 5–13. This appraisal review itself was subject to an independent review by Sirote, which concluded that there were no material concerns or issues. *See* Independent Appraisal Review Legal Opinion, Exhibit 9.

The RAR #4, at pp. 1–2, states that the Appraisal is not a qualified appraisal because it violates USPAP in several respects. Most of these alleged violations of USPAP are recapitulations of the RAR's objections to the Appraisal's data sources and valuation methodology, each of which is discussed below in detail.

In any event, neither the statute, the regulations, nor case law requires strict compliance with USPAP. To the contrary, the Tax Court has repeatedly reaffirmed that "[f]ull compliance with [USPAP standards] is not the sole measure of an expert's reliability" and that "a noncompliant valuation report is not per se unreliable." *SWF Real Estate LLC v. Commissioner*,

---

[27] Veal determined that the Appraisal had only three minor errors: it did not include photographs and maps of the eased property sales, it did not include adjustment grids, and it did not analyze comparable listings. These have no bearing on whether the Appraisal is qualified. For example, with respect to comparable listings, the appraisal review explains that "[t]here are relatively few listings of eased properties, and analyzing listings is not a requirement for this appraisal review." Appraisal Review at p. 13, Exhibit 8.

USPROD-0846590

T.C. Memo. 2015-63 (quoting other cases). Most significantly, Treasury itself expressly declined to require compliance with USPAP standards when it promulgated Treasury Regulation section 1.170A-17(a)(2). The preamble to the final rule states:

> The Treasury Department and the IRS agree that it is beneficial to provide some flexibility by requiring conformity with appraisal standards that are consistent with the substance and principles of USPAP rather than requiring that all appraisals be prepared strictly in accordance with USPAP. Accordingly, the final regulations do not adopt the recommendation to require strict compliance with USPAP and retain the requirement of consistency with the substance and principles of USPAP.

*Substantiation and Reporting Requirements for Cash and Noncash Charitable Contribution Deductions*, T.D. 9836, 83 Fed. Reg. 36,417, 36,420 (July 30, 2018).

The RAR ignores this authority and instead effectively adopts a standard—strict compliance with USPAP—that Treasury has expressly disclaimed. Notwithstanding this attempt to rewrite history and the regulations, compliance with USPAP standards is not required for an appraisal to be a qualified appraisal.

C.    The Appraisal meets each of the additional requirements of Treasury Regulation section 1.170A-17(a)

In addition to the requirements described above, Treasury Regulation section 1.170A-17(a) enumerates certain additional requirements of a qualified appraisal. The left-hand column of the chart below lists each of these elements in turn, while the right-hand side explains how the Appraisal satisfies each:

| Qualified Appraisal Element | Contents of Appraisal |
|---|---|
| A description of the property in sufficient detail. Treas. Reg. § 1.170A-17(a)(3)(i)(A). | The Appraisal contains descriptions of the Property, as well as maps, aerial photographs, and other renderings at pp. 12–22, as well as descriptions of the Property throughout the Appraisal. |
| The physical condition of the property. Treas. Reg. § 1.170A-17(a)(3)(i)(B). | The Appraisal contains a description of the condition of the Property at pp. 40–43, and |

56

| | contains a copy of the Baseline Documentation as an addendum. |
|---|---|
| The date (or dates) on which the property was appraised. Treas. Reg. § 1.170A-17(a)(3)(i)(C). | The Appraisal contains the date on which the Property was appraised at p. 8. |
| The appraised fair market value of the property on the date (or expected date) of contribution. Treas. Reg. § 1.170A-17(a)(3)(i)(D). | The Appraisal contains the fair market value of the Property on the date of the contribution at pp. 2–3, 152. |
| The terms of any agreement or understanding entered into (or expected to be entered into) by or on behalf of the donor or donee that relates to the use, sale, or other disposition of the property contributed. Treas. Reg. § 1.170A-17(a)(3)(ii). | The Appraisal attaches the Easement itself as an addendum and references and includes various relevant provisions throughout. |
| The date (or expected date) of contribution to the donee. Treas. Reg. § 1.170A-17(a)(3)(iii). | The Appraisal contains the date of contribution to the donee at p. 8. |
| The name, address, and taxpayer identification number of the appraiser. Treas. Reg. § 1.170A-17(a)(3)(iv)(A). | The Appraisal contains the name, address, and taxpayer identification number of the appraiser at pp. 1 and 8. |
| The qualifications of the qualified appraiser who signs the appraisal, including the appraiser's background and experience. Treas. Reg. § 1.170A-17(a)(3)(iv)(B). | The Appraisal lists the qualifications, background, and experience of Clark, the qualified appraiser who signed the appraisal, at pp. 154–56. |
| The signature of the appraiser and the date signed. Treas. Reg. § 1.170A-17(a)(3)(v). | The Appraisal contains the signature of the appraiser and the date signed at pp. 1, 4, and 7. |
| A declaration regarding the purpose of the appraisal and a recognition that the appraiser could be subject to penalties under the Code for a mistaken valuation. Treas. Reg. § 1.170A-17(a)(3)(vi). | The Appraisal declares its purpose and recognizes that the appraiser could be subject to penalties under the Code for mistaken valuation at pp. 3 and 7. |
| A statement that the appraisal was prepared for income tax purposes. Treas. Reg. § 1.170A-17(a)(3)(vii). | The Appraisal states that it was prepared for income tax purposes at pp. 3 and 8. |
| The method of valuation used to determine the fair market value. Treas. Reg. § 1.170A-17(a)(3)(viii). | The Appraisal states that it bases the fair market value of the Easement on the before and after value method at pp. 2–3 and 152. It further states that it bases the before value on the income approach (land residual method) using a discounted cash flow analysis and the after value on the sales comparison approach at pp. 27, 55, and 152. |
| The specific basis for the valuation. Treas. Reg. § 1.170A-17(a)(3)(ix). | The Appraisal details the specific basis for its valuation of the Property. Specifically, the section appraising the before value of the Property contains the data and analysis used to calculate the fair market value ("FMV") of the unencumbered property at pp. 55–121, while the section appraising the after value details the specific comparable sales used to calculate the FMV of the encumbered property at pp. 141–46. The appraisal of the FMV of the easement itself is |

USPROD-0846592

| | based upon these two figures and the calculations are given at p. 152. |
|---|---|
| No fee based on a percentage of the appraised value. *See* Treas. Reg. § 1.170A-17(a)(9). | The fee associated with the Appraisal was not based on a percentage of the appraised value. Appraisal at pp. 3 and 7. |

An appraisal that complies with the requirements of the regulations such that it contains sufficient information to allow the Service to evaluate the appraisal's methodology is a qualified appraisal.[28] *See, e.g., Scheidelman v. Commissioner*, 682 F.3d 189, 198 (2d Cir. 2012); *Friedberg v. Commissioner*, T.C. Memo. 2013-224 at 17–22; *Gorra v. Commissioner*, T.C. Memo. 2013-254 at 44.  The Appraisal follows established valuation law and principles; meets every requirement of the Code, regulations, and case law; and provides detailed analysis supporting its methodology and conclusions.  The above chart establishes that the Appraisal satisfies all of the relevant criteria and provides all of the requested information; the Appraisal is therefore a "qualified appraisal" under section 170(f)(11).

D.  The Appraisal properly applied the "before and after method" to establish the FMV of the Contribution

The value of a conservation easement for purposes of section 170 is equal to the FMV of the easement at the time of its contribution.  Treas. Reg. § 1.170A-14(h)(3)(i).  Typically, the FMV of noncash property is equal to the price at which the property would change hands in an arm's-length transaction on the open market.  *See* Treas. Reg. § 1.170A-1(c)(2).  In the context of conservation easements, the regulations implement this concept by providing two potential methods of valuation.  First, if "a substantial record of sales of [comparable] easements" is

---

[28] The Tax Court has even noted that substantial (rather than strict) compliance with the requirements of the regulations is sufficient for an appraisal to be qualified.  *Cave Buttes, LLC v. Commissioner*, 147 T.C. 338, 349 (2016) ("Strict compliance with the requirements is sufficient to win a deduction, but it isn't necessary.").  As demonstrated in this section, the Appraisal surpassed this standard by fully complying with all applicable requirements.

USPROD-0846593

available "to use as a meaningful or valid comparison," then the FMV of a donated easement is based on the sales prices of the comparable easements (the "comparable sales method"). Treas. Reg. § 1.170A-14(h)(3)(i). If no substantial record exists, however, then FMV generally is calculated based on a "before and after method," under which the FMV of an easement is equal to the difference between the FMV of the unencumbered property before the easement is granted and the FMV of the encumbered property after the easement is granted. *Id.*

Conservation easements generally are donated rather than sold, meaning that there are few comparable transactions. The result is that the before and after method is used to value conservation easements in most cases, and the comparable sales method is rarely, if ever, employed. *See, e.g., Symington v. Commissioner*, 87 T.C. 892, 895 (1986) (acknowledging that the before and after method is usually necessary); Rev. Rul. 73-339, 2 C.B. 68 (1973) (noting that, because there usually is no substantial record of marketplace sales to create a meaningful basis for comparison, open space easements generally are valued based on the before and after method).

As is typical, in this case no "substantial record of sales of [comparable] easements" was identified "to use as a meaningful or valid comparison" to the contributed easement. Treas. Reg. § 1.170A-14(h)(3)(i). Clark therefore relied on the before and after method to value the Easement, as directed by the controlling regulations and case law. *See* Appraisal at pp. 2–3 and 152, Exhibit 7.

1.    The Appraisal correctly determined the "highest and best use" of the unencumbered Property

When determining the value of property for purposes of conservation easement charitable deductions, it is necessary to consider not only the property's current use, but also its highest and best use ("HBU"). *Stanley Works v. Commissioner*, 87 T.C. 389, 400 (1986); *see also* Treas.

USPROD-0846594

Reg. § 1.170A-14(h)(3)(ii). The Tax Court has adopted the Appraisal Institute's definition of a property's HBU as "the reasonably probable and legal use . . . that is physically possible, appropriately supported, and financially feasible and that results in the highest value," *Palmer Ranch Holdings Ltd. v. Commissioner*, T.C. Memo. 2014-79 at 22 (quoting *Whitehouse Hotel L.P. v. Commissioner*, 139 T.C. 304, 331 (2012), *aff'd in relevant part*, 755 F.3d 236 (5th Cir. 2014)), *aff'd in relevant part*, 812 F.3d 982 (11th Cir. 2016), and similarly as "the highest and most profitable use for which [the property] is adaptable and needed or likely to be needed in the reasonably near future," *Hughes v. Commissioner*, T.C. Memo. 2009-94 (citing *Olson v. United States*, 292 U.S. 246, 255 (1934)). An owner need not actually use his property in accordance with its HBU; rather, the HBU "can be any realistic, objective potential use of the property." *Id.* (citing *Symington*, 87 T.C. at 896).

Consistent with these authorities, Clark's first step in valuing the unencumbered Property was to determine its HBU. In performing the analysis, Clark employed the criteria set out in the fourteenth edition of the Appraisal Institute's textbook, *The Appraisal of Real Estate*. Specifically, he considered what uses of the Property were (1) legally permissible, (2) physically possible, (3) financially feasible, and (4) maximally productive. Appraisal at pp. 52–54, Exhibit 7. Clark evaluated, *inter alia*, the zoning and other legal factors affecting the Property, the physical characteristics of the Property, and the feasibility of developing the Property, including the cost, market demand, and likely revenue associated with development. After visiting the Property, reviewing various supporting materials, and analyzing the relevant data, Clark determined that the Property's HBU was development as a residential community. A summary of Clark's conclusions is provided on pages 53–54 of the Appraisal, with supporting data and analysis included throughout the Appraisal's other sections.

60

2.    The Appraisal correctly estimated the "before" FMV of the unencumbered
       Property

After the determination of the unencumbered Property's HBU, the next step in the

valuation process is to estimate the FMV of the unencumbered Property using one of three

property valuation methods:  (1) the comparable sales approach, (2) the income capitalization

approach, and (3) the replacement cost approach.  *See, e.g., Hilborn v. Commissioner*, 85 T.C.

677, 689 (1985).  The comparable sales approach generally is preferred if reliable comparables

are available—otherwise, the income capitalization approach is used.[29]  *See, e.g., Whitehouse*

*Hotel*, 139 T.C. at 324 (noting that the court is not hostile to the income capitalization approach

if comparable sales are unavailable); *Schmidt v. Commissioner*, T.C. Memo. 2014-159 at 33–34

(employing the income capitalization approach where sales provided were too dissimilar); *Trout*

*Ranch, LLC v. Commissioner*, T.C. Memo. 2010-283 ("Given the lack of comparable market

sales, we agree that the income approach is the most appropriate method to value the

property. . . .  [Accordingly,] we shall . . . construct our own discounted cashflow analyses to

calculate the before and after values of the property."), *aff'd*, 493 Fed. Appx. 944 (10th Cir.

2012).

The comparable sales approach estimates the value of property based on the price of

other similar properties recently sold in the market.  Generally, comparable sales should meet

each of the following three criteria:  (1) the property sold should be similar to the subject

property, (2) the sale should be an arm's-length transaction, and (3) the sale should take place

within a reasonable time of the valuation date.  *See Butler v. Commissioner*, T.C. Memo. 2012-

72 (citing *Wolfsen Land & Cattle Co. v. Commissioner*, 72 T.C. 1, 19 (1979)).  If an insufficient

---

[29] The replacement cost method generally is used in the context of valuing structures (*e.g.*,
historic buildings), and thus is irrelevant for purposes of this discussion.

