1

1

2

3

4

5

6       UNITED STATES DEPARTMENT OF JUSTICE

7

8

9              AUDIO TRANSCRIPTION

10              ECOVEST-DOJ_1567963

11

12

13                IN THE MATTER OF

14              UNITED STATES V. ZAK

15

16

17         Cause No. 1:18-cv-05774-AT

18

19

20

21

22

**Exhibit**
1402

McCullough Sales Pitch (ECOVEST-DOJ_1567963)

```
                                                                    2
 1                       A P P E A R A N C E S

 2

 3        BOB McCULLOUGH

 4        Senior Vice President and CFO

 5        EcoVest Capital

 6

 7        NORM

 8

 9        MICHAEL

10

11

12

13

14

15

16

17

18

19

20

21

22
```

```
 1                    P R O C E E D I N G S
 2              MR. McCULLOUGH:  EcoVest Capital is our firm.
 3    I'm Bob McCullough.  I'm the senior vice president and
 4    CFO.  Our firm has been in existence as a standalone
 5    company since 2012.  But really before that, we were
 6    actually formed as a subsidiary of another company in
 7    2009.  And let me get to that in a minute because that
 8    gets to be really important.
 9              Our CEO and our founder is a gentleman named
10    Alan Solon.  Alan started his career in brand
11    marketing up in New York City, moved down here to do
12    the same sort of thing, you know, as his career
13    progressed.  And at one point in time wrote a business
14    plan for a second home amenity developer in the
15    Carolinas and did such a good job he was actually
16    asked to go run the P&L there.  And there -- that's
17    how he got into real estate development.
18              That path took him towards being a developer
19    on his own where he actually had a golf course
20    community development in Chattanooga, Tennessee.  And
21    in both of those instances, he inherited this concept
22    of a conservation easement.  So that's how he kind of
```

24

1   infrastructure and we can actually fund phase 1 of
2   construction as we're out there getting our other
3   financing in place.  I failed to mention that before,
4   but that comes back to us as an important point here
5   in a minute.
6           But again, a reasonable expectation of
7   development, yes, we've got a -- as I mentioned a
8   permit-ready fully underwritten development plan that
9   can actually fund phase 1 of construction.  If the tax
10  benefits are going to inure to the benefit of the
11  investors, we have to have a proper TEFRA partnership
12  structure in place.  Our attorneys of course have
13  structured that and opined on it, so we're comfortable
14  there.
15          So the last thing that you need is you need
16  to have an appraisal done of the valuation.  And this
17  is done by a process called a "qualified appraisal."
18  Now this is an area the IRS has already promised that
19  they're going to attack in an audit.  We know that.
20  So once again who we choose to use becomes extremely
21  important.  So we only use the best appraisers out
22  there.  We have predominantly used one gentleman named

McCullough Sales Pitch (ECOVEST-DOJ_1567963)

1   ==Claud Clark.  Claud has done over 500 conservation==
2   ==easement appraisals, which by the way is only a==
3   ==portion of his business.==
4           I think just by a way of example on how good
5   he is when that oil -- BP oil spill happened several
6   years ago, he was the appraiser that the state of
7   Alabama hired to do the appraised value on the, you
8   know, the harm basically that occurred to the state
9   because of that oil spill.  Claud has been successful
10  in defending himself in the tax courts with
11  conservation easements.  There is -- probably the most
12  famous case that benefited the taxpayers is a case
13  called the Kiva Dunes Case.  Claud was the appraiser.
14          In that case I came to find out later that it
15  was actually his first conservation easement
16  appraisal.  So, you know, even more kudos to him.  And
17  he has served as expert witness on behalf of other
18  taxpayers in several other court cases and appeals
19  cases.
20          We also used two other gentlemen that we're
21  starting to diversify with, Clay Vivald (phonetic) and
22  Ray Veild (phonetic) both again have histories very

```
 1    similar to Claud's.  Both have already defended their
 2    work product with the IRS.  So that's the type of
 3    person that we use.
 4            So I'm going to spend a minute and talk about
 5    how a qualified appraisal works.  You mentioned
 6    earlier that you've been involved with these, but they
 7    didn't use this kind of what they call the highest and
 8    best use methodology which the tax courts have
 9    actually prescribed in cases over the last several
10    years.
11            So let me just explain in kind of layman's
12    terms how a qualified appraisal works.  It works kind
13    of like a developer would look at a piece of property.
14    And I'll also explain why the traditional appraisal
15    methodology doesn't work here.  So let's say that
16    there's a landowner in Myrtle Beach.  Myrtle Beach is
17    going crazy with development right now.  And let's say
18    that that landowner has a traditional fair market
19    value appraisal, willing buyer to willing seller in
20    this market today based on, you know, similar property
21    trade complements.  And let's say that that
22    traditional fair market value appraisal comes back in
```

McCullough Sales Pitch (ECOVEST-DOJ_1567963)

1  a million dollars.
2          Well, if that landowner extinguishes these
3  very valuable development rights forever and takes a
4  million dollar noncash charitable deduction, they're
5  going to be underwater, you know, and lose money on
6  that transaction because they're not going to be able
7  to fully recoup that base usually based on where their
8  tax rate is.  And the federal government realizes that
9  that does not provide incentive.  So the tax courts
10 have prescribed what they call this before and after
11 highest and best use methodology.  And as I mentioned,
12 it effectively looks at the property like a developer.
13         If a developer came in and saw that they
14 could buy this piece of property from this fellow for
15 a million dollars, they don't think it's worth a
16 million.  They look at themselves and say, wow, I
17 think could build product for $4 million.  So now, I'm
18 $5 million all in.  And I believe I could sell it for
19 $15 and net out $10 million.  So, it's worth $10
20 million to me.  And that's kind of how this before and
21 after methodology works.
22         The appraiser calculates the first.  He

28

1   calculates the before value.  Think about it this way,
2   what's the value of this property with its development
3   rights intact that their highest and best use in this
4   market today before they're extinguished?  And in my
5   analogy, that's worth 10 -- that's the $10 million
6   number.
7           And then after they're extinguished, land, of
8   course, always has value, but with so many
9   restrictions, that value may be very low.  Let's say
10  it's calculated out to be $200,000.  The difference
11  between the before and the after, in my example, $9.8
12  million, that would be the value of the noncash
13  charitable deduction generated by placing a
14  conservation easement on that property in this market
15  today.  Did that make sense how I just explained that?
16          NORM:  Yeah.  Yeah.
17          MR. McCULLOUGH:  Okay, perfect.  So, Claud
18  goes through and he does his before and after
19  calculation.  We now know what the deduction value
20  should be.  And at this point in time, we've really
21  done everything that we need to do, and I hire the
22  minimum standards to mitigate risk and we're kind of

52

1         CERTIFICATE OF TRANSCRIBER

2         I, JIMMY JACOB, do hereby certify that this

3   transcript was prepared from audio to the best of my

4   ability.

5

6         I am neither counsel for, related to, nor

7   employed by any of the parties to this action, nor

8   financially or otherwise interested in the outcome of

9   this action.

10

11

12  June 30, 2020

13  DATE                          JIMMY JACOB

14

15

16

17

18

19

20

21

22