61

number of properties meets these criteria, or if insufficient data is available to assess comparability, a different approach—most commonly the income capitalization approach—is employed. *See, e.g., Trout Ranch*, T.C. Memo. 2010-283.

In estimating the value of the unencumbered land, Clark first searched for comparable sales using databases, interviews with developers, and online search tools. *See* Appraisal at p. 26, Exhibit 7. Clark was unable to identify sales that met the requisite criteria, and therefore determined that the most applicable method of valuing the Property was the income capitalization approach. *Id.* at p. 54.

The income capitalization approach, sometimes also called the subdivision development method or the land residual method, estimates the value of property based on the present value of income that the property is likely to produce in the future. *Schmidt*, T.C. Memo. 2014-159 at 24. To apply this method, an appraiser first estimates the property's future cash flows, and then calculates the present value of those cash flows based on a risk-adjusted rate of return. *See id.*; *see also Estate of Heck v. Commissioner*, T.C. Memo. 2002-34. The theory underlying this approach is that an arm's-length buyer should pay no more for a property than the present value of the property's anticipated future earnings. *See Butler*, T.C. Memo. 2012-72. As explained in the Appraisal, the component steps of this process are:

1. Estimating development expenses including direct and indirect costs;
2. Estimating the gross retail value by use of comparable sales;
3. Estimating sell-out time;
4. Discounting the proceeds from sales of the lots at an appropriate discount rate that considers the return on investment; and
5. Calculating the net present value of the income stream, after deducting all costs of development, to indicate the current value of the developed lots.

*Id.*

The Appraisal details each step of applying this process, and explains both Clark's analysis and his inputs. Specifically, Clark reviewed the Bowden Report, discussed below, met

USPROD-0846597

with its author, and verified its contents, including its pricing and cost estimates. For the costs of developing each tract, Clark interviewed a builder in the area, studied other high-rise projects, and relied on cost estimates from RS Means and Marshall and Swift, both commercial cost estimators. Appraisal, pp. 111, 114 Exhibit 7. Based on these sources, Clark estimated various other costs associated with the development, such as amenity construction, roads, utilities, compensation of sales professionals, and general overhead and taxes. After factoring in entrepreneurial profit, discount period, and the rate at which units could likely be absorbed into the market, Clark discounted the projected income stream to present value. *Id.* pp. 103–120. Based on these calculations, Clark estimated the value of the development rights to be $61,850,730. *Id.* p. 121.

Relying on an appraisal review performed by IRS Appraiser Gary McGurrin (the "McGurrin Review"), the RAR disputes Clark's "before" value of the Property on the basis that Clark failed to properly identify the Property's HBU. First, quoting the McGurrin Review, the RAR #4, at p. 2, appears to fault Clark for valuing the Property "subject to a hypothetical condition that the property was improved when, in fact, it is unimproved," with the result that "the Clark appraisal did not reflect the value of the property as of the date of contribution." The McGurrin Review returns to this theme repeatedly in its discussion of the HBU and the "before" value of the Property. *See* McGurrin Review, pp. 29–34, Exhibit 13. This position reflects a fundamental misunderstanding of the basic nature of conservation easements. The value of conservation easements is derived from *the relinquishment in perpetuity of the potential development rights in the property*, not from the value of vacant land. For this reason, Treasury

63

regulations,[30] case law,[31] and IRS guidance[32] all require an eased property to be valued at its highest and best use, rather than the property's then-current use, to determine the value of the easement. In addition, Clark included as addenda two Tax Court cases–*Trout Ranch* and *Kiva Dunes*–supporting the use of the discounted cash flow method to value the eased development rights. *See* Appraisal, pp. 225–274, Exhibit 7. The Tax Court's adoption and acceptance of the discounted cash flow method—where future *hypothetical* income streams are used to arrive at the current value of the development rights—demonstrates how the RAR's critiques are without merit. Also for this reason, analyzing market data from existing resorts was entirely appropriate,[33] while the sales of vacant land that the McGurrin Review used to determine the

---

[30] *See* Treas. Reg. § 1.170A-14(h)(3)(ii) (stating that, in applying the before and after method, the property is valued as "represented by [its] highest and best use," not as "represented by the property's current use"). Example 7 of the regulation is directly on point:

> C owns Greenacre, a 200-acre estate containing a house built during the colonial period. *At its highest and best use, for home development, the fair market value of Greenacre is $300,000.* C donates an easement (to maintain the house and Greenacre in their current state) to a qualifying organization for conservation purposes. The fair market value of Greenacre after the donation is reduced to $125,000. Accordingly, the value of the easement and the amount eligible for a deduction under section 170(f) is $175,000 ($300,000 less $125,000).

Treas. Reg. § 1.170A-14(h)(4), Example 7 (emphasis added). Critically, Greenacre's before value is not determined by the fair market value of its current state, as a large estate with one colonial-era house. Rather, the value is determined by looking to the fair market value of Greenacre as if it had achieved its highest and best use as a home development.

[31] *See, e.g., Kiva Dunes*, T.C. Memo. 2009-145 ("before" value of the land *as a hypothetical residential subdivision* was $31,938,985); *see also Trout Ranch*, T.C. Memo. 2010-283.

[32] *See, e.g.*, CCA 201319010 (May 10, 2013) (stating that "[t]he reasonable and objective possibilities for the highest and best use of the property control its value" and "[t]he fair market value of property is not affected by whether an owner has actually put the property to its highest and best use").

[33] The McGurrin Report, p. 27, criticizes the appraisal and the Bowden report for looking to existing resorts in the area for data relevant to valuing the Property before the easement. But

USPROD-0846599

before value of the Property are, in fact, not comparable: The Property must be valued at its HBU, not at its current use.

Second, the McGurrin Review criticizes Clark's reliance on the Strategic Planning Analysis conducted by Ralph Stewart Bowden, Inc. (the "Bowden Report"), which is incorporated into and attached as an addendum to the Appraisal.[34] The McGurrin Review faults Clark for relying on the Bowden Report "rather than independently developing a highest and best use analysis." McGurrin Review, p. 31, Exhibit 13. McGurrin does not explain why Clark is not allowed to consider the analysis of independent experts in developing the Appraisal; indeed, had Clark developed his HBU conclusion in a vacuum without considering any expert data, one may wonder whether the McGurrin Review would have raised the opposite critique. Further, the McGurrin Review's suggestion that Clark "perform[ed] no due diligence to verify Bowden's conclusions" is contradicted by the Appraisal itself, which describes how Clark and Bowden worked collaboratively to confirm the feasibility of certain aspects of the conceptual development. *See* Appraisal, p. 48, Exhibit 7.

Third, RAR #4, at pp. 2, 5, does not meaningfully analyze Clark's HBU determination, but instead unquestioningly adopts the HBU determination in the McGurrin Review of limited residential development. But the McGurrin Review's HBU is incorrect. For example, the

---

data from existing resorts—appropriately adjusted to account for differences—is especially pertinent in calculating the value of the Property at its HBU.

[34] Ralph Stewart Bowden Inc. is a real estate consulting firm that specializes in providing preliminary and ongoing strategic planning services based on market research and analysis to large- and small-scale master-planner, recreational-oriented developments. The firm's president, Ralph Bowden, has been providing such consulting services since 1972. *Qualifications,* BOWDEN'S MARKET BAROMETER, http://bowdensmarketbarometer.com/about-us/ (last visited September 1, 2020). The McGurrin Review notes that Bowden is "not a professional real estate appraiser," McGurrin Review at p. 29, but this is of no moment, as Bowden is not the appraiser and his conclusions were reviewed and confirmed by Clark, who is a qualified appraiser.

USPROD-0846600

McGurrin Review's determination was based, in part, on McGurrin's view that there is limited market demand for the subdivision contemplated in the Appraisal. As support for its conclusion, the McGurrin Review relies on the fact that Pelican Bay, a residential development near the Property, sold an average of fewer than two units per year since construction began in 2001. McGurrin Review, p. 39, Exhibit 13. However, as the McGurrin Review acknowledges, Pelican Bay's sales improved significantly since the end of the global financial crisis, *id.* pp. 39–40, and this trend appears to have continued to the present, with both home prices and sales and listing in the North Myrtle Beach area increasing substantially since 2014.[35] The RAR's determination about the Property's before HBU is, by its own admission, based on outdated information.

3.      The Appraisal correctly applied the "after" analysis to determine the FMV of the encumbered Property

The next step in the appraisal process is to perform the same analysis for the encumbered Property (the "after" analysis). The before and after values of the Property are then netted to determine the FMV of the contributed easement. For the reasons provided below, the Appraisal correctly appraised the after value of the Property and, ultimately, the FMV of the Contribution.

a)      The Appraisal correctly determined the "highest and best use" of the encumbered property

In performing the HBU analysis, Clark considered all of the restrictions of the Contribution and concluded that the encumbered property's HBU is forested recreational green space containing one reserved building site. Appraisal, pp. 138–40, Exhibit 7. The RAR does not address the HBU of the Property after the granting of the easement, but the McGurrin Review reaches a similar conclusion as Clark's, stating that the HBU of the encumbered property

---

[35] *See North Myrtle Beach Home Prices & Values*, ZILLOW, https://www.zillow.com/north-myrtle-beach-sc/home-values/ (last accessed September 16, 2020). The market temperature of the North Myrtle Beach real estate market is currently rated "very hot." *Id.*

USPROD-0846601

is limited residential development, with the potential for multiple homes to be constructed within the 2.66-acre building area. McGurrin Review, pp. 42–43, Exhibit 13.

> b)   The Appraisal correctly estimated the "after" FMV of the encumbered Property

Having determined the encumbered Property's HBU, Clark again endeavored to find comparable sales that were (1) similar to the Property, (2) recent, and (3) the result of an arm's-length transaction. *See Butler*, T.C. Memo. 2012-72 (citing *Wolfsen Land & Cattle Co.*, 72 T.C. at 19). Clark identified three comparable land sales in the southeastern United States that fit these criteria, each of which was fully or partially encumbered by a conservation easement. Appraisal, pp. 141–46, Exhibit 7. The tracts shared a common HBU to that of the Property, including residential-recreational based parcels that may be sold over time. *See id.* p. 141. After presenting and analyzing the comparable sales of encumbered tracts and making appropriate adjustments, Clark estimated the per acre "after" value of the encumbered Property to be $1,600 per acre. *See id.* p. 145. When combined with the valuation of the reserved lots, Clark determined that the "after" value of the Property was $198,432. *Id.* p. 146. The Appraisal determined the unencumbered Property value to be $61,850,730, and the encumbered Property value to be $198,432. Thus, the encumbered land was worth $61,652,000 less than the value of the unencumbered land. *Id.* p 152. This net amount represents the FMV of the Contribution and the amount of the deduction.

E.   Conclusion

For the reasons described above, the Appraisal correctly employed the before and after method to estimate the FMV of the Contribution. It satisfied the requirements of Treas. Reg. § 1.170A-17(a) and was performed by a "qualified appraiser" in accordance with generally

USPROD-0846602

accepted appraisal standards.  Accordingly, the Appraisal is a qualified appraisal under section 170(f)(11)(E).

## III.   Sale vs. Contribution

### A.   Introduction

As an alternative position, the RAR #2, p. 1, proclaims that the transfer of land to Arcadian Quay "was determined to be a sale and purchase of the property, not a contribution of capital."  RAR #2, p. 18, then proceeds to explain that, as a sale, "[t]he partnership's basis is the amount paid for the land when it acquired the land . . . and their [sic] holding period begins with the date of purchase."  This superficial application of the substance-over-form doctrine misses the mark, however, because the substance of the transaction is a partnership contribution and a subsequent sale of a partner's interest in the partnership—in other words, exactly the same as the transaction's form.

We depict below both the transaction as it actually happened and the RAR's proposed recast.

68

USPROD-0846603

Depiction of Actual Transaction



The RAR's Proposed Recast



69

USPROD-0846604

At bottom, the RAR seeks to transform a partnership contribution, in which Permenter and Wampee (PBH/WP in the graphics) exchanged land for an equity interest in AQ, into a sale of the land between Permenter and Wampee, as sellers, and AQ, as buyer.  In reality, however, AQ never owned (or had any control over) the approximately $3 million that the RAR claims Permenter and Wampee received from AQ in exchange for selling the land to AQ.  To get around this issue, the RAR would deem AQH to contribute the cash to AQ—before AHQ was even a partner in AQ—so that AQ could then be deemed to distribute this cash to Permenter and Wampee in exchange for the land.

The RAR's view of the "substance" of the transaction—which involves two deemed steps that never actually happened—cannot and does not better explain the transaction than the way it actually happened.  While we address below the shortfalls of the RAR's proposed recast from a technical standpoint, as a matter of commonsense, it is clear that the RAR is not focused on treating the transaction according to its substance, but rather on twisting the transaction to justify the RAR's preferred tax result.

Just as critically, the manner in which a taxpayer chooses to participate in a business venture is typically not subject to scrutiny.  *See, e.g.,* House Committee on the Budget, H.R. Rep. No. 111-443, 111th Cong., 2d Sess., 291 at 296 (2010)  (explaining that the codified economic substance doctrine is "not intended to alter the tax treatment of certain basic business transactions that, under longstanding judicial and administrative practice are respected, merely because the choice between meaningful economic alternatives is largely or entirely based on comparative tax advantages.").  As the Eleventh Circuit has explained: "There may be no tax-independent reason for a taxpayer to choose between these different ways of financing [a] business, but it does not mean that the taxpayer lacks a 'business purpose.'  To conclude

70

otherwise would prohibit tax-planning." *United Parcel Service v. Commissioner*, 254 F.3d 1014,

1019 (11th Cir. 2001). The decision to contribute, rather than sell, the land was a basic business

transaction and typical of land deals throughout the county. The RAR's challenges therefore fall

flat and do not stand upon the merits of its own erroneous and pre-determined conclusions.

      B.     The substance-over-form doctrine does not apply

      The substance-over-form doctrine cannot be used to recast the transaction because the

transaction has non-tax business purpose and economic substance. The substance-over-form

doctrine "inquires whether there is a legitimate non-tax business reason for the form; in other

words, were the parties motivated at least in part by reasons unrelated to taxes?…[, and] requires

that the agreement have non-tax 'economic substance.'" *Newman v. Commissioner*, 902 F.2d

159, 163-164 (2d Cir. 1990) (citing *Frank Lyon Co. v. United States*, 435 U.S. 561, 583-84

(1978)); *see also* section 7701(o) (codifying this doctrine). So long as these requirements are

met, "[t]he fact that favorable tax consequences were taken into account . . . on entering into the

transaction is no reason for disallowing those consequences." *Frank Lyon*, 435 U.S. at 580. The

transaction at issue squarely satisfies these requirements and therefore must be respected.

      1.     The transaction has substantial non-tax business purpose

      The contribution of the land to AQ had substantial non-tax business purpose. The

Eleventh Circuit, which would have jurisdiction over this case, has rejected a "narrow notion of

'business purpose,'" specifically recognizing that "'business purpose' does not mean a reason for

a transaction that is free of tax considerations." *United Parcel Service*, 254 F.3d at 1019; *Broun*

*v. United States*, 1992 WL 370784, at *2–*4 (M.D. Ga. Oct. 2, 1992) ("As long as there is some

motivation other than tax benefits, the transaction is not a sham.").

      Holding the land through a partnership (AQ) served various business exigencies. Despite

the RAR's assertion that AQ "did not engage in any transactions beyond the holding of the land

USPROD-0846606

title" and "was never meant to function as a self-sustaining venture," AQ was in fact engaged, and continues to be engaged, in the ongoing conduct of a business enterprise. AQ holds the land and was and is the entity responsible for carrying out the option for which the investors voted. It also engages in operational activities needed to manage the property, such as paying property taxes, monitoring the property for appreciation in value, monitoring and engaging in conservation-related activities on the land, and identifying any value-adding uses to which the reserved rights associated with the easement can be put to use. Because AQ meaningfully participated, and continues to participate, in business activities and was in no way transitory, its formation and operation as a partnership is beyond reproach. *See, e.g., Northern Indiana Public Service Co. v. Commissioner*, 115 F.3d 506, 512 (7th Cir. 1997) (holding that it was "unnecessary" and "inappropriate" to disregard the form of the subsidiary because even minimal business activity was sufficient to imbue the structure with economic substance).

Because holding the land through a partnership had a substantial business purpose, it is irrelevant whether the parties could have achieved that purpose through a different structure that would have increased their tax liabilities. *Helvering v. Gregory*, 69 F.2d 809, 810 (2d Cir. 1934) ("Any one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes.").

Further, the existence of AQ and its status as a partnership served an important role in negotiating the transaction with the sellers. Forming a partnership allowed the sellers, through SVP, to retain a 5-percent interest in the land, as well as to have an ongoing investment in AQ. This structure is extremely common in land development deals as it allows property owners a residual interest in the property so that they can benefit from back-end profit-participation rights.

72

*See, e.g.*, Meredith J. Kane, "Equity Investment in Real Estate Development Projects: A

Negotiating Guide for Investors and Developers" in *The Real Estate Finance Journal* (Spring

2001 issue), *available at* https://www.paulweiss.com/media/1962107/03-01kane.pdf.

Permenter's and Wampee's contribution of the land facilitated the existence and

operation of AQ as a going concern and permitted the sellers to retain in interest in the land and

in the partnership after the sale. Thus, there were valid and substantial business reasons for the

contribution.[36]

### 2.    The transaction meaningfully changed the parties' economic positions

The transaction also meaningfully changed the parties' economic positions. *See*

*Newman*, 902 F.2d at 163 ("The second factor requires that the agreement have non-tax

'economic substance.' We have construed that factor to require a 'change in the economic

interests of the relevant parties.'") (internal citations omitted). Upon the contribution of the land

to AQ, Permenter and Wampee no longer owned the land but rather owned an aggregate 95-

percent partnership interest in AQ. The contribution therefore effected a bona fide change in the

economic positions of the parties.

For example, the contribution meaningfully changed Permenter's and Wampee's

exposure to liability. By operation of state law, contributing the Property to a limited liability

company shifted potential liability associated with the land (e.g., a lawsuit from an accident or

environmental cleanup) to the limited liability company and away from Permenter and Wampee.

If such a liability did arise, under the partnership structure it would have been borne 95 percent

---

[36] Further, "as long as one party is motivated by non-tax considerations, . . . the form of the agreement will satisfy [the business purpose] factor." *Newman*, 902 F.2d at 163 (citing *Frank Lyon*). Thus, even if Permenter or Wampee did not have a valid business purpose (which it does), the valid business purposes of SVP, AQ, and AQH all preclude the application of the substance-over-form doctrine.

USPROD-0846608

by Permenter/Wampee and 5 percent by SVP, rather than the 100 percent liability Permenter/Wampee would have borne if it had continued to hold the land in fee simple.

In addition, by contributing the land to a partnership, Permenter and Wampee no longer had 100 percent of the potential upside and downside in the value of the land. If the value of the land were to increase, Permenter's and Wampee's allocable shares of that increase would be, after the contribution, an aggregate 95 percent instead of 100 percent. If the value of the land were to decrease, Permenter and Wampee would bear only 95 percent of the loss in value. Correspondingly, SVP had 5 percent of the upside and downside of the land through its 5 percent interest in the partnership.

Further, when AQH purchased the partnership interest from Permenter and Wampee, there was a true exchange of cash for an equity interest in a partnership. AQH, rather than Permenter and Wampee, became entitled to Permenter's and Wampee's allocable shares of the partnership assets and liabilities, including the 95 percent exposure to risk and 95 percent share of the potential upside and downside of the land. Further, under the purchase agreement for the sale of the 95-percent interest in AQ, Permenter and Wampee became entitled to various rights and subject to various obligations, such as the requirement to indemnify AQH for any loss or cost arising from an untrue representation made in the agreement. *See* Member Interest Purchase Agreement ("MIPA"), § 8(f), Exhibit 14.

The recast proposed by the RAR ignores these economic realities. Under the recast, Permenter and Wampee would immediately go from owning 100 percent of the land in the aggregate—including 100 percent of the risk, upside, and downside—to having no interest in the land. As a factual and legal matter, this is not what happened. After the contribution of the land and before the sale of their partnership interests, Permenter and Wampee had a bona fide 95

74

USPROD-0846609

percent interest in AQ and a corresponding allocable share of the risk, upside, and downside of the land. And upon the execution of the purchase agreement for the interest in AQ, the legal rights and obligations of Permenter/Wampee and AQH changed, as did the attendant economics of those rights and obligations. Recasting the transaction to rewrite reality is not a permissible application of the substance-over-form doctrine.

It is irrelevant that the RAR can imagine a different transaction (i.e., a contribution of cash by AQH followed by a sale of the land) that could have achieved a similar outcome. Indeed, the principal case on which the RAR relies for its substance-over-form position, *Helvering v. Gregory*, famously held that "[a]ny one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes." 69 F.2d 809, 810 (2d Cir. 1934). In other words, "a transaction must be given its effect in accord with what actually occurred and not in accord with what might have occurred. . . . [n]o matter how the transaction could have been devised otherwise." *Frank Lyon*, 435 U.S. at 576-77.

In short, the contribution and subsequent sale of Permenter's and Wampee's partnership interests had substantial business purpose and meaningfully changed the parties' economic positions. As discussed further below, no part of the transaction even approaches situations that have been classified as lacking economic substance or as shams. Indeed, courts have used a straightforward sale of equity as an example of a transaction with economic substance. *See Shockley v. Commissioner*, 872 F.3d 1235, 1250 (11th Cir. 2017) ("Had Petitioners simply chosen to sell their stock in a straightforward fashion, they could not be faulted for that choice even if it had been based solely on superior tax efficiency."). Because the form of the

75

transaction exactly matches its substance, the RAR's recast of the contribution as a sale of land cannot stand.

        3.    <u>Case law confirms that the substance-over-form doctrine does not apply</u>

           a)    Courts have consistently upheld analogous transactions

A robust line of cases has upheld very similar transactions, further confirming that the substance-over-form doctrine does not apply. For example, in *Holman v. Commissioner*, 130 T.C. 170 (2008), *aff'd*, 601 F.3d 763 (8th Cir. 2010), the taxpayers transferred property to a newly formed partnership and then transferred the partnership units six days later. The Tax Court held, and the Eighth Circuit affirmed, that the contribution and subsequent transfer were valid, principally because the taxpayers "bore a real economic risk of a change in value of the partnership for the 6 days that separated the transfer of [the property] to the partnership's account and the date of the" transfer.[37] *Id.* at 190; *see also Gross v. Commissioner*, T.C. Memo. 2008-221 (same result when 11 days passed between contribution and transfer because the "form of the transactions here in question accords with their substance"); *Rollins v. Commissioner*, 66 T.C.M. (CCH) 1869 (1993) ("[T]he substance of the transactions reflected the form: petitioner contributed [property] to the corporations which in fact sold the [property], and [the corporations] used the proceeds primarily to pay off bank debt. The contribution step has

---

[37] Similarly, a non-tax business purpose for a partnership contribution is not rendered invalid simply because the contribution was in effect only for a short period of time. *See, e.g.*, *Corum v. United States*, 268 F.Supp. 109 (D. Ky. 1967) ("An amount paid by a partner to a partnership at the end of the year in order to improve its financial statements for the business purpose of allowing it to bid on construction contracts was held to be a capital contribution which increased the partner's basis in the partnership even though the contribution was withdrawn shortly after the end of the year.").

USPROD-0846611

independent significance because of its nontax business purpose [i.e., facilitating the repayment of the corporations' debt]. . .").

Thus, multiple cases have upheld the very transaction at issue here (a contribution followed by a transfer of a partnership interest), and they counter the RAR's assertion that Permenter's subsequent transfer of its partnership interest somehow transforms the earlier partnership contribution into a sale. Rather, "the placing of assets into a limited liability entity such as the LLC is an ordinary and objectively reasonable business activity that makes sense with or without any subsequent" transfer. *Linton v. United States*, 630 F.3d 1211, 1224 (9th Cir. 2011). Moreover, these cases involved much shorter time periods between the contribution and subsequent transfer (as short as six days) than in the current transaction, whereas the sale of the partnership from Permenter/Wampee to AQH was not complete until nearly four months after the contribution of the Property to AQ. Thus, the RAR's emphasis on the time between the contribution and subsequent sale is simply a non-starter and not relevant to the legal analysis of the circumstances of the subject transaction.

Yet another partnership case showcases how a taxpayer's choice of form, so long as the business purpose and economic substance factors are met, is consistently respected and upheld by the courts. *Countryside Limited Partnership v. Commissioner*, T.C. Memo. 2008-3, addressed a partnership that (through two disregarded entities) borrowed money from a bank, used that money to purchase promissory notes, and subsequently distributed those notes to two partners in redemption of their interests. The Government argued that the distributions of the promissory notes lacked economic substance and should be recast as cash distributions.

The Tax Court upheld the transaction. In particular, while the court recognized that the means of accomplishing the partnership redemptions was designed to avoid tax, "those means

77

served a genuine, nontax, business purpose; viz, to convert [the partners'] investments in [the partnership] into 10-year promissory notes, two economically distinct forms of investment." As the court explained:

> In short, respondent, in finding a lack of economic substance, has erroneously focused on the tax-motivated means instead of the business-oriented end. The transaction requiring economic substance is [the partnership's] redemption of [the partners'] partnership interests therein. That the redemption of a partnership interest in exchange for bona fide promissory notes issued by an independent third party can serve a legitimate business purpose is beyond cavil. The question is whether such a redemption may be respected for tax purposes if the means undertaken to accomplish it are chosen for their tax advantage. On the facts before us, we conclude that the answer is yes.

*Id.*

In reaching its holding, the court relied on two similar cases, *Chisholm v. Commissioner*, 79 F.2d 14 (2d Cir. 1935), and *Hobby v. Commissioner*, 2 T.C. 980 (1943). In *Chisholm*, shareholders wishing to sell their shares in a corporation first contributed their shares to a partnership, and the partnership in turn sold the shares and subsequently reinvested the proceeds of the sale. Because the court determined that the taxpayers had a business purpose of "form[ing] an enduring firm which should continue to hold the joint principal and . . . invest and reinvest it," the transaction was valid and respected. In *Hobby*, a taxpayer sold its shares in a corporation and claimed the long-term capital gains rate to avoid anticipated redemptions of those shares, which would have given rise to short-term capital gains. The Tax Court upheld the transaction because the taxpayer's "primary purpose to realize the gain was a legitimate business purpose, even though it also had a collateral favorable tax effect."

These cases illustrate how a transaction that accomplishes a business objective with true economic consequences must be respected—even if the transaction could have been structured in a way that would have resulted in a higher tax liability. As the Tax Court framed the issue, the

78

focus of a transaction must be on its "business-oriented ends." Here, the contribution of land to AQ facilitated AQ's role as a business enterprise, allowed the sellers to have a continuing investment in the land and AQ, and effected a bona fide change in the parties' economic positions. The instant transaction is therefore squarely within the types of transactions consistently upheld by the courts.

<blockquote>
b)      Cases applying the substance-over-form doctrine are easily distinguishable
</blockquote>

The striking differences between the current facts and transactions that have been invalidated by courts further showcases the inapplicability of the substance-over-form doctrine here. The quintessential invalidated transactions involve artificial tax losses, circular cash flows, and/or absolutely no potential for pre-tax profit. Quite to the contrary, no part of the current transaction conjures any imaginary or purely theoretical economic effects to fabricate tax consequences. As discussed above, each step that the RAR challenges is a "real" transaction with economic consequences and imbued with business purpose. There is simply no comparison.

As one representative and well-known example, the court in *ASA Investerings Partnership v. Commissioner*, 201 F.3d 505 (D.C. Cir. 2000), invalidated a transaction designed to provide the U.S. taxpayer with artificial tax losses without the corresponding gain. Specifically, the U.S. taxpayer—motivated to shield a large anticipated capital gain from another source—formed a partnership with a foreign entity exempt from U.S. tax. The U.S. partner contributed a small amount of capital to the partnership, while the foreign entity supplied the majority of the capital. The partnership then used the capital to purchase short-term notes, and sold them several weeks later for cash and debt instruments in a manner that qualified for the installment method. The partnership reported a large gain in the year of sale (the difference

between the cash payment and small portion of recovered basis), which was allocated mostly to the foreign entity as the majority owner. The next year, the U.S. partner acquired the majority interest in the partnership, and the partnership sold the debt instruments and claimed a large loss (because the basis of the debt instruments far exceeded their value). The artificial loss was mostly allocated to the U.S. partner, but was disallowed because the court found that there had been no change to the U.S. partner's exposure to risk, ability to make a profit, or financial position (besides the artificial loss) as a result of the transaction.

The case *Wells Fargo & Co. v. United States*, 91 Fed. Cl. 35 (2010), addressed "round-tripping," another common substance-over-form scenario. In a "sale in/lease out" (SILO) transaction, the U.S. taxpayer purported to buy, for tax purposes, depreciable property from a tax-exempt entity using a non-recourse loan and then to lease the property back to the entity. Legal title or responsibility for the property did not shift. Further, the amount owed on the non-recourse loan—which purportedly generated interest deductions—and the rent payments matched in timing and amount, such that "the debt funds flow in a circle from the lender, to the taxpayer, to the tax-exempt entity, and then back to an affiliate of the lender." *Id.* In other words, nothing had changed from an economic perspective.

In *Winn-Dixie Inc. v. Commissioner*, 254 F.3d 1313 (11th Cir. 2001), a U.S. employer purchased whole life insurance policies on its employees and borrowed against those policies at a high interest rate. The interest and administrative fees outweighed the cash value of the policies, but the deductibility of the interest and fees "yielded a benefit projected to reach into the billions of dollars." The "program" could never generate a pretax profit and served no business purpose of the company. *See id.*

80

Even this quick summary of typical transactions invalidated under the substance-over-form doctrine[38] demonstrates the stark difference between "real" transactions and transactions "manufactured" for tax purposes.  Unlike these transactions, the transaction at issue had true economic effects and was undertaken for a business purpose.  That is, Permenter and Wampee actually transferred land to AQ—complete with the benefits and burdens of ownership—and actually sold their interests in AQ to AQH.  As described above, AQ actually engaged in business activities involving the land and, eventually, actually placed an easement on the property while AQH and AQ continued to operate the business.  There were none of the artificiality, paper losses, round-tripping, or other indicia frequently seen with invalidated transactions.  This is because, from start to finish, the transaction's form and substance aligned.

c)      The RAR's proposed recast is indefensible under the step transaction doctrine

In addition to its substance-over-form argument, the RAR, after describing the three well-known tests under the step transaction doctrine, invokes that doctrine in concluding that the transaction was a sale, rather than a contribution, of land.  Exam subsequently clarified that it believes that "both the end result test and the interdependence test" of the step transaction doctrine apply, but that it "has not ruled out the applicability of the binding commitment test."  It ultimately does not matter which test(s) the RAR relies on, however, because the step transaction doctrine has no application here.

The RAR, as supplemented, attempts to recast the transaction as a sale (rather than a contribution) of the land from Permenter and Wampee to AQ.  For all the reasons explained in this section, this proposed recast is indefensible.  Critically, "[e]ven if alternative explanations

---

[38] The case law sometimes refers to the "economic substance" and "sham transaction" doctrines, but at bottom all of the doctrines look to economic effects and business purpose.

USPROD-0846616

are available to account for the results of a transaction, [courts] will not disregard the form of the transaction if it accounts for the transaction at least as well as alternative recharacterizations." *Turner Broad. Sys., Inc. v. Commissioner*, 111 T.C. 315, 326 (1998); *see also* FSA 199936006 (Sept. 10, 1999) ("In order to recharacterize the transaction, there must be a logically plausible alternative explanation that accounts for all the results of the transaction."). The RAR's "alternative recharacterization" does not account for the transaction in a plausible or logical way, but rather in a manner that violates the fundamental precepts of the step transaction doctrine.

The crux of the step transaction doctrine is that steps in a transaction undertaken solely for tax purposes and otherwise unnecessary to complete the transaction may be disregarded. *See Long-Term Capital Holdings, LP v. United States*, 150 F. App'x 40, 43 (2d Cir. 2005) ("[U]nder the step transaction doctrine, a particular step in a transaction is disregarded for tax purposes if the taxpayer could have achieved its objective more directly, but instead included the step for no purpose than to avoid U.S. taxes."). In other words:

> The step transaction doctrine generally applies in cases where a taxpayer seeks to get from point A to point D and does so stopping in between at points B and C. The whole purpose of the unnecessary stops is to achieve tax consequences differing from those which a direct path from A to D would have produced. In such a situation, courts are not bound by the twisted path taken by the taxpayer, and the intervening stops may be disregarded or rearranged.

*Illinois Tool Works Inc. v. Commissioner*, T.C. Memo. 2018-121 (quoting *Smith v. Commissioner*, 78 T.C. 350, 389 (1982)); *see also Penrod v. Commissioner*, 88 T.C. 1415, 1428 (1987) (step transaction doctrine applies to "treat[] a series of formally separate 'steps' as a single transaction if such steps are in substance integrated, interdependent, and focused toward a particular result").

82

Here, the parties did not employ any meaningless step or follow a circuitous route.[39] This fact is confirmed by the RAR's proposed recast, which tellingly does not collapse, combine, or integrate any steps, or otherwise suggest a more direct path that the parties could have taken. Indeed, the proposed recast has just as many steps as the actual transaction—contravening the fundamental purpose of the step transaction doctrine to combine or collapse extraneous steps. This is because there is, quite simply, no more direct path to be taken—and the RAR's attempted recast is actually a complete distortion of the transaction. The step transaction doctrine therefore does not apply in these circumstances. *See Illinois Tool Works*, T.C. Memo. 2018-121 ("The step transaction doctrine has no application here. . . . In reality, respondent is not seeking to collapse unnecessary steps, but to recharacterize the first step. . .").

Perhaps more egregiously, the RAR does not just recharacterize steps that actually took place, but also invents entirely new steps that have no basis in reality. As "[u]seful as the step transaction doctrine may be . . . it cannot generate events which never took place just so an additional tax liability might be asserted." *Sheppard v. United States*, 361 F.2d 972, 978 (Ct. Cl. 1966). The IRS itself acknowledges that "courts have refused to apply the step transaction doctrine where its application would create steps that never actually occurred." Chief Counsel Memorandum 20123401F (Aug. 24, 2012); Private Letter Ruling 8948001 (July 21, 1989) ("Furthermore, courts have been reluctant to apply the step transaction doctrine to create steps that did not actually take place.").

As depicted above, to justify its theory that Permenter and Wampee sold the land to AQ, the RAR deems a fictional partnership contribution of cash from AQH to AQ, followed by an

---

[39] As discussed above, each step had a business purpose and was imbued with economic substance.

USPROD-0846618

equally fictional distribution of that cash from AQ to Permenter and Wampee. Neither of these steps actually happened. AQH did not make a contribution of cash to AQ, and AQ did not have the cash to distribute to Permenter and Wampee in exchange for the land. The RAR may not ignore transactions that actually occurred—a contribution of land and a sale of a partnership interest—in favor of its own fictional steps invented "in order to deny a legitimate tax consequence." *Turner Broadcasting*, 111 T.C. at 326.

The RAR's approach to this transaction strongly resembles the Government's position in the seminal case *Esmark, Inc. v. Commissioner*, 90 T.C. 171 (1988), *aff'd without published opinion*, 886 F.2d 1318 (7th Cir. 1989). In that case, a taxpayer had sold stock in a corporation to an unrelated buyer, and the buyer immediately redeemed the stock of that corporation in exchange for stock of a subsidiary of the purchased corporation. The Government argued that, because the buyer had intended from the beginning to directly hold the subsidiary stock, the step transaction doctrine should apply to disregard the buyer's ownership of the corporation that it had purchased. Specifically, the Government would have recast the transaction as a sale of the subsidiary stock to the buyer followed by a self-tender. *Id*. at 196.

Just as the RAR is attempting to do here, the Government in *Esmark* (1) "pointed to no meaningless or unnecessary steps that should be ignored" and (2) argued for a "recharacterization [that] does not simply combine steps; it invents new ones." *Id*. at 195-96. With respect to the first point, the court explained how the parties had three options to reach the intended result and that "[n]o route was more 'direct' than the others." *Id*. at 196. Specifically: "Each route required two steps, and each step involved two of three interested parties. Each route left petitioner, petitioner's shareholders, and the purchaser in the same relative positions. Faced with this choice, petitioner chose the path expected to result in the least tax." *Id*.

84

Similarly, the RAR's proposed recast uses the same number of steps and the same parties as the actual transaction and does not offer a more direct route within its final analysis. With respect to the second point, just as the *Esmark* court would not permit the Government to create a sale of the subsidiary and a self-tender offer—neither of which actually occurred—the RAR may not create a fictional contribution and distribution in this case. As the *Esmark* court clearly and concisely explained: "Courts have refused to apply the step-transaction doctrine in this manner." *Id.* (citing cases); *see also Grove v. Commissioner*, 490 F.2d 241 (2d Cir. 1973) ("Were we to adopt the Commissioner's view, we would be required to recast two actual transactions. . . into two completely fictional transactions. . . . Based upon the facts as found by the Tax Court, we can discover no basis for elevating the Commissioner's 'form' over that employed by the taxpayer in good faith.").

Courts have frequently rejected attempts to apply the step transaction doctrine in analogous circumstances. Notably, the Fifth Circuit in *G.M. Trading Corp. v. Commissioner*, 121 F.3d 977 (5th Cir. 1997), rejected the application of the step transaction doctrine to very similar facts. In *G.M. Trading*, G.M. had purchased debt from a bank for $600,000, and subsequently resold that debt to the Mexican Government in exchange for property that the Government transferred directly to one of G.M.'s subsidiaries. The court rejected a recast of the transaction as a contribution of the $600,000 from G.M. to the subsidiary, followed by the subsidiary's purchase of the property from the Government. Citing *Esmark*, *Grove*, and *Sheppard*, the court held that this application of the step transaction doctrine would impermissibly create new steps because G.M. was the entity who had paid the bank and because the subsidiary "*never had possession of that money.*" *Id.* at 979 n.2 (emphasis added). Just as in *G.M. Trading*, the step transaction doctrine cannot be applied here to conjure a contribution that

85

did not occur (i.e., the purported contribution of cash from AQH to AQ) followed by a sale when the would-be purchaser never had possession of the money (i.e., the proposed purchase of land by AQ from Permenter and Wampee).

Finally, the case cited in the RAR as supportive of its step transaction theory does not actually sustain its erroneous conclusions, *Margolis v. Commissioner*, 337 F.2d 1001 (9th Cir. 1964). That case involved the application of the step transaction doctrine to a transaction in which a taxpayer contributed land to an otherwise dormant corporation "that served no business purpose and performed no business function." *Margolis v. Commissioner*, T.C. Memo. 1962-86, *aff'd in relevant part*, 337 F.2d 1001 (9th Cir. 1964). Unlike the corporation in *Margolis*, AQ operated as a going concern after the sale to AQH and was in no way transitory. In fact, AQ is at the core of the RAR's proposed recast as the holder of the land—not an irrelevant entity like the corporation in Margolis. The RAR therefore has not identified any relevant case law that supports its position, and the proposed recast cannot be sustained.

> d)    Permenter and Wampee were bona fide partners of AQ

Despite the RAR's contentions, Permenter and Wampee were bone fide partners of AQ. Section 721(a) provides the operative rule of partnership contributions: "No gain or loss shall be recognized to a partnership or to any of its partners in the case of a contribution of property to the partnership in exchange for an interest in the partnership." Permenter and Wampee contributed the land to a partnership, AQ, and received in exchange only a partnership interest in AQ. Under these straight-forward facts, the statute is satisfied. *See also Johnston v. Commissioner*, 3 T.C. 799 (1944) (contribution of capital to partnership sufficient to uphold member's status as a bona fide partner).

Disregarding the plain language of section 721, the RAR #2, p. 19, asserts that Permenter and Wampee "never were valid partners in" AQ and that "[a]s a result, the transfer of the

86

Property by Permenter Brothers Holdings, LLC and Wampee Plantation Limited Partnership to the Taxpayer is akin to a transaction between a partnership and an unrelated party (i.e., a sale)." The RAR bases this conclusion on its assertion that Permenter and Wampee did not have meaningful potential upside or risk in the partnership. In other words, according to the RAR, Permenter and Wampee were not true owners of a partnership interest in AQ. An analysis of the facts as set forth above, however, clearly demonstrates that all relevant indicia of ownership were present and therefore that Permenter and Wampee were indeed bona fide partners in AQ.

For tax purposes, a taxpayer is the owner of property if, based on all the facts and circumstances, the taxpayer enjoys the benefits and bears the burdens of owning the property. *See, e.g.*, *Corliss v. Bowers*, 281 U.S. 376, 378 (1930). In a seminal tax ownership case, the Tax Court in *Grodt & McKay Realty Inc. v. Commissioner*, 77 T.C. 1221, 1737-38 (1981), set forth factors to consider in determining the benefits and burdens of ownership. These factors are the benchmark for determining the owner of property for tax purposes, including the owner of equity interests in business entities. *See, e.g.*, *H.J. Heinz Co. v. United States*, 76 Fed. Cl. 570 (2007). The factors are: (i) whether legal title passes; (ii) how the parties treat the transaction; (iii) whether an equity interest was acquired in the property; (iv) whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; (v) whether the right of possession is vested in the purchaser; (vi) which party pays the property taxes; (vii) which party bears the risk of loss or damage to the property; and (viii) which party receives the profits from the operation and sale of the property. *Grodt*, 77 T.C. 1221, 1737-38.

The RAR concentrates on the last two of these indicia, i.e., bearing the risk of loss and benefiting from potential upside. Both demonstrate, however, that Permenter and Wampee were

USPROD-0846622

valid owners of, and partners in, AQ. Permenter and Wampee had both the meaningful potential

for profit as well as the risk of loss with respect to their interest in AQ.[40]  Critically, after

Permenter and Wampee contributed the land in exchange for a partnership interest in AQ, they

were entirely exposed to all fluctuations in the value of AQ. That is, through its ownership of the

partnership interest, they bore the risk of AQ losing value and enjoyed the potential benefit of

AQ appreciating in value. *Cf. Wells Fargo & Co. v. United States*, 91 Fed. Cl. 35 (2010)

(taxpayer "did not acquire the benefits and burdens of ownership, because it was never subject to

increases or decreases in asset value" and "[a]t all times, [a different] entity retained the risk of

fluctuation in asset value"); *see also, e.g.*, PLR 9104043 ("true owner" of stock was the

shareholder who "will benefit from future growth in the loss corporation and will bear the burden

of future losses"). Indeed, the RAR concedes that the value of Permenter's and Wampee's

partnership interests in AQ appreciated and that they benefitted from this appreciation by selling

their partnership interests for an amount greater than its initial contribution. *See* RAR #2, p. 19;

*see also Holman v. Commissioner*, 130 T.C. 170 (six days between contribution and transfer of

partnership interest sufficient to expose partners to bona fide risk of ownership).

Permenter's and Wampee's exposure to the risks and benefits of being a partner is further

confirmed by looking to what they would receive in a hypothetical liquidation of AQ. If AQ

were to liquidate while Permenter and Wampee were partners, they would be entitled only to

their allocable share of the partnership assets, whether the value of that share was more or less

---

[40] Permenter's and Wampee's interests in AQ also met the other relevant indicia of ownership.
Permenter and Wampee held legal title to the partnership interest, all of the parties treated the
transfer as a partnership contribution, and they acquired an equity interest in the partnership. *See
Anschutz Co. v. Commissioner*, 664 F.3d 313, 326 (10th Cir. 2011) (An equity exists when a
"purported [owner] of property has an interest in the property that he cannot prudently
abandon.") (internal citation omitted).

88

than the value of their original investment in the partnership. This is the very definition of participating in the upside and risk in a business entity. *See, e.g.*, Rev. Proc. 93-27, 1993-2 C.B. 343 ("A capital interest [in a partnership] is an interest that would give the holder a share of the proceeds if the partnership's assets were sold at fair market value and then the proceeds were distributed in a complete liquidation of the partnership. This determination generally is made at the time of receipt of the partnership interest.").

The RAR relies on *Historic Boardwalk* for its position that Permenter and Wampee were not bona fide partners in AQ. As a threshold matter, we underscore that the Tax Court in that case held in favor of the taxpayer and concluded that the corporation at issue was a bona fide partner in the partnership. *See Historic Boardwalk Hall, LLC v. Commissioner*, 136 T.C. 1, 27-30 (2011), *rev'd*, 694 F.3d 425 (3d Cir. 2012). Because AQ is not located in the Third Circuit, the Tax Court's opinion is the controlling law in this case notwithstanding the Third Circuit's reversal of that decision. *See Golsen v. Commissioner*, 54 T.C. 742 (1970) (Tax Court follows its own precedent unless "a Court of Appeals decision [] is squarely in point where appeal from our decision lies to that Court of Appeals and to that court alone."), *aff'd*, 445 F.2d 985 (10th Cir. 1971).

Nevertheless, *Historic Boardwalk* is not even persuasive—much less precedential—authority here because the transaction at issue in that case is wholly distinguishable. The Third Circuit held that the corporation was not a bona fide partner because the corporation was *guaranteed* to receive tax credits in an amount at least equivalent to its contributions and, in the event of an IRS disallowance of the tax credits, was *guaranteed* the cash equivalent of the credits, plus penalties, interest, legal expenses, and a true-up for any income tax owed. *See Historic Boardwalk*, 964 F.3d at 456. Moreover, the corporation was entitled to a 3 percent

89

USPROD-0846624

preferred return on its contributions and "had the ability to ensure that it would eventually receive" such return. *See id.* at 458. There was also no risk of a failure to complete the project giving rise to the tax credits because the project was fully funded before the corporation was obligated to make any contributions. *See id.* at 455. Nor did the corporation have an opportunity for equity appreciation because the corporation's interest was subordinated such that there was "forecasted no residual cash flow available for distribution" to the corporation. *See id.* at 460. Thus, there was a complete absence of risk or the potential for upside.

Other prominent cases in which a court has found a partner not to be a bona fide equity holder share similar facts to those in *Historic Boardwalk.* For example, in *Chemtech Royalty Associates v. United States*, 766 F.3d 453 (5th Cir. 2014), the Fifth Circuit found that foreign banks were not bona fide partners where they received a fixed annual return on their investment regardless of the success of the business; the other investor bore all "non-insignificant risks"; the partnership agreement "included four significant 'ironclad' assurances to ensure that [the other investor] would not misappropriate or otherwise lose the banks' initial investment"; and the contributed property was not expected to increase in value. Similarly, in *TIFD III-E, Inc. v. United States*, 459 F.3d 220, 239 (2d Cir. 2006) (colloquially known as *Castle Harbour*), an equity investment in a partnership was not respected where the purported investors would receive an annual return irrespective of the successes or failures of the partnership and had "an ironclad assurance that they would receive repayment of their principal at the Applicable Rate of return, regardless of the success of the Castle Harbour venture." *See also Southgate Master Fund, LLC v. United States*, 659 F.3d 466 (5th Cir. 2011); *ASA Investerings Partnership*, 201 F.3d 505 (investors were not partners where there was a pre-arranged agreement to compensate one investor for its funding costs and no potential for another investor to make any profit); *WB*

*Acquisition, Inc. v. Commissioner*, T.C. Memo. 2011-36 (investors were not true partners where a profit cap limited their share in the profits), *aff'd sub nom. DJB Holding Corp. v. Commissioner*, 803 F.3d 1014 (9th Cir. 2015).

The core thread throughout these cases, including *Historic Boardwalk*, is that the purported partners could not lose their initial investment, did not bear any other risk of loss, were guaranteed a fixed return regardless of the status of the business, and/or had no opportunity for profit in excess of their guaranteed return. Not one of these factors applies to Permenter's or Wampee's interest in AQ. As discussed above, Permenter and Wampee contributed capital (i.e., the land) in exchange for an equity interest in AQ, and at that point their investment was entirely dependent on the value of the partnership interests. There was no guaranteed return or "assurance" that they would not incur a loss. In other words, Permenter and Wampee had a true equity interest in AQ.

The RAR also appears to suggest that Permenter and Wampee were not bona fide partners because of the length of time between their becoming partners and selling the partnership interest. Yet the RAR does not cite any authority—nor could it—for the proposition that a partner must hold its interest for a specific length of time to be a valid partner.[41] "Rather, the issue is whether the 'transaction, *as it stands at the time in question*, sufficiently shifts the benefits and burdens of ownership.'" *Wells Fargo*, 91 Fed. Cl. at 76 (quoting *Kwiat v. Commissioner*, 64 T.C.M. (CCH) 327, 1992) (emphasis added). Indeed, as discussed above, courts have upheld transactions where a partner contributed property and then sold its

---

[41] Notably, unlike section 351, section 721 has no requirement that an investor must have control "immediately after" a contribution for the contribution to be respected.

91

partnership interest within a much shorter timeframe. *See, e.g., Holman v. Commissioner*, 130 T.C. 170 (six days between contribution and transfer of partnership interest was respected).

Although courts have disregarded a purported equity holder's interest where that interest was merely "transitory" or "notional," that is not the case here. Permenter and Wampee obtained true risk of loss and potential upside in AQ and was under no obligation to sell their partnership interests at the time of contribution. Nor was AQH—an unrelated party—under any compulsion to buy Permenter's or Wampee's interest in AQ. *See H.J. Heinz Co. v. United States*, 76 Fed. Cl. 570 (2007) (respecting shareholder's interest in stock where shareholder benefitted from appreciation in the two months that the shareholder held the stock, and where the shareholder was under no preexisting obligation to dispose of the profits); *cf.* CCA 201507018 (organization was not a partner in a partnership where it was "essentially compelled to engage in" a transaction whereby its interest could be redeemed at any time). As discussed above, Permenter and Wampee did in fact benefit from the appreciation of the partnership interest that occurred during their ownership. Further, and contrary to the RAR's assertion that AQ "was never meant to function as a self-sustaining venture," AQ's existence as an operating partnership continued after Permenter's and Wampee's sale of the partnership interests—and the sellers continued to participate in the ownership of AQ. Thus, neither Permenter's or Wampee's partnership interest nor AQ itself can be disregarded as transitory. *See* Treas. Reg. § 1.704-1(e)(2)(iii) (indirect control of partnership treated as direct control in determining ownership of partnership).

Finally, the RAR's position that Permenter and Wampee were not bona fide partners but rather sold the land to AQ results in an impossibility. If Permenter and Wampee were not considered partners, then AQ could not exist as a partnership. *See* Treas. Reg. § 301.7701-3(a) (at least two persons required for a partnership). The RAR would cure this fatal flaw by deeming

92

AQH to be a partner in AQ through a deemed contribution of cash. But this would require inventing and reordering steps, which as discussed above is impermissible in recasting a transaction. Thus, the RAR offers no legal or statutorily viable alternative method to recast the transaction.

## IV.    Fair Market Value Is Not Calculated Based on Purchase of Partnership Interest

As an additional alternative argument, RAR #3 takes the position that the conservation easement should be valued by reference to the amount AQH paid to acquire its interest in AQ. This argument is flawed. Under the applicable regulations and case law, conservation easements are not valued based on the value of acquired partnership interests or based on the assets held by a partnership. Rather, conservation easements are valued based on the difference between what the value of the land would be if it were in its highest and best use state before and after the easement is placed. In any event, the fair market value of land cannot be determined based on one sale between private parties.

### A.    The methodology for valuing conservation easements and fee simple interests in land are not interchangeable

RAR #3 conflates the methodology for valuing a conservation easement with the methodology for valuing a fee simple interest in land. These interests are distinct, and the methodologies for valuing these interests are not interchangeable.

The RAR's position asserts that the value of the land is no different than the value of the conservation easement eliminating in perpetuity the rights to develop the land. This position is wholly inconsistent with the regulations under section 170. Those regulations provide that, with respect to conservation easements, the interest being valued is the "perpetual conservation restriction at the time of the contribution." Treas. Reg. § 1.170A-14(h)(3)(i), (ii). In other words, the value of the easement itself must be determined. Where no comparable sales of

USPROD-0846628

easements are available, easements are valued based on a comparison of the property before contribution and after contribution of the easement. Critically, the before and after values must assume the property is in its highest and best use state. Treas. Reg. § 1.170A-14(h)(3)(ii).

This is black letter law: The present value of the property at its hypothetical highest and best use—not in its current state—is used to determine the value of the easement. As the Tax Court has phrased the inquiry: "[T]he realistic, objective *potential* uses for property control the valuation thereof." *Johnston v. Commissioner*, T.C. Memo. 1997-475 (emphasis added) (internal citations omitted). It is irrelevant whether the property's owner intends to use the property in accordance with its highest and best use. "The fair market value of an easement is based upon the highest and best use of the property on the valuation date, and value is not affected by whether the actual owner actually has put the property to its highest and best use." *Clemens v. Commissioner*, T.C. Memo. 1992-436.

For example, in *Kiva Dunes Conservation, LLC v. Commissioner*, T.C. Memo. 2009-145, the Tax Court determined that the land upon which a conservation easement had been placed had a highest and best use, before the granting of the easement, as a residential subdivision. The value of the land *as a hypothetical residential subdivision* was $31,938,985. After the granting of the easement, the property's highest and best use was the continued operation of a golf course. The value of the land as a golf course was $2,982,981. The difference between these two figures was the value of the conservation easement. The fair market value of land at its highest and best use state, not the current state, was the relevant metric in determining the value of the easement. This valuation methodology has been consistently and *repeatedly* upheld by the courts.[42] Thus,

---

[42]     *See, e.g., Palmer Ranch Holdings Ltd v. Commissioner*, 812 F.3d 982, 986-87 (11th Cir. 2016) ("Partly because the tax court held that B–10's highest and best use was MDR-level

USPROD-0846629

the RAR's position ignores not only the regulations, but literally decades of well-settled jurisprudence.

      B.      <u>Amount paid for partnership interest is not proof of fair market value of land</u>

      Additionally, RAR #3 mistakes the consideration paid in a private sale of a partnership interest as necessarily equal to the fair market value of that partnership's asset. Consideration and market value, however, are distinct concepts. Moreover, there is no requirement that private parties transact at fair market value. As one court has described a similar situation: "The government is attempting to equate the venerable 'willing buyer-willing seller' test of fair market value . . . with the proper test for adequate and full consideration . . . . This conflation misses the mark." *Kimbell v. United States*, 371 F3d 257, 266 (5th Cir. 2004).

      Market value is only one type of value, and the consideration paid for property need not be keyed to any particular type of value. Market value is "based on *objective* observation of the *collective* actions of the market." The Appraisal Institute, *The Appraisal of Real Estate* (12th ed. 2007) p. 21 (emphases added). Other types of value include use value, limited-market value, going concern value, and investment value. Whereas market value focuses on an objective, collective opinion about value, investment value, for example, "represents the value of specific property to a particular investor." *Id.* at 26. It is inappropriate to presume that the sale of

---

development, the tax court deemed Durrance's MDR-predicated appraisal ($25,200,000) to be 'more accurate' than Page's lower-use figure ($7,750,000)."); *Stanley Works v. Commissioner*, 87 T.C. 389 (1986) ("We are satisfied that, at the time the easement was conveyed to the HVA, there was a reasonable probability the Stanley Works property would be developed as a pumped storage plant in the reasonably near future. Therefore, the value of the property before the gift of the easement should reflect that potential special use."); *Trout Ranch, LLC v. Commissioner*, T.C. Memo. 2010-283, *aff'd*, 110 AFTR 2d 2012-5621 (10th Cir. 2012) ("We find that Gunnison Riverbanks Ranch was worth $4.45 million (as a 40-lot residential subdivision) before the imposition of the conservation easement and was worth $3.89 million (as a 21-lot shared ranch) after the imposition of the conservation easement. The value of the conservation easement is the difference: $560,000 (and we so find).").

USPROD-0846630

Permenter's and Wampee's interests in AQ was based on market value of the Property rather than on other metrics of value.

A defining feature of market value, as stated above, is that it is based on objective and collective data. The RAR attempts to determine the fair market value of the Property based on one sale—the sale of the partnership interest to AQH. The sales comparison approach to determining fair market value, however, is appropriate only where "there are sufficient recent, reliable transactions to indicate value patterns or trends in the market." *Id.* at 419. The objective and collective opinion of value—the foundation of market value—cannot be determined by one sale. Market value must "reflect the price judgment of an average, reasonable, or hypothetical buyer and seller, rather than the views of the actual taxpayer or some other particular owner of the property in question." Bogdanski, *Federal Tax Valuation*, ¶2.01[2][c][ii]. Accordingly, even if the value of the conservation easement were equal to the fair market value of vacant land not taking into consideration its highest and best use (which it is not), such value cannot be established by one sale of the Property by private parties.

Another reason why fair market value cannot be established by one sale is that parties are not obligated to transact at market value. "Exchanges do not always occur at fair market value." *Kohler Co. v. United States*, 247 F. Supp. 2d 1083, 1091-1092 (ED Wis. 2003), *aff'd*, 468 F.3d 1032 (7th Cir. 2006). There are a variety of reasons why the consideration exchanged in a sale would not equal fair market value. In addition to the other types of valuation mentioned above, parties often depart from objective indicia of value for subjective reasons, such as economic compulsion or a desire to complete a transaction quickly. For example, here the seller desired to retain an interest in the land. "[E]ven putting subjective judgments aside, the value of an asset to

96

a person in the actual owner's shoes may not constitute fair market value." Bogdanski, ¶2.01[2][c][ii].

For these reasons, the consideration paid by a taxpayer does not establish a property's fair market value. "In valuing property for federal tax purposes, the judgment of the market clearly prevails over that of the taxpayer." *Id.* Indeed, "[l]ooking beyond the taxpayer himself or herself, the opinion or attitude of *any* single individual is unlikely to control the willing buyer-willing seller analysis, unless there is evidence that others would share the same view." *Id.* The fair market value of the conservation easement cannot be gleaned from the consideration paid for the AQ partnership interest.

    C.    <u>The policy underlying section 170(e) does not limit the amount of the deduction</u>

Finally, RAR #3 asserts that the policy underlying section 170(e) limits the deduction to the amount that AQH paid for the partnership interest in AQ. Section 170(e) reduces a charitable contribution of property by the amount of gain that would not be not long-term capital gain if the property were sold (i.e., ordinary or short-term capital gain).

RAR #3 does not contend that section 170(e) applies because a sale of the Property would have resulted in ordinary or short-term capital gain.[43] Rather, RAR #3, pp. 3-4, quotes the legislative history of section 170(e) and states that, from the legislative history, "[i]t is clear that Congress was concerned with gifts of significantly appreciated property." Then, without concluding that section 170(e) actually applies, RAR #3, p. 5, concludes that "[u]sing the investors' purchase amount to set an upper limit on the fair market value of the conservation easement also addresses the concerns of Congress regarding the potential lack of charitable intent in the donation of significantly appreciated property."

---

[43]    RAR #2 makes this argument and, as explained above, is incorrect.

USPROD-0846632

In essence, the RAR attempts to create a rule that a charitable contribution of property is limited to the basis in such property. To be clear, there is no such law. Rather, section 704(d)(3)(B), in codifying Revenue Ruling 96-11, explicitly provides the opposite: That a partner's charitable deduction is not limited to outside basis in a partnership making a charitable contribution in excess of the partner's basis. Even recent legislative proposals to limit charitable contribution deductions do not go as far as the RAR. *See, e.g.*, S. 170, Charitable Conservation Easement Program Integrity Act of 2019 (proposing to limit the amount of a partnership's conservation easement deduction to 2.5 times an investor's outside basis in the partnership for the first three years an investor is a partner in the partnership). It should go without saying that the RAR may not take the policy behind a Code section that does not apply to a taxpayer to invent new law.

## V.    The Penalty RAR erroneously asserts that penalties apply

### A.    The penalty for substantial or gross valuation misstatement does not apply

The Penalty RAR, p. 1, proposes the application of a 40% gross valuation misstatement penalty, asserting that the value of the property claimed is significantly more than the amount determined to be the "correct" amount of such valuation. In the alternative, the Penalty RAR argues that if the gross valuation misstatement does not apply, then the substantial valuation misstatement penalty applies. *Id.*

The Penalty RAR mistakenly asserts the applicability of both of these penalties. First, and as a threshold matter, because Clark properly valued the Property, there is no valuation misstatement. As explained above, the Easement value was determined based on the HBU of the Property. In the Appraisal, Clark details how he determined the Property's HBU and then estimated the FMV of the unencumbered Property using the appropriate estimation methodology to arrive at an accurate result.

98

USPROD-0846633

Second, and despite the RAR's assertion otherwise, a reasonable cause and good faith exception applies in substantial valuation misstatement cases, provided that the appraisal in question is a qualified appraisal and "the taxpayer made a good faith investigation of the value of the contributed property." *See* section 6664(c)(3)(A); Treas. Reg. § 1.6664-4(h).  AQ relied not only on the Appraisal, but also made its own investigation of the value of the contributed property through the engagement of multiple independent valuation groups to confirm the value associated with the development option on which the HBU of the Property was predicated. Specifically, AQ engaged Raymond Veal to perform an independent evaluation of the Appraisal. Appraisal Review, Exhibit 8.  In addition, AQ sought external review and confirmation of Veal's Appraisal Review by retaining Sirote & Permutt, P.C.  Independent Appraisal Review Legal Opinion, Exhibit 9.  Finally, and as discussed at length above, AQ independently reviewed and confirmed the value of the Property when it evaluated and confirmed the validity of the development investment option. *See e.g., Whitehouse Hotel Ltd. P'ship v. Commissioner*, 755 F.3d 236 (5th Cir. 2014) (reversing the Tax Court and holding that no penalty applied where the taxpayer had obtained a qualified appraisal, analyzed that appraisal, commissioned a second appraisal, and submitted a professionally prepared tax return, which was sufficient to show a good faith investigation).  Thus, AQ clearly satisfies the reasonable cause exception.

In general, the determination of whether a taxpayer acted with reasonable cause is made on a case-by-case basis, taking into account all facts and circumstances. *See* Treas. Reg. § 1.6664-4(b).  One of the facts and circumstances to be taken into account is whether the taxpayer reasonably relied in good faith on competent advisors and professionals, such as the opinion of a professional tax advisor, as to the treatment of the taxpayer under Federal tax law. *See* Treas. Reg. § 1.6664-4(c); *see also Dunlap v. Commissioner*, T.C. Memo. 2012-126, 2012

99

WL 1524660 at *29-*30 (reliance on qualified appraisal prepared by qualified appraiser constituted reasonable cause); *1982 East, LLC v. Commissioner*, T.C. Memo. 2011-84, 2011 WL 1398804 at *11 (considering taxpayer's appraisal as evidence of reasonable cause and good faith); *Evans v. Commissioner*, T.C. Memo. 2010-207, 2010 WL 3735709 at *10.

In *Dunlap*, the appraisal attached to the return demonstrated that the taxpayers had provided all relevant information to the appraisers, and the appraisal was consistent with the requirements imposed by the Treasury regulations in valuing charitable contributions. As observed by the Tax Court, "petitioners provided necessary and accurate information to [the appraiser] (in allowing him to inspect both the interior and exterior of [the property] as part of the appraisal)." T.C. Memo. 2012-126, 2012 WL 1524660 at *29. These appraisal reports, coupled with the taxpayer's testimony, established that the taxpayer reasonably relied in good faith on these advisors. *Id.* Similarly, AQ provided Clark with all relevant information associated with the conservation easement donation for Clark to conduct his appraisal. And, as discussed, the Appraisal was a qualified appraisal performed by a qualified appraiser.

Taxpayers may rely on advisors who have expertise and familiarity in the area of conservation easements. *See, e.g., Butler*, T.C. Memo. 2012-72, 2012 WL 913695 at *58 (reasonable cause existed where taxpayer demonstrated, inter alia, reliance on conservation advisory service that assisted the taxpayer in selecting qualified appraisers); *see also Atkinson*, T.C. Memo. 2015-236, at *57-*58 (reliance on land trust, qualified appraiser, and taxpayer's testimony of good faith investigation of value constituted reasonable cause). In this case, AQ also relied on NALT to provide a baseline report based on a conservation easement project proposal and that discussed the condition of the Property at the time of the easement gift to NALT. NALT has extensive familiarity with conservation easements, and its conservation

100

biologist looked at the Property in depth and produced baseline documentation of the conservation values.

AQ's reliance on the above advisors and professionals was reasonable. Taking the totality of the circumstances into account, the education and sophistication in the Manager of the Tax Matters Partner for AQ, Robert M. McCullough, is an important consideration in determining whether AQ's reliance was reasonable. While Mr. McCullough had adequate knowledge of real estate investment opportunities, he had only recently begun working in the conservation easement space, had no prior experience with respect to conservation easements in his professional background, and had little knowledge of the requirements and intricacies of section 170(h). Neither his education nor his practical experience gave Mr. McCullough any reason to second-guess professional tax advice regarding the structure of AQ, its conservation easement donation, or the manner in which it was reported on the tax return.

In conclusion, AQ reasonably and in good faith relied on (1) the Appraisal; (2) Veal's independent assessment of the Appraisal; (3) the external appraisal review by Sirote & Permutt, P.C.; (4) the documentation provided by NALT; and (5) its own independent due diligence and analysis.

B.      The penalty for a reportable transaction understatement does not apply

The Penalty RAR, p. 2, contends that if the substantial understatement of income tax penalty does not apply, then the reportable transaction understatement penalty should be imposed, which applies to a reportable transaction if a significant purpose of the transaction is

USPROD-0846636

the avoidance or evasion of Federal income tax. Notably, AQ timely disclosed the transaction; therefore the penalty rate is 20%, rather than 30%.

AQ participated in a syndicated conservation easement as described in Notice 2017-10, which applies to transactions entered into on or after January 1, 2010, but the Penalty RAR is erroneous on all conclusions.

First, and as described above, there is no understatement of tax and so this penalty is improperly asserted. Participating in a listed transaction is not per se impermissible as the RAR appears to insinuate, and no penalty can arise if there is no understatement of tax. Moreover, even if an understatement of tax existed, that by itself does not mean the transaction was entered into for tax avoidance purposes. Finally, as discussed above, AQ demonstrated that there was substantial authority for its tax treatment of the charitable donation.

C.    The penalty for negligence or disregard of rules and regulations does not apply

In conjunction with the reportable transaction understatement penalty, the Penalty RAR, p. 4, argues for the application of an accuracy-related penalty on the underpayment of tax attributable to negligence or disregard for rules. In this regard, the Penalty RAR, p. 5, asserts that AQ and its investors "failed to make a reasonable attempt to ascertain the correctness of a deduction which would seem to a reasonable and prudent person to be 'too good to be true' given that the deduction was almost 20 times the amount of investors' investment." In essence, the Penalty RAR merely reasserts its prior baseless allegations regarding the value of the Property and concludes that if one penalty does not apply, another one must. For the same reasons discussed above, none of the assertions made by the RAR is accurate, logical, or convincing in the face of the facts.

In addition, by its very definition, the negligence or disregard of rules penalty is simply inapplicable in this case. For an underpayment of tax to be negligent, the taxpayer must fail to

102

USPROD-0846637

make a reasonable attempt to comply with the provisions of the Code or must fail to exercise ordinary and reasonable care in preparing its tax return. Treas. Reg. § 1.6662-3(b)(1). The term "disregard" includes "any careless, reckless, or intentional disregard" with respect to the Code, Treasury regulations, revenue rulings, or notices published in the Internal Revenue Bulletin. Section 6662(c); Treas. Reg. § 1.6662-3(b)(2). "Carelessness" is indicated by a lack of reasonableness diligence when a position is "contrary" to a rule or regulation. *Id.* "Recklessness" is indicated by a lack of effort to determine whether a rule or regulation exists, in a "substantial deviation from the standard of conduct that a reasonable person would observe." *Id.* "Intentionality" is indicated if the taxpayer knowingly disregards a rule or regulation. *Id.*

AQ does not meet either of the definitions for "negligence" or "disregard." First, AQ did not fail to make a reasonable attempt to comply with the Code. As discussed in detail above, AQ made every effort to meticulously comply with each requirement, obtaining not just the requisite documentation but additional verification, and working in cooperation with many professionals and advisors at each stage.

Second, AQ did not engage in a careless, reckless, or intentional disregard of the rules and regulations. There can be no penalty for a disregard of the rules or regulations here because the taxpayer has directly complied with *every* applicable rule or regulation. AQ sought the proper approvals, painstakingly documented its compliance with each rule, and did not act or behave in a cavalier manner toward the requirements set forth in the Code. RAR #1 contends that the Appraisal overstates the value of the Easement, but in fact, AQ went well beyond what was required by the Code and retained multiple independent valuation groups to confirm the valuation prepared by Clark. The RAR collectively suggests that AQ should have done more to determine the accurate value of the land, but the Code itself requires substantially less than the

USPROD-0846638

diligence effected by AQ, and the RAR does not, and cannot, identify a single example of what more could have been done to ascertain the correct value of the Property. Indeed, given the documentation and information provided in the RAR, significantly less review, independent or otherwise, went into the RAR's erroneous appraisal report than with AQ's own.

Additionally and despite the RAR's unsupported assertions masquerading as fact, AQ may avail itself of both the reasonable basis standard and the reasonable cause and good faith exception. A return position with reasonable basis is not attributable to negligence. *See* Treas. Reg. § 1.6662-3(b)(1). As discussed above, AQ meets the reasonable basis standard because its return position is based on multiple authorities that are permitted by the Treasury regulations. Moreover, the reasonable cause and good faith exception of Treasury regulation section 1.6664-4 may provide relief from the penalty for negligence or disregard of rules or regulations, even if a return position does not satisfy the reasonable basis standard. *See* Treas. Reg. § 1.6662-3(b)(3). Accordingly, AQ maintains that it satisfies the reasonable cause and good faith exception.

Finally, even if AQ had disregarded a rule or regulation (which, as described above, it has not), such disregard would not be subject to the penalty for disregard of the rules or regulations if the position had a "realistic possibility of being sustained on its merits." Treas. Reg. § 1.6662-3(b)(2). The "realistic possibility" standard is based on the applicable legal authorities and a well-reasoned construction of the statutory provision. Treas. Reg. § 1.6694-2(b). Here, AQ's position complied with the applicable legal authorities interpreting section 170(h), including the Treasury regulations and case law, as described in detail above. Therefore, AQ has met the realistic probability standard and a penalty for disregard of the rules and regulations should not be imposed.

USPROD-0846639

D.   The penalty for substantial understatement of income tax does not apply

Finally, Penalty RAR, p. 5, proposes a penalty for the substantial understatement of income tax because it asserts that there exists an underpayment of tax that exceeds $5,000. A substantial understatement of income tax exists only if the amount of the understatement "exceeds the greater of- 10 percent of the tax required to be shown on the return for the taxable year, or $5,000." Section 6662(d)(1)(A).

First and foremost, AQ maintains its position that there was no understatement of tax here because, as described at length above, AQ properly reported the appropriate charitable deduction. Clark properly valued the Property and therefore, there is no valuation error. As such, the accompanying charitable deduction was appropriately taken, and there was no understatement of tax.

Second, even if an understatement of tax existed, the law provides for a reduction of the understatement by that portion of the understatement attributable to a taxpayer's tax treatment of any item where there is "substantial authority" for such treatment, or if the taxpayer discloses in the return relevant facts affecting tax treatment and there is a "reasonable basis" for the tax treatment by the taxpayer. Section 6662(d)(2)(B)(i) and (ii). In this instance, there is substantial authority and a reasonable basis for the tax position taken by AQ related to the tax treatment of the charitable contribution.

With regards to the substantial authority standard, all authorities—both in favor of and contrary to—a taxpayer's position are taken into account, and there may be substantial authority for multiple positions with respect to an issue. Treas. Reg. § 1.6662-4(d)(3)(i). Authorities are weighed based on their relevance and persuasiveness. Treasury regulation section 1.6662-4(d)(3)(iii) lists the types of authorities that are considered in determining whether the taxpayer's position has substantial authority, and these authorities include the Code, Treasury regulations,

105

USPROD-0846640

revenue rulings and revenue procedures, court cases, legislative history, explanations of tax legislation prepared by the Joint Committee, and documents published in the Internal Revenue Bulletin. The above discussion demonstrates, using various authorities cited in the regulations to section 6662, that AQ's position has substantial authority. The legal tax opinion previously produced to the IRS through the examination process also analyzes and weighs these same types of sources to reach the conclusion that the weight of the authority favors AQ's position.

Determining whether a position has a reasonable basis involves an objective analysis based on authorities that existed at the time the return was filed. Treas. Reg. § 1.6662-3(b)(3). Specifically, a return position based on "one or more" of the authorities that can be relied on to show that the taxpayer had substantial authority for its position "will generally satisfy the reasonable basis standard." *Id.* In this regard, taxpayers may rely on any of a number of authorities to show reasonable basis, including those listed in Treasury regulation section 1.6662-4(d)(3)(iii). As described above, AQ relied on a number of authorities to provide support for its claim of the deduction, including the definitions of key terms used in section 170 (such as "qualified contribution property" and "qualified appraisal") in the Code and the Treasury regulations and case law interpreting section 170.

## CONCLUSION

AQ forewent valuable development opportunities when it made the Contribution. By enacting section 170(h), Congress spoke clearly: A charitable deduction is afforded to taxpayers who make qualified conservation contributions. AQ did so, and is thus entitled to its claimed deduction. The RAR's adjustments should be reversed.

* * *

106

USPROD-0846641

The undersigned attorneys declare, under penalties of perjury, that they prepared the foregoing protest on the basis of facts submitted to them by AQ, which facts they believe to be true and correct.

Sean M. Akins
(202) 662-5062

Kandyce Korotky
(202) 662-5908

Pooja S. Kothari
(202) 662-5369

COVINGTON & BURLING, LLP
850 10th St. NW
Washington, DC 20001

107

USPROD-0846642

# ATTACHMENT 1

---

Form 2848, *Power of Attorney and Declaration of Representative*

USPROD-0846643

Form **2848**
(Rev. February 2020)
Department of the Treasury
Internal Revenue Service

**Power of Attorney
and Declaration of Representative**

▶ Go to *www.irs.gov/Form2848* for instructions and the latest information.

OMB No. 1545-0150

**For IRS Use Only**
Received by:
Name _____
Telephone _____
Function _____
Date __ / __ / __

| **Part I** | **Power of Attorney** |
|---|---|

**Caution:** A separate Form 2848 must be completed for each taxpayer. Form 2848 will not be honored for any purpose other than representation before the IRS.

**1   Taxpayer information.** Taxpayer must sign and date this form on page 2, line 7.

| Taxpayer name and address | Taxpayer identification number(s) |
|---|---|
| Arcadian Quay Holdings, LLC as Tax Matters Partner for Arcadian Quay, LLC 3424 Peachtree Road NE, Suite 700 Atlanta, GA 30326 | ▆▆▆▆▆ |
| | Daytime telephone number | Plan number (if applicable) |

hereby appoints the following representative(s) as attorney(s)-in-fact:

**2   Representative(s)** must sign and date this form on page 2, Part II.

| Name and address | |
|---|---|
| Sean M. Akins; Covington & Burling LLP 850 10th St., NW Washington, D.C. 20001 | CAF No. _____ <br> PTIN _____ <br> Telephone No. (202) 662-5062 <br> Fax No. (202) 778-5062 |
| **Check if to be sent copies of notices and communications** ☑ | Check if new:  Address ☐   Telephone No. ☐   Fax No. ☐ |

| Name and address | |
|---|---|
| Kandyce Korotky; Covington & Burling LLP 850 10th St., NW Washington, D.C. 20001 | CAF No. _____ <br> PTIN _____ <br> Telephone No. (202) 662-5908 <br> Fax No. (202) 778-5908 |
| **Check if to be sent copies of notices and communications** ☑ | Check if new:  Address ☐   Telephone No. ☐   Fax No. ☐ |

| Name and address | |
|---|---|
| Pooja S. Kothari; Covington & Burling LLP 850 10th St., NW Washington, D.C. 20001 | CAF No. 0313-64679R <br> PTIN _____ <br> Telephone No. (202) 662-5369 <br> Fax No. (202) 778-5369 |
| (Note: IRS sends notices and communications to only two representatives.) | Check if new:  Address ☐   Telephone No. ☐   Fax No. ☐ |

| Name and address | |
|---|---|
| | CAF No. _____ <br> PTIN _____ <br> Telephone No. _____ <br> Fax No. _____ |
| (Note: IRS sends notices and communications to only two representatives.) | Check if new:  Address ☐   Telephone No. ☐   Fax No. ☐ |

to represent the taxpayer before the Internal Revenue Service and perform the following acts:

**3   Acts authorized (you are required to complete this line 3).** With the exception of the acts described in line 5b, I authorize my representative(s) to receive and inspect my confidential tax information and to perform acts that I can perform with respect to the tax matters described below. For example, my representative(s) shall have the authority to sign any agreements, consents, or similar documents (see instructions for line 5a for authorizing a representative to sign a return).

| Description of Matter (Income, Employment, Payroll, Excise, Estate, Gift, Whistleblower, Practitioner Discipline, PLR, FOIA, Civil Penalty, Sec. 4980H Shared Responsibility Payment, etc.) (see instructions) | Tax Form Number (1040, 941, 720, etc.) (if applicable) | Year(s) or Period(s) (if applicable) (see instructions) |
|---|---|---|
| TEFRA Partnership Proceedings | Form 1065 | 2016 |
| | | |
| | | |

**4   Specific use not recorded on Centralized Authorization File (CAF).** If the power of attorney is for a specific use not recorded on CAF, check this box. See *Line 4. Specific Use Not Recorded on CAF* in the instructions  . . . . . . . . . .  ▶ ☐

**5a   Additional acts authorized.** In addition to the acts listed on line 3 above, I authorize my representative(s) to perform the following acts (see instructions for line 5a for more information): ☐ Access my IRS records via an Intermediate Service Provider;
☐ Authorize disclosure to third parties;   ☐ Substitute or add representative(s);   ☐ Sign a return; _____

☐ Other acts authorized: _____

**For Privacy Act and Paperwork Reduction Act Notice, see the instructions.**     Cat. No. 11980J     Form **2848** (Rev. 2-2020)

Form 2848 (Rev. 2-2020)                                                                                                    Page **2**

**b** **Specific acts not authorized.** My representative(s) is (are) not authorized to endorse or otherwise negotiate any check (including directing or accepting payment by any means, electronic or otherwise, into an account owned or controlled by the representative(s) or any firm or other entity with whom the representative(s) is (are) associated) issued by the government in respect of a federal tax liability.

List any other specific deletions to the acts otherwise authorized in this power of attorney (see instructions for line 5b): _____

_____

**6** **Retention/revocation of prior power(s) of attorney.** The filing of this power of attorney automatically revokes all earlier power(s) of attorney on file with the Internal Revenue Service for the same matters and years or periods covered by this document. If you **do not** want to revoke a prior power of attorney, check here   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   ▶ ☐

**YOU MUST ATTACH A COPY OF ANY POWER OF ATTORNEY YOU WANT TO REMAIN IN EFFECT.**

**7** **Signature of taxpayer.** If a tax matter concerns a year in which a joint return was filed, each spouse must file a separate power of attorney even if they are appointing the same representative(s). If signed by a corporate officer, partner, guardian, tax matters partner, partnership representative (or designated individual, if applicable), executor, receiver, administrator, or trustee on behalf of the taxpayer, I certify that I have the legal authority to execute this form on behalf of the taxpayer.

▶ **IF NOT COMPLETED, SIGNED, AND DATED, THE IRS WILL RETURN THIS POWER OF ATTORNEY TO THE TAXPAYER.**

| | | |
|---|---|---|
| *(signature)* | 1/13/2021 | Manager for the Tax Matters Partner - see attached |
| Signature | Date | Title (if applicable) |

Robert M. McCullough as Manager for the Tax Matters Partner                           Arcadian Quay Holdings, LLC as Tax Matters Partner for Arcadian Quay, LLC

Print name                                                                 Print name of taxpayer from line 1 if other than individual

**Part II**   **Declaration of Representative**

Under penalties of perjury, by my signature below I declare that:
• I am not currently suspended or disbarred from practice, or ineligible for practice, before the Internal Revenue Service;
• I am subject to regulations contained in Circular 230 (31 CFR, Subtitle A, Part 10), as amended, governing practice before the Internal Revenue Service;
• I am authorized to represent the taxpayer identified in Part I for the matter(s) specified there; and
• I am one of the following:

**a** Attorney—a member in good standing of the bar of the highest court of the jurisdiction shown below.

**b** Certified Public Accountant—a holder of an active license to practice as a certified public accountant in the jurisdiction shown below.

**c** Enrolled Agent—enrolled as an agent by the IRS per the requirements of Circular 230.

**d** Officer—a bona fide officer of the taxpayer organization.

**e** Full-Time Employee—a full-time employee of the taxpayer.

**f** Family Member—a member of the taxpayer's immediate family (spouse, parent, child, grandparent, grandchild, step-parent, step-child, brother, or sister).

**g** Enrolled Actuary—enrolled as an actuary by the Joint Board for the Enrollment of Actuaries under 29 U.S.C. 1242 (the authority to practice before the IRS is limited by section 10.3(d) of Circular 230).

**h** Unenrolled Return Preparer—Authority to practice before the IRS is limited. An unenrolled return preparer may represent, provided the preparer (1) prepared and signed the return or claim for refund (or prepared if there is no signature space on the form); (2) was eligible to sign the return or claim for refund; (3) has a valid PTIN; and (4) possesses the required Annual Filing Season Program Record of Completion(s). **See Special Rules and Requirements for Unenrolled Return Preparers** *in the instructions for additional information.*

**k** Qualifying Student—receives permission to represent taxpayers before the IRS by virtue of his/her status as a law, business, or accounting student working in an LITC or STCP. See instructions for Part II for additional information and requirements.

**r** Enrolled Retirement Plan Agent—enrolled as a retirement plan agent under the requirements of Circular 230 (the authority to practice before the Internal Revenue Service is limited by section 10.3(e)).

▶ **IF THIS DECLARATION OF REPRESENTATIVE IS NOT COMPLETED, SIGNED, AND DATED, THE IRS WILL RETURN THE POWER OF ATTORNEY. REPRESENTATIVES MUST SIGN IN THE ORDER LISTED IN PART I, LINE 2.**

**Note:** For designations d–f, enter your title, position, or relationship to the taxpayer in the "Licensing jurisdiction" column.

| Designation— Insert above letter (a–r). | Licensing jurisdiction (State) or other licensing authority (if applicable) | Bar, license, certification, registration, or enrollment number (if applicable) | Signature | Date |
|---|---|---|---|---|
| a | DC | 983671 | *(signature)* | 1/13/2021 |
| a | DC | 1035436 | *(signature)* | 1/13/2021 |
| a | DC; NY | 1024332; 5583034 | *(signature)* | 1/13/2021 |
| | | | | |
| | | | | |

Form **2848** (Rev. 2-2020)

USPROD-0846645

Form **2848**
(Rev. Dec. 2015)
Department of the Treasury
Internal Revenue Service

# Power of Attorney
## and Declaration of Representative

▶ Information about Form 2848 and its instructions is at *www.irs.gov/form2848.*

OMB No. 1545-0150

**For IRS Use Only**
Received by:
Name _____
Telephone _____
Function _____
Date ___ / ___ / ___

**Part I**   Power of Attorney

**Caution:** A separate Form 2848 must be completed for each taxpayer. Form 2848 will not be honored for any purpose other than representation before the IRS.

**1**   **Taxpayer information.** Taxpayer must sign and date this form on page 2, line 7.

| Taxpayer name and address | Taxpayer identification number(s) |
|---|---|
| ARCADIAN QUAY HOLDINGS LLC<br>AS TAX MATTERS PARTNER FOR ARCADIAN QUAY LLC<br>3424 PEACHTREE ROAD NE, SUITE 1550<br>ATLANTA, GA 30326 | ▪▪▪▪▪▪▪ |
| | Daytime telephone number         Plan number (if applicable) |

hereby appoints the following representative(s) as attorney(s)-in-fact:

**2**   **Representative(s)** must sign and date this form on page 2, Part II.

| Name and address | |
|---|---|
| DARREN J HARDIN, CPA<br>7464 WOODROW ST<br>IRMO, SC 29063 | CAF No. **6505-86443R**<br>PTIN **P00126993**<br>Telephone No. **803-792-9096**<br>Fax No. **803-792-9097** |
| Check if to be sent copies of notices and communications ☑ | Check if new: Address ☑  Telephone No. ☑   Fax No. ☑ |

| Name and address | |
|---|---|
|  | CAF No. _____<br>PTIN _____<br>Telephone No. _____<br>Fax No. _____ |
| Check if to be sent copies of notices and communications ☐ | Check if new: Address ☐  Telephone No. ☐   Fax No. ☐ |

| Name and address | |
|---|---|
|  | CAF No. _____<br>PTIN _____<br>Telephone No. _____<br>Fax No. _____ |
| (Note: IRS sends notices and communications to only two representatives.) | Check if new: Address ☐  Telephone No. ☐   Fax No. ☐ |

| Name and address | |
|---|---|
|  | CAF No. _____<br>PTIN _____<br>Telephone No. _____<br>Fax No. _____ |
| (Note: IRS sends notices and communications to only two representatives.) | Check if new: Address ☐  Telephone No. ☐   Fax No. ☐ |

to represent the taxpayer before the Internal Revenue Service and perform the following acts:

**3**   **Acts authorized (you are required to complete this line 3).** With the exception of the acts described in line 5b, I authorize my representative(s) to receive and inspect my confidential tax information and to perform acts that I can perform with respect to the tax matters described below. For example, my representative(s) shall have the authority to sign any agreements, consents, or similar documents (see instructions for line 5a for authorizing a representative to sign a return).

| Description of Matter (Income, Employment, Payroll, Excise, Estate, Gift, Whistleblower, Practitioner Discipline, PLR, FOIA, Civil Penalty, Sec. 5000A Shared Responsibility Payment, Sec. 4980H Shared Responsibility Payment, etc.) (see instructions) | Tax Form Number (1040, 941, 720, etc.) (if applicable) | Year(s) or Period(s) (if applicable) (see instructions) |
|---|---|---|
| **TEFRA PARTNERSHIP PROCEEDINGS** | **FORM 1065** | **2016** |
| | | |
| | | |

**4**   **Specific use not recorded on Centralized Authorization File (CAF).** If the power of attorney is for a specific use not recorded on CAF, check this box. See the instructions for Line 4. Specific Use Not Recorded on CAF   .   .   .   .   .   .   .   .   .   .   .   .   .   .   ▶ ☐

**5a**   **Additional acts authorized.** In addition to the acts listed on line 3 above, I authorize my representative(s) to perform the following acts (see instructions for line 5a for more information):

☐ Authorize disclosure to third parties;   ☐ Substitute or add representative(s);   ☐ Sign a return; _____

☐ Other acts authorized: _____

For Privacy Act and Paperwork Reduction Act Notice, see the instructions.          Cat. No. 11980J          Form **2848** (Rev.12-2015)

USPROD-0846646

Form 2848 (Rev. 12-2015)                                                                                                           Page **2**

**b** **Specific acts not authorized.** My representative(s) is (are) not authorized to endorse or otherwise negotiate any check (including directing or accepting payment by any means, electronic or otherwise, into an account owned or controlled by the representative(s) or any firm or other entity with whom the representative(s) is (are) associated) issued by the government in respect of a federal tax liability.
List any other specific deletions to the acts otherwise authorized in this power of attorney (see instructions for line 5b): ........................
.......................................................................................................................................................................................

**6** **Retention/revocation of prior power(s) of attorney.** The filing of this power of attorney automatically revokes all earlier power(s) of attorney on file with the Internal Revenue Service for the same matters and years or periods covered by this document. If you **do not** want to revoke a prior power of attorney, check here . . . . . . . . . . . . . . . . . . . . ▶ ☐
**YOU MUST ATTACH A COPY OF ANY POWER OF ATTORNEY YOU WANT TO REMAIN IN EFFECT.**

**7** **Signature of taxpayer.** If a tax matter concerns a year in which a joint return was filed, each spouse must file a separate power of attorney even if they are appointing the same representative(s). If signed by a corporate officer, partner, guardian, tax matters partner, executor, receiver, administrator, or trustee on behalf of the taxpayer, I certify that I have the legal authority to execute this form on behalf of the taxpayer.

▶ **IF NOT COMPLETED, SIGNED, AND DATED, THE IRS WILL RETURN THIS POWER OF ATTORNEY TO THE TAXPAYER.**

| | | |
|---|---|---|
| _(signature)_ | 8/2/2018 | SEE ATTACHED FOR TITLE OF SIGNER |
| Signature | Date | Title (if applicable) |

| | |
|---|---|
| ROBERT M MCCULLOUGH - SEE ATTACHED | ARCADIAN QUAY LLC |
| Print Name | Print name of taxpayer from line 1 if other than Individual |

| **Part II** | **Declaration of Representative** |
|---|---|

Under penalties of perjury, by my signature below I declare that:

• I am not currently suspended or disbarred from practice, or ineligible for practice, before the Internal Revenue Service;
• I am subject to regulations contained in Circular 230 (31 CFR, Subtitle A, Part 10), as amended, governing practice before the Internal Revenue Service;
• I am authorized to represent the taxpayer identified in Part I for the matter(s) specified there; and
• I am one of the following:

**a** Attorney—a member in good standing of the bar of the highest court of the jurisdiction shown below.
**b** Certified Public Accountant—licensed to practice as a certified public accountant is active in the jurisdiction shown below.
**c** Enrolled Agent—enrolled as an agent by the Internal Revenue Service per the requirements of Circular 230.
**d** Officer—a bona fide officer of the taxpayer organization.
**e** Full-Time Employee—a full-time employee of the taxpayer.
**f** Family Member—a member of the taxpayer's immediate family (spouse, parent, child, grandparent, grandchild, step-parent, step-child, brother, or sister).
**g** Enrolled Actuary—enrolled as an actuary by the Joint Board for the Enrollment of Actuaries under 29 U.S.C. 1242 (the authority to practice before the Internal Revenue Service is limited by section 10.3(d) of Circular 230).
**h** Unenrolled Return Preparer—Authority to practice before the IRS is limited. An unenrolled return preparer may represent, provided the preparer (1) prepared and signed the return or claim for refund (or prepared if there is no signature space on the form); (2) was eligible to sign the return or claim for refund; (3) has a valid PTIN; and (4) possesses the required Annual Filing Season Program Record of Completion(s). *See Special Rules and Requirements for Unenrolled Return Preparers in the instructions for additional information.*
**k** Student Attorney or CPA—receives permission to represent taxpayers before the IRS by virtue of his/her status as a law, business, or accounting student working in an LITC or STCP. See instructions for Part II for additional information and requirements.
**r** Enrolled Retirement Plan Agent—enrolled as a retirement plan agent under the requirements of Circular 230 (the authority to practice before the Internal Revenue Service is limited by section 10.3(e)).

▶ **IF THIS DECLARATION OF REPRESENTATIVE IS NOT COMPLETED, SIGNED, AND DATED, THE IRS WILL RETURN THE POWER OF ATTORNEY. REPRESENTATIVES MUST SIGN IN THE ORDER LISTED IN PART I, LINE 2.**
**Note:** For designations d-f, enter your title, position, or relationship to the taxpayer in the "Licensing jurisdiction" column.

| Designation— Insert above letter (a–r). | Licensing jurisdiction (State) or other licensing authority (if applicable). | Bar, license, certification, registration, or enrollment number (if applicable). | Signature | Date |
|---|---|---|---|---|
| B | SC | 5825 | _David Hardin CPA_ | 8-10-18 |
| | | | | |
| | | | | |
| | | | | |

Form **2848** (Rev. 12-2015)

USPROD-0846647

**ARCADIAN QUAY LLC**



**DECEMBER 31, 2016**

**ATTACHMENT TO FORM 2848: POWER OF ATTORNEY**

<u>Page 2, Line 7:  Signature of Taxpayer</u>

Arcadian Quay Holdings LLC, Tax Matters Partner of Arcadian Quay LLC by Robert M.
McCullough, Senior Vice President and CFO of EcoVest Capital Inc, Manager of  EcoVest
Management LLC (Successor to Arcadian Quay Management LLC), Manager of Arcadian Quay
Holdings LLC

_____
Robert M. McCullough

_____8/2/2018_____
Date